UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Civil Action No.

ROBERT WADE,
Petitioner

v.   **04-12135 NG**

BERNARD F. BRADY, Acting Superintendent, and
THOMAS F. REILLY, Attorney General,
Respondents

## MEMORANDUM IN SUPPORT OF PETITION
## FOR WRIT OF HABEAS CORPUS

### QUESTIONS PRESENTED FOR REVIEW

1. Did the Massachusetts Supreme Judicial Court make an unreasonable determination of facts and an unreasonable application of clearly established federal law in affirming the trial court's denial of the Defendant's post-conviction Motion for DNA testing, which testing would have completely exonerated the Defendant and which testing the Defendant was prepared to pay for personally without requesting funding from the Commonwealth?

2. Did the Massachusetts Supreme Judicial Court make an unreasonable determination of facts and an unreasonable application of clearly established federal law in affirming the trial court's denial of the Defendant's Motion for a New Trial where the Defendant was denied his constitutional right to effective assistance of counsel where counsel failed to order DNA testing pre-trial?

3. Did the Massachusetts Supreme Judicial Court make an unreasonable determination of facts and an unreasonable application of clearly established federal law where the Defendant was denied his constitutional right to effective assistance of counsel where counsel pursued a manifestly unreasonable theory of defense: that the alleged victim consented and that she had Alzheimer's disease, thereby effectively arguing to the jury that

the victim was unable to consent, thus proving the Commonwealth's case and ensuring his client's conviction?

4. Did the Massachusetts Supreme Judicial Court make an unreasonable determination of facts and an unreasonable application of clearly established federal law where the Defendant was denied his constitutional right to due process and to a fair trial where the trial court failed to instruct the jury that the victim's death from pneumonia following the incident must be the natural and probable consequence of the perpetrator's actions?

## STATEMENT OF THE CASE

The Defendant, Robert Wade, was indicted in December, 1993 in Plymouth County Superior court on one count of first degree murder and one count of aggravated rape. (R. 13-14.) He was tried before a jury, Tierney, J. presiding, beginning on September 2, 1997, and he was convicted both of aggravated rape and of first degree felony murder predicated on the charge of aggravated rape. (R. 32.) He was sentenced to life on the first degree murder conviction. (R. 11.) He timely noted his appeal, and the Supreme Judicial Court affirmed his conviction. (R. 33.)

Mr. Wade filed a Motion for a New Trial and for DNA testing, which motions were denied by the Plymouth County Superior Court, Chin, J. presiding, following hearing. He timely noted his appeal, and the Supreme Judicial Court affirmed the Superior Court's denial of the Motion for a New Trial on April 12, 2004.

## FACTUAL BACKGROUND

Evidence at Trial

The Defendant, Robert Wade, worked as a farm hand for Elliot Francescon in Plymouth County, Lakeville, Massachusetts. (Vol. II/29, 49.) Mr. Francescon and his mother, Johanna Francescon, lived on the farm. (Vol. II/51, 53.) Mr. Wade also lived on the farm, alone in an

2

outbuilding, near the main house. (Vol. II/62.) Johanna Francescon was eighty-three years old, and Elliot Francescon was fifty-nine years old at the time of these incidents. (Vol. II/36, 48.)

On October 24, 1993, between 2:30 p.m. and 5:30 p.m., Mr. Francescon left the farm to do errands. (Vol. II/59, 61.) When he came back to the farm, he worked outside until around 7:30 p.m. (Vol. II/64-65; Vol. III/42-46.) He then stopped by Mr. Wade's house to see if Mr. Wade wanted to accompany him to the grocery store. (Vol. II/65.) He observed that Mr. Wade was wearing pants but no shirt. (Vol. II/66.) There was no noise coming from Mr. Wade's cabin. (Vol. III/49.)

Mr. Francescon testified that Mr. Wade declined to go to the store and that he quickly shut the door. (Vol. II/66.) When Mr. Francescon returned to the main house, he found the back door open. (Vol. II/67-68.) There were no signs of a physical struggle. (Vol III/54.) He called for his mother but there was no response. (Vol. II/69.) He testified that he thought she might have wandered off since she suffered from Alzheimer's disease. (Vol. II/70; III/3224.)

