**Motions, Pleadings and Filings**

United States District Court,

E.D. Virginia,
Alexandria Division.
Brian Lee **CHERRIX**, Petitioner,
v.
Daniel A. **BRAXTON**, Warden, Sussex I State Prison, Respondent.
**No. Civ.A. 00CV1377.**

Feb. 28, 2001.

After petitioner's state capital murder conviction was upheld on direct appeal, 513 S.E.2d 642, petitioner sought habeas relief. The District Court granted injunctive relief to petitioner for purpose of conducting DNA testing of seminal fluid found in murdered woman. On state's petition for writ of mandamus relating to the injunction, the District Court, Lee, J., held that: (1) District Court had authority under funding assistance in capital cases statute to grant petitioner's request for funds; (2) custodians of DNA evidence would be required to make it available for testing; (3) rule providing for financially unable defendants in capital cases authorized funding for services which were reasonably necessary to support petitioner's writ of habeas corpus; (4) discovery of evidence was reasonably necessary for dual purpose of supporting habeas petitioner's claims of actual innocence and using innocence as gateway to show that prejudice resulted from his counsel's ineffective assistance; and (5) petitioner had shown good cause for DNA retesting.

Writ denied.

West Headnotes

**[1] Habeas Corpus 883.1**
197k883.1 Most Cited Cases
District Court had authority under funding assistance in capital cases statute to grant petitioner's request for funds for DNA testing to support petition for habeas corpus subsequent to his conviction for sodomy and capital murder; petitioner was financially unable to obtain DNA testing and DNA testing was reasonably necessary to support his claim that he did not commit rape and murder on basis that only one perpetrator was found to have committed the crimes, DNA testing of the kind needed in his case was not available at time of crime, and test could provide material evidence of his claim of actual innocence. Federal Food, Drug, and Cosmetic Act, § 408(q), 21 U.S.C.A. § 848(q); 28 U.S.C.A. § 2254.

**[2] Habeas Corpus 362.1**
197k362.1 Most Cited Cases
Petitioner was not required to exhaust his state remedy of seeking clemency before seeking habeas relief on ground of newly discovered evidence following his conviction for sodomy and capital murder; petitioner sought funding assistance to conduct DNA testing not available at time of offense, and habeas funding statute allowed for funding of services that were reasonably necessary to his pursuit of clemency. Federal Food, Drug, and Cosmetic Act, § 408, 21 U.S.C.A. § 848(q); 28 U.S.C.A. § 2254.

**[3] Pardon and Parole 21**
284k21 Most Cited Cases
"Clemency" is the historic remedy employed to prevent a miscarriage of justice where the judicial process has been exhausted.

**[4] Habeas Corpus 312**
197k312 Most Cited Cases
A habeas petitioner is procedurally barred from litigating a constitutional claim in federal court if the petitioner has failed to assert the claim in a prior state proceeding. 28 U.S.C.A. § 2254.

**[5] Habeas Corpus 401**
197k401 Most Cited Cases
Newly-discovered evidence showing factual innocence may serve as a gateway to have the habeas corpus petitioner's procedurally barred constitutional claims heard on the merits, and ultimately, to prevent a fundamental miscarriage of justice. 28 U.S.C.A. § 2254.

**[6] Habeas Corpus 883.1**
197k883.1 Most Cited Cases
DNA testing of semen taken from rape and murder victim was reasonably necessary to support procedurally barred ineffective assistance of counsel claim based on newly discovered evidence demonstrating factual innocence; although petitioner made ineffective assistance of counsel claim during his state habeas proceedings, petitioner's counsel never sought DNA testing, and newly-discovered evidence after DNA testing could demonstrate his factual innocence. U.S.C.A. Const.Amend. 6; 28 U.S.C.A. § 2254.

**[7] Habeas Corpus 486(1)**
197k486(1) Most Cited Cases
To assert a constitutional claim of ineffective assistance, a habeas petitioner must show that a constitutional violation has probably resulted in the conviction of one who is actually innocent; to establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence. U.S.C.A. Const.Amend. 6; 28 U.S.C.A. § 2254.

**[8] Habeas Corpus 486(4)**
197k486(4) Most Cited Cases
A court reviewing a habeas petition on the basis of ineffective assistance of counsel should consider the probative force of relevant evidence that was either excluded or unavailable at trial; the new facts need only raise sufficient doubt about a habeas petitioner's guilt to undermine confidence in the result of the trial and to establish a threshold showing of innocence sufficient to justify a review of the merits of the petitioner's constitutional claims. U.S.C.A. Const.Amend. 6; 28 U.S.C.A. § 2254.

**[9] Habeas Corpus 688**
197k688 Most Cited Cases
In consideration of a habeas corpus petitioner's request for discovery, a District Court may provide a petitioner investigative services to support reasonable claims in support of the petition. Federal Food, Drug, and Cosmetic Act, § 408, § 21 U.S.C.A. § 848(q); 28 U.S.C.A. § 2254.

**[10] Habeas Corpus 883.1**
197k883.1 Most Cited Cases
Just as the District Court has the authority to appoint investigators or psychiatrists to assist indigent persons in the litigation of their cases, a court may order the provision of a forensic scientist to perform DNA testing to aid a petitioner in support of his petition for habeas corpus; the provision of testing is not a judgment that a particular claim will be entertained. Federal Food, Drug, and Cosmetic Act, § 408, 21 U.S.C.A. § 848(q); 28 U.S.C.A. § 2254.

**[11] Habeas Corpus 688**
197k688 Most Cited Cases

**[11] Habeas Corpus 883.1**
197k883.1 Most Cited Cases

District Court had authority under habeas funding statute to order state attorney general and state trial level clerk of court to preserve and make DNA evidence accessible for testing pursuant to habeas corpus petitioner's request. Federal Food, Drug, and Cosmetic Act, § 408, § 21 U.S.C.A. § 848(q); 28 U.S.C.A. § 2254.

[12] **Habeas Corpus 688**
197k688 Most Cited Cases
"Good cause" for discovery under discovery rules governing habeas corpus cases is shown where specific allegations before a court indicate a reason to believe that the petitioner may be able, if the facts are fully developed, to demonstrate that he is entitled to relief. 28 U.S.C.A. § 2254.

[13] **Habeas Corpus 688**
197k688 Most Cited Cases
Petitioner who sought to conduct DNA testing on semen found in murder victim demonstrated good cause to make limited discovery under Antiterrorism and Effective Death Penalty Act (AEDPA) in his petition for habeas corpus following his conviction for sodomy and capital murder, where petitioner faced execution, he made viable claims of constitutional error, and advancements in DNA technology could demonstrate a viable claim of his actual innocence. Fed.Rules Civ.Proc.Rule 34, 28 U.S.C.A.; 28 U.S.C.A. § 2254.

[14] **Habeas Corpus 688**
197k688 Most Cited Cases
State attorney general and clerk of trial court were "parties" to habeas corpus suit under common notions of who constituted a party for discovery purposes in petitioner's effort to have DNA testing conducted on seminal fluid which was found in victim who was murdered and raped allegedly by petitioner, although attorney general and clerk of court were "non-parties" to underlying habeas action, where they were proper individuals to provide information petitioner needed to develop his habeas petition. Fed.Rules Civ.Proc.Rule 34, 28 U.S.C.A.; 28 U.S.C.A. § 2254.

[15] **Habeas Corpus 452**
197k452 Most Cited Cases
The provision of federal habeas corpus review is premised on the notion that the federal court will venture into the state's realm, to determine whether there has been a violation of a petitioner's constitutional rights. 28 U.S.C.A. § 2254.

[16] **Habeas Corpus 450.1**
197k450.1 Most Cited Cases
The sovereignty and independence of the state realm should be respected in federal habeas corpus proceedings; however, the finality of an action taken in the state realm is not to be protected to the exclusion of the vindication of one's constitutional rights, especially when the penalty is death.

[17] **Habeas Corpus 452**
197k452 Most Cited Cases
State appellate review serves in the vast majority of cases to vindicate failures in due process protection, but it is the occasional lapse of the state court that the federal writ of habeas corpus stands ready to correct. U.S.C.A. Const.Amend. 5; 28 U.S.C.A. § 2254.

[18] **Mandamus 1**
250k1 Most Cited Cases

[18] **Prohibition 1**
314k1 Most Cited Cases
Courts should resort to the remedy of a writ of mandamus or prohibition only in extraordinary circumstances.

[19] **Mandamus 4(1)**

250k4(1) Most Cited Cases

[19] **Mandamus** 60
250k60 Most Cited Cases
Issuance of writ of mandamus or prohibition was not appropriate in state's effort to deny habeas petitioner's effort to obtain and test DNA found in victim who was allegedly raped and murdered by petitioner; state did not demonstrate clear and indisputable right to issuance of writ and did not seek other means, such as direct appeal, to attain desired relief.

[20] **Mandamus** 32
250k32 Most Cited Cases

[20] **Prohibition** 5(2)
314k5(2) Most Cited Cases
Where a court acts well within its discretion in ordering discovery, there is no clear error as a matter of law as required for issuance of writ of mandamus or prohibition.

*758 Michele Jill Brace, Washington, DC, Robert Lee Jenkins, Bynum & Jenkins, Alexandria, VA, for Petitioner.

Pamela Rumpz, Office of the Attorney General, Richmond, VA, for Respondent.

POST CONVICTION PROCEEDING

LEE, District Judge.

