Exhibit B

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. No. 04-12135-NG

ROBERT WADE,
Petitioner

v.

BERNARD F. BRADY, Acting Superintendent, and
THOMAS F. REILLY, Attorney General,
Respondents

**AFFIDAVIT OF DR. ALBERT B. HARPER**

I, Dr. Albert B. Harper, do hereby declare and verify as follows:

1. I am the Director of the Henry C. Lee Institute of Forensic Science at the University of New Haven. My duties include training law enforcement officers and attorneys in the application of Forensic Science to legal issues, including matters involving crime scene investigation, crime scene reconstruction, bloodstain pattern analysis, forensic use of DNA and homicide investigation.

2. My duties as Director of the Henry C. Lee Institute of Forensic Science at the University of New Haven also include providing Forensic Science expertise in the above mentioned areas of Forensic

Science for law enforcement agencies and attorneys. Said Forensic Science consultation has been provided to both prosecutors and defense attorneys in numerous states, including Massachusetts. I have been qualified to testify as an expert in forensic science in Maine, Connecticut, New York, Florida, and Pennsylvania.

3. I am also a licensed attorney in the State of Connecticut and practice criminal defense law.

4. At the request of Attorney Janet H. Pumphrey, I have reviewed a laboratory report on case C93-1187 Lakeville dated March 10, 1997, a criminalistics report on case C93-1187 Lakeville dated June 27, 1997 from the Massachusetts State Police Crime Laboratory and signed by one Debbie McKillop-Shields, and a trial transcript of the testimony of Debbie McKillop-Shields designated pages 4- 174 to 4- 188.

5. Based on my review on the above materials, it is apparent that there is biological evidence of the presence of more than two persons on the orange pants worn by the victim.

6. Trial testimony of Debbie McKillop-Shields concurred in this finding, but did not elucidate the fact that the identity of the source of the

second individual was not pursued by the State Police Crime Laboratory.

7. The serological methods used in the analysis of the biological materials found in the crotch of the orange pants worn by the victim inherently lack the discrimination power to identify the source of the biological materials to a single individual person.

8. At the time of the analysis, PCR based DNA techniques existed that would have offered substantial certainty as to the identity of the source of the biological materials found in the crotch of the orange pants worn by the victim.

9. Though available and in routine use in criminal prosecutions at the time of trial, neither the State nor the defendant conducted said PCR based DNA tests.

10. The serological testing that was performed was either an antigen specific reaction or an electrophoresis based test that was of limited discrimatinatory power that required large amounts of relatively recent biological material. The serology results reported on March 10, 1997 indicated that the Defendant is blood group of H/O

12. I hereby certify that the facts set forth above are true and correct to the best of my personal knowledge and belief.

Dr. Albert B. Harper
Executive Director
Henry C. Lee Institute of Forensic Science



# The Commonwealth of Massachusetts
# Department of State Police

WILLIAM F. WELD
GOVERNOR

KATHLEEN M. O'TOOLE
SECRETARY

COLONEL REED V. HILLMAN
SUPERINTENDENT

Crime Laboratory
59 Horse Pond Road
Sudbury, Massachusetts 01776
Telephone (508) 358-3110
Fax (508) 358-3111

June 27, 1997

## CRIMINALISTICS REPORT

LAB. NO.: **C93-1187 Lakeville** (CPAC)

INCIDENT NO.: 93-113-0900-0236

Examination of Materials in Connection with a Fatal Beating/Reported Sexual Assault in Lakeville on October 24, 1993.

Victim: Johanna Francescon
Suspects: Robert Wade

---

On October 25, 1993, Sergeant Thomas Bavin of the Lakeville Police Department delivered the following items to the laboratory in connection with the above subject:

| | |
|---|---|
| Hospital Specimen Kit | - Francescon |
| Yellow Sheet and T-shirt | - Wade (living quarters) |
| Blue Pants and Brown Belt | - Wade |

On November 18, 1993, Trooper Frank Hommel of Plymouth CPAC delivered the following item to the laboratory in connection with the above subject:

| | |
|---|---|
| Blue Tablecloth | - Wade (living quarters - outside) |

On November 23, Trooper Leonard Coppenrath of Plymouth CPAC delivered the following items to the laboratory in connection with the above subject:

| | |
|---|---|
| Comforter | - Wade (living quarters) |
| White Bra | - Francescon |
| Orange Pants | - Francescon (from hospital) |
| Orange Stripped Shirt | - Francescon (from hospital) |
| T-shirt | - Francescon (from hospital) |
| Grey Sweater | - Francescon (from hospital) |

