

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. No. 04-12135-NG

ROBERT WADE,
Petitioner

v.

BERNARD F. BRADY, Acting Superintendent,
THOMAS F. REILLY, Attorney General, and
TIMOTHY J. CRUZ, District Attorney for Plymouth County
Respondents

## PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION TO DISMISS

Plaintiff, Robert Wade, by and through his attorneys, responds to Defendants Thomas F.

Reilly and Timothy J. Cruz's Motion to Dismiss as follows:

### INTRODUCTION

This issue in this case is whether the Constitution permits the State to arbitrarily deny a

convicted prisoner access to DNA evidence that has the undisputed potential to prove his actual

innocence of the crime for which he is imprisoned . The Defendants do not deny that DNA

analysis could prove or disprove Plaintiff Robert Wade's long-asserted claim of innocence, yet

they unjustly refuse to allow him access to biological evidence for objective scientific testing –

to be conducted at his own expense -- that serves only the interest of truth.  Because the

Defendants' actions are arbitrary, unreasonable, and violate Mr. Wade's constitutional rights, he

brings this Section 1983 action.

1

The Defendants have not offered a *single* legitimate state interest to support their refusal to allow testing, and they do not explain why they have ignored another, more compelling, state interest favoring testing: the interest of the state in ensuring that only the truly guilty are punished. Although the First Circuit has not yet had the opportunity to address this precise constitutional issue, the federal right of post-conviction access to evidence for the purpose of DNA testing has been recognized by a number of courts and commentators throughout the country. *See Harvey v. Horan, reh'g en banc denied as moot*, 285 F.3d 298, 306 (4th Cir. 2002) ("*Harvey II*") (Luttig, J., concurring); *Godschalk v. Montgomery County District Attorney's Office*, 177 F.Supp.2d 366 (E.D. Pa. 2001); *see also* Seth F. Kreimer & David Rudovsky, *Double Helix, Double Find: Factual Innocence and Postconviction DNA Testing*, 151 U.Pa.L.Rev. 547 (2002). *See also Osborne v. District Attorney's Ofc.*, 423 F.3d 1050 (9th Cir. 2005) (holding that *habeas* statute does not bar §1983 suit for access to DNA evidence, and remanding for consideration of merits); *Bradley v. Pryor*, 305 F.3d 1287 (11th Cir. 2002) (same).

### SUMMARY OF FACTS AND PROCEDURAL HISTORY

In 1993, Plaintiff Robert Wade worked as a farm hand for Elliot Francescon in Plymouth County, Lakeville, Massachusetts. Although Mr. Wade was able to perform the manual labor for which he was hired, he had (and continues to have) extremely low intellectual functioning; school records revealing an IQ of 72 in 9th grade placed him in the range of borderline mental retardation. At the time of Plaintiff's employment, Mr. Francescon's elderly mother, Johanna, also resided on the property, and had advanced Alzheimer's disease.

On October 24, 1993, Mr. Francescon found his mother, Johanna Francescon in Mr.

2

Wade's cabin on the property. Ms. Francescon was taken to the hospital where she was admitted

and diagnosed with a fractured hip and fractured wrist. Surgery was performed, and four days

later, on October 29, 1993, Ms. Francescon developed respiratory problems and, later,

pneumonia. Her condition improved, and on November 2, 1993, she was transferred out of the

intensive care unit to a regular ward. Two days later, she again developed pneumonia, and she

died on November 13, 1993.

Laboratory tests on the vaginal swabs and slides collected from the victim's vagina

revealed the presence of semen containing spermatozoa. Serological (blood typing) analysis

conducted on a semen- and blood-stained cutting from the crotch area of the victim's pants

yielded the presence of both "H" and "A" antigens. The Plaintiff's blood type is an "O"

secretor, meaning that his semen and/or blood would yield only the "H" antigen in serological

analysis; that blood type is shared by a full 40% of the population. Because the victim, like the

Plaintiff, also has Type "O" blood, however, the presence of A antigens, if accurately typed,

would indicate that *a third party's* blood and/or semen was also present on the victim's stained

clothing. No DNA testing was performed on any of this evidence, prior to trial or at any time

since, however.

It was undisputed at trial that on the day Mrs. Francescon was found in Mr. Wade's

cabin, she and Mr. Wade were both nude. He told authorities (and maintains to this day) that,

although she had made a sexual advance towards him, no intercourse had in fact occurred

because he was highly intoxicated and unable to achieve an erection. He also denied physically

harming her in any way. If she was raped by someone, he maintained, another man must have

committed that crime.

3

Mr. Wade, was indicted in December, 1993 in Plymouth County Superior court on one count of first degree murder and one count of aggravated rape. Nearly four years later, he was tried before a jury, Tierney, J. presiding, beginning on September 2, 1997. At trial, defense counsel asked the jury to acquit on the ground that the victim had consented to sexual intercourse with Mr. Wade; notably, however, Mr. Wade himself never conceded (prior to trial, or at trial) that he had intercourse with the victim, consensual or otherwise. He was convicted both of aggravated rape and of first degree felony murder predicated on the charge of aggravated rape. He was sentenced to life on the first degree murder conviction.

On appeal, Mr. Wade argued, *inter alia,* that the alleged victim's death was not the "natural and probable consequence" of his acts. The Supreme Judicial Court affirmed the Defendant's conviction on August 6, 1998. On November 26, 2002, Mr. Wade filed a Motion for a New Trial seeking DNA testing, which motion was denied by the Plymouth County Superior Court, Chin, J. presiding, following a non-evidentiary hearing. The Supreme Judicial Court affirmed the Superior Court entered an order denying Mr. Wade's leave to appeal the denial of the Motion for a New Trial on April 14, 2004.

