UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. No. 04-12135-NG


ROBERT WADE,
Petitioner

v.

BERNARD F. BRADY, Acting Superintendent,
THOMAS F. REILLY, Attorney General, and
TIMOTHY J. CRUZ, District Attorney for Plymouth County
Respondents


## PLAINTIFF'S RESPONSE TO DEFENDANTS' FURTHER ARGUMENT


**MR. WADE'S SECTION 1983 CLAIMS ARE NOT BARRED BY COLLATERAL ESTOPPEL UNDER THE "OTHER CIRCUMSTANCES" EXCEPTION TO THE APPLICATION OF THE DOCTRINE**

It is undisputed that the doctrine of collateral estoppel applies in civil rights actions brought pursuant to 42 U.S.C. §. 1983. Johnson v. Mahoney, 424 F.3d 83, 92 (1st. Cir. 2005). Yet it is also undisputed that even where a civil rights issue has been previously litigated (in whole or in part) in state court, the application of collateral estoppel to bar relitigation of the claim in federal court is not mandatory. The guiding principle in determining whether to allow defensive use of collateral estoppel is whether the party against whom it is asserted "'lacked full and fair opportunity to litigate the issue in the first action or [whether] other circumstances justify affording him an opportunity to relitigate the issue.' " Id., *quoting* Martin v. Ring, 401 Mass. 59, 62, 514 N.E.2d 663, 665 (1987), *quoting* Fidler v. E.M. Parker Co., 394 Mass. 534,

476 N.E.2d 595, 600 (1985), *quoting* RESTATEMENT (SECOND) OF JUDGMENTS § 29 (1982)

(emphasis supplied).  Under this rule, a new determination may be warranted, and collateral

estoppel shall not apply, "in order to take account of an intervening change in the applicable

legal context <u>or otherwise to avoid inequitable administration of the laws</u>...." RESTATEMENT

(SECOND) OF JUDGMENTS, § 28(2) (1982) (emphasis supplied).

    Here, there are compelling "other circumstances" which justify affording Mr. Wade the

opportunity to relitigate the issue of whether his due process rights are violated by the State's

continued denial of access to potentially exculpatory evidence: namely, that the Commonwealth

has no legitimate state interest whatsoever in denying DNA testing.  The DNA testing he

requests – and which he is prepared to conduct ***at no expense to the State*** – can prove his actual

innocence (or, potentially, confirm his guilt) beyond any doubt.  Thus, the issue raised by this

Section 1983 action is whether a state actor, ***for absolutely no reason whatsoever***, may

arbitrarily deny a prisoner access to exonerating evidence.  Substantive due process demands that

the answer to this question is an emphatic no.

    The Due Process Clause provides protection to the individual from the "arbitrary exercise

of the powers of Government."  <u>Daniel v. Williams</u>, 474 U.S. 327, 331 (1986) , *quoting* <u>Hurtado</u>

<u>v. California</u>, 110 U.S. 516, 527 (1884) (holding that the due process clause "bar[s] certain

government actions regardless of the fairness of the procedures used to implement them");

<u>County of Sacramento v. Lewis</u>, 523 U.S. 833, 845 (1988).  The Supreme Court has stated that

actions which are shockingly arbitrary violate substantive due process.  <u>Id</u>, at 851.  The due

process clause requires that procedures used to deprive someone of life or liberty must be

fundamentally fair and free from arbitrariness. *See* Mathews v. Eldridge, 424 U.S. 319, 348-49 (1976).

In denying access to potentially exonerating evidence, the Commonwealth is acting arbitrarily because it simply has no legitimate reason to withhold evidence. Given the Innocence Project's willingness to pay for the testing, there will be no financial burden on the state. And surely, the traditional interest of the state in "finality" is far outweighed by the possibility that an innocent man is languishing in prison, particularly where a simple scientific test can resolve the issue once and for all. The principle that "finality" must, at times, yield to the justice system's truth-seeking imperative is one that is well settled in federal constitutional jurisprudence. *See, e.g.,* Schlup v. Delo, 513 U.S. 298, 320-21 (1995) (holding that, under "fundamental miscarriage of justice" exception to procedural bars, credible showing of actual innocence will warrant consideration of otherwise procedurally barred habeas claims). There is simply no state interest in finality if an innocent man is in prison and DNA tests can prove it.