Unable to find his mother, he went back to Mr. Wade's cabin, knocked on the door, but there was no response. (Vol. II/72; III/57.) He opened the door, and Mr. Wade came out of the room naked. (Vol. II/74; III/57.) Mr. Francescon observed the decedent lying on the bed naked. (Vol. II/75.) He testified that Robert wade said, "She came to me." (Vol. II/76.)

While helping his mother to dress, Mr. Francscon observed that her hands were cut, that she had a scratch over her eye, and that her shoulder was scraped. (Vol II/77-78; III/67.) He saw no other injuries. (Vol. III/67.) He testified that she could stand on her own but that she could not or would not walk. (Vol. III/75.)

Mr. Francescon then left the cabin for a period of time. (Vol. II/88.) The Defendant

3

remained alone with Ms. Francescon. (Vol. II/86-88.) As Mr. Francescon was leaving, he heard Mr. Wade yelling at Ms. Francescon, "See all the trouble you got me into." (Vol. II/85-87.) Later Mr. Francescon went back into the cabin and had Mr. Wade help him retrieve a wheelchair that had been stored in another building. (Vol. II/88-91.) Francescon took his mother and Wade back to the main house, then called the police. (Vol. II/92.)

Officer Ralph Schlagater searched the property, and he found a brown shoe and one sock, belonging to Ms. Francescon, on the driveway. (Vol. III/13-15; II/96-97.)

At trial, there was evidence of additional injuries. Ms. Francescon's back and buttocks had scrapes consistent with sliding across a rough surface, (Vol. III/105-09, 163), abrasions on her knees, (Vol. III/170), and red marks around her neck consistent with choking. (Vol. III/165.)

Laboratory tests show evidence of sperm cells insider her vagina. (Vol. IV/156.) The serology reports merely concluded that the Defendant could not be excluded as the source of the semen taken from the physical evidence. DNA testing was done on the seminal fluid or the blood. Blood was detected on her clothes, but it could not be identified. (Vol. IV/206-10.) There was no evidence that Wade was injured or bleeding. Ms. Francescon's clothes were heavily soiled with dirt, and the back of her brassiere was torn. (Vol. IV/70, 158.)

Ms. Francescon was taken to the hospital that evening, where she was admitted and diagnosed with a fractured hip and fractured wrist. (Vol. II/93; III/91, 93.) There was medical testimony that the wrist fracture could have been an older injury. (Vol. III/95, 132-33.) The hip fracture required surgery. (Vol. III/100, 143-44.) There was medical testimony that an eighty year old person would not have been able to bear weight on that fracture. (Vol. III/144.)

The surgery was performed on October 25, 1993, and four days later, on October 29,

1993, Ms. Francescon developed respiratory problems and, later, pneumonia. (Vol. III/235-36, 110.) Her condition improved, and on November 2, 1993, she was transferred out of the intensive care unit to a regular ward . (Vol. III/237-38.) Two days later, she again developed pneumonia, and she died on November 13, 1993. (Vol. III/238, 241-43.)

## STANDARD OF REVIEW

Because the underlying habeas petition was filed after April 24, 1996, the Anti-terrorism and Effective Death Penalty Act, Pub. L. No.104-132, 110 Stat. 1214 (1996) ("AEDPA") controls. Lindh v. Murphy, 521 U.S. 320, 322, 336 (1997). The AEDPA allows a federal court to grant habeas corpus relief where the state court adjudication was based on an "unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. 2254(d)(2). "[A] determination of a factual issue made ... shall be presumed to be correct," unless the petitioner is able to "rebut the presumption of correctness by clear and convincing evidence." 28 U.S.C. 2254(e)(1). Subsection 2254(e)(2) applies exclusively to determinations of basic, primary or historical facts, Sanna v. Dipaolo, 265 F.3d 1, 7 (1st Cir. 2001), not to mixed questions of fact and law, which are more amenable to analysis under section 2254(d)91). Dollinger v. Hall, 302 F.3d 5, 8 n.5 (1st Cir. 2002); Ouber v. Guarino, 293 F.3d 19, 27 (1st Cir. 2002).

The AEDPA allows habeas relief if the state court decision involved an unreasonable application of clearly established federal law, as determined by the Supreme Court of the United States. 28 U.S.C. 2254(d)(1). A state court's decision is an "unreasonable application" of clearly established federal law where the federal habeas court find that the "state court correctly identified the governing legal principle from [this Court's] decisions bu7t unreasonably applied it to the facts

5

of the particular case." Williams v. Taylor, 529 U.S. 362, 405, 412-13 (2000). A federal habeas court "should ask whether the state court's application of clearly established federal law was objectively unreasonable." Id. At 409, Ouber, 293 F.3d at 31.