SUPPLEMENTAL MEMORANDUM OPINION
TABLE OF CONTENTS

I. Background .......................................................... 760

II. The Court's Narrow Application of § 848(q) ........................... 762

III. Actual Innocence Under Herrera ....................................... 765
   A.  Viability of Free-Standing Innocence Claim ...................... 766
   B.  Clemency Alternative ........................................... 767

IV. Miscarriage of Justice under Schlup .................................. 769

V. Authority of the Court to Order Petitioners to Retain and to Provide
   Access to Evidence ................................................ 770
   A.  Narrowness of January 9, 2001 Order ............................ 770
   B.  Source of the Court's Authority in 2254 Cases .................. 774
      1.  The Court's Authority Under the Federal Rules of Civil
          Procedure ................................................. 775
      2.  The Court's Authority to Order State Officials to Act ..... 778
      3.  The Court's Authority to Order the Retention of Evidence .. 781
   C.  Overlap of State and Federal Realms ............................ 784
   D.  Inappropriateness of Mandamus Relief ........................... 785

VI. Conclusion .......................................................... 786

*759 *SUPPLEMENTAL MEMORANDUM OPINION*

THIS MATTER is before the Court on the request by the Fourth Circuit Court of Appeals to respond to the Warden of Sussex I State Prison, the Attorney General for the Commonwealth of Virginia, and the Accomack County Circuit Clerk of Court's Petition for Writ of Mandamus and/or Prohibition and Appeal from Order Granting Injunction. Petitioners move for relief from this Court's January 9, 2001 Order granting the habeas petitioner's motion for DNA testing and motion for the retention and preservation of evidence. The Court submits this Supplemental Memorandum Opinion to clarify and reaffirm its January 9, 2001 Order.

The narrow issues before this Court are (1) whether it is within the district court's discretion to authorize funding under 21 U.S.C. § 848(q)(9) for the retesting of DNA evidence when the petitioner has made a preliminary showing of constitutional error and a new DNA rest is reasonably necessary no support his claims for relief by determining the origin of the seminal fluid found in the decedent's body; and (2) whether the Court is empowered to order the custodians of the evidence to make the evidence available to a private entity for testing. This Court holds that it is within its discretion to grant funding for DNA testing and to require the custodians of the evidence to make it available for testing. See 21 U.S.C. § 848 (q); 28 U.S.C. §§ 2254(2)(A)(ii), (2)(B).

The two motions before the district court were the [Habeas] Petitioner's Motion for DNA Testing and the [Habeas] Petitioner's Motion for Retention and Preservation of Evidence. The habeas petitioner requested funding from the federal court for deoxyribonucleic acid ("DNA") retesting of physical evidence collected from the decedent victim's body which would support the habeas petitioner's claims of constitutional error. The Warden of the Sussex I State Prison ("Warden") refused to conduct a DNA retest of the seminal fluid retrieved from the decedent victim's body, even though the Commonwealth of Virginia's ("Commonwealth") first DNA test used technology that is below today's standards, which rendered an inconclusive result. The new DNA testing methods could possibly procure conclusive evidence demonstrating that a third person committed the murder and sodomy which may ultimately exonerate the habeas petitioner of capital murder.

The Court granted the habeas petitioner's request for funds, and ordered that the custodians of the evidence make it available for testing, for three reasons. First, § 848(q) authorizes a district court to provide funding for services which are *760 reasonably necessary to support the habeas petitioner's petition for writ of habeas corpus. See 21 U.S.C. § 848(q). Second, the Court holds that discovery of the evidence is reasonably necessary for the dual purpose of supporting the habeas petitioner's claims of actual innocence and using innocence as a gateway to show that prejudice resulted from his counsel's ineffective assistance. See *Herrera v. Collins*, 506 U.S. 390, 402, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993); *Schlup v. Delo*, 513 U.S. 298, 326, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995); *Strickland v. Washington*, 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Third, Cherrix has shown good cause for DNA retesting. See Rules Governing § 2254 Cases, Rule 6(a); 28 U.S.C. §§ 2254(2)(A)(ii), (2)(B). Therefore, based on the particular facts in this case, it is within the Court's discretion to order the retest of the seminal fluid under § 848(q).

## I. BACKGROUND

In 1997, habeas petitioner Brian Lee Cherrix ("Cherrix") was convicted of the 1994 murder and sodomy of Tessa Van Hart in an Accomack County Circuit. Court in Virginia. [FN1] The gruesome facts of the case are set forth by the Virginia Supreme Court. See *Cherrix v. Commonwealth*, 257 Va. 292, 513 S.E.2d 642, 645-646 (1999).

> FN1. The specific charges are as follows: (1) capital murder during the commission of forcible sodomy; (2) use of a firearm during the commission of a murder; (3) forcible sodomy; (4) use of a firearm during the commission of forcible sodomy; and (5) possession of a firearm by a previously convicted felon.

Ms. Van Hart was a pizza delivery woman who was dispatched to deliver an order for pizza. Ms. Van Hart was sodomized, shot twice in the head, and murdered by a lone assailant. At trial, the Commonwealth presented evidence showing that in 1996 Cherrix volunteered that he had information about the sodomy and murder of Ms. Van Hart, subsequently confessed to her sodomy and murder, and

then led the police to recover a weapon that may have been involved in the murder. At trial, Cherrix denied that he confessed. Cherrix asserted that he told the police he knew who committed the murder, that he was innocent, and that he had an alibi for the time of the offense. The jury convicted Cherrix of all the charges. The trial court, pursuant to the jury's recommendation, sentenced Cherrix to death for capital murder. [FN2] *See id.* Cherrix appealed the decision and also pursued state habeas relief in the Virginia Supreme Court. The Virginia Supreme Court denied both attempts to overturn the conviction. The day before Cherrix's scheduled execution date, this Court stayed his execution.

> FN2. The trial court also sentenced Cherrix to life imprisonment for his forcible sodomy conviction, eight years imprisonment for using a firearm in the commission of those offenses, and five years imprisonment for possessing a firearm after being convicted of a felony.

Prior to his submission of his federal petition for writ of habeas corpus, and pursuant to 21 U.S.C. § 848 (q), Cherrix filed a motion for DNA retesting of the seminal fluid collected from Ms. Van Hart's anus. The circumstances surrounding the request for DNA retesting are as follows. In connection with the investigation of the case in 1994, the Commonwealth conducted DNA testing on fluid collected from Ms. Van Hart's anus and found the presence of seminal fluid. In conjunction with the autopsy of Ms. Van Hart, the medical examiner divided the material taken from her body into spermatozoa and non-spermatozoa fractions, which were then subject to Polymerase Chain Reaction "PCR" DNA testing. (Habeas Pet., Ex: App. 89.) The non-spermatozoa fractions were consistent with the DNA collected from Ms. Van Hart. (*See id.*) The PCR test results on the spermatozoa fractions were inconclusive. The test could not amplify the spermatozoa fractions; therefore, it was unable to ascertain the identity of the assailant who sodomized Ms. Van Hart and left the seminal *761 fluid in her body. The Commonwealth's theory of the case at trial was that a lone assailant murdered and sodomized the victim. Therefore, it is reasonable to infer that the person whose seminal fluid is found in Ms. Van Hart's anus was the perpetrator of this gruesome crime.

Six years later, DNA technology has advanced. Cherrix argues that by using current test models it is possible to make a conclusive determination of the origin of the seminal fluid found in Ms. Van Hart's body. Cherrix asserts that advances in DNA testing now make it possible to evaluate samples that were not amenable to DNA testing in 1994. The new methods, the Short Tandem Repeat ("STR") DNA test and the Mitochondrial Test, can render a conclusive opinion by evaluating substances other than spermatozoa that are contained within seminal fluid, such as epithelial cells and white blood cells. (Habeas Pet., Ex: App. 91-92.) Therefore, Cherrix moved for DNA testing, under 21 U.S.C. § 848(q), as reasonably necessary to support his petition for writ of habeas corpus, which contains claims of actual innocence and constitutional error.

While the DNA motion was pending, Cherrix filed a motion for the retention and preservation of evidence, asking the Court to order 10 separate state agencies to preserve the evidence pertaining to Ms. Van Hart's murder and Cherrix's prosecution, including any bodily fluids collected from. Ms. Van Hart. The Warden objected to the Court ordering any state agencies to act. On December 12, 2000, the Court conditionally granted Cherrix's motion for the retention and preservation of evidence and ordered the Virginia Attorney General and the Clerk of Court for Accomack County to preserve all evidence, including any bodily fluids collected from Ms. Van Hart that pertains to Ms. Van Hart's murder and Cherrix's prosecution. *See Cherrix v. Taylor,* Order (E.D.Va. Dec. 12, 2000) (conditionally granting motion for retention and preservation of evidence).

Subsequent to Cherrix's filing of his petition for writ of habeas corpus, and upon consideration of the petition and the evidence submitted in support thereof, the Court granted Cherrix's motion for funding for DNA retesting on the basis that such testing was reasonably necessary to support Cherrix's claims for federal habeas relief. *See Cherrix v. Taylor,* No. 00-1377, Order (E.D.Va. Jan. 9, 2001) (granting motion for DNA testing and motion for retention and preservation of evidence). Specifically, the Court granted funding for a private laboratory to conduct DNA testing and ordered the Virginia Attorney General and the Clerk of Court for Accomack County to make the requisite materials available for the testing. (*See id.*)

The next day, the Court denied the Warden's oral motion to stay the January 9, 2001 Order because the Warden set forth no basis for his claim. *See Cherrix v. Taylor*, No. 00-1377, Order (E.D.Va. Jan. 10, 2001) (denying motion to stay). That same day, the Warden, the Virginia Attorney General, and the Clerk of Court for Accomack County ("Petitioners") filed in the Fourth Circuit Court of Appeals an application for an emergency stay of the January 9, 2001 Order, and a petition for writ of mandamus and/or prohibition and appeal from the January 9, 2001 Order. On February 5, 2001, the Fourth Circuit granted Petitioners's application for an emergency stay. Pursuant to Federal Rule of Appellate Procedure 21(b), the Fourth Circuit invited this Court to submit a response to the petition for writ of mandamus. *See* Fed.R.App.P. 21(b)(4) (stating that the court of appeals may invite or order the trial-court judge to address the petition).