On November 24, 1993, the Massachusetts State Police Crime Laboratory received a request for technical assistance in connection with a Fatal Beating/Reported Sexual Assault investigation in Lakeville, MA. I, Debbie McKillop Shields, responded to 26 Howland Road, Lakeville, MA, where I met with the following State Police personnel:

| | |
|---|---|
| Trooper Patricia Beehan | Fingerprint and Photography Section |
| Sgt. Robert Kelliher | Plymouth CPAC |
| Trooper Leonard Coppenrath | Plymouth CPAC |
| Trooper Frank Hommel | Plymouth CPAC |
| Sgt. Thomas Bavin | Lakeville Police Department |

An examination was conducted of a building identified to me as the workers living quarters. A mattress, bedding, clothing items and numerous debris were noted within the building. Chemical screening tests for the presence of blood were conducted on items examined within this building. Chemical screening tests for the presence of blood were negative on clothing, bedding, a napkin and the mattress (red-brown stain on side). Two additional red-brown stains were noted on the up-side of the mattress. Chemical screening tests for the presence of blood were positive on both red-brown stains noted. Each red-brown stain was removed from the mattress along with a control cutting and transported to the laboratory for further examination and analysis.

+ −

On November 26, 1993, Trooper Leonard Coppenrath of Plymouth CPAC delivered the following items to the laboratory in connection with the above subject:

| | |
|---|---|
| Pubic Hair Combings | - Wade |
| Pubic Hair Sample | - Wade |
| Head Hair Combings | - Wade |
| Head Hair Sample | - Wade |
| Known Blood Sample | - Wade |
| Known Saliva Sample | - Wade |

via court order

On May 6, 1995, Sergeant Paula Loud of Plymouth CPAC received the following items from Chemist III, Edward Geraghty:

Hospital Specimens Kit, Yellow Sheet, T-shirt, Blue Pants, Brown Belt,
Blue Table Cloth,
Comforter, White Bra, Orange Pants, Orange Striped Shirt, T-shirt, Grey Sweater,
Pubic Hair Combings, Pubic Hair Sample, Head Hair Combings, Head Hair Sample.

On June 7, 1995, Sergeant Paula Loud of Plymouth CPAC delivered the following items to the laboratory in connection with the above subject:

Hospital Specimens Kit, Yellow Sheet, T-shirt, Blue Pants, Brown Belt,
Blue Table Cloth,
Comforter, White Bra, Orange Pants, Orange Striped Shirt, T-shirt, Grey Sweater,
Pubic Hair Combings, Pubic Hair Sample, Head Hair Combings, Head Hair Sample.

**EXAMINATIONS**

**Item 1. Hospital Specimens Kit**

Item 1a. Hospital Report Forms: This item was reviewed and copied prior to laboratory examination.

Item 1b. Vaginal Smear Slide (1): Microscopic examination revealed the presence of sperm cells.

Item 1c. Vaginal Swabs (3): This item was retained for further testing.

Item 1d. Oral Secretions: This item was retained for further testing.

Item 1e. Fingernail Scrapings: No debris were noted.

**Clothing Items from Victim (Francescon)**

Item 2. Orange Pants: This item consists of a pair of heavily soiled/dirt stained orange pants. Visible red-brown stains were present on the legs. Testing for the presence of human blood was positive on this garment. Testing for the presence of seminal fluid reside and sperm cells was positive of the crotch panel area of this garment. Trace materials recovered from this garment include dirt, vegetative matter and hairs.

H Spt

Item 3. Bra: This item consists of a soiled white bra which appears torn up the back panel. Additional tears were present in both the right and left bra cups. Visible red-brown stains were present on the side panels and clasp area. Testing for the presence of human blood was positive on this garment. Several hairs were recovered from this garment.

Serology Rpt

Given to Police

Item 4. Orange Striped Shirt: Visible blackish residues were present on this garment. Chemical screening tests for the presence of blood were positive on the heaviest soiled area present on the right rear. Visible red-brown stains were also present on the left sleeve, back and rear neck area. Testing for the presence of human blood was positive on this garment. Several hairs were also recovered from this garment.

H Spt

Item 5. T-shirt: Visible red-brown stains were present on the front and back (interior and exterior) of this garment. The heaviest concentration was present on the bottom edge and mid-area. Testing for the presence of human blood was positive on this garment. The bottom edge of this garment appears torn.

Item 6. Grey Sweater: This item consists of a heavily soiled/dirty grey sweater. Visible blackish residues were present on this garment. Chemical screening tests for the presence of blood were positive on the interior side of the heaviest soiled area present on the right rear. Visible red-brown stains were also present on the interior portions of this garment. Testing for the presence of human blood was positive on this item. Several hairs were also recovered from this garment.