On October 8, 2004, Mr. Wade filed a petition for writ of habeas corpus pursuant to 29 U.S.C. § 2254. The Defendants filed a motion to dismiss the petition as time-barred, and the Court ordered additional briefing on the constitutional issues. Included in his habeas corpus petition was a claim seeking access to the vaginal swabs and/or slides collected from the victim at the time of her hospitalization, which Mr. Wade sought to subject to DNA testing at his own expense for the purpose of proving his actual innocence. Both parties filed supplemental memoranda of law, and on May 12, 2004, the Plaintiff moved to amend his complaint to add the

4

section 1983 count. On September 26, 2005, the Court entered an order which allowed the Defendants' motion to dismiss the habeas petition as time-barred, but, recognizing that other courts had permitted suits for access to DNA evidence to prove innocence under 42 U.S.C. § 1983, allowed the Plaintiff's motion to amend his complaint. The Plaintiff filed the amended complaint, and the Defendants Reilly and Cruz moved to dismiss the complaint.

Since filing his original *habeas* petition, lead counsel for Plaintiff has sought and obtained the assistance of the New York-based Innocence Project ("the IP"). Founded in 1992, the IP pioneered the litigation model which has thus far led to the exoneration of 164 innocent individuals through post-conviction DNA testing nationally. *See* www.innocenceproject.org. Indeed, the most recent exoneration of an Innocence Project client – Robert Clark of Georgia -- was announced less than a week before this Memorandum was to be filed. In Mr. Clark's case, the DNA testing conducted by court order (and over the State's opposition) not only proved his actual innocence of the rape for which he was convicted in 1982, but also identified the true perpetrator of that crime through a "hit" in the convicted-felon DNA databank – a man who had gone on to commit at least two other rapes while Mr. Clark was wrongfully imprisoned for his crime. *See* Shiela Dawan, "After 24 Years in Prison, Man Has a Reason to Smile," THE NEW YORK TIMES, Dec. 8, 2005, available at www.nytimes.com.

In addition to providing *pro bono* representation to persons seeking access to DNA testing, the Innocence Project maintains a small fund for DNA testing for its indigent clients. In the instant case, the IP has agreed to bear the costs of all DNA testing that the Court allows to proceed, should Plaintiff lack the necessary funds to cover those costs himself.

5

**ARGUMENT**

### I.    STANDARD OF REVIEW

In evaluating a motion to dismiss, all the Plaintiffs' allegations are accepted as true, and

are viewed in the light most favorable to the non-moving party. *Martin v. Applied Cellular*

*Technology,* 284 F.3d 1, 6 (1st Cir. 1002).  It is improper to grant a motion to dismiss unless the

complaint sets forth no grounds on which the requested relief can be granted.  *Id.*  When a

motion to dismiss is based on a complaint, as here, the facts alleged in the complaint control.

*Mihos v. Swift,* 358 F.3d 91, 99 (1st Cir. 2004).


### II.    MR. WADE'S REQUEST FOR DNA TESTING IS PROPERLY BROUGHT UNDER SECTION 1983 AND IS NOT BARRED BY THE *HECK* DOCTRINE BECAUSE, IF SUCCESSFUL, IT WOULD NOT NECESSARILY IMPLY THE INVALIDITY OF HIS SENTENCE OR CONVICTION.

Although Mr. Wade seeks only DNA testing and does not challenge either the fact or

length of his incarceration, the Defendants assert that dismissal is appropriate under the so-called

*Heck* doctrine.  As explained by the Court in *Wilkinson v. Dotson,* __ U.S. __, 125 S.Ct. 1242,

1248 (2005), the cases, *Heck v. Humphrey,* 512 U.S. 477 (1994) and *Preiser v. Rodriguez,* 411

U.S. 475 (1973), "taken together, indicate that a state prisoner's section 1983 is barred ... no

matter the relief sought ... if success in that action would necessarily demonstrate the invalidity

of confinement or its duration."

Here, however, success would not necessarily demonstrate the invalidity of the Plaintiff's

confinement or its duration.  This is because the only *inevitable* consequence of success in this

action would be *release of evidence to a laboratory for DNA testing*.  If testing is ordered, Mr.

Wade's section 1983 action will terminate.  All other consequences of success are contingent.

6

The laboratory may fail to obtain DNA test results. If results are obtained, they could further inculpate Mr. Wade. If, on the other hand, exculpatory results are obtained, Mr. Wade will proceed via a new action – potentially in state or federal court – to secure his release from prison. Thus, it cannot be said that "success in [this] action would necessarily demonstrate the invalidity of confinement or its duration." *Wilkinson v. Dotson*, __U.S. __, 125 S.Ct. 1242, 1248 (2005). Both the Eleventh and the Ninth Circuits have held that a section 1983 case and a habeas corpus petition are not mutually exclusive. *Osborne v. District Attorney's Office for the Third Judicial District*, 423 F.3d 1050 (9th Cir. 2005); *Bradley v. Pryor*, 305 F.3d 1287 (11th Cir. 2002).