Indeed, the usual interests in "finality" that would ordinarily work in favor of the imposition of collateral estoppel clearly do not apply in the DNA testing context, where this dichotomy is a false one. For the state's legitimate interests are actually *advanced* by the very DNA testing Mr. Wade requests. If the test results inculpate Mr. Wade, the Commonwealth's interest in finality and accuracy are most assuredly served. By contrast, if Mr. Wade's innocence is proven by the DNA test, testing of the physical evidence in this case could also result in the identification and apprehension of the true perpetrator. General Laws chapter 22E, section 3, enacted in 1997, established a state DNA database, and it requires mandatory DNA testing of

anyone convicted of a felony.  That state database is linked to the National DNA Index System

("CODIS") maintained by the FBI, which can, in a matter of minutes, compare any DNA profiles

obtained to those of millions of convicted offenders and unsolved crimes nationwide.  As of

January 2006, those combined databanks contained the profiles of over *3 million* convicted

felony offenders, including 5,936 from Massachusetts alone. *See*

http://www.fbi.gov/hq/lab/codis/clickmap.htm.

Nor are the Commonwealth's interests are prejudiced by allowing DNA testing because it

is not forfeiting any right to contest the meaning or relevance of any test results obtained.  DNA

testing only serves the interest of truth – and it is clearly a violation of substantive due process to

deny Mr. Wade access to truth for no legitimate reason.

Conversely, the state's interest in preventing miscarriages of justice is stronger than its

interest in finality of judgments.  In the words of the Brady court:

> Society wins not only when the guilty are convicted but when criminal trials are fair; our
> system of the administration of justice suffers when any accused is treated unfairly. An
> inscription on the walls of the Department of Justice states the proposition candidly for
> the federal domain: 'The United States wins its point whenever justice is done its citizens
> in the courts.' A prosecution that withholds evidence on demand of an accused which, if
> made available, would tend to exculpate him or reduce the penalty helps shape a trial that
> bears heavily on the defendant. That casts the prosecutor in the role of an architect of a
> proceeding that does not comport with standards of justice...

Brady v. Maryland, 373 U.S. 83, 87-88 (1961).  A right of access is fundamentally consistent

with the "law's foundational concern for the determination of guilt and innocence."  Harvey v.

Horan, 119 F.Supp.2d 581 (E.D. Va. 2000), *rev'd on other grounds,* 278 F.3d 370 (4th Cir.

2002).

The Supreme Court recognized that due process requires the state to turn over all exculpatory evidence prior to trial.  Brady v. Maryland, 373 U.S. 83, 87 (1961).  A post-conviction right of access to potentially exculpatory biological evidence for the purpose of DNA testing is simply a logical extension of Brady.  *See also* Kyles v. Whitley, 514 U.S. 419 (1995) (Brady obligation extended to investigators and other persons working with prosecutors); Arizona v. Youngblood, 488 U.S. 51 (1988) (noting that the State satisfied Brady when it provided untested evidence to defendant's experts for evaluation); United States v. Agurs, 427 U.S. 97, 110-11 (1976) (recognizing situations in which "elementary fairness" requires disclosure of exculpatory evidence regardless of whether it has been requested by criminal defendant).  As Judge Luttig noted in Harvey, "the right of access to evidence is sufficiently supported by the history and traditions that our criminal justice system be fair and that the innocent not be wrongfully deprived of their liberty ... and by our now-settled practice ... that all potentially exculpatory evidence be provided to the accused...."  Harvey v. Horan, 285 F.3d 298, 319-20 (4th Cir. 2002).

The Commonwealth used the semen evidence in question at trial to link Mr. Wade to the crime and to secure his conviction.  Thus, the relevance of the evidence has already been argued to the jury and established beyond question.  As Judge Luttig noted, there is no more shockingly arbitrary act than to refuse access to evidence which was used to convict a defendant.