## ARGUMENT

I. <u>The Trial Court Erred in Denying the Defendant's Motion for DNA Testing Where the Defendant Was Prepared to Pay for the Testing Himself and Where he was not Requesting Funding from the Commonwealth.</u>

The Plymouth County District Attorney's Office vigorous opposed both the Defendant's Motion for DNA Testing and the Motion for a New Trial, and on July 30, 2003, the Court (Chin, J.) denied the Defendant's Motion for DNA Testing. The Court found the Defendant's assertion that he did not have sex with the victim not to be not credible and that it was inconsistent with the Defendant's trial theory of consent.

However, the Defendant argued in his Motion for a New Trial that he received wholly inadequate and incompetent assistance of counsel at trial and that trial counsel's theory of consent was completely misguided.[1] More importantly, there was no inconsistency between the evidence presented at trial and the Defendant's Motion for a New Trial. In his Affidavit which accompanied the Motion for a New Trial, the Defendant categorically denied having had sexual intercourse with the victim. The only evidence at trial was the following: that the victim was found naked in the Defendant's bed, that a witness testified that the Defendant stated, "She came to me," and that the Defendant yelled at the victim, "See all the trouble you got me into." There was no direct evidence that the Defendant had sexual intercourse with the victim. Moreover, in Dr. John

---

[1] Although found competent to stand trial, the Defendant is mentally retarded and illiterate, which presents a real question as to his ability to understand his trial attorney's theory of defense.

Daignault's psychological evaluation of the Defendant, prepared in anticipation of the 1997 trial and admitted at the Motion for DNA Testing hearing, Dr. Daignault stated that the Defendant had said at the scene, "I could not get a hard on.... Nothing happened." He further stated that the Defendant had consumed three bottles of wine and eighteen beers on the day of the incident. These statements are completely consistent with the Defendant's Affidavit in which he stated that he did not have sexual intercourse with the victim.

Denial to a defendant of access to evidence which would be completely exonerating represents a most egregious denial of due process guaranteed by the Fourteenth Amendment. A Pennsylvania case exemplifies just how far a court will go in protecting a defendant's due process rights with respect to evidence which would be completely exonerating. In Godschalk v. Montgomery County District Attorney's Office, 177 F.Supp. 2d 366 (E.D. Pa. 2001), the defendant brought a § 1983 action for access to biological evidence for DNA testing after he had been convicted of rape in state court in 1987. At the trial in Godschalk, the state had relied on identification testimony of one of the victims and a confession made by the defendant. The Court held that "if by some chance no matter how remote, DNA testing on the biological evidence excludes [the defendant] as the source of the genetic material from the victims, a jury would have to weigh this result against [the defendant's] uncoerced detailed confessions to the rapes. While [the defendant's] detailed confessions to the rapes are powerful inculpatory evidence, so to any DNA testing that would exclude [the defendant] as the source of the genetic material taken from the victims would be powerful exculpatory evidence." Id. at 370.

Here, not only was there no confession as in the Pennsylvania case, but there were statements by the Defendant close to the time of the incident that because he had had so very much

7

to drink that he "could not get a hard on.... Nothing happened." There was evidence that the victim had voluntarily come to the Defendant's cabin, but there was never any evidence whatsoever that they had actually had sexual relations. "Since DNA testing of the genetic material could indeed provide material exculpatory evidence for a jury to consider along with the inculpatory evidence of [the defendant's] detailed confession, [the defendant] has a due process right of access to the genetic material for the limited purpose of DNA testing." Id. *See also* Taylor v. State of Texas, 939 S.W.2d 148 (1996).

In Harvey v. Horan, 285 F.3d 298 (4th Cir. 2002), the Fourth Circuit declined to "constitutionalize a right to post-conviction DNA testing in federal court" because of the federalism concerns where, procedurally, a "Virginia prisoner ... sought ... to bypass Virginia's system of criminal justice altogether and proceed directly into federal court under § 1983." Id. at 299, 303. However, the Court eloquently pronounced:

> The American criminal justice system rightly sets the ascertainment of truth and the protection of innocence as its highest goals. The average school child is aware (or so we hope) that the accused is clothed with a presumption of innocence and that the prosecutor must prove beyond a reasonable doubt that a crime was committed. Moreover, the concern with innocence does not end at trial. Elaborate post-conviction procedures are rightly in place to ensure not only that a trial was fair, but also that no individual has been wrongly convicted.