This Court accepts the Fourth Circuit's invitation to respond to the arguments asserted by Petitioners, which were never presented to the district judge in connection with their oral motion for a stay. After consideration of Petitioners' petition for writ of mandamus, the Court reaffirms its ruling that it is within this Court's *762 discretion to require Petitioners to make the evidence available so that a private laboratory may conduct DNA testing that is reasonably necessary to support Cherrix's petition for writ of habeas corpus.

## II. THE COURT'S NARROW APPLICATION OF § 848(q)

[1] The Court employed § 848(q) within the limit of the powers the statute grants. Section 848(q) provides:

> In any post conviction proceeding under section 2254 ... seeking to vacate or set aside a death sentence, any defendant who is or becomes financially unable to obtain adequate representation or investigative, expert, or other reasonably necessary services shall be entitled to the appointment of one or more attorneys and the furnishing of such other services in accordance with paragraphs (5), (6), (7), (8), and (9).

21 U.S.C. § 848(q)(B). Section 848(q) is a funding statute that authorizes the Court to disburse federal funds so that a habeas petitioner's attorneys can obtain investigative and other services on behalf of the habeas petitioner. *See* 21 U.S.C. §§ 848(q)(4)(B), (q)(9). In its petition for a writ of mandamus, Petitioners argue that this Court exceeded its authority under 21 U.S.C. § 848(q), but the Court used § 848(q) only for the function it is meant to provide: the provision of funding. In arguing that the Court should not have granted funding for the services of DNA testing, Petitioners fail to recognize the parameters of a district court's discretion under the statute. Section 848(q) requires a district court to provide for the furnishing of investigative and other services upon a showing that such services are "reasonably necessary" to a habeas petitioner's development of his case. *See* 21 U.S.C. § 848(q)(9) (stating that a habeas petitioner shall be entitled to the furnishing of services upon a showing of reasonable necessity); *McFarland v. Scott*, 512 U.S. 849, 854, 114 S.Ct. 2568, 129 L.Ed.2d 666 (1994) (stating that § 848(q) on its face grants indigent capital defendants a mandatory right to qualified legal counsel and related services). Once Cherrix made a showing that DNA testing is "reasonably necessary" to his habeas petition, this Court had the discretion to provide for funds for testing or discovery that may be necessary to support the habeas petition.

Cherrix has satisfied the standard of this and other courts for demonstrating that investigative services are "reasonably necessary." This Circuit has stated that the services of an expert are reasonably necessary if either: (a) the services are needed to prepare the claims in the habeas petition, or to obtain evidence not yet acquired to support a claim in the habeas petition; or (b) the habeas petition raises claims entitling the petitioner to a hearing at which such expert would testify. [FN3] *See Lawson v. Dixon*, 3 F.3d 743, 753 (4th Cir.1993) (holding that habeas petitioner did not need services of psychiatrist because: (i) petitioner had already filed his petition, and so did not need psychiatrist to prepare his claims; and (ii) psychiatrist had already formed an opinion on the elements of petitioner's claim, so petitioner had already acquired the evidence sought). As will be explained in great detail herein, Cherrix raises claims of constitutional violations and actual innocence that can only be explored through DNA analysis of Cherrix's blood and the physical evidence taken from the murder scene. *See infra* sections II, III, and IV. Therefore, Cherrix satisfies the first standard set forth by the Fourth Circuit for demonstrating that the requested DNA services are "reasonably necessary."

> FN3. For the purposes of Cherrix's motion, the equivalent would be that services for DNA testing would be reasonably necessary if the habeas petitioner raises claims entitling the petitioner to a hearing at which the testing results would be used as evidence.

The Fifth Circuit has stated that a habeas petitioner must be able to do at least one of the following to show reasonable *763 necessity: (a) state how he would employ experts in preparation for an evidentiary hearing; (b) demonstrate that experts will show that an aspect of the habeas petitioner's trial violated the petitioner's constitutional rights; or (c) where petitioner seeks an expert in order to raise forensic issues not raised at trial, appeal, or in a state habeas proceeding, show a miscarriage of justice, or cause and prejudice. See *Fuller v. Johnson*, 114 F.3d 491, 502 (5th Cir.1997) Cherrix has demonstrated that DNA services are reasonably necessary under all three standards set forth by the Fifth Circuit. The expert services of a DNA laboratory could provide Cherrix with evidence supporting his claim that he did not commit the rape and murder of Ms. Van Hart. This goes to any actual innocence and constitutional error claims that Cherrix could present at an evidentiary hearing. In addition, Cherrix seeks to demonstrate that there will be a miscarriage of justice if a person who is actually innocent is executed. Cherrix needs the DNA testing services to support his claim that he is actually innocent. Thus, Cherrix meets the Fifth Circuit's standard for a showing that DNA testing is "reasonably necessary" to his habeas case.

Texas district courts recognize yet another grounds upon which certain investigative services may be "reasonably necessary" to a habeas petitioner's case. In the case of *Patterson v. Johnson*, the court noted that funds for investigative services may be "reasonably necessary" at the pre-petition stage to enable a habeas petitioner to research and identify the factual bases of possible claims. 2000 WL 1234661, *2 (N.D.Tex. Aug. 31, 2000). The *Patterson* court noted investigative funds may be necessary to permit a habeas petitioner to state claims with sufficient particularity. See *id.* Like the *Patterson* court, this Court also concluded in issuing its January 9, 2000 Order that "it made little sense" to force a habeas petitioner to make good faith claims of constitutional violations--and, in this case, actual innocence--without supplying the petitioner with the resources to investigate his claims' factual basis and validity. Therefore, Cherrix has demonstrated a reasonable necessity sufficient enough to stand up to the standards of not only this circuit, but of other jurisdictions as well.

Moreover, in its determination of whether DNA testing was reasonably necessary to Cherrix's case, this Court properly considered, among other factors, the recommendations contained in a Report sponsored by the Attorney General of the United States. See National Commission on the Future of DNA Evidence, POSTCONVICTION DNA TESTING: RECOMMENDATIONS FOR HANDLING REQUESTS, at 4-5 (NIJ1999) [hereinafter "1999 REPORT"], *available at* <http:// www.ncjrs.org/pdffiles1/nij/177626. pdf>. According to the Report, Cherrix's habeas case is one for which DNA testing should be granted because DNA testing may exonerate Cherrix. See *id.*

The National Institute of Justice published a report in 1996 profiling the cases of 28 different individuals who had been convicted of crimes and subsequently exonerated by post-conviction DNA tests. [FN4] See National Commission on the Future of DNA Evidence, CONVICTED BY JURIES, EXONERATED BY SCIENCE: CASE STUDIES IN THE USE OF DNA EVIDENCE TO ESTABLISH INNOCENCE AFTER TRIAL, at 34-79 (NIJ1996) [hereinafter "1996 REPORT"], *available at* <http:// www.ncjrs.org/pdffiles/dnaevid. pdf>. In response to the report's concerns, and to maximize the value of forensic DNA evidence in the criminal justice system, Attorney General Janet Reno established the National Commission on the Future of DNA Evidence. See 1999 REPORT, at iii. The report, entitled *Postconviction DNA Testing: Recommendations for Handling Requests* ("1999 Report"), provides law enforcement officials with information and *764 guidelines for addressing requests for post-conviction DNA testing. See generally 1999 REPORT.

> FN4. A 1999 update to these numbers revealed that 60 people since 1992 had been convicted of crimes and exonerated by DNA evidence. See 1999 REPORT, at 2.

The 1999 Report recommends that DNA testing always be allowed in cases like Cherrix's. See *id.* at 3 (stating that prosecutors and defense counsel should concur on the need for DNA testing in Category 1 cases). The Report categorizes requests for post-conviction DNA testing into five categories and provides

a sound framework for analysis of requests. Category 1 cases are cases in which biological evidence was collected and still exists, and if such evidence is subjected to DNA testing or retesting, exclusionary results will exonerate the habeas petitioner. *See id.* at xiii, 4. The Commission's first example of a Category 1 case closely approximates Cherrix's case:

> Petitioner was convicted of the rape of a sexually inactive child. Vaginal swabs were taken and preserved. DNA evidence that excludes the petitioner as the source of the sperm will be dispositive of innocence. Note that in a case such as this, the victim's DNA--also obtainable from the vaginal swab-- operates as a control that confirms that the correct sample is being tested.

*Id.* at 4. Like Cherrix's case, this first example of a Category 1 case is one in which DNA evidence excludes the habeas petitioner as the source of the seminal fluid in a forced sexual penetration case, thereby providing evidence dispositive of innocence. *See id.* at 4 (setting forth examples 1 and 4 that demonstrate the import of DNA testing to cases like the instant one). The Commission recommends that DNA testing be allowed in Category 1 cases, and Cherrix's case is clearly a Category 1 case.

Throughout Cherrix's prosecution, the Commonwealth has asserted that a sole perpetrator sodomized and murdered Ms. Van Hart. Therefore, if the DNA retesting of the fluid on the anal swab shows that someone other than Cherrix sodomized Ms. Van Hart and left the seminal fluid in her body, then it is arguable that a third person, and not Cherrix, would be the perpetrator of this horrible crime. [FN5] Such a theory is consistent with the evidence presented at Cherrix's trial. The central evidence used to convict Cherrix consisted of (1) an officer's written documentation of Cherrix's confession that he shot Ms. Van Hart twice in the head and sodomized her, [FN6] and (2) Cherrix's leading the police to the location of a gun which may have been used in the murder. Throughout all of his proceedings, Cherrix has maintained his innocence, and no physical evidence conclusively has connected the identified gun to Cherrix or to Ms. Van Hart's murder. Cherrix moves for a retest of the seminal fluid collected from Ms. Van Hart's body because new DNA tests could possibly prove what the original test could not: Cherrix's potential innocence. Cherrix can utilize the facts in his case, his claims of constitutional error, and the possible evidence procured from the DNA test in an attempt to make a truly persuasive showing of innocence coupled with constitutional error in his trial. *See Schlup,* 513 U.S. at 327, 115 S.Ct. 851. Additionally, the Supreme Court in *Herrera v. Collins* left open the question of whether a truly *765 persuasive showing of innocence can be grounds for federal habeas relief. 506 U.S. at 427-28, 113 S.Ct. 853. Therefore, this is a Category 1 case, and, under 21 U.S.C. § 848(q), DNA testing is reasonably necessary to Cherrix's claims. The testing gives Cherrix the opportunity to develop evidence which could substantiate his habeas claims.