Item 7. Known Blood Sample - Johanna Francescon: This item has been processed by the Serology section of the laboratory.

**Items from Suspect (Wade) and Living Quarters**

Item 8. Blue Pants and Brown Belt: Visible red-brown stains were present on the exterior front fly area and upper left leg of this garment. Testing for the presence of human blood was positive on this item. Several hairs were also recovered from this garment.

Item 9. Yellow Sheet: Numerous red-brown stains were present on this item. Testing for the presence of human blood was positive. Several hairs were recovered from this item. A T-shirt (Item 10) was recovered from this item during the examination.

Item 10. T-shirt: This item consists of a heavily soiled T-shirt. Blackish residues and abrasions were present on the back portion of this garment. The left shoulder strap was torn. Visible red-brown stains were present on the left shoulder strap, interior side and chest. Testing for the presence of human blood was positive on this garment. Testing for the presence of seminal fluid residue and sperm cells was positive on whitish stains present on the lower area of this garment. Trace materials recovered from this garment included hairs and vegetative matter.

Item 11. Blue Tablecloth (living quarters - outside): This item consists of a soiled/stained tablecloth. Visible red-brown stains were present on this item. Testing for the presence of human blood was positive.

Item 12. Comforter: This item consists of a heavily soiled floral comforter. Visible red-brown stains were present on this item. Testing for the presence of human blood was positive. Several hairs were recovered form this item.

Item 13. Pubic Hair Combings - Robert Wade: Numerous hairs were noted.

Item 14. Pubic Hair Sample - Robert Wade: Numerous hairs were noted.

Item 15. Head Hair Combings - Robert Wade: Numerous hairs were noted.

Item 16. Head Hair Sample - Robert Wade: Numerous hairs were noted.

Item 17. Known Blood Sample - Robert Wade: This item has been processed by the Serology section of the laboratory.

Item 18. Known Saliva Sample - Robert Wade: This item was retained for further testing.

Item 19. Mattress Cuttings (2)/control cutting: The red-brown stains in cutting A measure approximately ½" x ½" and 1-1/4" x 1/8". The red-brown stain in cutting B measures approximately 1/4" x 1/4". Testing for the presence of human blood was positive on the red-brown stains recovered from the mattress.

## CONCLUSIONS

Serological Examinations - Seminal Residue
Testing for the presence of seminal fluid residue and sperm cells was positive on the following Items:

| | |
|---|---|
| Item 1c. | Vaginal Swabs (3) |
| Item 2. | Orange Pants (crotch cutting) |
| Item 10. | T-shirt (lower area) |

Serological Examinations - Human Blood
Testing for the presence of human blood was positive on the following items:

| | |
|---|---|
| Item 2. | Orange Pants (right leg) |
| Item 3. | White Bra ( right cup and interior left side) |
| Item 4. | Orange Striped Shirt (left neck, interior left sleeve and front area) |
| Item 5. | T-shirt (mid-center and bottom interior edge) |
| Item 6. | Grey Sweater (mid-center interior) |
| Item 10. | T-shirt ( left strap, interior side and chest) |
| Item 8. | Blue Pants (front fly area and left leg) |
| Item 9. | Yellow Sheet (5-cuttings) |
| Item 11. | Blue Tablecloth (3-cuttings) |
| Item 12. | Comforter (3-cuttings) |
| Item 19. | Mattress (2-cuttings) |

**COMMENTS**

Specimens from the following items have been retained should comparative analysis be requested:

| | |
|---|---|
| Item 1c. | Vaginal Swabs (3) |
| Item 1d. | Oral Secretions |
| Item 2. | Orange Pants |
| Item 3. | White Bra |
| Item 4. | Orange Striped Shirt |
| Item 5. | T-shirt |
| Item 6. | Grey Sweater |
| Item 7. | Known Blood Sample - Johanna Francescon |
| Item 8. | Blue Pants |
| Item 9. | Yellow Sheet |
| Item 10. | T-shirt |
| Item 11. | Blue Tablecloth |
| Item 12. | Comforter |
| Item 17. | Known Blood Sample - Robert Wade |
| Item 18. | Known Blood Sample - Robert Wade |
| Item 19. | Mattress |

Please note that comparative analysis necessitates the submission of the appropriate standards from both the victim and the suspect.

Further analysis upon request.

Debbie McKillop Shields
Chemist II
Crime Laboratory

DMS/dms

Report to: ADA Jean Holmes
Plymouth D.A.'s Office

Tpr. Frank Hommel
Plymouth CPAC

COMMONWEALTH OF MASSACHUSETTS

Middlesex ,ss.