The Defendants' argument is that Mr. Wade is trying to use the Section 1983 action as a discovery device to overturn his state conviction. However, the Defendants have not – and cannot – articulate a basis in Supreme Court or First Circuit precedent for granting a motion to dismiss a Section 1983 action based on the subjective or long-term aspirations of a Section 1983 plaintiff. The cases cited by the Defendants were decided *before* the Supreme Court in *Wilkerson v. Dotson* made clear that the necessary-implications test and its focus on objective inevitable consequences strictly governs this area of Section 1983 law. That decision squarely controls the issue here. *See Dotson,* 125 S.Ct. at 1248. In *Dotson*, decided in 2005, the Supreme Court considered whether prisoners in Ohio could bring a challenge to parole procedures via Section 1983. The state of Ohio argued that a Section 1983 action was barred since inmates brought the action "only because they believe that victory on their claims will lead to speedier release from prison," which makes the lawsuits "in effect" a collateral attack on the duration of their confinement. Id. at 1245-46. The Court, however, rejected this argument on the subjective intent of the prisoners and criticized the logical "jump from a true premise (that in all likelihood

7

the prisoners hope these actions will help bring about their earlier release) to a faulty conclusion (that habeas is their sole avenue for relief)." *Id.* at 1246. The Court held that a Section 1983 action was proper because "[s]uccess for Dotson does not mean immediate release from confinement or a shorter stay in prison; it means at most new eligibility review, which at most will speed *consideration* of a new parole application." *Id.* at 1248 (emphasis in original). The Court concluded that Section 1983 actions where "success on respondents' claims would not inevitably lead to release" do not lie at the "core of habeas corpus." *Id.* (internal quotations omitted).

The analogy between the present case and *Dotson* could not be more obvious. Access to biological evidence for DNA testing will not inevitably lead to Mr. Wade's release from prison. In *Dotson*, success on the 1983 action brought the plaintiffs directly to a parole hearing, where the parole board could immediately order their early release. *Id.* at 1248. Like the *Dotson* plaintiffs, Mr. Wade is at least one, if not many, step removed from securing a platform. If Mr. Wade prevails in this action and is allowed to proceeding with testing, the next step is the laboratory test at his own expense. If the test fails to produce exculpatory results, his efforts are over. However, even if the tests produce exculpatory results, Mr. Wade still must initiate a separate action for relief, wherein a different court would *consider* his application, and where no particular outcome is guaranteed. In sum, success in this action will not *necessarily* implicate his conviction and so Section 1983 is proper. *See also Nelson v. Campbell*, 541 U.S. 637 ("we were careful in *Heck* to stress the importance of the term 'necessarily[.]'" (*citing Heck v. Humphrey,* 512 U.S. 477, 487 (1994); *Harvey v. Horan*, 285 F.3d 298, 308-10 (4th Cir. 2002) (Luttig, J. concurring)).

8

## II.    MR. WADE'S CLAIMS ARE NOT TIME-BARRED BY THE STATUTE OF LIMITATIONS.

The State next contends that Mr. Wade's Section 1983 claim for access to DNA testing is

barred by Massachusetts' three-year statute of limitations. This is incorrect. Mr. Wade's claims

are not time-barred because (A) the State's refusal to grant the requested access to evidence for

DNA testing is current and ongoing, and thus constitutes a "continuing violation" to which the

statute of limitations clearly does not apply. Even if this Court to find otherwise, Mr. Wade's

claim is not time-barred because (B) the applicable limitations period should be equitably tolled.

### A.    Denial of Access to Evidence for DNA Testing is a Continuing Violation.

The harm of which Mr. Wade complains does not flow from a single failure to provide

access to evidence more than three years ago. Rather, each passing day that the Defendants fail

to comply with their constitutional duties and release this DNA evidence for testing constitutes a

new violation, bringing a fresh statutory period. *See e.g. Mack v. Great Atl. & Pac. Tea Co.*, 871

F.2d 179, 183 (1st Cir. 1989) (discussing continuing-violation doctrine in context of an alleged

discriminatory promotional system). In Mr. Wade's case, the Defendants continue to violate the

Constitution and Mr. Wade's rights with each day he is denied access to evidence. The fact that

the Defendants may have engaged in prior constitutional violations does not provide justification

for their present and future constitutional violations. As the Seventh Circuit has noted, a

violation "continue[s] for as long as the defendants [have] the power to do something about

[plaintiiff's] condition." *Heard v. Sheahan*, 253 F.3d 316, 318 (7th Cir. 2001).

Other circuits have recognized the continuing violation doctrine in a number of different

contexts. *See Khunle Brothers, Inc. V. County of Geauga*, 103 F.3d 516 (6th Cir. 1997) (ongoing

prohibition placed on Plaintiff's use of road stated continuing violation); *Rehabilitation Assoc.*

9

*Of Va. V. Kozlowski*, 838 F.Supp. 243 (E.D. Va. 1993) (continued application to unlawful policy stated continuing violation); *Abif v. Slaton*, 806 F.Supp. 993 (N.D. Ga 1992) (failure to release or transfer prisoner after sentence vacated constituted a continuing violation); *Pitts v. City of Kankakee*, 267 F.3d 592 (7th Cir. 2001) ("each day ... brings a new duty on the government's part and a corresponding new right to seek vindication of the constitutional right in question"); *U.S. v. City of Parma*, 661 F.2d 562 (6th Cir. 1981) (Fair Housing Act action not barred under statute of limitations where pattern and practice involved continuing violation); *Kielczynski v. Village of LaGrange*, 19 F.Supp.2d 877 (E.D. Ill. 1998) (continuing violation doctrine applied to unlawful employment practices).