> [I]t could indeed be thought shockingly arbitrary that the government would literally dispose of the evidence used to deny one of his liberty (if not his right to life) before it would turn that evidence over to the individual, when he steadfastly maintains his factual innocence and asks only that he be allowed to subject that evidence to tests which, it is conceded, given the evidence introduced at trial in support of conviction, could prove absolutely innocent of the crime.

<u>Harvey v. Horan</u>, 285 F.3d 298, 319-20 (4th Cir. 2002):

The Commonwealth of Massachusetts has deprived Mr. Wade of his liberty for thirteen years despite constitutional errors at trial and questions regarding the reliability of the evidence against him. Mr. Wade was represented at trial by an incompetent attorney who tried the case under a consent theory and argued to the jury that the rape victim had Alzheimer's disease. That wholly misguided theory ensured a guilty verdict after the jury was instructed that an incompetent person cannot consent. It was that attorney who failed to order DNA testing, and appellate counsel failed to raise either of those issues in Mr. Wade's direct appeal, thus denying him for a second time effective assistance of counsel.

In their Further Argument, the Defendants trivialize Mr. Wade's mental retardation by stating that he was found competent to stand trial. Notwithstanding that he was found competent to stand trial, Mr. Wade is mentally retarded, and he has very little understanding of these proceedings. He is also illiterate, and he has a severe speech impediment. That being said, he has, from the day of the incident, consistently denied that he had sexual intercourse with the victim. Given his trial counsel's wholly misguided trial theory of consent, given Mr. Wade's extremely limited ability to participate in his defense, and given the fact that he is making a claim of actual, factual innocence, "other compelling circumstances" establish that he should be allowed to proceed with DNA testing which could be completely exonerating. By contrast, if DNA testing should prove, in fact, that Mr. Wade is guilty, the Commonwealth has lost absolutely nothing, and it can then be assured that justice has been done and that the man convicted for this crime was truly guilty.

An even more cogent example of the arbitrariness of the Defendants' actions here is the fact that Massachusetts District Attorneys' offices other than Plymouth make such evidence readily available as a matter of policy when it is requested post-conviction, and, indeed, actively *encourage* defendants to make such applications.  An Assistant District Attorney in the Homicide Unit of the Suffolk County District Attorney's office represented his office's policy as follows:

> Any defendant who files a motion for a new trial is encouraged, through his lawyer, to contact the ADA in the Homicide Unit who is assigned to handle the motion, and to present to the ADA the theory under which DNA testing might help exonerate the defendant.  We have consistently stated that the DA's office does not fear the results of DNA testing – after all, if we are going to rely on it as a tool to procure convictions, then we should be equally enthusiastic about its value in identifying wrongfully convicted defendants.  Therefore, the government should not be in the business of impeding a defendant's access to the testing itself.

M. Lee, *The Impact of DNA Technology on the Prosecutor: Handling Motions for Post Conviction Relief*, 31 New.Eng.L.Rev. 663, 664 (2000-2001).  Similarly, the Chief of the Homicide Unit in the Suffolk county District Attorney's office, represented the Suffolk county District Attorney's office policy:

> [I]deally a prosecutor's office reaches a level where it is willing to go into a family's living room after they have come to court, after they have gone to trial, after twelve people have found the defendant guilty beyond a reasonable doubt, and after the Supreme Judicial Court reviewed the entire case and affirmed the conviction, and tell the family that because of DNA evidence, the defendant has been exonerated.  When a prosecutor's office reaches this level, then I think confidently and comfortably these prosecutors have created an environment where they are working day-in and day-out to do exactly the same thing that other offices are now doing by establishing innocence units which focus on those who may have been wrongly convicted....  I can give you comfort that at least from my perspective in my office that we are doing everything possible to work on a daily basis, whether it be DNA testing ... to ensure that the right person is being charged, the right person is being indicted, and ultimately, the right person is being convicted by a jury.