Id. at 299. Indeed, the Court stated, "[t]he question before us is not whether [the defendant] should or will receive the DNA evidence. He should and he will." Id. at 298.

In short, it was an outrageous violation of the Defendant's constitutional right to exculpatory – indeed, exonerating – evidence for the trial court to deny the Defendant's Motion for DNA Testing where the Defendant was prepared to pay for the DNA testing himself and not rely on Commonwealth funding. In the Court's Memorandum on the Defendant's Motion for a

8

New Trial, the trial court (Walker, J.) commented that Judge Chin had determined that DNA testing was "not likely to exonerate the defendant." It would seem that where access to evidence such as DNA testing, which would be completely exonerating, is denied, that a standard of "not likely to exonerate the defendant" is completely at odds with any sense of fundamental fairness and due process.

II. <u>The Defendant was Denied Effective Assistance of Counsel Because (A) Defense Counsel Failed to Order DNA Testing Pre-Trial and (B) Because He Pursued a Manifestly Unreasonable Theory of Defense: that the Alleged Victim Consented and that she had Alzheimer's Disease, thereby Effectively Arguing to the Jury that the Victim was Unable to Consent, thus, Proving the Commonwealth's Case and Ensuring his Client's Conviction.</u>

The Sixth and Fourteenth Amendments to the United States Constitution guarantee Mr. Wade's right to competent counsel. Under the Sixth Amendment to the United States Constitution, this Court and the reviewing court must use a two-pronged cause and prejudice test. <u>Strickland v. Washington</u>, 466 U.S. 668, 687-88, 694 (1984) (whether counsel's performance was below professional norms and whether Mr. Wade suffered prejudice as result); <u>Hill v. Lockhart</u>, 474 U.S. 52, 58 (1985); <u>United States v. Fisher</u>, 3 F.3d 456, 463 (1st Cir. 1993) (same).

"The assistance of counsel is 'deemed necessary to insure fundamental human rights of life and liberty.' <u>Johnson v. Zerbst</u>, 304 U.S. 458, 462 (1938). It is a right accorded to every defendant, rich or poor, and zealously safeguarded by the Sixth and Fourteenth Amendments to the United States Constitution. <u>Faretta v. California</u>, 422 U.S. 806 (1975). <u>Gideon v. Wainwright</u>, 372 U.S. 335 (1963).

As set forth below, Mr. Wade here argues that trial counsel was ineffective for two reasons: (A) he failed to order DNA testing of the physical evidence, thereby depriving Mr. Wade of a valid and completely exonerating defense and (B) he presented a "manifestly unreasonable"

9

theory of defense, from the beginning of the trial through closing arguments, that the alleged victim consented to sexual intercourse with the Defendant and that the alleged victim suffered from Alzheimer's disease which caused her to have hypersexuality. However, by arguing that the alleged victim suffered from Alzheimer's disease, counsel was also arguing that she was incompetent because of dementia, which theory, if the jury believed that the victim and Defendant had engaged in consensual sexual intercourse, would surely result in the Defendant's conviction because if the victim were incompetent she could not validly consent to sexual intercourse.

A.   <u>Trial Counsel Failed to Submit the Physical Evidence to DNA Testing</u>.

DNA testing existed at the time of the Defendant's trial, and there was no excuse for trial counsel not to have ordered it. As set forth in his Affidavit appended to his Motion for a New Trial, the Defendant did not have sexual intercourse with the alleged victim. If DNA evidence can completely exonerate him, trial counsel should have had the physical evidence tested, and Mr. Wade did not receive effective assistance of counsel because of this lapse. Where completely exonerating evidence exists, it must be obtained and it must be introduced. "It is far worse to convict an innocent man than to allow a guilty man to go free." <u>In Re Winship</u>, 397 U.S. 358, 372 (1970)(Harlan, J., concurring).