> FN5. *Cf. Hunt v. McDade,* 205 F.3d 1333, 2000 WL 219755, *3 (4th Cir.2000) (unpublished) (finding that DNA was not sufficient to prove the petitioner's actual innocence because multiple assailants were involved in the crime, and further noting that cases where courts have exonerated individuals post-conviction have been single assailant DNA cases).

> FN6. Cherrix's confession does not preclude a person's actual innocence of a crime. *See* Bruce M. Lyons, *New Committee Looks at DNA and the Death Penalty,* CRIM.JUST., Spring 2000, at 1 (reporting that, among DNA exonerations, twenty-one percent of wrongful convictions were based on confessions that were made by or attributed to the defendant); *see generally* Richard Leo & Richard J. Ofshe, *The Consequences of False Confessions: Deprivations of Liberty and Miscarriages of Justice in the Age of Psychological Interrogation,* J. OF CRIM.L. & CRIMINOLOGY, Winter 1998 (reporting statistics on the unreliability of confessions).

The Court finds it ironic that the Commonwealth refuses to conduct retests of the evidence in this case, considering who is among the membership of Attorney General Janet Reno's Commission. Paul B. Ferrera, Director of the Division of Forensic Sciences for the Commonwealth of Virginia, is a member of the national commission that set forth the DNA recommendations and category guidelines. *See id.* at vi. The Commonwealth has stated in its pleadings that it refuses to retest the DNA evidence in this case in its own laboratory. (Resp. in Opp'n to Pet.'s Mot. for DNA Testing at 1-2 (stating, in response to Cherrix's request that the evidence be transported to the Virginia Department of Forensic Sciences, that this Court does not have authority to direct or compel the Director of Department of Corrections "to do anything").) Yet, at the same time, the Commonwealth objects to the federal court affording Cherrix access to evidence

and to testing by an outside laboratory. The Commonwealth maintains its objection despite a showing that Cherrix's claims meet the criteria proposed by the Attorney General's national commission of which the Commonwealth's own Director of Forensic Science is a member. (*Id.*) The fact that the Court considered the Commission's observations further supports the conclusion that the Court appropriately applied the § 848(q) standard in its January 9 Order in granting funds for the DNA testing.

The Court's respect for the import of the "reasonably necessary" standard is evidenced by the Court's careful consideration of the propriety of providing funds with respect to each of the services Cherrix requested. In its January 9 Order, the Court denied Cherrix's request for funds for a mental health expert. (Jan. 9 Order at 5-6.) The Court conducted a thorough and reasoned analysis before concluding that the services of Dr. John L. Bulette, Cherrix's proffered mental health expert, were not reasonably necessary for Cherrix's case. (*Id.* at 5-6.) The Court conducted just as thorough an evaluation under the "reasonably necessary" standard in deciding to disburse funds for DNA testing. The Court's careful consideration of the DNA issue is explored more fully below in the discussion of Cherrix's need to retest the DNA evidence.

### III. ACTUAL INNOCENCE UNDER HERRERA

Cherrix asserts that the execution of a person actually innocent of the crime of which he was convicted would be in violation of his Eighth Amendment right against cruel and unusual punishment. *See generally* U.S. CONST. amend. VIII. Cherrix asserts that the evidence derived from the retest of the DNA evidence would help him to prove his claim of actual innocence. Therefore, according to Cherrix, the DNA retest is reasonably necessary under 21 U.S.C. § 848(q). Petitioners argue that "[c]laims of actual innocence based on newly-discovered evidence *have never been held* to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceedings." *Herrera*, 506 U.S. at 400, 113 S.Ct. 853 (emphasis added); *See also Wilson v. Greene*, 155 F.3d 396, 404 (4th Cir.1998); *Spencer v. Murray*, 18 F.3d 229, 236 (4th Cir.1994). This Court agrees.

Ultimately, this Court makes no finding as to the validity of Cherrix's *Herrera* claim for actual innocence based on newly-discovered evidence because no new evidence is before this Court. Ordering a new DNA test has the potential of producing three different outcomes. First, the test can prove inconclusive, in which case no newly-discovered evidence would be before *766 the Court, and the *Herrera* inquiry would be futile. Second, the test results can show that Cherrix sodomized Ms. Van Hart and deposited the seminal fluid into her body, in which case the evidence would moot his claims of innocence. Third, the test results can show a third party deposited the seminal fluid into Ms. Van Hart's body. If the test results implicate a third party, then the issue would be placed before the Court of whether such evidence, coupled with the other allegations of constitutional error, would be sufficient to grant Cherrix federal habeas relief. *See, e.g., Wilson*, 155 F.3d at 404-405 (undertaking a preliminary inquiry as to whether the habeas petitioner's claims fit within the narrow scope of an actual innocence claim, then finding that the petitioner's claims failed to reach such standard); *Spencer*, 18 F.3d at 236 (same). However, the DNA evidence must first be brought before the Court in discovery prior to consideration of the habeas corpus petition on the merits.

#### A. Viability of Free-Standing Innocence Claim

The *Herrera* court left open the question of whether a truly persuasive showing of actual innocence could be an independent constitutional basis for federal habeas relief. *See Herrera*, 506 U.S. at 427-429, 113 S.Ct. 853. *Herrera* was a 6:3 decision. At least three of the Justices who concurred in the opinion did not foreclose on the viability of actual innocence serving as a free-standing claim for federal habeas relief. Justices O'Connor and Kennedy did not reach the decision of whether a truly persuasive showing of innocence could be an independent basis upon which to grant federal habeas relief. Justices O'Connor and Kennedy rested on the assertion that the United States Supreme Court would never have to decide such an issue because any truly persuasive claim of innocence would be resolved by executive clemency. *See Herrera*, 506 U.S. at 427, 113 S.Ct. 853 (O'Connor, J., concurring) ("the Court has no reason to pass on, and appropriately reserves, the question whether federal courts may entertain convincing claims of actual innocence. That difficult question remains open. If the Constitution's guarantees of fair procedure and the safeguards of clemency and pardon fulfill their historical mission, it may never require resolution at

all."). Moreover, Justice White held that a persuasive showing of "actual innocence" made after trial based on newly-discovered evidence could render the execution of a habeas petitioner unconstitutional. *See id.* at 429, 113 S.Ct. 853 (White, J., concurring).

Justices O'Connor, Kennedy, and White were convinced by the facts that Herrera's free-standing claim of actual innocence was not sufficient to warrant an independent constitutional claim. *See id.* at 427, 429, 113 S.Ct. 853. First, Herrera's newly-discovered evidence consisted of affidavits. *See id.* at 417, 113 S.Ct. 853. Second, the affidavits were given over eight years after the trial. *See id.* at 418, 113 S.Ct. 853. Third, the affidavits themselves contained internal inconsistencies. *See id.* Finally, when the affidavits were considered with the evidence presented at trial--two eyewitness identifications, numerous pieces of circumstantial evidence, and a handwritten letter where Herrera apologized for killing the officers--the evidence still pointed strongly toward the petitioner's guilt. *See id.* Ultimately, the newly-discovered affidavit evidence did not meet the standard of a truly persuasive showing of actual innocence. [FN7]

> FN7. The majority in *Herrera* did not set forth the standard that a person must reach for a truly persuasive showing of actual innocence. However, in *Schlup*, the Supreme Court made several references to the strength of the evidence needed to be produced to sustain such a claim. *See Schlup*, 513 U.S. at 316, 115 S.Ct. 851. (stating that "the evidence of innocence would have had to be strong enough to make his execution 'constitutionally intolerable' even if his conviction was the product of a fair trial.") The *Schlup* Court stated that the new facts would have to unquestionably establish the person's innocence. *See id.* at 317, 115 S.Ct. 851 ("[i]f there were no question about the fairness of the criminal trial, a *Herrera*-type claim would have to fail unless the federal habeas court is itself convinced that those new facts unquestionably establish [the habeas petitioner's] innocence.")

*767 The circumstances in Cherrix's case are different. The evidence to be discovered in Cherrix's case constitutes DNA test results on seminal fluid seized from the body of the victim, which may be highly probative of the perpetrator's identity. The persuasiveness of forensic examination evidence on a claim of innocence is unquestionable. *See* 1999 REPORT at xiii. The United States Attorney General's 1999 Report acknowledges DNA testing as a key forensic technique for identifying criminals when biological tissues are left at a crime scene, and acknowledges DNA testing's proper use as a means to help convict or exonerate people of crimes. A national survey of forensic crime laboratories reported that DNA testing was used to exclude suspects in about 20-25% of its cases. *See* 1996 REPORT at 20. Courts throughout the country have found that DNA is highly probative evidence of guilt and innocence, [FN8] and DNA testing is becoming a leading basis upon which wrongfully convicted individuals have secured releases from convictions. [FN9] Overall, DNA test results have led to more than 60 people being exonerated of their crimes since 1992. *See* 1999 REPORT at 2.

> FN8. *See, e.g., Spencer v. Commonwealth*, 240 Va. 78, 393 S.E.2d 609, 621 (1990) (holding that the DNA tests were properly admitted a jury trial which resulted in Spencer's capital murder conviction). The same DNA tests used to help convict Spencer resulted in the exoneration of David Vasquez, who had pled guilty to the crime and had been sentenced to 35 years in prison. *See* 1996 REPORT at 73.