Debbie McKillop Shields, whom I know to be a Chemist of the Massachusetts Department of State Police Crime Laboratory appeared before me and affirmed the attached to be the results made on Lab.No.:C93-1187 Lakeville, a Reported Sexual Assault, Fatal Beating in Lakeville.

Sworn and subscribed to before me this 30th day of June 1997.

Ann Shirley Tidd
NOTARY PUBLIC

My commission expires: March 02, 2002

**EXAMINATION**

Grouping tests conducted on the aforementioned known samples revealed the following:

| SEROLOGY RESULTS - KNOWN SAMPLES | | | | | | |
|---|---|---|---|---|---|---|
| SAMPLE DESCRIPTION | ABO/SECRETOR STATUS | PGM | EsD | EAP | ADA | AK |
| Blood and Saliva - Francescon | (H/O) / secretor 2fir | 1- 1+ | 1 | BA | 1 | 1 |
| Blood and Saliva - Wade | (H/O) / secretor | 1+2+ | 1 | A | 1 | 1 |

KEY
ABO = Blood Group (antigens)
PGM = Phosphoglucomutase Subtyping
EsD = Esterase D
EAP = Erythrocyte Acid Phosphatase
ADA = Adenosine Deaminase
AK = Adenylate Kinase

Grouping tests conducted on the following seminal samples revealed the results below:

| SEROLOGY RESULTS - QUESTIONED SAMPLES | | | |
|---|---|---|---|
| SAMPLE DESCRIPTION | BODY FLUID(S) IDENTIFIED | ABO(H) | PGMsub |
| Item 1c. Vaginal Swab | seminal residue | H/O | 1-1+2+ |
| Item 2. Orange Pants (crotch - #1) | seminal residue and amylase | H/O | --- |
| Item 2. Orange Pants (crotch - #2) | seminal residue and amylase | A,H/O | --- |
| Item 2. Orange Pants (crotch - #3) | seminal residue and amylase | H/O | --- |
| Item 10. T-shirt, lower area (stain #1) | seminal residue and amylase | H/O | --- |
| Item 10. T-shirt, lower area (stain #2) | seminal residue and amylase | H/O | --- |

from Wade residue

KEY
ABO(H) = Blood Group Substances
PGMsub = Phosphoglucomutase Subtyping
--- = inconclusive
Amylase, a constituent of saliva was detected.

All positive results are set forth above. For clarity, the control specimens were omitted from the above table.

enzyme which helps change starch into sugar

what tests did you perform and what were the results?

On the standards, we were looking for, one would be the blood type of the individuals involved. That test was conducted, along with what's called a secretor status. That is conducted on the saliva specimen from the standards. In addition, there are five enzyme systems which are used to enable, to build a profile, you might say, of the different components in the samples that were obtained.

Q And did you do that with the blood sample from Mrs. Francescon?

A Yes.

Q And could you tell the jurors what your result was?

A She's consistent with having type O blood and she's called a secretor, meaning that she will secrete her blood group substances in other body fluids besides her blood. This means that I'm able to look at her saliva, a saliva sample does not have blood in it, but by doing a test, I can find blood group substances within the saliva that will indicate her blood type. About eighty percent of the population are considered

saliva - Francescon", of an H and a slash and an O. What does the H stand for?

A The H is the identifying factor that we look for. It would be the H antigen, and that indicates a type O person.

Q Now, did you do similar tests on the blood and saliva samples of the Defendant, Robert Wade?

A Yes, the same tests were conducted on his blood and saliva.

Q And can you tell the jurors what the results were in regards to Mr. Wade?

A Yes, he also has type O blood, he is also a secretor. He has a PGM type of one plus, two plus, and his ESD type is one, his EAP type is A, his ADA type is one, and his AK type is also one.

Q Now, in regards to the blood type, the O, is it fair to say that people have different, different people have different blood types?

A Yes.

Q And in regards to the subgroupings that you've just talked about in regards to your testing of the blood, the PGM, ESD, EAP, ADA and the AK, again, are those tests used in order to identify different qualities that might exist in different individuals in their blood?

A Yes.

Q And what results did you get?

A On cutting number one, I found H blood group substances consistent with someone who has type O blood and is a secretor. The same was found on cutting three. I found H blood group substances consistent with an individual who has type O blood and is a secretor. On the cutting number two, I found, again, H blood group substances, again consistent with someone that is an O secretor. In addition, I found an A blood group substance which would originate from an A secretor.

Q When you say would have originated from an A secretor, what type of fluid or how would, what type of fluid would leave an A secretor marking on an item such as this at the level of tests that you were doing?