The Defendants in this case currently have possession of the evidence that can prove Plaintiff's innocence, and it is within their power to provide access – yet they continue to refuse that access. This case involves a claim deeply rooted in principles of criminal justice and the right of all criminal defendants to pursue objective, state-of-the-art scientific testing – at no cost whatsoever to the State -- on evidence that can prove their innocence. The statute of limitations cannot be applied to give defendants "an easement across the Constitution." *See Palmer v. Board of Ed.,* 46 F.3d 682, 685 (7th Cir. 1995) (holding that a claim of race discrimination arises each day a child is assigned to a school under a racially discriminatory policy and stating. "[s]uppose the school board had voted in 1980 to provide white pupils but not black pupils with school books. A child whose parents neglected to sue during his first two years in school would not be doomed to another ten years of education without books").

Here, Mr. Wade is not seeking money or any relief that would burden the State; he is merely seeking the opportunity to put his claim of innocence to the test of modern science.

10

Certainly there is a compelling societal interest in rectifying wrongful imprisonment, and the

Defendants have not identified *any* legitimate State interest suggesting that access should be

denied. Indeed, the State's arbitrary refusal to release this evidence for testing also frustrates its

own interest in ensuring that the truly guilty are apprehended and convicted of crimes they

commit. With the advent of modern DNA databanks, the requested testing has the potential not

just to exonerate Mr. Wade, but to identify the true perpetrator, who might otherwise be free to

commit

The State's ongoing refusal to release the DNA evidence Mr. Wade seeks to test is

clearly a continuing violation of the constitutional right he seeks to vindicate with this action.

His claim is therefore timely, and he should be allowed to proceed with his suit.

      B.      The Statute of Limitations Should be Equitably Tolled.

Even if the Court were to find that the Defendants' civil rights violation is not a

continuing one, the three-year limitations period should be equitably tolled in this case. Federal

courts possess the power to use equitable principles to fashion their own tolling provisions in

exceptional situations in which state statutes of limitations eradicate rights or frustrate rights

created by federal law. *Rodriguez v. Holmes*, 963 F.2d 799 (5th Cir. 1992); *Meyer v. Frank,* 550

F.2d 726, 729 (2d Cir.) (stating that "[i]t is well settled that the federal courts have the power to

toll statutes of limitations borrowed from state law in appropriate circumstances"), *cert. denied,*

434 U.S. 830 (1977); *Kaiser v. Cahn,* 510 F.2d 282, 287 (2d Cir.1974) (finding that "in applying

federal law to a claim based on a federal statute" a result may be prevented which would

substantially impair a valid federal interest; in this respect, the court is not "necessarily bound by

the state's determination of when its statute of limitations is tolled where the question arises in a

11

civil rights claim in the federal court"). The Supreme Court has recognized "[e]quity eschews mechanical rules; it depends on flexibility." *Holmberg v. Armbrech*, 327 U.S. 392, 396 (1946). Indeed, courts traditionally do <u>not</u> apply statutes of limitations to actions, like this one, which solely seek equitable relief. *Id.* at 396.

Equitable tolling has been held to apply in a situation where a plaintiff with a plausible claim may not be able to fully litigate that claim in a timely fashion due to the lapses of his attorney. The additional equitable consideration applicable in this case is whether the errors of plaintiff's counsel are of the type that should require visitation of the consequences of those errors upon the client. *See Volk v. Multimedia, Inc.*, 516 F.Supp. 157, 162 (S.D. Ohio 1981), *citing Smith v. Hudson*, 600 F.2d 60, 63 (6th Cir. 1979); *Carter v. City of Memphis, Tennessee*, 636 F.2d 159 (6th Cir. 1980).

This case clearly presents such extraordinary circumstances. Plaintiff's trial was marred by the egregious incompetence of trial counsel, whose entire defense (that the victim had consented to sexual intercourse with the defendant) was not only inconsistent with his own client's statements to authorities, but which -- due to the victim's Alzheimer's disease -- was not legally sufficient grounds for an acquittal *even if credited by the jury*. The victim was an eighty-three year old woman who suffered from Alzheimer's disease. Alzheimer's patients sometimes present with inappropriate hypersexuality. Trial counsel's theory was that because of her hypersexuality, the alleged victim came to the Defendant and initiated a sexual encounter with him. This theory, however, was wholly illogical and ensured his client's conviction.[1]  What

---

[1]     Moreover, trial counsel was unable to prove the consent theory. He was unable to obtain the services of a psychotherapist to present this unique theory of her hypersexuality due to

12

defense counsel inexplicably failed to understand was that if the victim had Alzheimer's disease, the victim was legally incapable of consent. The jury was amply instructed by the Court on the victim's inability to consent on the basis of incompetence; and because Alzheimer patients suffer from dementia and that its principal symptomology includes significant impairment of cognitive functioning, that finding was inescapable here. With the jury's being told *repeatedly* by defense counsel that the alleged victim had Alzheimer's, a finding of incompetency was ensured by this very line of argument, and the Court's corresponding instructions on the law.

Trial counsel's illogical, misguided, and legally insufficient "consent defense" also had the effect of precluding him from taking investigatory steps that *could* have yielded an acquittal for his client: DNA testing. By conceding (without factual or legal support) that his client had sexual intercourse with the victim, he failed to pursue the most obvious method of scientific testing which could have shown just the opposite. That testing could well have shown that, however compromising a position Mr. Wade appeared to be in when the victim was found in his cabin, another man had in fact committed this far more brutal rape and assault.