D. Meier, *The Prosecution's Perspective on Post-Conviction Relief in Light of DNA Technology and Newly Discovered Evidence*, 35 NewEng.L. Rev. 657, 660-61 (2000-2001). Indeed, the arbitrariness of the Defendants' actions in this case is all the more extreme in light of the fact that had Mr. Wade have been convicted in Suffolk county rather than in Plymouth county, different state actors apparently would not have so trampled on his constitutional rights. This arbitrary geographical disparity would certainly seem to warrant use of the well-established, equitable exception to collateral estoppel here, *i.e*., that relitigation shall not be barred where it would result in "inequitable administration of the laws." Fidler v. E.M. Parker Co., Inc., 394 Mass. 534, 544, 476 N.E.2d 595, 601 (1985) (quoting RESTATEMENT (SECOND) OF JUDGMENTS, § 28(2)).

Mr. Wade asserts that he is actually innocent, a claim that he seeks to present when ripe. However, the only way for him to ripen this claim is through DNA testing. Yet the Defendants' refusal to release the evidence prevents him from obtaining the very testing that would support (or contradict) his claim. This places Mr. Wade in an intractable Catch-22, claiming actual innocence but unable to prove innocence without access to the evidence, which evidence, if it proved innocence, would have the effect guaranteeing access to the evidence now denied.

The Commonwealth also advances the circular argument that because the other, non-DNA evidence presented against Mr. Wade at his trial was allegedly "overwhelming," he should not have the opportunity to put that evidence to the test of objective, DNA science. This foregone-conclusion argument (which, even more illogically, cited the very biological evidence that Mr. Wade now seeks to subject to DNA testing as a ground for denying access to a more

objective test on that same evidence) was the basis for the denial of the DNA testing motion in state court.[1]   However, the fallacy of this argument has been revealed by dozens of pre- and post-conviction DNA exonerations in recent years – including ones where, prior to testing, the defendants' guilt had appeared to be beyond dispute.

Indeed, one of the most remarkable recent cases occurred right here in Boston.  In 1997, Stephan Cowans of Massachusetts was convicted of shooting a Boston police officer; the evidence against him included, among other things, a positive eyewitness identification by the surviving victim, and testimony by not one but *two* police department fingerprint analysts that prints taken from the crime scene perfectly matched Cowans's own.  But in 2004, DNA testing conducted on saliva from a glass of water the perpetrator drank at the scene, and skin cells from the band of a hat that fell off his head while fleeing, yielded the same male DNA profile -- which conclusively excluded Cowans as the source.  The fingerprint was then re-analyzed, and, after police concluded that the prior match had been "a mistake" by both analysts, Cowans was exonerated and released from prison in January 2004.  *See* "Man Freed in 1997 Shooting of

_____

[1] As noted in great (and ironic) detail in the State's Further Opposition at pp. 12-13, both Judge Chin and Judge Walker cited the fact that when rudimentary serology tests were performed prior to trial on the vaginal slides from the victim, Mr. Wade "[could] not be excluded" as the source of the sperm.  This apparently "link" between Mr. Wade and the biological evidence deposited by the perpetrator was also cited by Judge Chin to negate Mr. Wade's own credibility when he denied having sex with the victim.  There is no question, however, that modern DNA testing is exponentially more precise, discriminating, and reliable than the now-outdated serological techniques that formed the basis of this pre-trial "evidence." The Commonwealth's argument, in essence, is that because Mr. Wade was *likely*  the source of this critical biological evidence, he cannot now seek a DNA test to determine, with 100% certainty, whether *it actually came from him or not*.  The patent fallacy of this logic makes it all

Officer," BOSTON GLOBE, Jan. 24, 2004.[2]   The obvious lessons of the Cowans case make it all the more troubling that here, the Commonwealth -- rather than be humbled by the human errors that can occur in our justice system, and actively seeking to correct such errors through DNA science – has chosen to serve as a roadblock to truth-seeking.