B.   <u>The Defendant was Denied Effective Assistance of Counsel Because Counsel Pursued a Manifestly Unreasonable Theory of Defense: that the Alleged Victim Consented and that she had Alzheimer's Disease, thereby Effectively Arguing to the Jury that the Victim was Unable to Consent, thus, Proving the Commonwealth's Case and Ensuring his Client's Conviction</u>.

Defense counsel's misguided theory of this case was as follows. From the beginning, the defense was consent. The alleged victim was an elderly, eighty-three year old woman who suffered from Alzheimer's disease. Alzheimer's patients sometimes present with inappropriate

10

hypersexuality. Trial counsel's theory was that because of her hypersexuality, the alleged victim came to the Defendant and initiated the sexual encounter with him. Trial counsel attempted to obtain the services of a psychotherapist to present this unique theory of her hypersexuality due to Alzheimer's disease; however, by the time of trial, he did not have an expert. Rather, he attempted to cross-examine the Commonwealth's witnesses in an effort to establish to the jury that the alleged victim had not only consented, but had inappropriately sought out a sexual relationship with the Defendant because she was so ill with Alzheimer's:

> Q:   With Alzheimer's Disease, are you familiar with any concepts, theories of hypersexuality? ...
>
> A:   ... Yes. ... It's been defined as a – well, I would define it as a nymphomania or an overt display of sexual activity in my own observation of the geriatric population of – ...

(Tr. III/253.) Trial counsel was unable to elicit from the victim's physician any evidence that she had exhibited any signs of hypersexuality. (Tr. III/256.) In his notes to the file, trial counsel wrote that the victim would "take clothes off," that she engaged in "sexual hissing," and he questioned whether her sexual history could be determined by her medical records.

The defense strategy was, thus, consent. Indeed, it was consent based upon the sexual aggressiveness of the victim, which was a symptom of her Alzheimer's disease. In trial counsel's proposed jury instructions, ten out of the fifteen requested instructions involved consent. He argued in closing that the Defendant had said to the victim's son that "she came to me." (Tr. V/12.) He argued to the jury that there was no force, no bruising, no ripped clothing. (Tr. V/13.)

But what defense counsel inexplicably failed to understand was that if the victim had

Alzheimer's disease, the victim was incapable of consent. Repeatedly throughout the trial, defense counsel established the fact that the victim had Alzheimer's Disease. In his Jury Voir Dire Questions, defense counsel requested that the Court ask three questions about Alzheimer's Disease:

> 35. It is alleged that the victim in this case, Johanna Francescon, suffered from Alzheimer's Disease. Do you have any relatives or close friends who suffer from this Disease?
>
> 36. If it was shown that a person, here the victim, suffered from Alzheimer's Disease, would that sway your opinion in judging the alleged conduct of the defendant, Robert Wade?
>
> 37. Are you more inclined to convict a defendant because of the age of the victim, whether they suffer from Alzheimer's Disease or not?

In his cross-examination of the Commonwealth's witnesses, he questioned about Alzheimer's Disease:

> Q: How long had it been that your Mom had been diagnosed, to your knowledge, with Alzheimer's Disease?
>
> A: ... Maybe a year, something like that...

(Tr. II/39.) In arguing his Motion for a Required Finding, defense counsel noted that the victim had Alzheimer's disease. (Tr. IV/218.) In his closing argument, defense counsel reiterated to the jury that the victim had Alzheimer's disease. (Tr. V/19.)

The jury was amply instructed by the Court on the victim's inability to consent on the basis of incompetence:

> If the evidence convinces you beyond a reasonable doubt that Johanna Francescon was incapable of freely giving consent because of a mental or physical disease or was incapacitated or rendered senseless, then it necessarily follows that she did not consent. It's a question of fact in each case as to whether a particular person was or was not able to consent to a particular occasion. How do you determine this? The crucial factor is often

> the person's intelligence, but you may also consider other factors, such as a person's maturity, mental state, and experience. The question comes down to whether the person was intelligent and aware enough to understand and evaluate what was happening and to make a decision whether or not to consent based upon that understanding. If the Commonwealth has not proven beyond a reasonable doubt that Johanna Francescon did not have enough understanding and awareness of that occasion to be able to consent, then it automatically follows that she did not consent. If the Commonwealth has not proved this beyond a reasonable doubt, then the Commonwealth must prove beyond a reasonable doubt that Johanna Francescon did not, in fact, consent.