> FN9. *See Toney v. Gammon*, 79 F.3d 693, 700 (8th Cir.1996) (holding that the district court abused its discretion by denying the habeas petitioner's motion to conduct DNA testing which was unavailable at trial); *Watkins v. Miller*, 2000 WL 680418, *1 (S.D.Ind. May 16, 2000) (affirming its order for release of the habeas petitioner after DNA evidence showed he was actually of the murder); *People v. Dabbs*, 154 Misc.2d 671, 675-76, 587 N.Y.S.2d 90 (1991) (ordering post-conviction DNA testing and vacating conviction based on DNA evidence test results in a rape case).

Cherrix argues that the new STR and Mitochondrial methods of DNA testing will produce new evidence that will exonerate him of capital murder by showing that someone other than he sodomized Ms. Van Hart and left the seminal fluid in her body. If Cherrix approached this Court with a DNA test in hand, issued from a Virginia state DNA testing lab, stating that someone else's seminal fluid was found in Ms.

Van Hart's body, then this Court would not be required to ignore such persuasive evidence of actual innocence. Cherrix cannot return to the Virginia courts to request retesting now because his conviction is final. *See* Va.Sup.Ct.Rules, Rule 1:1; Va.Code § 8.01-654(A)(1). Virginia law does not have a post-conviction mechanism for Cherrix to present his request, or even to present the newly-discovered rest results. Moreover, such newly-discovered evidence would illuminate Cherrix's federal habeas claims that his conviction is unconstitutional. As stated above, this Court did not abuse its discretion in examining the facts of the case, and the persuasive nature of DNA testing, to reach its conclusion that ordering a DNA retest was reasonably necessary to support Cherrix's petition for federal habeas relief.

### B. Clemency Alternative

[2] Petitioners argue that Cherrix is not entitled to federal habeas relief on the grounds of newly-discovered evidence because Cherrix has failed to exhaust his state remedy of seeking clemency. It is true that the United States Supreme Court and this Circuit have acknowledged that normally a claim of actual innocence based on newly-discovered evidence is an issue to be reserved for clemency actions. *See Herrera*, 506 U.S. at 417, 113 S.Ct. 853 (acknowledging that the traditional remedy for claims of actual innocence based on late findings of newly-discovered evidence has been executive clemency); *768Royal v. Taylor*, 188 F.3d 239, 243 (4th Cir.1999) ( "[W]hen available, state clemency proceedings provide the proper forum to pursue claims of actual innocence based on new facts.")

The argument that clemency is the proper course to pursue using newly-discovered evidence still supports Cherrix's claims for DNA testing. Section 848(q) of Title 21 of the United States Code encompasses claims for a habeas petitioner's compensation of fees incurred during Virginia state clemency proceedings. *See Strickler v. Greene*, 57 F.Supp.2d 313, 317-18 (E.D.Va.1999) (holding that § 848(q) allows funding for services that are reasonably necessary in the habeas petitioner's pursuit of clemency from the Governor of Virginia); *see also Hill v. Lockhart*, 992 F.2d 801, 803 (8th Cir.1993) (stating that funding for services are reasonably necessary under § 848(q)(10) if the request is made as part of a non-frivolous federal habeas corpus proceeding and the state law provides no avenue to obtain compensation for these services). Therefore, as an alternative to his petition for habeas relief, the Court's grant of funding under § 848(q) would serve as a legitimate basis upon which to equip Cherrix's counsel with the tools needed to adequately pursue a clemency proceeding.

[3] This Court should not be placed in the position of having to deny an inmate access to DNA testing because he failed to seek clemency; nor should the Court be placed in the position of having to deny an inmate the opportunity to enter the executive clemency process armed with potentially exculpatory DNA test results. The issue of clemency must be analyzed within the context of the motion before the Court. Clemency is the historic remedy employed to prevent a miscarriage of justice where the judicial process has been exhausted. Cherrix is making a request for DNA retesting that is reasonably necessary to demonstrate constitutional error at his trial and that he is actually innocent. *See Herrera*, 506 U.S. at 412, 113 S.Ct. 853. The United States Supreme Court has acknowledged that the execution of someone who is actually innocent is the quintessential miscarriage of justice. [FN10] *See Schlup*, 513 U.S. at 324-25, 115 S.Ct. 851. Without the DNA testing, it would be futile for Cherrix to seek clemency because he has no new evidence upon which to make a truly persuasive claim for Clemency.

> FN10. The need to prevent a miscarriage of miscarriage will be explored more fully below. *See infra* section IV.

It is unlikely that a viable petition for clemency is available to Cherrix without the persuasive conclusions of the DNA tests. The Governor of Virginia is not required to review or accept for submission any clemency petition, even if the applicant presents compelling evidence of actual innocence. *See* Va. Const., Art. V, § 12; Va.Code § 53.1-229, -230 (2000). Moreover, "most of the Virginia proceedings than culminated in executive clemency began in court with successful requests for access to court exhibits containing critical biological evidence that was ultimately subjected to DNA testing." *See* 1999 Report at 17.

As an indigent defendant, Cherrix applied to this Court for funding to conduct DNA retesting on

evidence which is within the Commonwealth's possession. The results of this retest may create newly-discovered evidence exonerating Cherrix of Ms. Van Hart's murder. If the newly-discovered evidence exonerates Cherrix, then the Court may have to address whether Cherrix's failure to seek clemency presents a bar to his quest for federal habeas relief. As of now, this Court makes no determination on the newly-discovered evidence and Cherrix's claims of actual innocence. This Court only holds that the discovery of DNA evidence is reasonably necessary to support Cherrix's case. Therefore, it is within the Court's *769 discretion no order DNA testing under 21 U.S.C. § 848(q).

### IV. MISCARRIAGE OF JUSTICE UNDER SCHLUP

[4][5][6] Even if this Court were to find that Cherrix cannot assert an independent claim of actual innocence under *Herrera*, the DNA tests are reasonably necessary to serve as a gateway to allow claims that may be procedurally barred to be heard on the merits. *See Schlup,* 513 U.S. at 327, 115 S.Ct. 851. A habeas petitioner is procedurally barred from litigating a constitutional claim in federal court if the petitioner has failed to assert the claim in a prior state proceeding. *See generally id.* However, newly-discovered evidence showing factual innocence may serve as a gateway to have the habeas petitioner's procedurally barred constitutional claims heard on the merits, and ultimately, to prevent a fundamental miscarriage of justice. *See id.* Cherrix did assert an ineffective assistance of counsel claim during his state habeas proceedings. However, Cherrix's counsel never sought DNA testing which could at this point prove that, but for counsel's ineffectiveness, the result of the proceeding would have been different. Therefore, Cherrix may be able to assert such claims of ineffective assistance of counsel before this Court because they are based on newly-discovered evidence that could demonstrate factual innocence.

[7][8] To assert a constitutional claim of ineffective assistance, the habeas petitioner must show that a "constitutional violation has probably resulted in the conviction of one who is actually innocent." *Schlup,* 513 U.S. at 327, 115 S.Ct. 851 (citing *Murray v. Carrier,* 477 U.S. 478, 496, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986)). "To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." *Id.* The reviewing court should consider the "probative force of relevant evidence that was either excluded or unavailable at trial." *See id.* at 327-28, 115 S.Ct. 851. The new facts need only raise sufficient doubt about a habeas petitioner's guilt to undermine confidence in the result of the trial and to establish a threshold showing of innocence sufficient to justify a review of the merits of the petitioner's constitutional claims. *See id.* at 317, 115 S.Ct. 851.

Cherrix claims in his habeas petition that his confinement violates his Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendment rights under the Constitution. (Habeas Pet. at 26.) Of relevance to this motion, Cherrix argues that his trial counsel violated his Sixth Amendment right to the effective assistance of counsel and that, but for such ineffectiveness, he would have been exonerated of the crimes involved. *See Strickland,* 466 U.S. at 687-91, 104 S.Ct. 2052. Under *Strickland,* a court must determine (1) whether the identified acts or omissions of counsel were outside the wide range of professionally competent assistance, and (2) whether there was a reasonable possibility that but for counsel's unprofessional performance the result of the proceeding would have been different. *See id.* at 690, 694, 104 S.Ct. 2052. Cherrix states that his trial counsel unreasonably failed to conduct an effective cross-examination of the Commonwealth's forensic pathologist or to obtain an independent expert in order to challenge and rebut the pathologist's testimony concerning the 1994 seminal fluid DNA test results. (Habeas Pet. at 92-93.) Cherrix argues further that his rights were violated by his trial counsel's failure to secure evidence that may have demonstrated than he did not sodomize and murder Ms. Van Hart. (Habeas Pet. at 89-96.) Forensic tests on seminal fluid in a murder and sodomy prosecution are critical evidence that weigh heavily in a determination of guilt. In this case, the then existing 1994 DNA testing methods were technologically inferior to recent DNA testing methods, and resulted in an inconclusive determination of the origin of the seminal fluid. It does *770 not appear that further tests were conducted when Cherrix became a suspect in 1997. Trial counsel's failure to pursue forensic evidence in 1997 which bears directly on guilt or innocence in a capital case may amount to error warranting federal habeas relief. *See Jones v. Wood,* 114 F.3d 1002, 1008-1009. (9th Cir.1997); *Toney v. Gammon,* 79 F.3d 693, 700 (8th Cir.1996); *Henderson v. Sargent,* 926 F.2d 706, 712-14 (8th Cir.1991); *Bliss v. Lockhart,* 891 F.2d 1335, 1342-43 (8th Cir.1989); *Jenkins v. Scully,* 1992 WL 32342 (W.D.N.Y. Feb. 11, 1992).

The results from the requested DNA retests have the possibility of showing that Cherrix did not sodomize Ms. Van Hart and leave the seminal fluid taken from her body. As allowed in *Schlup*, Cherrix seeks to utilize this evidence of actual innocence to support his claim that his counsel's representation violated his Sixth Amendment right to the effective assistance of counsel. This Circuit has previously found with regard to *Schlup*-type claims of innocence that "DNA evidence that the defendant ... was not the one who contributed the seminal fluid found in the semen samples taken from the victim or her clothing established the requisite probability that a reasonable jury would not have returned a guilty verdict." *Hunt v. McDade*, 205 F.3d 1333, 2000 WL 219755, *3 (4th Cir.2000) (unpublished). [FN11] Cherrix's requested DNA evidence can establish the requisite possibility that would enable a jury not to return a guilty verdict because, as explained earlier, it can eliminate Cherrix as the one who contributed the seminal found in Ms. Van Hart's body. [FN12] Therefore, Cherrix's request for DNA testing is reasonably necessary to support his claim that he was deprived of his Sixth Amendment right to the effective assistance of counsel, and that this deprivation resulted in the incarceration of an innocent man.