A At this level, any potential body fluid can leave that. It can be seminal fluid, it can be saliva, it can be perspiration. It can be any form of body fluid that would be secreted from an individual who is considered a secretor.

Q And how would it be transferred or can it be transferred, rather, simply by touching the item?

A Yes, a secretor can handle an item, for instance,

and in that fashion, the potential of transferring their perspiration from their hands, yes, can be transferred to an item and then be detected in the test that I did. That is a possibility.

Q And in this particular case, would it be fair to say to a reasonable degree of medical certainty that that A in that particular location would be consistent with an individual being an A secretor having handled that item at some point in time?

MR. SHINE: Objection.

THE COURT: Overruled.

Q Can you say whether or not that would be --

A (Interrupting) I can say that the presence of the A would be consistent from someone who is an A secretor. In what mechanism the sample or the body fluid got onto that sample, I could not say.

Q But, it comes from touching.

MR. SHINE: Objection.

THE COURT: Overruled.

THE WITNESS: That would be a possibility, yes.

Q Did you also conduct testing in regards to the third sample that you took in this large area in the crotch of the pants?

A Yes.

certainty?

MS. HOLMES: I'm sorry, a reasonable degree of scientific certainty.

THE COURT: Then you may have it.

MS. HOLMES: Thank you.

THE COURT: Over your objection.

Q With a scientific certainty in mind, were you able to come to a conclusion?

A Yes.

Q And can you tell the jurors what that is?

A In reference to the vaginal swab, at this level of analysis, the suspect cannot be excluded as a contributor into that sample.

Q And why is that? Can you explain to the jurors how you come to that conclusion?

A Yes. In comparing the results obtained with the standard from the suspect, Mr. Wade, he is both an O secretor, meaning he has blood type O, and he's a secretor. On that particular sample, we do find the evidence reflects O blood, excuse me, individual of type O, is also a secretor, and the fact that his PGM markers are present in that sample. The Defendant is a one plus, two plus, and a one plus, two plus is identified in the specimen. The specimen is the seminal residue

that was tested.

Q And there's three numbers there. Can you explain to the jurors the three numbers that you have on the PGM, what that means, the significance of the one minus, one plus, two plus?

A The presence of three bands, and when I say bands, I mean the fact that these are identified as bands on a gel, three bands indicate the presence of more than one contributor. When someone is born, they can only have two bands, or perhaps one band if the bands are identical, they would reflect a single band. The presence of three bands then indicates that the contributor of that specimen, there is more than one person. This sample being a vaginal swab collected from the interior of the vaginal cavity of the victim, it is consistent to have any of her contributing factors present there.

Q And why is that?

A The specimen would be collected from her vaginal cavity.

Q Is there a bodily fluid that would then contribute to that particular item?

A Yes, the vaginal secretions could give you a result, would give you a result that would reflect

the person whose sample was collected. In this particular case, we have a combination of factors, and the victim cannot, the victim cannot be excluded as a contributor of that sample. However, she cannot be a contributor of the seminal fluid. She's not capable of producing seminal fluid. So, she cannot be a contributor of the seminal fluid portion.

Q Ms. McKillop-Shields, can you or were you able to or can you give us an opinion to a reasonable degree of scientific certainty as to whether or not the results that you got on the vaginal swab would be consistent with bodily fluids combined from the victim in this case and the Defendant in this case?

A Yes, it would be consistent with that.

Q Were you able to make any further comparisons in regards to the orange pants?

A In regards to the orange pants, in all three specimens, the suspect cannot be excluded as a contributor or a source of the seminal residue and amylase identified on those items. However, on item specimen two which is cutting number two, he cannot be the single source.

Q In regards to those, the orange pants, does the

same principle apply that you just told us about in regards to the victim's vaginal secretions being also represented in those samples, possibly?

A Right, the fact that she is a secretor, then her blood group substances would be in her vaginal secretions, and it could also be in the amylase which is the saliva. I'm unable to tell you from which individual the saliva came from, but, in fact, that the presence of saliva is there, and it could be that saliva can also contribute to these blood group substances.

Q And would the seminal fluid be consistent with having come from the Defendant in this case?

A Yes, at this level of analysis, he cannot be excluded as a contributor into the stain, yes, into the seminal residue amylase stain.

MS. HOLMES: Thank you, I have no further questions.

CROSS EXAMINATION BY MR. SHINE

Q Good afternoon.

A Good afternoon.

Q I'm going to ask you, I'm going to cut to the chase here. There were three samples taken off the orange pants and all three tested positive for the presence of seminal residue and amylase.