The Defendant, both illiterate and mentally retarded, depended entirely upon his trial attorney to protect his rights. Surely, with the State's high Court handing down its first case on the admissibility of PCR-DNA testing in criminal proceedings just weeks before Mr. Wade's trial (*see* State's Motion to Dismiss at 9), given these impairments, he could not reasonably be expected to pursue such testing on his own. To the extent that trial counsel could be reasonably expected to pursue that option, however, counsel's failure to do so places his conduct far below that of an ordinary, even fallible, lawyer. His trial decisions and failure to pursue available pre-

---

Alzheimer's disease, and his cross-examination of the Commonwealth's witnesses in an effort to

13

trial scientific testing were "manifestly unreasonable," and the Defendant was wholly deprived

of an otherwise available ground of defense: pursuit of a theory of genuine innocence through

DNA testing. *See Strickland v. Washington*, 466 U.S. 668, 687-88, 694 (1984); *Hill v. Lockhart*,

474 U.S. 52, 58 (1985); *United States v. Fisher*, 3 F.3d 456, 463 (1st Cir. 1993) (same). *See*

*also Rompilla v. Beard*, 125 S.Ct. 2456, 2463-63, __ U.S. ___ (2005) (finding counsel's

performance in death penalty case constitutionally deficient when counsel failed to investigate

readily-available mitigation evidence; under *Strickland*, court "looks to norms of adequate

investigation" to evaluate counsel's performance).[2]

Moreover, the running of the limitations period is tolled when a plaintiff is under a

mental disability. *See* G.L. c. 260, § 7; *Horning v. Horning*, 6 Mass. App. Ct. 109 (1978).  Here,

the Plaintiff had an IQ of 72 when he was fifteen years old, was diagnosed as "borderline"

retarded by the psychologist who evaluated him for competence to stand trial, and is illiterate.

For the Defendants to suggest that he was "on notice" of Supreme Judicial Court DNA cases in

1997 is to unfairly attribute to him a level of understanding and comprehension that he simply

does not possess.

---

establish consent was unsuccessful.

[2] In *Rompilla*, the Supreme Court also cited the American Bar Association's Standards governing
defense counsel's duty to investigate claims of actual innocence as well as mitigation.  Those
standards were in effect at the time of Plaintiff's trial, and are highly applicable here:

> It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the
> case and to explore all avenues leading to facts relevant to the merits of the case and the
> penalty in the event of conviction. The investigation should always include efforts to
> secure information in the possession of the prosecution and law enforcement authorities.
> The duty to investigate exists regardless of the accused's admissions or statements to the
> lawyer of facts constituting guilt or the accused's stated desire to plead guilty. 1 ABA
> Standards for Criminal Justice 4-4.1 (2d ed. 1982 Supp.).

14

Equitable tolling of a statute of limitations has been held particularly appropriate for plaintiffs who are incarcerated and thus unable to pursue their claims with the same effectiveness as an individual who does not suffer from the disability of imprisonment, as well as for plaintiffs who have sought redress in another forum and seek to pursue a federal civil rights action only after the claims advanced in the other forum have been denied. *See Jones v. Blanas*, 393 F.3d 918, 928 (9th Cir. 2003) (applying the equitable tolling doctrine to a section 1983 claim filed by a civil detainee). That doctrine is particularly applicable here, where the Plaintiff is not only incarcerated, but also illiterate and borderline retarded.

Mr. Wade's habeas petition seeking relief on grounds of ineffective assistance of counsel, of course, has already been dismissed by this Court as time-barred, and he is *not* seeking to litigate that issue in this Section 1983 action. But the compelling facts from the trial record on which he premised his IAC claim can also be considered by this Court in applying the equitable-tolling doctrine to his 1983 action. And the deficient representation that prevented plaintiff from obtaining DNA testing at the time of trial surely warrants tolling of the limitations period now, when such testing can be performed using DNA technology that is even more sophisticated than was available just seven years ago.

A second reason the equitable tolling doctrine should apply here is the notable timing of Petitioner's 1997 trial with the emerging availability of DNA evidence. If there is any ground on which counsel's failure to pursue DNA testing at the time of trial can be construed as reasonable, it is that such testing was far less widely available in 1997 as compared to the present day. Indeed, as the State's own Motion sets forth, Massachusetts' Supreme Judicial Court did not

*Rompilla*, 125 S.Ct. at 2466.

even rule on the *admissibility* of the PCR and STR-based DNA testing Plaintiff now seeks to

conduct until August 25, 1997 – less than a month before Plaintiff's trial began. (*See* Mot. to

Dismiss at 9). Moreover, STR-DNA testing was not fully validated for use nationwide until two

years later, in 1999. *See* JOHN M. BUTLER, FORENSIC DNA TYPING: BIOLOGY AND TECHNOLOGY

BEHIND STR MARKERS (Academic Press, 2001) at 9. In light of this chronology – and the fact

that DNA testing no less accurate and reliable than it was in 1997 – equitable considerations

surely favor allowing Plaintiff's action to proceed in 2005.

Third, other circuits have held that a complaint should not be dismissed on a Rule

12(b)(6) motion with respect to timeliness where equitable tolling is raised as an argument. *See*

*Hernandez v. City of El Monte*, 138 F.3d 393, 401-02 (9th Cir. 1998). The questions of notice,

prejudice, and reasonable and good faith conduct are essentially factual in nature and depend

upon matters outside the pleadings, so the applicability of the equitable tolling doctrine "is not

generally amenable to resolution on a Rule 12(b)(60) motion." *Hernandez*, 138 F.3d at 402

(*quoting Supermail Cargo, Inc. V. United States*, 68 F.3d 1204, 1206-07 (9th Cir. 1995))(*noting*

that "a complaint cannot be dismissed unless it appears beyond a doubt that the plaintiff can

prove no set of facts that would establish the timeliness of the claim").