Finally, any argument that the Commonwealth may have an interest is foreclosing "floodgates" of such post-conviction litigation under the equitable "other circumstances" ground cannot withstand the practical realities of DNA technology.  There is likely to be a finite window of time between the advent of science of DNA and its application as forensic evidence in past convictions, and the current practice in which DNA testing is routinely ordered in relevant criminal cases prior to trial.  It is not hard to imagine a day in the near future in which every potentially exonerated defendant will either have access to DNA evidence and be exonerated, or will be released because their sentence is over, and the need for  post-conviction DNA requests will be greatly narrowed or eliminated altogether.  Indeed, the change in the applicable legal context that has been occasioned by the recent advent of forensic DNA testing in the post-conviction context appears to be one circumstance which the Restatement of Judgments contemplates under the "other circumstances" exception to the to the general rule of issue preclusion: when "[t]he issue is one of law and (a) the two actions involve claims that are substantially unrelated, or (b) a new determination is warranted in order to take account of an

---

the more compelling that this Court revisit the merits of Mr. Wade's constitutional claim and allow the DNA testing which can put this issue to rest once and for all.

[2] Copies of all news articles cited in this Motion are on file with petitioner's counsel and available on request; most are also readily available from on-line newspaper archives

intervening change in the applicable legal context or otherwise to avoid inequitable administration of the laws...." RESTATEMENT (SECOND) OF JUDGMENTS, § 28(2) (1982); Fidler, *supra*, 394 Mass. at 544.

The intensity with which this potentially exculpatory evidence has been protected by the Defendants is striking.  The government's "chief business is not to achieve victory but to establish justice." Brady, 373 U.S. at 87, n.2.  In Mooney v. Holohan, 294 U.S. 103 (1935), the Court recognized that the interest of our criminal justice system is not only in convicting the guilty but also in ensuring that the innocent are not wrongfully convicted.  Similarly, the Court has long held that legal rules should be applied to vindicate the central, truth-seeking function of our justice system.  *See Tehan v. United States ex rel. Shott*, 382 U.S. 406, 417 (1966) ("The basic purpose of a trial is the determination of truth"); *Williams v. United States*, 401 U.S. 646, 653 (1971) (impairment of the trial's "truth-finding function" is of primary concern, warranting retroactive imposition of new constitutional rules, where defects in procedure raise "serious questions about the accuracy of guilty verdicts").  The historical underpinnings of a prosecutor's "duty to seek justice" date from the 19th century and carry over into the rules of professional responsibility for prosecutors:  "The prosecutor in a criminal case shall … not intentionally avoid pursuit of evidence because the prosecutor believes it will damage the prosecution's case or aid the accused."  Mass.R.Prof.Conduct, 3.8(j).  *See generally* B. Green, *Why Should Prosecutors "Seek Justice"?*, 26 FordhamUrb.L.J. 607 (19998-1999).

In sum, the following "other circumstances" amply justify affording Mr. Wade the opportunity to relitigate the constitutional issues raised in his Motion for a New Trial before the

Plymouth Superior Court and before the Single Justice of the Supreme Judicial Court.    Johnson v. Mahoney, 424 F.3d 83, 92 (1st. Cir. 2005). *quoting* Martin v. Ring, 401 Mass. 59, 62, 514 N.E.2d 663, 664 (1987) (*quoting* Fidler v. E.M. Parker Co., 394 Mass. 534, 476 N.E.2d 595, 600 (1985)).  The liberty interests sought to be protected here involve the most vital of constitutional rights. The Commonwealth can articulate no legitimate state reason to deny access to evidence which, at no cost to taxpayers, would unequivocally establish innocence (or guilt); indeed, its only legitimate interests (in ensuring the accuracy of its criminal proceedings, exonerating the innocent, and identifying the true perpetrators of crime) are actually served by the DNA testing sought.  And denial of access to potentially exonerating evidence is an arbitrary act by government actors violative of substantive due process.

Robert Wade, by his Attorney

[s]_____

Robert Wade, by his Attorney
Janet H. Pumphrey
45 Walker Street
Lenox, MA 01240
(413) 637-2777
BBO 556424
Court of Appeals Bar No. 38130

[s]_____

Nina Morrison, Esq.
Barry C. Scheck, Esq.
THE INNOCENCE PROJECT
100 Fifth Avenue, 3rd Floor
New York, New York 10011
(212) 364-5361