(Tr. V/86.) It is common knowledge that Alzheimer patients suffer from dementia and that its principal symptomology includes significant impairment of cognitive functioning. With the jury's being told *repeatedly* by defense counsel that the alleged victim had Alzheimer's, they understood, based upon their common knowledge, that she was incompetent. They were instructed by the Court that if she were incompetent, she was incapable of consenting, and so sexual intercourse would be rape. The defense theory of the case was consent, and the Court adequately instructed the jury that if the victim were incompetent, she was unable to consent. Thus, defense counsel "made" the Commonwealth's case and assured conviction of his client.

Where trial counsel's conduct falls measurably below that of an ordinary, fallible lawyer, his trial decisions are "manifestly unreasonable," and where a defendant is deprived of an otherwise available ground of defense, a defendant is deprived of his constitutionally guaranteed right to effective assistance of counsel. *See* Strickland v. Washington, 466 U.S. 668, 687 (1984). The Strickland standard requires that "the defendant must first show that 'counsel's performance was deficient' in that 'counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense' in that 'counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'"

Most cases reversing convictions because of ineffective assistance of counsel involve trial attorneys who perform negligently at trial by failing to object to damaging evidence. In cases such cases as those, perhaps trial counsel's performance may be understood as momentary lapses within the context of a fast-moving trial. However, here, defense counsel pursued this novel theory for months before trial. His notes to the file and his attempts to obtain expert testimony of the subject of hypersexuality indicate that he long-planned this theory of the case. There is simply no excuse whatsoever for trial counsel's gross incompetence, and his misdirected trial theory resulted in the certain conviction of his client.

III. <u>The Massachusetts Supreme Judicial Court Made an Unreasonable Determination of Facts and an Unreasonable Application of Clearly Established Federal Law Where the Defendant was Denied his Constitutional Right to Due Process and to a Fair Trial Where the Trial Court Failed to Instruct the Jury that the Victim's Death from Pneumonia Three Weeks after Surgery Must be the Natural and Probable Consequence of the Perpetrator's Actions?</u>

The Defendant was denied his Fifth and Fourteenth Amendment right to due process and to a fair trial where the trial court's jury instructions were erroneous in two respects. First, the trial court failed to instruct properly regarding causation, and, second, the trial court erroneously instructed that a verdict of aggravated rape precluded a manslaughter verdict as a matter of law.

The Defendant was convicted of first-degree felony murder predicated on a charge of aggravated rape on the theory that the Defendant's actions in raping and injuring the elderly victim were the proximate cause of her death fro pneumonia some three weeks later. The trial court properly instructed on proximate cause but omitted the instruction that the victim's death must be proven to be the natural and probable consequence of the Defendant's actions.

In <u>Commonwealth v. Matchett</u>, 386 Mass. 492, 505 (1982), the Supreme Judicial Court

held that conviction on a theory of felony murder required proof that the "homicide must be the natural and probable consequence of the felonious act." It is, thus, Massachusetts law that the Commonwealth has the burden of proof as to this element, and certainly this issue was contested at trial. Mr. Wade was entitled to a jury verdict on whether his actions, if proven, were the proximate cause of Ms. Francescon's death three weeks later from pneumonia, and he was also entitled to the jury's verdict whether that death, even if proximately caused, was a probable rather than a possible consequence of his actions.

The Defendant's Fifth and Fourteenth Amendment guarantees to due process, to a fair trial, and to a jury verdict on every element are all violated the trial court's omission of this element of the offense, and the Supreme Judicial Court made an unreasonable application of clearly established federal law, denying the Defendant his federal constitutional right. The court's "mandatory [direction] directly foreclosed independent jury consideration of whether the facts proved established certain elements of the offenses with which [the Defendant] is charged...relieved the State of its burden of proof articulated in Winship, namely prove by evidence every essential element ... beyond a reasonable doubt." Carella v. California, 491 U.S. 263, 266 (1989)(interpreting jury instructions which imposed conclusive presumptions). Such an instruction is violative of the Fifth and Fourteen Amendments. Id.

15

## CONCLUSION

For the foregoing reasons, Robert Wade requests that this Court grant his petition for habeas corpus relief.

                                                    Respectfully submitted,
                                                   Robert Wade, by his Attorney
                                                   Janet H. Pumphrey

                                                 45 Walker Street
                                                 Lenox, MA 01240
                                                 (413) 637-2777
                                                 BBO 556424