> FN11. *See also Commonwealth v. Reese*, 444 Pa.Super. 38, 663 A.2d 206, 207 (1995) (holding that DNA test results warranted a new trial of a post-conviction petitioner who was convicted of rape and kidnaping); *State v. Hicks*, 195 Wis.2d 620, 536 N.W.2d 487, 492 (1995) (holding that a new trial was necessary due to the petitioner's counsel's failure to seek DNA testing on hairs gathered from the crime scene); *State v. Hammond*, 221 Conn. 264, 604 A.2d 793, 807-08 (1992) (holding that a new trial was warranted and stating that the defendant was entitled to have DNA testing done on vaginal swabs taken from the victim); *State v. Thomas*, 245 N.J.Super. 428, 586 A.2d 250, 254 (1991) (reversing order denying motion for DNA testing and stating that if the DNA test results indicated that the defendant was not the assailant, the trial court had the option of either conducting a hearing on the evidence or ordering a new trial).
>
> FN12. The seminal fluid was the Commonwealth's most important evidence of sexual activity in connection with the murder. Without proof of the sexual assault, the murder may not have been capital murder. (Habeas Pet. at 28 (citing J.A. at 1085.))

## V. AUTHORITY OF THE COURT TO ORDER PETITIONERS TO RETAIN AND TO PROVIDE ACCESS TO EVIDENCE

### A. Narrowness of January 9, 2001 Order

Petitioners take exception to their understanding of the Court's January 9, 2001 Order as directing the Attorney General and the Clerk of the trial court to undertake specific tasks in conjunction with Cherrix's request for DNA testing (Pet. for Writ of Mandamus at 9.) Petitioners argue that 21 U.S.C. § 848(q)(9) does not grant the district court the authority to "direct or compel" the Attorney General to do anything. (*Id.* at 10.) Petitioners assert that, in effect, this Court is enlisting the Attorney General and the Clerk to gather evidence for Cherrix, thereby making them investigators for Cherrix in the development of his case. (*Id.* at 11.) Petitioners' argument lacks merit in two respects: (1) Petitioners mischaracterize the scope of the Court's January 9, 2001 Order, and (2) Petitioners fail to recognize the long-established authority of the Court to order custodians of records and evidence, including state officials, to make *771 accessible those records or evidence and to retain and preserve those records or evidence.

This Court's January 9, 2001 Order conditionally granted Cherrix's Motion for DNA testing upon consideration of his Petition for Writ of Habeas Corpus, without ruling on the merits of Cherrix's habeas corpus claims. The Court found that allowance of fees for DNA testing was reasonably necessary to support Cherrix's application for a writ of habeas corpus. *See* 21 U.S.C. § 848(q)(9). Accordingly, the Court set forth the conditions under which Cherrix would receive funds for the DNA testing. The Court took no position at that time regarding the merits of whether DNA testing would be admissible to support the allegations of Cherrix's claim, but found that DNA testing was appropriate based on the preliminary showing made in the habeas petition.

[9][10][11] In consideration of a habeas petitioner's request for discovery, the Court may provide a habeas petitioner investigative services to support reasonable claims in support of the petition. Just as the Court

has the authority to appoint investigators or psychiatrists to assist indigent persons in the litigation of their cases, the Court may order the provision of a forensic scientist to perform DNA testing to aid a petitioner in support of his petition for habeas corpus. The provision of testing is not a judgment that a particular claim will be entertained. *See In re Warden, Kentucky State Penitentiary v. Gall*, 865 F.2d 786, 789 (6th Cir.1989). The Court cannot formulate a ruling on Cherrix's habeas petition until it has the opportunity to consider evidence acquired through the retesting of the DNA. A conclusive finding regarding the merits of Cherrix's claims is a determination for a later date. *See Bracy v. Gramley*, 520 U.S. 899, 909, 117 S.Ct. 1793, 138 L.Ed.2d 97 (1997) (finding that habeas petitioner was entitled to discovery of documents to support his claim, even though strong possibility existed that petitioner would be unable to obtain evidence sufficient to support his claim). In its January 9, 2001 Order, The Court merely acted to ensure that an indigent individual had access to all reasonable avenues of discovery so that he could develop his case. *See McFarland v. Scott*, 512 U.S. at 854, 114 S.Ct. 2568 (stating that § 848(q)(4)(B) "grants indigent capital defendants in post-conviction proceedings a *mandatory right* to qualified legal counsel and related services" [emphasis added] ); *Coleman v. Vasquez*, 771 F.Supp. 300, 303 (N.D.Cal.1991) (stating that purpose of § 848(q) is to put indigent defendants as nearly as possible in same position as nonindigent defendants) (citing *United States v. Sanders*, 459 F.2d 1001, 1002 (9th Cir.1972)); 21 U.S.C. §§ 848(q)(4)(B), (q)(9).

Petitioners' writ of mandamus demonstrates an additional lack of understanding of the scope of the Court's January 9 Order in its statements of concern regarding the compromise to the integrity of the evidence to be preserved and tested. Contrary to Petitioners' argument, this Court did not order that evidence be "turned over" to Cherrix. This Court was concerned with granting Cherrix "access" to evidence. (Jan. 9 Order at 2.) The Court was equally concerned with ensuring that the evidence was not destroyed pending Cherrix's access to the evidence. (*Id.* at 2-3.) As stated by the Seventh Circuit, both litigants *and* "[j]udges must be vigilant to prevent the destruction of evidence." *Mathis v. John Morden Buick, Inc.*, 136 F.3d 1153, 1156 (7th Cir.1998). The Court has not taken any action that compromises the integrity of the evidence.

The Court's Order did not provide for the final testing of the evidence, only for its preservation and for testing funds. At the time of the Court's January 9 Order-and presently-the Court intended to conduct a hearing to determine how the DNA testing would proceed. *See* 1999 REPORT, an xvi (recommending such a hearing). The Court expected both the Commonwealth and the parties to participate in structuring conditions for the testing of \*772 the requested evidence in order to protect the integrity of the evidence and to ensure equal access to all parries.

The procedure the Court adopts for the analysis of the evidence will address the Petitioners' concern than Cherrix may consume the remaining forensic evidence and that the integrity of the evidence be maintained. (Pet. for Writ of Mandamus at 14.) [FN13] Attorney General Janet Reno's 1999 Report on Post-conviction DNA Testing provides guidelines for adopting procedures for DNA testing. *See* 1999 REPORT, at 52-53. The report recommends that courts set an informal conference with counsel before evidence is tested to discuss issues. *See id.* at xvi, 52. The Report sets forth several points about which the Court should consult with the parties in devising a plan for the testing of DNA evidence:

> FN13. The Petition for Writ of Mandamus refers only to a concern that the integrity of the evidence would be compromised, but the Court derives from this that Petitioners share the concerns of the Warden that Cherrix will consume the remaining evidence. (Supp. to Warden's Mot. for Emergency Stay at 2.) The Petition also raises a concern as to the loss of the chain-of-custody for the forensic evidence, but, as is explained herein, this issue is not ripe for review. The Court has merely ordered that funds for DNA testing shall be provided and that the evidence shall be protected from destruction. The Court fully intends to impose procedures to protect the chain of custody when the Court actually orders that the evidence be moved to permit the DNA testing. *Cf. Gall*, 865 F.2d at 789 n. 1 (stating that mandamus petitioner's fears regarding integrity of evidence and chain of custody were "vastly overblown" because petitioner was free to send representative to monitor retesting, and petitioner could argue the vitiating effects of time if retesting produced different results).

- The method of preserving evidence for chain-of-custody purposes during the testing process.
- The type of DNA analysis to be utilized.
- The laboratory that will perform the testing. [FN14] It might be necessary for the court to enter an order to release evidence to a laboratory for testing. Prior to any release, both sides should be notified and given an opportunity to be heard.

> FN14. The Report contains a comprehensive section devoted to the factors to be considered in selecting a laboratory for DNA testing. See 1999 REPORT, at 60-63.

- Determination of the estimated cost of the testing and who will pay for it. This may be determined by local policy, State statute, agreement between the parties, or court order. [FN15] In category I cases, the testing will generally be at State expense, but often the petitioner or his family will have to pay, with reimbursement made if there is an exoneration or exclusion.

> FN15. In compliance with the Court's January 9 Order that Cherrix submit a written budget for the DNA testing, the parties have already submitted the proposed budget and objections. See generally Cherrix v. Taylor, No. 00-1377-AM, Proposed Budget for DNA Testing, Proposed Procedures for Safeguarding the Evidence, Schedule of Fees and Credentials for Proposed DNA Laboratory and Schedule of Fees and Credentials for Proposed Phlebotomist (E.D.Va. Jan. 22, 2001); Cherrix v. Braxton, No. 00-1377-AM, Warden's Objection to Cherrix's Proposed Budget for DNA Testing and Proposed Procedures for Safeguarding the Evidence (E.D.Va. Feb. 1, 2001); Cherrix v. Braxton, No. 00-1377-AM, Reply in Support of Proposed Budget for DNA Testing and Proposed Procedures for Safeguarding the Evidence (E.D.Va. Feb. 5, 2001).

- Determination of the amount of sample available for testing and replicate testing. If the entire amount of sample will necessarily be consumed, arrangements should be made for a defense or prosecution expert to observe the testing procedures, either by counsel or upon order of the court. The court should try to get the parties or their experts to agree to a protocol to be used. Otherwise, the court may be called upon to determine the protocol to be followed.