Finally, in weighing the equities as to the tolling issue, it bears emphasizing that the State

*will not be prejudiced in any way* if Plaintiff's action is allowed to proceed. The DNA testing he

seeks will occur at no financial cost to the State. Moreover, the traditional rationale for

imposition of a limitations period – *i.e.*, that the passage of time makes it more difficult to

reliably and fairly adjudicate an action – are simply inapplicable where DNA evidence is

16

concerned. As noted by the Justice Department's National Commission on the Future of DNA

Evidence:

> The results of DNA testing do not become weaker over time in the manner of testimonial
> proof. To the contrary, the probative value of DNA testing has been steadily increasing as
> technological advances and growing databases amplify the ability to identify perpetrators and
> eliminate suspects . . . . The strong presumption that verdicts are correct, one of the
> underpinnings of restrictions on post-conviction relief, has been weakened by the growing
> number of convictions that have been vacated by exclusionary DNA test results..

POSTCONVICTION DNA TESTING: RECOMMENDATIONS FOR HANDLING REQUESTS, Nat'l Instit.

Just., U.S. Dept. Just., NCJ 177626 (Sept. 1999). Surely, there can be no dispute that were this

Court to grant DNA testing and a male DNA profile is obtained from the sperm deposited by

Mrs. Francescon's assailant, the case would benefit from infinitely *more* precise, reliable, and

accurate scientific evidence – whether inculpatory  or exculpatory – than was heard by the jury

that convicted Mr. Wade eight years ago.

　　　　Indeed, the State's assertion of a statute of limitations defense here is particularly ironic –

even disingenuous – in light of recent assertions by State prosecutors that the probative value of

DNA evidence should *override* the statute of limitations in active criminal prosecutions. *See*

Suzanne Smalley, "Newest Suspect in Rapes: the DNA," THE BOSTON GLOBE, June 20, 2004

(reporting "John Doe" indictments sought by several Massachusetts prosecutors based solely on

DNA test results from unsolved rape cases, in order to preserve the ability to prosecute the DNA

donors even after the limitations period has run).

　　　　The State cannot claim prejudice from DNA testing that yields only the truth. As such,

the equities clearly weigh in Plaintiff's favor, and the limitations period should be tolled.

17

III.   **The Defendants' Refusal to Provide Access to Evidence for DNA Testing Violates Mr. Wade's Right to Procedural and Substantive Due Process, Protected by 42 U.S.C. 1983.**

For the Defendants to suggest that the Complaint fails to state a claim under section 1983 because there was no constitutional violation of due process at his trial (State's Mot. at 12-13) belies a misapprehension of the Plaintiff's claims. Whether or not his trial was a fair one, Mr. Wade is *currently* being denied procedural due process by the State because he is being denied access to evidence for DNA testing. The procedural due process right is found in the Commonwealth's duty to disclose exculpatory evidence long recognized by the Supreme Court in *Brady v. Maryland*, 373 U.S. 83, 87 (1963). In *Brady*, the Supreme Court recognized that the interests of the criminal justice system included not only convicting the guilty but ensuring that the innocent are not wrongly convicted. *Id.* at 87. Rejecting a "sporting theory" of justice, the Supreme Court ruled that defendants must be given access to potentially exculpatory evidence in the hands of police and prosecutors to ensure fairness and increase the chance that only the truly guilty are convicted. *Id.* at 90.

The Defendants misconstrue *Brady* when they claim that the case does not "obligate the Commonwealth of Massachusetts to furnish a defendant with exculpatory evidence that is fully available to Wade through the exercise of reasonable diligence." The requested evidence has not been and is not "available" to the Plaintiff – if it were, there would be no need for this Section 1983 action. The evidence he seeks to subject to DNA testing (the vaginal swabs/slides from the victim's rape kit, and the stained cuttings from her pants) are in the State's sole custody and control. Indeed, the State has refused to grant his simple request to release those items to a private laboratory for DNA testing since December 2002, and continues to do so today.

18

The Defendants also argue, principally in reliance upon a Fifth Circuit decision (which itself does not involve a 1983 claim), that a *Brady* claim "should not be brought" in a section 1983 action. *See* State's Mot. at 12-13. In *Kutzner v. Cockrell*, 303 F.3d 333 (5th Cir. 2002), a prisoner filed a successive habeas corpus petition in which, on the eve of his execution, he included among his *Brady* claims a request for DNA testing of evidence from his trial, and further argued that the State had violated *Brady* by falsely informing the defendant pre-trial that no DNA testing was possible given the small quantity of evidence available. The Fifth Circuit Court of Appeals held that this application of *Brady* would only apply to "the discovery, after trial[,] of information which had been known to the prosecution but unknown to the defense." *Id.* at 22. However, the *Kutzner* case differs significantly from this case. First, and most important, *Kutzner* was brought as an eleventh-hour, successive habeas petition subject to numerous procedural bars, not a Section 1983 action, and never asserted the constitutional claims that form the basis of Mr. Wade's Complaint. Furthermore, in *Kutzner*, the Defendant "knew of the [fingernail] scrapings, blot, and first hair at trial," yet he never requested its testing. *Id.* at 19. Trial counsel had even argued to the jury that the sole issue was the identification of the killer, and he criticized the state for failing to test the nail scrapings and hair and produce DNA evidence that could have revealed the killer's identity. Here, by contrast, as set forth above in Section II, defense counsel did not request DNA testing because he tried this case on a legally insufficient theory of consent, not identification. It was not until Mr. Wade's Rule 30 motion that he articulated his innocence, began requesting DNA testing, and suggested the incompetence of his trial attorney. In contrast, the *Kutzner* court found that the plaintiff had been represented by "qualified" counsel at trial. *Id.* at 338. The complaint here, therefore, is not a successive

19

habeas corpus petition. Furthermore, the only published decision cited by defendants in which
an analogous claim brought Section 1983 was denied – the Fourth Circuit's opinion in *Harvey v.
Horan*, was arguably mooted by subsequent legislative action.[3] And to the extent that the
*Harvey* case is still good law, it is at most persuasive authority in this Circuit. The Plaintiff
respectfully submits that Judge Luttig's lengthy and well-reasoned concurrence in *Harvey II*
recognizing a federal right of access to DNA evidence stands on equal footing with the majority
decision and should carry substantial persuasive authority in this Court's consideration of the
claim.