Id. at 52-53. Instituting these guidelines, both parties could agree an a testing facility so as to diminish the concern about *773 whether all of the forensic evidence is consumed for testing; both parties could rely on the results of a single analysis. In addition, the Warden's concern regarding Cherrix's reference to the possibility of obtaining physical samples from Ms. Van Hart's family would not be an issue. (Supp. to Warden's Mot. for Emergency Stay at 2.) All parties could agree to a qualified laboratory that can test the existing forensic evidence without needing to obtain additional testing material. (Mem. in Support of Pet. Mot for DNA Testing, Ex. 2: Aff. of Dr. William M. Shields ¶ 5.) Cherrix's expert, Dr. William Shields, has sworn that forensic and paternity laboratories can perform accurate STR and Mitochondrial DNA tests on very minute and degraded samples. (Id.) In short, Petitioners' concerns regarding the integrity and exhaustion of the evidence are premature and not well founded.

Petitioners assert that the Court has made the Attorney General and the Clerk of the trial court responsible for gathering evidence for Cherrix, and for providing the investigative services referred to in § 848(q)(4)(B). (Pet. for Writ of Mandamus at 10.) The Court has done no such thing. The Court in its January 9, 2001 Order did not order the Attorney General or the Clerk to investigate the case by seeking out materials and documents outside of their custody and control. Nor did the Court order the Attorney General or the Clerk to draw Cherrix's blood. Finally, the Court did not order the Attorney General or the Clerk to have Cherrix's blood or the evidence in their custody analyzed at their expense or in their facilities. If the Court had ordered these things, then the Court arguably would have been making the Attorney General and the Clerk responsible for providing the services described in § 848(q)(4)(B). Instead, what this Court did order was that the Attorney General and the Clerk retain and preserve evidence in their custody and control, so that Cherrix could ultimately review the evidence in preparation of his case.

This Court acted in its January 9 Order precisely and specifically how the Attorney General of the United States has recommended that the Court act. In its 1999 Report, The National Commission on the Future of DNA Evidence recommends that "the court issue an evidence preservation order to the investigating

agency, clerk of court, crime laboratory, prosecutor's office, or any other agency in a jurisdiction that may have evidence that might be subject to DNA testing." 1999 REPORT, at 52. Moreover, the Commission states that the court may issue these orders *sua sponte,* and that the evidence protected may include items not used at trial. *Id.* This Court's January 9, 2001 Order provided:

> [I]t is hereby ... ORDERED that Pamela A. Rumpz, in her capacity as the Assistant Attorney General, notify the state government officials who possess evidence pertaining to the murder of Tessa Van, Hart of this pending habeas proceeding and to take steps to preserve all evidence in their care, custody, and control until further order of the Court. Such evidence includes bodily fluids, and other tangible objects in the care, custody, or control of the Commonwealth of Virginia and the Clerk of the Court for the Accomack County Circuit Court. It is further
>
> \* \* \* \* \* \*
>
> ORDERED that Pamela A. Rumpz, in her capacity as the Assistant Attorney General of Virginia, and Samuel H. Cooper, Jr., in his capacity as the Clerk of Court for Accomack County Circuit Court, Jr., [sic] *make available* to Petitioner any bodily fluids or swabs seized from Tessa Van Hart, or the Petitioner for testing *to the laboratory as directed by the Court.*

(Jan. 9 Order at 7-8 (emphasis added).) The Court did not order Petitioners to turn over these materials to Cherrix; the Court explicitly held that it granted Cherrix's motion for the preservation of evidence \* 774 so that Cherrix could have "access" to the evidence:

> First, Petitioner's Motion for the Preservation of Evidence is GRANTED because the of evidence is necessary to ensure Petitioner's *access* to evidence.

(*Id.* at 1.) The January 9 Order does not demonstrate any intention that Cherrix or his counsel should take possession of the evidence. (*See id.* at 1, 7-8.) In agreement with the reasoning set forth by the Attorney General's Commission on why the courts should issue preservation orders, this Court issued its January 9 Order "to prevent destruction or disposal of evidence that might be subject to DNA testing." 1999 REPORT, at 52.

In addition, the Court's January 9 Order granted Cherrix's request for funds so that he could independently conduct his own DNA analysis. (Jan. 9 Order at 3-5.) it is clear from the Court's Order that an independent laboratory is to perform the services of analyzing Cherrix's bodily fluid samples, contrary to Petitioners' assertions that the Court makes them responsible for providing Cherrix services in connection with the DNA testing:

> [I]t is hereby ... ORDERED that Petitioner's Motion for funds for DNA testing is GRANTED subject to this Court's approval of the following submissions by the Petitioner: (1) a written budget on the proposed laboratory fees and information about the accreditation or credentials of the proposed laboratory; and (2) a written statement of costs for the collection of Petitioner's bodily fluid samples at the prison, and the name, credentials, and fees of the service performing the collection for the Court's approval.

(*Id.* at 7; *see also id.* at 5.) Also clear is that Petitioners are not responsible for the costs of obtaining Cherrix's bodily fluid samples. (*Id.*) Petitioners agree that § 848(q) of Title 21 of the United State Code empowers the Court to grant a motion to disburse funds for reasonably necessary investigative expenses. (Pet. for Writ of Mandamus at 10.) As previously explained, DNA analysis is reasonably necessary to Cherrix's case. *See infra* sections II, III.B.

Upon examination of the Court's January 9 Order, the mandate of the Attorney General of the United States that courts conscientiously examine the need for DNA testing, and the existing law, it is inescapable that the Court had the authority to issue every aspect of its January 9, 2001 Order. The Court is explicitly granted the authority to issue these orders under § 848(q)(9), the Federal Rules of Civil Procedure, and federal case law.

### B. SOURCE OF THE COURT'S AUTHORITY IN 2254 CASES

The Court did not act solely under § 848(q) in issuing its Order. Petitioners' principal contention in their petition for a writ of mandamus and/or prohibition is that this Court did not have the authority under 21 U.S.C. § 848(q) to compel the Attorney General to locate, preserve, and turn over to Cherrix evidence from his state court criminal trial. (Pet. for Writ of Mandamus at 3.) However, the Court acted pursuant

to 848(q)(9) only in finding that Cherrix should receive funding for the investigative services Cherrix seeks to employ. Petitioners take the Court's citation to a statutory reference used in a section of the Court's January 9 Order and argue as if the cited statute is the sole authority upon which the Court relied in issuing its multi-faceted Order. The Court acted pursuant to the power granted by 848(q) only in authorizing funds for Cherrix's DNA testing, and in denying funds for a mental health expert. (Jan. 9 Order at 3-6.) The Court cited federal case law and the Rules of Civil Procedure in exercising its authority to order Petitioners to produce, preserve, and retain evidence. (Id. at 1-3) (citing Arizona v. Youngblood, 488 U.S. 51, 58, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988); United States v. Shipp, 203 U.S. 563, 574, 27 S.Ct. 165, 51 L.Ed. 319 (1906); Fed.R.Civ.P. 26(b)(1)). The January 9 Order*775 evidences the Court's recognition of the limited scope of § 848(q) as a funding statute. In ordering the Attorney General and Clerk to preserve and make accessible evidence, the Court acted within the broad authority of federal law. (Id. at 2-7 (citing statutory law of § 848(q), federal cases, and the Federal Rules of Civil Procedure)).

Petitioners fail to recognize the discretion of a district court under the Federal Rules of Civil Procedure, and the requirements imposed on a district court under federal law. Section 948(q) sets forth the strictures of only some procedures governing federal habeas corpus cases. There are also general federal rules and guidelines that govern § 2254 cases. See 28 U.S.C. § 2254(f); 28 U.S.C.A. § 2254 and Annotations; Fed.R.Civ.P. 81(a)(2); Rules Governing § 2254 Cases, Rule 6(a). This Court acknowledged in its January 9, 2001 Order that it could apply the Federal Rules of Civil Procedure in this § 2254 habeas corpus case. (Jan. 9 Order at 2 n. 1. ("The Federal Rules of Civil Procedure may be applied to petitions filed under section 2254.")) The Federal Rules of Civil Procedure govern the majority of issues that arise in a petitioner's development of his habeas case.

### 1. The Court's Authority Under the Federal Rules of Civil Procedure

[12][13] Rule 6(a) of the Rules Governing Section 2254 Cases states that "a party shall be entitled to invoke the processes of discovery available under the Federal Rules of Civil Procedure" if good cause is shown and the judge, in the exercise of his discretion, grants the party leave to do so. Rules Governing § 2254 Cases, Rule 6(a); see also Fed.R.Civ.P. 81(a)(2) (stating that the Federal Rules of Civil Procedure apply to proceedings for habeas corpus); Jenkins, 1992 WL 32342, at *1 (stating that, under Rule 6, the discovery devices available under the Federal Rules of Civil Procedure may be utilized in § 2254 cases). Good cause for discovery under Rule 6(a) is shown "where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is [ ] entitled to relief." Bracy, 520 U.S. at 908-09, 117 S.Ct. 1793 (quoting Harris v. Nelson, 394 U.S. 286, 300, 89 S.Ct. 1082, 22 L.Ed.2d 281 (1969)); see also Quesinberry v. Taylor, 162 F.3d 273, 279 (4th Cir.1998) (same). Where, as here, there are claims of constitutional error, there has been an advancement in DNA technology that could demonstrate a viable claim of actual innocence, and the habeas petitioner faces execution, the Court acted within its discretion in finding that good cause was shown to make limited processes of discovery available to Cherrix. See Bracy, 520 U.S. at 909, 117 S.Ct. 1793 (stating that it is the duty of the court to provide the necessary facilities and procedures for an adequate inquiry); compare Jenkins, 1992 WL 32342, at *1 (finding that the habeas petitioner had shown good cause to use discovery devices of the Federal Rules because the DNA fingerprinting tests petitioner sought to utilize were unavailable at the time of his trial); Gaitan-Campanioni v. Thornburgh, 777 F.Supp. 1355, 1356 (E.D.Tex.1991) (holding that although discovery is permitted in habeas cases only by leave of court, court should not hesitate to allow discovery where it will help illuminate issues underlying applicant's claim).