Furthermore, for the Defendants to suggest that a *Brady* claim "should not be brought" in
a section 1983 case on the basis of an inapposite Fifth Circuit decision misconstrues the
fundamental purposes of the civil rights legislation:

> It is abundantly clear that one reason the legislation was passed was to afford a federal
> right in federal courts because, by reason of prejudice, passion, neglect, intolerance, or
> otherwise, state laws might not be enforced and the claims of citizens to the enjoyment of
> rights, privileges, and immunities guaranteed by the Fourteenth Amendment might be
> denied by state agencies.

*Monroe v. Pope*, 365 U.S. 167, 180 (1961). The Supreme Court long ago in *Brady* recognized

that due process requires the state to turn over all exculpatory evidence. *Brady v. Maryland*, 373

U.S. 83, 87 (1963). A post-conviction right of access for the purpose of DNA testing is a logical

extension of *Brady* and has been recognized by other courts. *See e.g., Godschalk v. Montgomery*

*County District Attorney's Office,* 177 F.Supp.2d 366, 370 (E.D. Pa. 2001); *Harvey II*, 285 F,.3d

---

[3] After the Fourth Circuit reversed the District Court's order granting DNA testing under Section
1983, Mr. Harvey sought rehearing *en banc*. That petition was denied as moot when, in the
intervening months, Virginia passed a new law providing a statutory mechanism for convicted
persons to obtain DNA testing (a statute that Massachusetts still does not have). Mr. Harvey
proceeded to file a DNA testing motion in state court under the new law, which was granted.

at 315-18 (Luttig, J., concurring (discussing the basis of a procedural due process post-conviction right to access to evidence).

Moreover, the Defendants' refusal to allow DNA testing has prevented Mr. Wade from showing actual innocence, a right which derives from both substantive and procedural due process guarantees, as well as the Sixth and Eighth Amendments. The due process clause requires that procedures used to deprive someone of life or liberty must be fundamentally fair and free from arbitrariness. *Mathews v. Eldridge*. 424 U.S. 319, 334 (1976). The nature of the due process protection is flexible and each situation calls for particularized procedural protections to prevent the risk of erroneous decisions. *Greenholtz v. Inmates of Nebraska Penal & Corr. Complex*, 442 U.S. 1, 12-13 (1979). Whether a due process right should exist must necessarily balance the nature of the private interest, the value of the due process safeguard, and the government's interest. *United States v. Ruiz*, 536 U.S. 622, 631 (2002).

Recognition of a procedural due process right of access depends upon the application of a balancing test. Under Supreme Court precedent, the constitutionally required level of due process protection is determined by examining (1) the private interest affected by official action, (2) the risk of an erroneous deprivation of such an interest, and (3) the government's interest, including the fiscal and administrative burdens that the procedural safeguard would entail. *Mathews*, 424 U.S. at 335; *Ruiz*, 536 U.S. at 631; *Greenholtz*, 442 U.S. at 12-13.

In this case, the first and second factors are easily satisfied. The interests of the private individual are great as DNA makes it possible to confirm guilt or innocence after a conviction has been entered. The risk of erroneous deprivation of this interest is also great. The Innocence Project has identified no fewer than 164 individuals in the United States who have been

21

exonerated postconviction by DNA testing. *See* http://www.innocenceproject.org/case/index.php
(last visited December 8, 2005). DNA technology is unquestionably more sensitive,
discriminating, and accurate than prior forensic testing methods. For this reason, former Attorney
General John Ashcroft has observed that "DNA can operate as a kind of truth machine, ensuring
justice by identifying the guilty and clearing the innocent." Jonathan Peterson, "*Funds for DNA
Testing of Criminals are Diverted*," L.A. Times, December 27, 2001, at A22. In light of the
numerous convictions that have been conclusively determined to be erroneous, it is
unconscionable – and unconstitutional -- in this day and age to permit a State to bar access to
readily available evidence which, if subjected to testing, could determine whether a miscarriage of
justice has occurred.

As for the third factor in the balancing test, there is no dispute that allowing access to the
evidence will not impose a burden on legitimate governmental interests, and, in fact, furthers state
interests. Indeed, the Defendants have not identified *any* burden resulting from Mr. Wade's
request for access. Rather than creating a burden on the state, testing would further the state's
interest in ensuring actual justice and in preventing miscarriages of justice. *See, e.g., Brady*, 373
U.S. at 87-88.