Petitioners argue that Cherrix should not be granted access to the general avenues of discovery because Cherrix did not seek DNA testing in his trial in state court. (Pet. for Writ of Mandamus at 6.) In 1996, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") amended the statute governing habeas cases to alter the discovery allowable in habeas corpus proceedings. See 28 U.S.C.A. §§ 2254(20 (A)(ii), (2)(B)), Pub.L. No. 104-132, 110 Stat. 1214 (1996), cited in Charles v. Baldwin, 1999 WL 694716, *1 (D.Or. Aug. 2, 1999). AEDPA precludes a court from considering new facts presented for the first time in a federal habeas *776 proceeding unless the court has decided that a petitioner is entitled no an evidentiary hearing. See id. If the petitioner is not entitled to a hearing, then "good cause" is not

shown, and the full ambit of discovery is not available to a habeas petitioner. Yet, there are two exceptions to the AEDPA's limitation on a habeas petitioner's access to discovery. First, if the claim involving previously unpresented facts relies on a new rule of constitutional law, then AEDPA does not limit the scope of discovery. See *Charles*, 1999 WL 694716, at *1-2 (explaining the operation of AEDPA and citing subsection (2)(A)(i)). Cherrix's claims of ineffective assistance of counsel and actual innocence do not implicate this exception. The second exception to AEDPA's limitation applies in this case:

> (A) the claim relies on ...
> (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

*Id.* at *2 (quoting AEDPA).

Good cause is shown that Cherrix is entitled to utilize limited discovery because Cherrix could not have presented to the trial court the evidence he now seeks, and because upon this evidence a jury would not find Cherrix guilty. As explained above, the Commonwealth admitted DNA evidence in Cherrix's state trial. However, the DNA testing on the seminal fluid was partially inconclusive. Cherrix could not have previously discovered through the exercise of due diligence the quality of DNA test results he now seeks because DNA technology had not advanced to the level of accuracy and precision it has now achieved.

Furthermore, based on the results that Cherrix expects from the DNA tests, it is arguable that no reasonable jury would find him guilty of the sodomy and murder of Ms. Van Hart. As previously noted, it has not been alleged that more than one perpetrator committed the sodomy and murder of Ms. Van Hart. See *infra* section III, IV. Also, the Commonwealth contends that the inability to amplify the spermatozoa in the seminal fluid recovered from Ms. Van Hart indicates that the assailant may have worn a condom. If Cherrix's requested DNA analysis reveals the presence of sperm-yielding DNA that does not match Cherrix's DNA, then the Commonwealth's theory of the case is discredited. See *Hunt*, 205 F.3d 1333, 2000 WL 219755, at *3. This Circuit in *Hunt* noted that, in several cases, when it has been attested that only one perpetrator committed a sexual assault, evidence that the defendant was not the contributor of the DNA established "the requisite probability that a reasonable jury would not have returned a guilty verdict against that defendant." *Id.* If a jury believes that Cherrix did not contribute the semen at the scene, the jury could find that Cherrix did not commit the sodomy or the murder. At the same time, if spermatozoa is detected through DNA analysis, this calls into question the Commonwealth's theory of the case that the assailant wore a condom. A jury could find that this discredits the Commonwealth's case, and therefore find Cherrix not guilty. Thus, because Cherrix could not have "previously discovered evidence through the exercise of due diligence" and, by considering the new evidence, "no reasonable factfinder would have found [him] guilty of the underlying offense," Cherrix satisfies the exception to AEDPA and is entitled to a range of discovery tools. *Charles*, 1999 WL 694716, at *2 (quoting AEDPA).

[14] The Attorney General for the Commonwealth of Virginia and the Clerk of the Accomack County Circuit Court argue in the Petition that this Court acted outside of its authority in ordering Petitioners to undertake specific tasks in conjunction with Cherrix's request for DNA testing because both the Attorney General *777 and the Clerk of the trial court are "non-parties to the underlying habeas action." (Pet. for Writ of Mandamus at 9.) However, Petitioners have resorted to an argument based on the literal interpretation of the labeling of a habeas case. Wardens of correctional facilities are almost without exception the named respondents in § 2254 habeas petitions. See, e.g., *Quesinberry*, 162 F.3d 273; *Bracy*, 520 U.S. 899, 117 S.Ct. 1793, 138 L.Ed.2d 97; *Jenkins*, 1992 WL 32342; *Esposito v. Manson*, 65 F.R.D. 658 (D.Conn.1975). However, it is evident that wardens do not generally play a role in the proceedings which result in the confinement of habeas petitioners. Therefore, wardens are not responsible for the alleged unconstitutionality of which petitioners are complaining, and wardens do not have possession or control over the records or evidence utilized in the offending trial proceeding. See *Harris v. Nelson*, 394 U.S. 286, 296, 89 S.Ct. 1082, 22 L.Ed.2d 281 (1969) (noting the non-existent role of wardens in trial proceedings). For these reasons, even before Rule 6(a) of the Rules Governing § 2254 Habeas Cases made the discovery rules of the general Federal Rules of Civil Procedure available to §

2254 petitioners, the Supreme Court noted that the Federal Rules were "ill-suited to the special problems and character of [habeas] proceedings." *Id.; see also* RULES GOVERNING § 2254 CASES, Rule 6(a), Advisory Committee Notes (indicating that Rule 6 was adopted in 1976). As an example, the Supreme Court noted that Rule 33 provides for written interrogatories to be served by a party upon any adverse party. *See Harris,* 394 U.S. at 296, 89 S.Ct. 1082; Fed.R.Civ.P. 33. The *Harris* court noted that this would mean that a prisoner's interrogatories would be served upon the warden, although the warden would be unable to answer from personal knowledge any questions relating to the petitioner's arrest and trial. *See Harris,* 394 U.S. at 296, 89 S.Ct. 1082. The *Harris* court noted that a literal application of the Federal Rules would invoke a circuitous and burdensome procedure of requiring wardens to solicit answers from the appropriate officials and then replying "under oath." *See id.*

To address the dearth in rules applicable to habeas cases, the Supreme Court promulgated, and Congress adopted, the Rules Governing § 2254 Cases. *See Bracy,* 520 U.S. at 904, 117 S.Ct. 1793 (stating that habeas rules were promulgated as a result of *Harris v. Nelson* ). Now that the Federal Rules are applicable to federal habeas cases, the courts must employ them under the Supreme Court's mandate that district courts "arrange for procedures that will allow development ... of the facts relevant to disposition of a habeas corpus petition." *Harris,* 394 U.S. at 298, 89 S.Ct. 1082. The *Harris* Court instructed that, in reviewing habeas cases, district courts should fashion appropriate modes of procedure analogous to existing rules and in conformity with judicial usage. *See id.* Accordingly, the proper individuals to whom this Court should look to provide the information Cherrix needs to develop his habeas petition are the Attorney General and the Clerk of the trial court, who are the equivalents to "parties" to this suit under the common notions of who constitutes a party for discovery purposes.

Rule 34 of the Federal Rules of Civil Procedure states that a party may request that another party produce documents and tangible things for testing. *See* Fed.R.Civ.P. 34(a). Because the evidence that Cherrix seeks to perform DNA analysis upon is in the custody or control of Petitioners, this Court acted within its authority to order Petitioners to retain the evidence so that it may be produced to Cherrix for testing. *See id.* Furthermore, even if Petitioners are not viewed as equivalent to parties in Cherrix's action, Rule 34(c) permits the Court to compel non-parties to produce documents and "things." *See* Fed.R.Civ.P. 34(c). Rule 35(a) of the Federal Rules of Civil Procedure grants the Court the authority to order DNA testing of Cherrix's bodily *778 fluids in support of the Petition for Habeas Corpus. *See* Fed.R.Civ.P. 35(a); *see, e.g., Dechaine v. Warden, Maine State Prison,* 2000 WL 1183165, *17 (D.Me. July 28, 2000) (stating that Rule 35 is implicated in a request that saliva be submitted for DNA testing).

**2. The Court's Authority to Order State Officials to Act**

Federal case law demonstrates that, notwithstanding Petitioners' status as "non-parties," the Court had the authority to order Petitioners to retain and make accessible evidence in their custody pursuant to the Court's authority to provide a habeas corpus petitioner with access to avenues of discovery. Similar to the instant case, the habeas petitioner in *Bracy v. Gramley* sought materials that were not in the custody or control of the respondent. 520 U.S. at 902, 117 S.Ct. 1793. Bracy alleged as the basis of his habeas petition that the federal judge who had tried Bracy's case was corrupt, and that Judge Thomas J. Maloney convicted Bracy to deflect attention away from the judge's extortion and racketeering practices. *See id.* at 901, 117 S.Ct. 1793. An Illinois district court ultimately convicted Maloney of conspiracy, racketeering, extortion, and obstructing justice. *See id.* at 902, 117 S.Ct. 1793. Bracy sought discovery of the materials from Maloney's trial: the sealed transcript from the trial, reasonable access to the prosecution's materials, the opportunity to depose persons associated with Maloney, and a chance to search Maloney's rulings for a pattern of pro-prosecution bias. *See id.* As in this case, the warden was the respondent in *Bracy,* yet Bracy sought materials that were in the custody or control of other parties. The Supreme Court held that Bracy was entitled to the requested discovery. *See id.* at 908-09, 117 S.Ct. 1793. Similarly, Cherrix is entitled to discovery here. Although Warden Daniel A. Braxton is the named respondent in this case, this Court has the authority to hold that materials in the custody or control of the Attorney General or the Clerk should be made available to Cherrix. *See id.* at 908-09, 117 S.Ct. 1793.

Although the parties that were required to give petitioner access to materials were federal officials in *Bracy,* a federal district court also has the authority to order state officials to turn over documents and