DNA testing is uniquely capable of preventing miscarriages of justice, and preventing
such miscarriages lies at the very heart of the Supreme Court's procedural due process
jurisprudence. *See United States v. Bagley*, 473 U.S. 667, 675 (1985) (noting that the *Brady* rule
requiring the disclosure of exculpatory evidence exists to ensure that miscarriages of justice do
not occur); *see also United States v. Agurs*, 427 US. 97, 108 (1976) (noting that in *Brady* the
Court rejected the "sporting theory of justice"). Indeed, suppression of evidence favorable to a

22

criminal defendant would violates these basic principles regardless of good or bad faith of the prosecution. *Brady,* 373 U.S. at 83. The clear imperative of this jurisprudence thus favors finding a right of access to evidence for the purposes of testing. *See Kyles v. Whitley*, 514 U.S. 419 (1995) (*Brady* obligation extended to investigators and other persons working with prosecutors); *Arizona v. Youngblood*, 488 U.S. 51 (1988) (noting that the State satisfied *Brady* when it provided untested evidence to defendant's experts for evaluation); *Agurs*, 427 U.S. at 110-11 ("elementary fairness" requires disclosure of exculpatory evidence regardless whether it has been requested by a criminal defendant).

Furthermore, Mr. Wade's request for access to evidence is also based on principles of substantive due process, which prevents the state from arbitrarily denying him the right to conduct objective DNA testing that could prove (or disprove) his innocence claim. The due process clause provides protection to the individual from the "arbitrary exercise of the powers of Government." *Daniel v. Williams*, 474 U.S. 327, 331 (1986) (*quoting Hurtado v. California*, 110 U.S. 516, 527 (1884) (holding that the due process clause "bar[s] certain government actions regardless of the fairness of the procedures used to implement them"); *County of Sacramento v. Lewis*, 523 U.S. 833, 845 (1988). The Defendants' refusal to allow access to evidence for DNA testing is shockingly arbitrary and amounts to a violation of substantive due process as well as procedural due process. The Defendants can identify no state interest in refusing access to evidence that would prove Mr. Wade's innocence. As Judge Luttig noted in his thoughtful concurrence in *Harvey II*:

[I]t could indeed be thought shockingly arbitrary that the government would literally dispose of the evidence used to deny one of his liberty (if not his right to life) before it would turn that evidence over to the individual, when he steadfastly maintains his factual

23

> innocence and asks only that he be allowed to subject that evidence to tests which, it is
> conceded, given the evidence introduced at trial in support of conviction, could prove him
> absolutely innocent of the crime.

*Harvey II*, 285 F.3d at 319-20 (Luttig, J.). These principles of substantive due process mandate

that Mr. Wade be given access to the evidence that could prove his own innocence here.

Other circuits have recognized due process violations in similar contexts where the

government turned a blind eye to readily available information that would result in an end to

wrongful custodial confinement. *See e.g., Fairley v. Luman*, 281 F.3d 913, 915 (9th Cir. 2002)

(arrestee detained and held for twelve days on warrant for his twin brother stated a claim for

violation of substantive due process); *Wilson v. Lawrence*, 260 F.3d 946, 957 (8th Cir. 2002) (state

officials' reckless failure to follow an obvious lead that resulted in erroneous conviction and nine

years of false imprisonment would violate due process); *Lee v. City of Los Angeles*, 250 F.3d 668,

685 (9th Cir. 2001) (plaintiff stated viable substantive due process claim where police department

failed to check fingerprints and physical description, and ignored plaintiff's obvious mental

incapacity, resulting in two years of false imprisonment); *Armstrong v. Squadrito*, 152 F.3d 564,

568 (7th Cir. 1998) (due process violation found where plaintiff was kept in custody for 57 hours

because of misfiled papers and refusal to respond to inquiries regarding prisoner's status).

There is absolutely no prejudice to the Defendants in allowing this action to proceed. The

Defendants continue to preserve the evidence in their evidence lockers, while Mr. Wade spends

the rest of his life in prison without the possibility of parole. Allowing this action to proceed will

not prejudice the Defendants' ability to challenge the impact of the test results on Mr. Wade

conviction. Even if exculpatory results are obtained, the Defendants (if they even choose to

contest the significance of the results) will retain the right to object to Mr. Wade's motion to

24

vacate his conviction in a subsequent proceeding. Conversely, the prejudice to Mr. Wade from granting Defendants' motion is great. Rather than allowing an objective, dispositive test of Mr. Wade's claims of innocence, the Defendants' postion would bar Mr. Wade from even passing through the courthouse (or laboratory) door. In light of the extraordinary circumstances of this case and the lack of any appreciable prejudice to the Defendants, this matter should not be dismissed under Rule 12(b)(6), and Mr. Wade should be allowed access to evidence in the State's custody for the purpose of DNA testing.

Respectfully submitted,

Robert Wade, by his Attorneys

Janet H. Pumphrey, Esq.
45 Walker Street
Lenox, MA 01240
(413) 637-2777
BBO 556424
Nina Morrison jkp.
Nina Morrison, Esq.
Barry C. Scheck, Esq.
THE INNOCENCE PROJECT
100 Fifth Avenue, 3rd Floor
New York, New York 10011
(212) 364-5340

25

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Civil Action No. 04-12135-NG

ROBERT WADE,
Petitioner

v.

BERNARD F. BRADY, Acting Superintendent, TIMOTHY CRUZ,
District Attorney, and
THOMAS F. REILLY, Attorney General,
Respondents

**Certificate of Service**


I, Janet H. Pumphrey, hereby certify that on __12/9/05__ , I caused a copy of the Plaintiff's Opposition to Defendants' Motion to Dismiss to be served by first-class mail, postage prepaid, upon Eva M. Badway, Assistant Attorney General, Criminal Bureau, One Ashburton Place, Boston, Massachusetts 02108 and Nancy White, Esq. General Counsel, Department of Correction, 50 Maple Street, Suite 3, Milford, MA 01757-3698.

Janet H. Pumphrey

1