## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

```
_____
ROBERT WADE,                    )
     Plaintiff,                 )
                                )
     v.                         )       Civ. No. 04-12135-NG
                                )
BERNARD F. BRADY,               )
THOMAS F. REILLY, and           )
TIMOTHY J. CRUZ,                )
     Defendants.                )
_____)
```

GERTNER, D.J.:

## TABLE OF CONTENTS
## MEMORANDUM AND ORDER RE: MOTION TO DISMISS
## October 27, 2006

I.   INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . -1-

II.  FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . -6-
     A.   The Crime . . . . . . . . . . . . . . . . . . . . . . -6-
     B.   Procedural History . . . . . . . . . . . . . . . . . -7-

III. ANALYSIS . . . . . . . . . . . . . . . . . . . . . . . . -11-
     A.   Standard of Review . . . . . . . . . . . . . . . . . -11-
     B.   Statute of Limitations . . . . . . . . . . . . . . . -11-
     C.   Heck, Habeas, and the Implicit Exception to § 1983 -16-
          1.   The Relevant Precedent . . . . . . . . . . . . . -17-
          2.   Plaintiff's Case . . . . . . . . . . . . . . . . -20-
     D.   Collateral Estoppel . . . . . . . . . . . . . . . . -24-
          1.   Legal Standard . . . . . . . . . . . . . . . . . -25-
          2.   Analysis . . . . . . . . . . . . . . . . . . . . -29-
     E.   Due Process . . . . . . . . . . . . . . . . . . . . -35-
          1.   Brady Rights . . . . . . . . . . . . . . . . . . -38-
               a.   Brady's Holding and Its Applicability to DNA
                    Testing . . . . . . . . . . . . . . . . . . -38-
               b.   Brady, Wrongful Conviction, and
                    Due Process . . . . . . . . . . . . . . . . -42-
               c.   Due Process Analysis . . . . . . . . . . . . -44-
          2.   Meaningful Access to the Courts . . . . . . . . -50-
          3.   Additional Claims . . . . . . . . . . . . . . . -53-

IV.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . -53-

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **ROBERT WADE,** ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civ. No. 04-12135-NG** |
| ) | |
| **BERNARD F. BRADY,** ) | |
| **THOMAS F. REILLY, and** ) | |
| **TIMOTHY J. CRUZ,** ) | |
| **Defendants.** ) | |

**GERTNER, D.J.:**

### MEMORANDUM AND ORDER RE: MOTION TO DISMISS
### October 27, 2006

## I.    INTRODUCTION

Plaintiff Robert Wade ("Wade") initiated the current § 1983[1] action on December 12, 2005, suing various public officials in Plymouth County to obtain access to DNA testing of biological evidence used eight years before in his felony murder trial.[2]  Defendants have moved to dismiss under Fed. R. Civ. P. 12(b)(6), arguing that prosecutors have no constitutional obligation to provide such access.

Wade, who has been diagnosed with borderline retardation, was convicted of felony murder in 1997.  The underlying felony was rape.  Despite the existence of blood and semen evidence, which suggested that another individual may have been involved in the rape (either in addition to, or in lieu of, Wade), Wade did

---

[1] 42 U.S.C. § 1983 (1996).

[2] Wade has volunteered to pay for the testing.  Thus, the issue before the Court is not whether the State has an obligation to provide testing, but whether it has an obligation to allow testing.

not seek DNA testing until 2002, nearly five years after his conviction.[3]  Two Associate Justices of the Massachusetts Superior Court denied Wade's motions for DNA testing without comment on its constitutional status.  A Single Justice of the Supreme Judicial Court of Massachusetts ("SJC") denied his appeal without any opinion.  Wade then brought a habeas petition before this Court, which was denied as time-barred.  Wade v. Brady, 04-cv-12135-NG (D. Mass. Sept. 26, 2005) (order granting motion to dismiss).  He now reconfigures his claim as a § 1983 claim, addressing the same issue:  access to DNA testing.

Wade's claim raises a host of unsettled legal issues, both substantive and procedural.  The fundamental question is whether a constitutional right exists to post-conviction DNA testing. The advent of DNA testing has been a watershed development for criminal law and criminal procedure, allowing for a qualitative advance in the determination of guilt or innocence.[4]  The legal progress, however, has lagged behind the technological progress. The constitutional footing of a convicted offender's rights to DNA access is still largely unexplored.

_____

[3] DNA evidence had only been ruled admissible in Massachusetts courts one week before Wade's trial began.  See discussion infra.

[4] See generally http://www.innocenceproject.org (last visited Aug. 22, 2006). One hundred eighty-three convicted felons have been exonerated by post-conviction DNA testing, including individuals whose guilt had previously seemed unassailable.

Few courts have considered the issue as a § 1983 right, and their decisions do not reveal an obvious consensus. The Eastern District of Pennsylvania held that § 1983 petitioners have a post-conviction due process right, grounded in <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), to access evidence that could undermine faith in the jury verdict. <u>Godschalk v. Montgomery County Dist. Attorney's Office</u>, 177 F. Supp. 2d 366, 370 (E.D. Pa. 2001). The Eastern District of Virginia arrived at the same decision in connection with a § 1983 petition. <u>Harvey v. Horan</u>, No. 00-1123-A, 2001 WL 419142, at *4 (E.D. Va. Apr. 16, 2001), and was subsequently reversed by the Fourth Circuit. <u>Harvey v. Horan</u> (<u>Harvey I</u>), 278 F.3d 370 (4th Cir. 2002).[5]

There are many ways in which to characterize a right to post-conviction DNA testing. The most obvious, and the one most frequently discussed by the above-cited decisions, is to analogize it to <u>Brady v. Maryland</u>'s guarantee that defendants be

_____

[5]  While the Court refused to rehear the case *en banc*, Judge Luttig filed a lengthy concurrence, arguing that prisoners retained a residual liberty interest that entitled them to post-conviction DNA access in certain cases. <u>Harvey v. Horan</u> (<u>Harvey II</u>), 285 F.3d 298, 308 (4th Cir. 2002).

Judge Luttig concurred in the denial of rehearing only because plaintiff had already received access to the DNA evidence, rendering his appeal moot. <u>Harvey v. Horan</u> (<u>Harvey II</u>), 285 F.3d 398, 304 (4th Cir. 2002) (Luttig, J. concurring).

The Fifth Circuit denied plaintiff's motion for DNA access in connection with a habeas petition challenging a 1997 conviction. <u>Kutzner v. Cockrell</u>, 303 F.3d 333, 338 (5th Cir. 2002). The court denied relief because petitioner had access to the underlying evidence, which he now sought to be tested. <u>Id.</u> at 336. <u>Brady</u>, the court suggested, applied only to evidence known to the prosecutor and unknown to the defendant. <u>Id.</u> The Sixth Circuit recently issued a short, unpublished opinion in the same vein. <u>Alley v. Key</u>, No. 06-5552, 2006 WL 1313364 (6th Cir. May 14, 2006).

afforded access to favorable, material evidence.  373 U.S. at 87-88.  While defendants note correctly that <u>Brady</u> focused on pre-trial disclosure obligations, that is not the end of the analysis.  <u>Brady</u> justified the pre-trial disclosure obligations imposed on prosecutors under the Due Process Clause.  It did not foreclose, either explicitly or implicitly, the existence of analogous obligations in the post-conviction context.

<u>Brady</u>'s disclosure requirements were based on the belief that innocent defendants would be punished if the State denied them access to exculpatory evidence.  The same risk persists in the post-conviction setting.  And DNA testing's unique qualities justify a completely different balance than the courts usually strike in addressing post-conviction challenges.  When the evidence is a new witness, or a recanted confession, for example, years after the conviction, it may or may not exonerate the defendant.  As such, it is difficult to justify the cost of further proceeding  -- the financial cost to the government, the emotional cost to the victims.

But DNA testing is different.  Because DNA testing can exonerate the defendant, the government may only legitimately deny access to testing if it has a compelling reason to do so.  To hold otherwise would subordinate the pursuit of justice to an arid obsession with procedure.  Where DNA evidence can prove that a miscarriage of justice was perpetrated by an earlier verdict,

-4-

our interest in fundamental fairness and the integrity of the criminal justice system require that DNA testing be allowed. Because I find that a Due Process right to DNA testing does exist, I hereby deny defendant's motion to dismiss.

One caveat: This decision resolves a motion to dismiss the complaint, a very preliminary stage in the analysis.  It does not resolve the question of whether plaintiff is entitled to DNA access in this case.  A number of other questions must be addressed before such a finding can be made, namely, what showing a defendant must make before receiving access to DNA evidence; whether equitable tolling saves plaintiff from any possible statute of limitations issues; and whether the facts of plaintiff's case meet the showing required for the relief sought.[6]

II.  **FACTS**

    A.  **The Crime**

In 1993, Robert Wade was employed as a farmhand on a Lakeville, Massachusetts, farm where he also lived.  Although plaintiff was able to perform the manual labor for which he was hired, testing reveals that he has a 72 point IQ – a score that

---

[6] The first and last questions here are an acknowledgment that many a case exists where DNA evidence relates very tangentially, if at all, to the finding of guilt.  In cases where an exclusionary test result would have no impact on the earlier verdict, plaintiff would not have a right to testing. Where an exclusionary test result would automatically exonerate a prisoner, the right is clearly implicated.  The remaining issue is, "at what point between those two poles does the due process interest become actionable?"

places him in the range of borderline mental retardation.  The
mother of plaintiff's employer also lived on the farm.  She
suffered from advanced Alzheimer's disease.

On October 24, 1993, plaintiff's employer found his mother
naked and injured in Wade's cabin.  She was quickly taken to the
hospital and treated for a fractured wrist, fractured hip, and
abrasions on her shoulders, knees, and buttocks.  Surgery was
performed on the victim's hip.  Four days later she developed
respiratory problems and then pneumonia.  Her condition improved
temporarily and she was transferred out of the intensive care
unit to a regular ward.  However, she soon developed pneumonia
again and died on November 13, 1993.

After the victim first arrived at the hospital, police
collected vaginal swabs and slides, and a semen and blood-stained
cutting from the crotch of her pants.  Laboratory tests on the
vaginal swabs and slides revealed the presence of semen.

At trial, the pathologist testified that "in reference to
the vaginal swab, at this level of analysis, the suspect can not
be excluded as a contributor into that sample."  Compl. ¶ 17.
Laboratory tests on the cuttings revealed the presence of both
"H" and "A" antigens.  Plaintiff's blood is an "O" secretor, a
blood type shared by 40% of the population.  "O" secretors yield
only an "H" antigen in serological analysis.  Because the victim
also has Type "O" blood, the presence of "A" antigens, if

-6-

accurately typed, suggests that a third party's blood and/or semen was also present on the victim's clothing.  No DNA testing was performed on any of the samples, either at trial or afterwards.

Although plaintiff was in the cabin when the victim was found, he told authorities, and has maintained to this day, that he did not have intercourse with the victim or harm her in any way.

**B.  Procedural History**

Wade was indicted on December 6, 1993, on one count of aggravated rape and one count of first degree murder.  The jury trial took place in early September 1997.  Wade's counsel never ordered DNA testing on the sperm sample found in the victim's vagina, presumably because his theory, improbable to be sure, was that whatever sexual activity had occurred was consensual. Moreover, DNA testing was not a common practice in 1997.[7]

On September 8, 1997, the jury returned guilty verdicts on both counts of the indictment, aggravated rape under MASS. GEN. LAWS ch. 265, § 22 (2000), and first degree murder on a felony murder theory, under MASS. GEN. LAWS ch. 265, § 1 (2000).  Wade filed his notice of appeal on September 24, 1997, the same day that his counsel moved to withdraw and Wade moved for appointment

---

[7] As noted <u>supra</u> n.3, it had only been ruled admissible one week before Wade's trial started.

of appellate counsel.  On September 29, 1997, counsel's motion to
withdraw was allowed, and appellate counsel was appointed.  On
November 21, 1997, new counsel filed her appearance.

On August 6, 1998, the SJC affirmed the first degree murder
conviction but vacated the aggravated rape conviction.  <u>See</u>
<u>Commonwealth v. Wade</u>, 697 N.E.2d 541 (Mass. 1998).  The rationale
for its decision was that the murder was based only on a felony-
murder theory, and since the rape charge was the underlying
felony, it was necessarily a lesser included offense.  Wade did
not seek certiorari to the United States Supreme Court.

On May 9, 2000, Wade filed a *pro se* motion to appoint yet
another lawyer, and a *pro se* motion for a writ of habeas corpus.
On May 23, 2000, the Superior Court denied both motions.  In so
doing, the court stated only that it denied the motion for new
counsel because Wade had been permitted to change lawyers once
and could not do so again.  Nothing in the record discloses the
grounds for Wade's habeas claims or why the Superior Court
rejected them.  Although no counsel had been appointed, a new
attorney entered an appearance for Wade on July 17, 2000.

Over the next two years, counsel took no action on Wade's
behalf.  Then, on August 21, 2002, counsel filed a motion in
Superior Court for preservation of evidence, which was allowed on
October 31, 2002.  On December 9, 2002, Wade filed a motion for
DNA testing of physical evidence, and three weeks later a motion

for new trial based on ineffective assistance of counsel.  On July 29, 2003, a hearing was held on Wade's motion for DNA testing and the motion was denied.  In denying the motion, the court found Wade's testimony that he did not have sex with the victim unconvincing and in direct conflict with Wade's trial theory of consent.[8]

Wade filed a motion for reconsideration of the denial of his motion for DNA testing on August 13, 2003; it was denied without hearing on August 15, 2003.  Wade's motion for a new trial was denied on December 23, 2003.

On February 9, 2004, Wade filed a petition to a Single Justice of the SJC, pursuant to MASS. GEN. LAWS ch. 278, § 33E (1998), seeking leave to appeal both the denial of his motion for DNA testing and his motion for a new trial.  Without comment, the Single Justice denied leave to appeal on April 12, 2004.

On October 8, 2004, Wade filed a petition for federal habeas relief in this Court, pursuant to 28 U.S.C. § 2254 (1996).  Respondents moved to dismiss shortly thereafter.  In response to this Court's order, both parties filed supplemental briefing on whether habeas case law required that a threshold showing of actual innocence be made before DNA testing could be ordered.  Petitioner also filed a motion to amend on May 13, 2005.  On

---

[8] The Superior Court decision denying Wade's motion for DNA testing made clear that his counsel argued a consent theory at trial.  See Def. Ex. H.

September 26, 2005, this Court entered an order allowing respondents' motion to dismiss the habeas petition as time-barred[9] and allowing the petitioner's motion to amend to include claims made pursuant to § 1983.

On October 11, 2005, plaintiff filed an amended complaint under § 1983, alleging that defendants violated plaintiff's constitutional rights, specifically, his rights established by the First, Sixth, Eighth and Fourteenth Amendments, by refusing to surrender the blood and semen samples for DNA testing. Defendants moved to dismiss again on November 1, 2005, and plaintiff filed an opposition.

## III. <u>ANALYSIS</u>

### A. <u>Standard of Review</u>

"In considering a motion to dismiss, a court must take the allegations in the complaint as true and must make all reasonable inferences in favor of the plaintiffs." <u>Watterson v. Page</u>, 987 F.2d 1, 3 (1st Cir. 1993). "The complaint will survive as long as it pleads sufficient facts to warrant recovery on any cognizable theory of the case." <u>Tompkins v. United Healthcare of New England, Inc.</u>, 203 F.3d 90, 93 (1st Cir. 2000). However, the court "need not credit a complaint's 'bald assertions' or legal

---

[9] <u>See</u> Memorandum and Order Re: Respondent's Motion to Dismiss; Petitioner's Motion to Amend and Consolidate; and Petitioner's Motion for Appointment of Counsel, dated September 26, 2005. The Court found that Wade's habeas action was barred by the one-year statute of limitations of 28 U.S.C. § 2244(a) (1996) and that equitable tolling was not available because Wade could not show "actual innocence."

conclusions." Glassman v. Computervision Corp., 90 F.3d 617, 628 (1st Cir. 1996).

### B.    Statute of Limitations

Section 1983 does not contain a specific statute of limitations. See Wilson v. Garcia, 471 U.S. 261, 266 (1985). Instead, § 1983 claims "borrow[ ] the appropriate state law governing limitations unless [it is] contrary to federal law." Vistamar, Inc. v. Fagundo-Fagundo, 430 F.3d 66, 69 (1st Cir. 2005) (quoting Poy v. Boutselis, 352 F.3d 479, 483 (1st Cir. 2003)).  Liability under § 1983 is most akin to tort liability, so the applicable statute of limitations is the three year period Massachusetts law has established for personal injury actions. McIntosh v. Antonino, 71 F.3d 29, 33-34 (1st Cir. 1995). Although the limitation period is borrowed from state law, the accrual period is taken from federal law. Id. at 34.  Under federal law, accrual starts when the plaintiff "knows, or has reason to know, of the injury on which the action is based." Id. (quoting Rivera-Muriente v. Agosto-Alicea, 959 F.2d 349, 353 (1st Cir. 1992)).

In the instant action, the accrual inquiry is particularly complicated.  Arguments could be made for several "start dates": 1) The date of Wade's conviction (Sept. 8, 1997); 2) the date Wade first asked for access to his DNA (Aug. 21, 2002); 3) the denial of this request by either the Superior Court (July 29,

2003) or the SJC (April 12, 2004); or 4) the time at which the constitutional dimension of his injury, and therefore the reason to know that his injury was actionable, became clear (uncertain). The analysis is further complicated by Wade's claim of equitable tolling, a doctrine used to advance the cause of justice when strict application of the statute of limitations would yield fundamentally unfair results.

Defendants argue that plaintiff knew, or had reason to know, of the injury upon which his action is based by the first date of September 8, 1997, the date of conviction. Plaintiff was indicted on December 6, 1993, but did not go to trial until nearly four years later, in early September 1997.[10] Def. Ex. A. A week before trial, on August 25, 1997, the SJC handed down two decisions in unrelated cases, determining that short tandem repeat ("STR") DNA testing and two other techniques derived from the polymerase chain reaction ("PCR") testing method were scientifically valid and would be admissible if properly performed.[11] Commonwealth v. Rosier, 685 N.E.2d 739 (Mass. 1997) (STR testing valid); Commonwealth v. Sok, 683 N.E.2d 671 (Mass. 1997) (PCR-derived techniques valid). Two weeks later, on

---

[10] The docket does not make clear whether the trial commenced on September 3, 4, or 5.

[11] In Commonwealth v. Sok, the Court described its ruling as "indicati[ve] of the rapid pace at which PCR-based technology is developing and the scientific recognition that new systems are receiving as they are validated for forensic use." 683 N.E.2d 671, 681 n.20 (Mass. 1997).

September 8, 1997, plaintiff was found guilty of murder in the first degree. Def. Ex. A. Three weeks after Wade's conviction, on September 30, 1997, the Massachusetts Legislature passed a law related to the collection and testing of DNA evidence for individuals accused of crimes. See Mass. Gen. Laws ch. 22E, §§ 1-15. Because of this confluence of events, defendants argue that the statute of limitations expired in September 2000, two years before plaintiff sought access to his DNA in state court[12] and four years before he filed the present action.[13]

In contrast, plaintiff dates the limitations period from 2003, when he was refused access to DNA testing.[14] Obviously, any injury from 2003 necessarily occurred within three years of

_____

[12] Plaintiff requested access to his DNA in Massachusetts Superior Court on December 9, 2002. Def. Ex. A. Plaintiff states that this request was made in 2003, but the state court docket makes clear that this position is incorrect.

[13] Although plaintiff filed his amended complaint on October 11, 2005, he filed his original petition for habeas corpus relief, which later evolved into his § 1983 action, on October 8, 2004. Because the claims raised in his § 1983 complaint do not just arise out of the actions referenced in his original complaint, but are identical to the earlier claims in his habeas petition, the amended pleading relates back to the date of the original pleading. See Fed. R. Civ. P. 15(c)(2). See also Jackson v. Suffolk County Homicide Bureau, 135 F.3d 254, 256 (2d Cir. 1998); Mayle v. Felix, 125 S. Ct. 2562, 2572 (2005).

[14] Plaintiff's complaint states, "[t]his case arises from the Defendants' refusal to release biological evidence currently in their possession for the purposes of state-of-the-art Short Tandem Repeat . . . DNA and Mitochondrial DNA testing . . . Counsel for the Defendant was informed by the District Attorney's Office that they would not look for the evidence without a court order." Compl. ¶¶ 1-2. Given that plaintiff did not request access to the DNA until December 9, 2002, and was not denied such access until July 30, 2003, plaintiff's argument must be that his accrual period began in 2003, or, perhaps, in 2002.

October 8, 2004,[15] when Wade filed his habeas petition in this
Court.[16]

The parties' disagreement highlights the fundamental
question before the Court: how to determine the period of accrual
for a newly emergent right.  If the prosecutor had an obligation
to provide DNA testing in September 1997, it would make sense to
consider this the appropriate time of accrual.  However, STR DNA
testing was not even determined to be admissible by the SJC until
a scant week before plaintiff's trial.  Thus, it makes little
sense to assume that STR or PCR DNA testing made the leap from
"questionably admissible" to "constitutionally compelled" in
seven days.

Another tenable argument is that Wade reasonably learned of
his injury when he filed the motion for DNA testing in 2002 (and
it was not immediately granted), or when his first action was
ultimately denied in 2003.  At this point, it was certainly clear
that an injury had occurred, and Wade had already couched his
request in constitutional terms.  See Def. Ex. J, N.  This
possibility is inviting insofar as it provides clear evidence of

---

[15] See supra note 10.

[16] Plaintiff quickly confuses his position by arguing that the State's
refusal to grant DNA testing is a continuing violation and therefore not bound
by the statute of limitations.  Because this argument is only relevant if the
injury occurred before October 4, 2001, plaintiff's new position suggests an
earlier date of injury.  Ultimately, plaintiff's vacillation obscures whether
he thinks the violation began in 1997, with his conviction, or 2003, when he
requested, and was denied access to, his DNA.  Based on the language of his
complaint, I believe plaintiff intended to assert a 2003 date for the start of
the accrual period.

plaintiff's knowledge, but raises the unsettling possibility that Wade himself could control the accrual period through his filing decisions.  If such a rule were implemented the statute of limitations would not have expired until 2006.

Another possibility is to conclude that defendant's statute of limitations period should accrue at the time when Wade could have reasonably understood that he had suffered an injury compensable under § 1983.  Because neither party has briefed this issue, and the question of when Wade "reasonably understood" the dimensions of his injury has a factual component, I will not select a date at this time.[17]

It is also possible that the statute of limitations should be considered to have been equitably tolled.  Plaintiff has raised issues of incompetence of counsel in both his Motion for a New Trial in Superior Court and in his habeas petition to this Court.  Additionally, plaintiff's case is complicated by his illiteracy, borderline mental retardation, and potentially incompetent trial counsel.  The resolution of these issues

---

[17] A few preliminary suggestions:  One possibility may be August 27, 2001, when the Eastern District of Pennsylvania issued the first federal court decision finding a constitutional right to post-conviction DNA testing.  See Godschalk, 177 F. Supp. 2d 366.  Selecting this particular theory of accrual avoids the major problems inherent to the two positions above: it does not require Wade to divine the future constitutional significance of his lack of DNA access in 1997, nor does it link the accrual date to a time selected by Wade, at his convenience, for the vindication of his rights.  Instead it focuses on the real statute of limitations issue: when Wade could have been reasonably expected to file a motion challenging the constitutionality of the State's refusal to allow access to the DNA evidence in question.  If the August 27, 2001, date is appropriate, Wade's action, which commenced on October 8, 2004, would be barred by the statute of limitations.

requires factual findings beyond the face of the papers before me, further militating against dismissal.[18]

### C.    <u>Heck, Habeas, and the Implicit Exception to § 1983</u>

Defendants contend that plaintiff's complaint must be dismissed because it "necessarily implies the invalidity of plaintiff's underlying state conviction[]," Def. Mem. at 5, in contravention of the Supreme Court's ruling in <u>Heck v. Humphrey</u>, 512 U.S. 477 (1994).  This position fundamentally misconstrues a well-established Supreme Court precedent, the basic substance of plaintiff's complaint, or both.  Unlike the § 1983 actions limited by <u>Heck</u>, plaintiff requests only the opportunity to test DNA evidence currently in the state's possession.  Nothing about this request "necessarily" implies *anything* about plaintiff's underlying conviction.  The results of the testing could be inconclusive or inculpatory.  Moreover, if testing yields exculpatory results, plaintiff's conviction would stand unless successfully challenged in a separate action, brought at a future date, alleging a different constitutional violation altogether.[19]

---

[18] "Because the applicability of the equitable tolling doctrine often depends on matters outside the pleadings, it 'is not generally amenable to resolution on a Rule 12(b)(6) motion.'"  <u>Hernandez v. City of El Monte</u>, 138 F.3d 393, 402 (9th Cir. 1998) (<u>quoting</u> <u>Supermail Cargo, Inc. v. United States</u>, 68 F.3d 1204, 1206 (9th Cir. 1995)).

[19] At present, the alleged violation is simply that plaintiff has been denied the opportunity to test evidence in the government's possession.  He has not challenged the constitutionality of his conviction in any way.  <u>See,</u> <u>e.g.</u>, <u>Harvey II</u>, 285 F.3d at 308 (Luttig, J. concurring) ("[I]n order to overturn a conviction based on exculpatory evidence that might appear from any DNA testing, the petitioner would have to initiate an entirely separate action at some future date, *in which he would have to argue for his release upon the*

### 1.  **The Relevant Precedent**

As the Supreme Court has often noted, habeas corpus and the Civil Rights Act of 1871, Rev. Stat. § 1979, as amended, 42 U.S.C. § 1983, are the primary avenues of relief available to prisoners seeking redress for constitutional injury.  See, e.g., Hill v. McDonough, 126 S. Ct. 2096, 2101 (2006) (citing Muhammed v. Close, 540 U.S. 749, 750 (2004)); Heck, 512 U.S. at 480.  Both provide access to federal courts, but the two actions differ in scope.  Id.  In Preiser v. Rodriguez, the Court decided that habeas corpus is the exclusive remedy available for state prisoners who challenge the fact or duration of their confinement, or seek immediate or speedier release.[20]  411 U.S. 475, 488-90 (1973).  Because the plaintiff in Preiser sought speedier release from prison, he was prohibited from pursuing his action under § 1983.

The court addressed a similar issue in Heck,[21] a case in which the plaintiff was not technically challenging the fact or length of his confinement, but rather was seeking monetary

_____

basis of a separate constitutional violation altogether.").

[20] The Court was especially concerned with the fact that allowing § 1983 actions in these cases would enable prisoners to circumvent the habeas exhaustion requirements by simply re-labeling habeas actions as § 1983 claims. Preiser v. Rodriguez, 411 U.S. 475, 489-90 (1973).

[21] Heck was a malicious prosecution/§ 1983 action, directly challenging petitioner's conviction for murder.  The Court held that in order to recover damages under § 1983 based on allegations that tend to impugn the validity of a criminal conviction, a plaintiff must prove "favorable termination" of the criminal action against him.  See, e.g., Limone v. United States, 271 F. Supp. 2d 345, 359 (D. Mass. 2003).

damages.  The Preiser decision noted in dicta that actions for
monetary damages sought neither immediate nor speedier release
and, as such, fell comfortably within the boundaries of § 1983.
Although this statement is frequently true, the Heck court
concluded that in the case at bar establishing the basis for
plaintiff's damages action would necessarily demonstrate the
invalidity of his conviction.  Heck, 512 U.S. at 481-87.
Accordingly, the court viewed this kind of damages claim to be
the functional equivalent of the actions prohibited in Preiser,
and held that § 1983 is an inappropriate vehicle for damages
actions that *necessarily* imply the unlawfulness of a prisoner's
conviction or confinement.  Id. at 486-87.

     In Wilkinson v. Dotson, 544 U.S. 74 (2005), the Court
further elaborated on this approach.  In Dotson, the Court
considered two challenges by Ohio prisoners to the retroactive
application of new, stringent parole guidelines.  Both
individuals sought to enjoin the state from applying the new
parole guidelines to pre-guidelines sentences and requested new
hearings.  The state of Ohio challenged the inmates' reliance on
§ 1983, arguing that habeas was the only appropriate vehicle in
this circumstance because the inmates' motivation in filing the
actions was to gain a speedier release from prison.

     The Court rejected this position, noting that it "jumps from
a true premise (that in all likelihood the prisoners hope these

actions will help bring about earlier release) to a faulty
conclusion (that habeas is their sole avenue for relief)."
Dotson, 544 U.S. at 78.  Dotson stressed that the implied
exception to § 1983's coverage existed only in cases where the
claimant sought core habeas corpus relief, and not in cases that
simply "relate to" such relief.  Id. at 81.  In other words, the
Court was willing to preempt § 1983 when it operated as the
functional equivalent of habeas corpus, delivering release or
speedier release to prisoners.  Without such an exception,
prisoners could side step the restrictions on successive habeas
petitions.  But in situations where § 1983 relief was
distinguishable from habeas, situations where relief would not
necessarily invalidate the underlying conviction, courts have no
reason to withhold § 1983 relief if the language of the statute
applies.  Thus, the Dotson respondents' claims were cognizable
under § 1983 because success meant only new eligibility review,
not necessarily a speedier release.

## 2.  **Plaintiff's Case**

Defendants cite the Fourth Circuit's decision in Harvey I,
278 F.3d at 375, for the proposition that § 1983 is an
inappropriate vehicle for seeking DNA testing.  There, the Fourth
Circuit reasoned that favorable DNA tests would allow the
plaintiff to challenge his underlying conviction, thereby

-19-

circumventing <u>Heck</u>.[22]    In contrast, the Eleventh and Ninth
Circuits have held that § 1983 is an appropriate vehicle for
plaintiffs to seek access to DNA evidence.    See <u>Bradley v. Pryor</u>,
305 F.3d 1287 (11th Cir. 2002); <u>Osborne v. Dist. Attorney's
Office for Third Judicial Dist.</u>, 423 F.3d 1050 (9th Cir. 2005).
I agree with the Eleventh and Ninth Circuits.[23]

As an initial matter, the only *inevitable* consequence of
plaintiff's § 1983 action would be the release of evidence to a
laboratory for DNA testing.    The results of any such test are
uncertain: they could be exculpatory, inconclusive, or even
inculpatory.    "That these scientific possibilities exist, in and
of itself, suffices to establish that the asserted right of mere
access is not a direct, or for that matter even an indirect,
attack on one's conviction or sentence."    <u>Harvey II</u>, 285 F.3d at
308 (Luttig, J. concurring).    <u>See also</u> <u>Osborne</u>, 423 F.3d at 1054.
And even if the results of DNA testing were exculpatory,
plaintiff is in no way ensured of attaining his freedom: he must
still initiate an entirely separate action, asserting a distinct
constitutional violation, in order to prevail.[24]    <u>See</u> <u>Id.</u>;

---

[22] The Fifth Circuit has also adopted this position.    See <u>Kutzner v.
Montgomery County</u>, 303 F.3d 339, 340 (5th Cir. 2002).

[23] I agree with Judge Luttig's statement in <u>Harvey II</u> that, "I do not
believe it even arguable that a post-conviction action merely to permit access
to evidence for the purpose of STR DNA testing 'necessarily implies'
invalidity of the underlying conviction." <u>Harvey II</u>, 285 F.3d at 308 (Luttig,
J. concurring).

[24] In other words, a state action for post-conviction relief or a
petition for writ of habeas corpus.

Bradley, 305 F.3d at 1290; Harvey II, 285 F.3d at 308.  As such,
there is nothing about plaintiff's action that could ever
"necessarily imply" the invalidity of his earlier conviction.

Both Heck and Dotson provide further support for this
position.  In Heck, the Court included two footnotes to help
clarify its position on when the relief sought by a prisoner
"necessarily" implied the invalidity of a conviction.  Heck, 512
U.S. at 487 nn.6-7.  In the "impermissible" example, the Court
described a situation where: "[a] state defendant is convicted of
and sentenced for the crime of resisting arrest, defined as
intentionally preventing a peace officer from effecting a *lawful*
arrest.  He then brings a § 1983 action against the arresting
officer, seeking damages for violation of his Fourth Amendment
right to be free from unreasonable seizures."  Id. at 487 n.6
(citation omitted).  Because success in this action would require
negating an element of the offense, and therefore invalidating
his conviction, § 1983 is not appropriate.   Id.

In the "permissible" example, the Court explained that a
"suit for damages attributable to an allegedly unreasonable
search may lie even if the challenged search produced evidence
that was introduced in a state criminal trial resulting in the §
1983 plaintiff's still-outstanding conviction.  Because of
doctrines like independent source and inevitable discovery, and
especially harmless error, such a § 1983 action, even if

-21-

successful, would not *necessarily* imply that the plaintiff's conviction was unlawful." <u>Id.</u> at 487 n.7 (citations omitted). Thus, defendants are not prohibited from bringing § 1983 actions that increase their likelihood of gaining release, as long as they do not "necessarily" vitiate the legality of their current confinement. The mere possibility that the tainted evidence might be found admissible later through an exception in the law was enough to show that a defendant's conviction was not necessarily invalidated.

If this example does not necessarily imply the invalidity of one's conviction, then plaintiff's action, which may actually produce inculpatory evidence, and can only position plaintiff for a future challenge to his conviction, does not necessarily imply much of anything. This position is also supported by the first example, in which the Court emphasized that a finding of "necessary invalidity" required "negating an element of the offense." <u>Heck</u>, 512 U.S. at 487 n.6.

The DNA evidence that Wade seeks is even less necessarily vitiating than that: not only may it yet be found inadmissible, it may in fact be inculpatory.[25]

<u>Dotson</u> buttresses this point further. In <u>Dotson</u>, as in the present case, plaintiffs sought a new hearing that could

---

[25] Nor could it negate an element of *any* criminal conviction, given that the motion seeks only permission to test the evidence.

potentially expedite their release.  As the Dotson Court noted, the only necessary result of their success would be to "speed *consideration*" of their release, not secure the release itself. 544 U.S. at 75.  In Wade's case, the connection between his request and any possible release is even more attenuated.  Wade's success in this action does not even necessarily speed consideration of his release.  It allows nothing more than access to evidence that *may* prove to be exculpatory and which *may*, if exculpatory, permit petitioner to obtain his release through a separate action.

Because plaintiff's action does not necessarily imply the unlawfulness of his conviction, it cannot fall within the implied habeas exception to § 1983's coverage.  Consequently, § 1983 is an entirely appropriate medium for plaintiff to raise his claim for access to DNA testing.

### D.    **Collateral Estoppel**

#### 1.    **Legal Standard**

Defendants next argue that collateral estoppel precludes Wade from bringing this action in federal court because he has already been denied relief in state court.  While this argument raises an interesting and complicated question, I disagree with defendants and do not find Wade's claim to be precluded by any earlier judgment.

"The federal courts have traditionally adhered to the
related doctrines of res judicata and collateral estoppel."
Allen v. McMurry, 449 U.S. 90, 94 (1980).  Under collateral
estoppel, an issue may not be re-litigated by either of the
original parties if it has been actually and necessarily
determined by a court of competent jurisdiction.  Montana v.
United States, 440 U.S. 147, 153 (1979).  This policy helps to
conserve judicial resources, relieve parties of the burden of re-
litigating settled issues, and prevent inconsistent rulings.  See
Allen, 449 U.S. at 94.

Collateral estoppel is typically applied by federal courts
to issues that have been previously litigated in state court in
order to promote comity between state and federal courts.  See
Id. at 95; Johnson v. Mahoney, 424 F.3d 83, 93 (1st Cir. 2005).
See also 28 U.S.C. § 1738 (1948) (establishing that state court
judgments shall have the same "full faith and credit" in federal
court that they would in courts of that state).  These principles
apply in § 1983 actions.  Johnson, 424 F.3d at 93 (citing Allen,
449 U.S. at 96).

However, the principles underlying § 1983 actions and
collateral estoppel can conflict in certain cases.  "The very
purpose of [§] 1983 was to interpose the federal courts between
the States and the people[] as guardians of the people's federal
rights[, and] to protect the people from unconstitutional action

under color of state law, 'whether that action be executive, legislative or *judicial.*'" <u>Mitchum v. Foster</u>, 407 U.S. 225, 242 (1972) (citation omitted) (emphasis added).  On the one hand,  § 1983 was intended to protect the people's federal rights against transgressions by the state, but on the other hand, federal courts are obligated by the doctrine of collateral estoppel to give preclusive effect to judgments by the very same entities.

The legislative history of § 1983 lends only "equivocal" support for the notion that Congress intended to override § 1738 or the common law doctrine of collateral estoppel.  <u>Allen</u>, 449 U.S. at 99.  Rather than denuding state court judgments of preclusive force, Congress intended for federal courts to step in only when state courts were unwilling or unable to do their jobs. <u>Id.</u> at 100-01.  Thus, federal courts may deny preclusive effect to state court judgments only "where state law did not provide fair procedures for the litigation of constitutional claims, *or where a state court failed to even acknowledge the existence of the constitutional principle on which a litigant based his claim*."  <u>Id.</u> at 101 (emphasis added).

This exception balances the Congressional intent of § 1983 with the interest in promoting comity.  State courts retain their ability to decide federal constitutional questions without fear of unfettered review by federal courts, and federal courts reserve the power necessary to fulfill § 1983's mandate, ensuring

-25-

the protection of federal rights when state courts prove unable or unwilling to do so.[26]

When considering collateral estoppel claims that stem from earlier state court judgments, a federal court must look to the preclusion law of the applicable state.  See Johnson, 424 F.3d at 93 (citing Kremer v. Chemical Constr. Corp., 456 U.S. 461, 466 (1982)).  See also § 1738.  "Massachusetts courts apply the doctrine of collateral estoppel as it has been described in the Restatement (Second) of Judgments."  Johnson, 424 F.3d at 93 (citing Martin v. Ring, 514 N.E.2d 663, 664 (Mass. 1987)).  According to the Restatement, the general rule is that "[w]hen an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties."  Restatement (Second) of Judgments § 27 (1982).  "Actually litigated" means that an issue has been properly raised, submitted for determination, and necessarily determined by the earlier decision.  See Restatement (Second) of Judgments § 27 cmt. (d).

Where, as here, the defendants in the presentation are different from the defendants in the earlier action, the

---

[26] The exception also shades into collateral estoppel's traditional requirement that individuals be allowed to litigate their claims fully and fairly.  Allen, 449 U.S. at 101.  If state courts give federal claims short shrift in an earlier adjudication, it would be difficult to describe those claims as "fully and fairly litigated," and therefore ineligible for federal review.

Restatement has carved out an exception when "[t]he issue is one of law and treating it as conclusively determined would inappropriately foreclose opportunity for obtaining reconsideration of the legal rule upon which it was based." Restatement (Second) of Judgments § 29(7). Comment (i) elaborates further on this exception, stating:

> When the issue involved is one of law, stability of decision can be regulated by the rule of issue preclusion or by the more flexible rule of stare decisis. . . If the rule of issue preclusion is applied, the party against whom it is applied is foreclosed from advancing the contention that stare decisis should not bind the court in determining the issue. Correlatively, the court is foreclosed from an opportunity to reconsider the applicable rule, and thus to perform its function of developing the law.

Restatement (Second) of Judgments § 29 cmt. (i). This exception may be especially appropriate when state courts make fundamentally legal decisions about unsettled federal rights.

### 2. <u>Analysis</u>

There are two major impediments to applying collateral estoppel to Wade's § 1983 action. The first issue is that none of the state court decisions ever decided whether Wade had a Due Process right to DNA testing. If the issue was never decided, it cannot have a preclusive effect. Restatement (Second) of Judgments § 27 cmt. (d). The second concern is that none of the state court decisions even acknowledged the constitutional principle upon which Wade based his claim for DNA testing, either

explicitly or by implication.  Given that a major purpose behind
§ 1983 was to protect federal rights when state courts refused to
do so, this lack of acknowledgment makes the application of
collateral estoppel inappropriate for the present case.

That Wade's Fourteenth Amendment claim was never actually
decided by the state court decisions is clear from a review of
both the motions filed by the parties and the opinions issued by
the state courts.  When Wade first moved for DNA testing, his
motion requested "that the Court order the District Attorney's
Office . . . to submit, for the purposes of DNA testing, certain
physical evidence which might contain biological materials, such
as semen, which could demonstrate his innocence of the charge of
which he was convicted."  Def. Ex. F.  No legal argument of any
kind was made; just the simple request.  The Superior Court
denied the motion because the presiding associate justice did not
find Wade's affidavit, in which he claimed innocence, to be
credible.  No legal, much less any constitutional, grounds were
cited for the decision.  The Superior Court decision presented
Wade with a Catch-22.  Because Wade had failed to supply evidence
supporting his claim of innocence, he was prohibited from testing
the DNA evidence which could potentially prove his innocence.

Wade raised a Due Process argument for the first time in his
Motion for Reconsideration, citing Godschalk, 177 F. Supp. 2d at
370, for the proposition that no matter how remote the chance of

success, if DNA testing could provide material exculpatory evidence, a criminal defendant has a limited Due Process right to access that evidence for testing.[27]  The Superior Court denied both Wade's Motion for Reconsideration and his Motion for New Trial.  In its decision, the court dismissed Wade's request for reconsideration in four sentences, noting agreement with the earlier court's judgment that Wade's affidavit was not credible. Def. Ex. M at 3.  With respect to the Motion for New Trial, the court held that trial counsel was not ineffective for failing to seek DNA testing because the available evidence strongly suggested Wade's guilt. Def. Ex. M at 4-5.  At no point did the court even *mention* Wade's assertion of a constitutional right to testing.

By simply repeating the earlier judgment's refrain that Wade's showing of innocence was insufficient to merit DNA review, the opinion strongly suggested that the constitutional claim was not even considered.  Significantly, the Due Process right described in <u>Godschalk</u> hinges not on whether the *trial* evidence suggests innocence, but on whether an exclusionary result from DNA testing would provide material exculpatory evidence.  And the determination that Wade's affidavit asserting his innocence was not credible is largely irrelevant to his § 1983 constitutional

---

[27] As noted above, that decision in fact led to Godschalk's exoneration, despite the skepticism of the district court judge and what appeared, on first glance, to be powerful evidence of guilt.  <u>See</u> <u>Godschalk</u>, 177 F. Supp. 2d at 370.

claim.  Whether or not a defendant "appears guilty" in the
absence of DNA evidence suggests very little about the
exculpatory value of the evidence or Wade's entitlement to test
it and prove his innocence.[28]   The constitutional question is
whether exculpatory DNA testing would be enough to call the
sanctity of the trial verdict into question.[29]

By focusing on Wade's inability to make an *ex ante* showing
of innocence, the Superior Court failed to give either explicit
or implicit consideration to the constitutional question before
it.  Because the due process argument was so clearly outside the
scope of either Superior Court decision, it would make little
sense to say that this legal issue was ever actually "decided" by
the court, as required by the Restatement (Second) of Judgments §
27.

Moreover, given the lack of a written opinion it is
impossible to know whether or not the Single Justice considered
the issue, let alone decided it.  "[I]f there is no showing as to

---

[28] See supra n.7.

[29] See generally n.4.  In each of the cases referred to in that
footnote, the evidence of guilt at trial was overwhelming.  None of those
individuals would have received DNA testing through the courts if forced to
meet the *ex ante* innocence showing required by the Superior Court.  But in all
of those cases, exclusionary DNA test results were enough to exonerate the
convicted individuals, despite the strong evidence introduced at trial.  For
instance, in Godschalk, the trial judge wrote, "While plaintiff's detailed
confessions to the rapes are powerfully inculpatory evidence, so to[o] any DNA
testing that would exclude plaintiff as the source of the genetic material
taken from the victims would be powerful exculpatory evidence."  Godschalk,
177 F. Supp. 2d at 370.  Thus, because exclusionary results would be material
evidence of innocence, the judge held that Godschalk was entitled to DNA
testing even though the chances of favorable results seemed "remote."  Id.
Ultimately, this testing did in fact exonerate him.  See infra n.4.

the issues that were actually decided, there is no issue
preclusion." 18 Charles Alan Wright, Arthur R. Miller, & Edward
H. Cooper, Federal Practice & Procedure § 4420 (2d ed. 2002).
See also United States v. International Bldg. Co., 345 U.S. 502,
505 (1953); Plastics, Inc. v. Illinois Tool Workers, 439 F.2d
871, 873 (1st Cir. 1971). In such cases, the burden is on the
party asserting preclusion to show that the decision involved
actual resolution of the issues. 18 Wright & Miller § 4420. See
also Lunborg v. Phoenix, 91 F.3d 265, 271-72 (1st Cir. 1996);
Frederick E. Bouchard, Inc. v. United States, 583 F. Supp. 477,
482-83 (D. Mass. 1984). Here, defendants have not attempted to
make such a showing. Because I cannot say with confidence that
the issue was actually decided in the state court proceedings, it
would be fundamentally unjust to preclude Wade from bringing his
claim in federal court.

As noted above, there is also a second, related reason to
withhold preclusive effect from the earlier decisions: Given the
mandate of § 1983, federal courts cannot, in good conscience,
apply collateral estoppel against a claim raised in state court
when the state court never even acknowledged the existence of the
constitutional principle on which the claim is based. Allen, 449
U.S. at 100-01. Wade sought permission to test his DNA evidence
in three separate actions: his motion for DNA testing, his motion
for reconsideration, and his petition to the Single Justice. All

three actions were denied by the presiding judge, yet not one mention was made, in any of the opinions, of Wade's constitutional right to test DNA evidence that could potentially prove his innocence.  Nor did any of these decisions include written findings that implied anything about Wade's Due Process claim.

Section 1983 was passed to ensure that individuals had a viable legal forum in which to vindicate their federal rights. Mitchum, 407 U.S. at 240-42; Allen, 449 U.S. at 98-101.  It did not guarantee that "'every person asserting a federal right is entitled to one unencumbered opportunity to litigate that right in a federal district court, regardless of' whether that claim has already been decided against him in a full and fair proceeding in state court." Harang v. Prosise, 462 U.S. 306, 313 (1983) (quoting Allen, 449 U.S. at 103).  But when state courts fail to even acknowledge the fundamental constitutional principles upon which an individual's claim is based, the spirit of § 1983 requires that such an opportunity be provided at the federal level.[30]

---

[30] Making any other decision for cases without a written opinion – i.e. cases where it is not entirely clear whether consideration of the federal issue was ever given – would serve to immunize any state court decision that thwarted the vindication of valid federal rights, as long as it was done without a written opinion.  Creating such a loophole in the protections guaranteed by § 1983 is antithetical to the law's purpose and would deprive individuals of important federal oversight.

Finally, concerns about giving preclusive effect to state court judgments are exacerbated when such questions concern fundamental rights in unsettled, changing (or open) areas of the law. As explained in Comment (i) of Restatement (Second) of Judgments § 29, requiring preclusion in such cases would deny courts "an opportunity to reconsider the applicable rule, and thus to perform its function of developing the law." Restatement (Second) of Judgments § 29 cmt. (i). Obviously, any such exception would have to be drawn very narrowly so that the exception would not swallow the rule.

For the reasons discussed above, I hereby deny defendants' motion to dismiss on collateral estoppel grounds.

### E.   Due Process

In their motion to dismiss, defendants argue that Wade does not have a Due Process right to DNA testing. More specifically, they assert that Brady is inapplicable because it applies to only "the discovery, after trial[,] of information which had been known to the prosecution but unknown to the defense." Kutzner, 303 F.3d at 336 (quoting United States v. Agurs, 427 U.S. 97, 103 (1976)). This position mischaracterizes Wade's claim for a much simpler, and more easily rebuttable, one. Wade's argument is that the State violated his Due Process rights by denying him access to potentially favorable evidence. This Due Process right is *analogous* to Brady, not a literal application of its pre-trial

guarantee.  A fairer rendering of this argument, and one with which this Court agrees, is that the same motivations undergirding <u>Brady</u>, the desire to avoid wrongful convictions by providing access to evidence in the prosecutor's possession, apply in the post-conviction context.

The Supreme Court has often remarked that Due Process rights are fluid and adaptable to the exigencies of a particular factual context.  <u>See</u> discussion <u>infra</u>.  <u>Brady</u> has been expanded from its limited core to various contexts not specifically contemplated by the Court's initial holding.  <u>See</u> discussion <u>infra</u>.  Each of the <u>Brady</u> expansions represents an attempt by the Court to balance the goal of avoiding wrongful convictions without imposing prohibitive costs on the criminal justice process.  In some cases, the constitutional concerns override the costs, requiring that a criminal defendant be allowed unfettered access to evidence.  In other cases, disclosure requirements are crafted more narrowly to avoid unacceptable costs.  In effect, Wade's argument is that the same balancing test that required procedural safeguards in other contexts requires post-conviction disclosure of DNA evidence in certain cases.  I agree.

Wade also presents a valid argument, for purposes of a Rule 12(b)(6) analysis, that the State has denied him meaningful access to the courts by withholding access to the requested evidence.  The Supreme Court has made clear that individuals have

a substantial interest in maintaining access to the courts.  This right is of particular importance to prisoners, who are denied access to many other means of recourse available within a democratic system.  While the phrase "access to the courts" may conjure images of physical restraint, it concerns not only literal bars, but also regulations that functionally bar defendants from pursuing their claims in court.  In the instant case, denying Wade access to DNA evidence makes it functionally impossible for him to challenge the legality of his confinement.  Absent favorable results on a DNA test, Wade will not be able to receive meaningful relief through either habeas corpus or state post-conviction proceedings.

As with all Due Process rights, Wade's entitlement is surely not absolute and can be trumped by prohibitive costs that may inhere in his request.  But no such costs have been asserted by defendants thus far, though further litigation may disclose them.[31]

------

[31] Judge Luttig's opinion in Harvey II also suggests that Wade may be entitled to relief on a straight-forward, substantive due process theory. Harvey II, 285 F.3d at 318-20.  Luttig noted, "I am reluctant to predict the Court in this highly subjective area of the law. However, I believe that, excepting those Justices peculiarly inured in what can be the ways of bureaucracy, that it could indeed be thought shockingly arbitrary that the government would literally dispose of the evidence used to deny one of his liberty (if not his right to life) before it would turn that evidence over to the individual, when he steadfastly maintains his factual innocence and asks only that he be allowed to subject that evidence to tests which, it is conceded, given the evidence introduced at trial in support of conviction, could prove him absolutely innocent of the crime." Id. at 319-20.

### 1. __Brady Rights__

Because DNA testing is still relatively new, there are few cases[32] that have considered whether a post-conviction right to DNA testing is required by the same Due Process principles that motivated __Brady__.  Neither the Supreme Court nor the First Circuit has ruled on the constitutional significance of DNA testing. Thus, __Brady__'s applicability to DNA testing, be it in the pre-trial or post-conviction context, is an issue of first impression.  Drawing on the Supreme Court's access to evidence cases, I find that the Due Process principles underlying __Brady__, at least for the purposes of a Rule 12(b)(6) analysis, support a DNA testing right in both the pre-trial and post-conviction settings.[33]

### a. __Brady's Holding and Its Applicability to DNA Testing__

__Brady__ marked the first time the Court had imposed an affirmative obligation on prosecutors to provide defendants with evidence favorable to their case.  Under the Court's ruling, all evidence favorable to the defense must be made available upon

---

[32] The few cases that have addressed the issue have split.  __See__ __Godschalk__, 177 F. Supp. 2d 366 (__Brady__ requires DNA testing); __Harvey v. Horan__, No. 00-1123-A, 2001 WL 419142 (same) (overturned by __Harvey I__, 278 F.3d 370); __Kutzner__, 303 F.3d 333 (no Due Process right to testing); __Harvey I__, 278 F.3d 370 (same).  __See also__ __Harvey II__, 285 F.3d at 311 (Luttig, J. concurring) (Due Process right is legitimate extension of principles that underlie __Brady__).

[33] This is not to say that the two rights are entirely coterminous.

request, as long as it was material to either guilt or

punishment.  Brady, 373 U.S. at 87.  Disclosure is required by

the Due Process Clause of the Constitution, irrespective of the

good or bad faith of the prosecutor.  Id.

Over time, Brady's disclosure requirements have expanded.

In Agurs, the Court held that where the evidence is "obviously of

such substantial value to the defense" prosecutors have a

constitutional duty to turn it over, even in the absence of a

request.  427 U.S. at 110.  The prosecution is also required to

reveal the contents of plea agreements with major government

witnesses.  Giglio v. United States, 405 U.S. 150, 154 (1972).

The Court's decision in United States v. Bagley, 473 U.S. 667

(1985), made clear that Brady included impeachment evidence, and

Kyles v. Whitley, 514 U.S. 419 (1995), established that the

disclosure obligations included information held by police but

unknown to prosecutors.[34]

Although Brady's holding specifically contemplated evidence

of known exculpatory value, its central premise has been adapted

to evidence of uncertain exculpatory value, such as the untested

DNA evidence in this case.  In United States v. Valenzuela-

Bernal, the Court recognized that defendant had a legitimate

interest in interviewing the witnesses who had been deported by

---

[34] Kyles also required prosecutors to view the evidence collectively.
Thus, if the evidence was exculpatory when considered together, it must be
disclosed, even if no specific item could be considered exculpatory on its
own.

the government, despite the fact that their testimony may not be exculpatory.  458 U.S. 858 (1982).  In Pennsylvania v. Ritchie, defendant sought review of complainant's confidential records held by the state's Children and Youth Services ("CYS") agency. 480 U.S. 39, 43-45 (1987).  The Court balanced the defendant's entitlement to exculpatory material with the uncertain content of the files and the victim's interest in confidentiality by requiring the trial court to conduct an *in camera* review of the files.  Id. at 58-59.  If the *in camera* review found "information that probably would have changed the outcome of [the] trial," the court would have to release it to the defendant to use in his defense.  Id. at 58-60.  Similarly, in Arizona v. Youngblood, the Court noted that granting defendant's expert access to blood and semen evidence was part of the state's compliance with Brady. 488 U.S. 51, 55 (1988).  The Court also held that defendants had a Due Process interest in "evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant."  Id. at 57.  Bad faith destruction of such evidence violates the Constitution, even though its exculpatory value is highly uncertain.

Each of the above-cited decisions imposed certain necessary restrictions on defendants' Due Process right to examine potentially exculpatory evidence.  Thus, in Valenzuela-Bernal,

the Court conditioned the right on a showing of materiality.  In
Ritchie, the Court required the trial court to conduct an *in
camera* review in order to minimize any potential breach of
confidentiality.  And in Youngblood, the Court required a showing
of "bad faith."

None of these limitations applies to Wade's case.  There are
no doubts regarding the potential materiality of the evidence,[35]
no conflicting confidentiality interests, and no issues with
evidence that has been lost.  Wade's DNA evidence is currently
being preserved by the State and is presumably available for
testing, if required by this Court.[36]  Thus, it is clear from
Court precedent that Wade has a right to DNA testing under Brady.
If there is any bar to Wade's accessing the evidence, it must be
related to the post-conviction posture of his claim.

   b.   **Brady, Wrongful Conviction, and Due Process**

---

[35] The materiality of DNA evidence is highlighted by the Court's recent
decision in House v. Bell, 126 S. Ct. 2064 (2006), in which a defendant
attempted to use new, exculpatory DNA evidence to clear the procedural hurdles
imposed on his defaulted habeas claims.  The Court held that because the DNA
evidence undermined the only physical evidence that linked House to the crime
scene, House was able to meet the stringent "actual innocence" showing
necessary to clear the procedural bars.  Id. at 2076-86.  Materiality is also
implied by the Court's recognition in Youngblood, that part of the state's
compliance with Brady was met by providing the blood and semen samples for
testing by the defense.  488 U.S. at 55.

[36] Moreover, "[f]rom a constitutional perspective, there is no
functional difference between denying access to evidence in the prosecutor's
possession and bad faith destruction of that evidence; in both cases, evidence
which 'could form a basis for exonerating the defendant' has been deliberately
denied to the defendant."  Seth F. Kreimer & David Rudovsky, Double Helix,
Double Bind: Factual Innocence and Postconviction DNA Testing, 151 U. PA. L.
REV. 547, 586 (2002) (hereafter "Double Helix").

The Supreme Court has declared that "'due process,' unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstance[]." Matthews v. Eldridge, 424 U.S. 319, 334 (1976) (quoting Cafeteria Workers v. McElroy, 367 U.S. 886, 895 (1961)). On the contrary, Due Process "'is flexible and calls for such procedural protections as the particular situation demands.'" Greenholtz v. Inmates of Nebraska Penal & Correctional Complex, 442 U.S. 1, 12 (1979) (quoting Morrissey v. Brewer, 408 U.S. 471, 481 (1972)). This flexibility is "necessary to gear the process to the particular need; the quantum and quality of the process due in a particular situation depend upon the need to serve the purpose of minimizing the risk of error." Id. at 13 (citation omitted).

In order to determine the appropriate scope of Due Process rights, the Court must consider, as it did in Brady, "(1) the nature of the private interest at stake, . . . (2) the value of the additional safeguard, and (3) the adverse impact of the requirement upon the Government's interests." United States v. Ruiz, 536 U.S. 622, 631 (2002). See also Wolff v. McDonnell, 418 U.S. 539, 560 (1974).

While Due Process does not require that every conceivable step be taken, irrespective of cost, "'to eliminate the possibility of convicting an innocent person,'" Herrera v. Collins, 506 U.S. 390, 399 (1993) (quoting Patterson v. New York,

-40-

432 U.S. 197, 208 (1977)), this interest is profoundly important
and is the driving force behind <u>Brady</u>.  <u>See, e.g.</u>,<u>Bagley</u>, 473
U.S. at 675 (stating that <u>Brady</u>'s purpose is "to ensure that a
miscarriage of justice does not occur").  The interest in
ensuring verdicts worthy of confidence is essential not only to
<u>Brady</u>, but to its various progeny.  As the Court noted in
<u>California v. Trombetta</u>, the cases granting "constitutionally
guaranteed access to evidence" all derive from the joint
constitutional imperatives of "protecting the innocent from
erroneous conviction and ensuring the integrity of our criminal
justice system."  467 U.S. 479, 485 (1984).  <u>See also</u> <u>Agurs</u>, 427
U.S. at 112 (recognizing "our overriding concern with the justice
of the finding of guilt"); <u>Kyles</u>, 514 U.S. at 434 (stating that
the relevant issue is "whether in [the absence of exculpatory
evidence defendant] received a fair trial, understood as a trial
resulting in a verdict worthy of confidence").  In each of the
access to evidence cases, this interest in fundamental fairness
trumped the adverse impact imposed on the government by new
procedural requirements.

### c.  <u>Due Process Analysis</u>

The original "access to evidence" right in <u>Brady</u> derived
from the Court's recognition that defendants possess a
substantial interest in obtaining favorable evidence, which
outweighs the minimal adverse impact on prosecutors.  After

conviction, the defendant's interest in accessing evidence may be reduced, and the government's costs in providing evidence may be higher, but this does not imply the absence of a post-conviction Due Process right – just the striking of a different Due Process balance.

   As an historical matter, <u>Brady</u> applied to *pre-trial* disclosure requirements.  Its focus on pre-trial obligations stems from the criminal trial's traditional status as the determinative adjudication of guilt or innocence.  Traditionally, the Court has been reluctant to reconsider trial determinations of guilt or innocence because of both the cost attendant to allowing such review, <u>see</u> <u>Schlup v. Delo</u>, 513 U.S. 298, 321 (1995); <u>Herrera</u>, 506 U.S. at 401, and doubt that subsequent determinations would improve reliability.  <u>See</u> <u>Herrera</u>, 506 U.S. at 403 ("[T]he passage of time only diminishes the reliability of criminal adjudications."); <u>McCleskey v. Zant</u>, 499 U.S. 467, 491 (1991) ("[W]hen a habeas petitioner succeeds in obtaining a new trial, the 'erosion of memory and dispersion of witnesses that occur with the passage of time' prejudice the government and diminish the chances of reliable criminal adjudication.") (<u>quoting</u> <u>Kuhlmann v. Wilson</u>, 477 U.S. 436, 453 (1986) (plurality opinion)).

   Although the same interest that motivated <u>Brady</u> – avoiding the wrongful conviction of the innocent – still applies in the

-42-

post-conviction setting,[37] the chance of reliable adjudication may decrease in a subsequent trial because the truth-finding value provided by new evidence is outweighed by the inevitable erosion of memory and dispersion of witnesses that happens over time. This is particularly true where the evidence comes from a newly emergent witness, as in Herrera. 506 U.S. at 415. The

_____

[37] Neither the Supreme Court nor the First Circuit have addressed this issue, but logic dictates that conviction cannot entirely eradicate the interest at stake. Whenever an exclusionary DNA test result will destroy confidence in a verdict, the *exact* same interests that are present in Brady and In re Winship, 397 U.S. 358 (1970), are also present. The costs of vindicating those interests may have changed post-conviction – and as a result, plaintiff's entitlement to relief may have changed – but the interest itself is identical. A criminal defendant's right to a verdict worthy of confidence simply cannot be lost by virtue of his having received a trial verdict that is, itself, not worthy of confidence.

Moreover, the existence of such an interest can also be implied from various statements by the Court. For instance, the Court has noted that "a prisoner retains an overriding 'interest in obtaining his release from custody if he is innocent of the charge for which he was incarcerated.'" Schlup, 513 U.S. at 321 (quoting Kuhlmann, 477 U.S. at 252 (Powell, J. concurring)). The court has also demonstrated on numerous occasions that "[e]ven those in our society who have been lawfully deprived of their freedom retain residual, substantive liberty interests." Harvey II, 285 F.3d at 312 (Luttig, J. concurring). See also Youngberg v. Romeo, 457 U.S. 307, 315 (1982) ("The mere fact that [petitioner] has been committed under proper procedures does not deprive him of all substantive liberty interests under the Fourteenth Amendment."); Vitek v. Jones, 445 U.S. 480, 491-94 (1980) (holding that convicted prisoner possessed a liberty interest in not being transferred to a mental institution without Due Process). In fact, even "the core liberty interest protected by the Fourteenth Amendment – freedom from bodily restraint – itself, residually survives conviction and incarceration." Harvey II, 285 F.3d at 312-13 (citing Foucha v. Louisiana, 504 U.S. 71, 80 (1992); Greenholtz, 442 U.S. at 18; Youngberg, 457 U.S. at 316). Although the Court has never ruled on the existence of a post-conviction Brady right, the existing cases strongly suggest that core due process interests – such as the interests that undergird Brady – must also survive conviction.

Even were this not true, Judge Luttig has explained that a prisoner retains "at least a residual, substantive liberty interest in meaningful access to existing executive mechanisms of clemency, [in order to] pursue his freedom from confinement from the executive based on the claim that he is factually innocent of the crime for which he was convicted." Id. at 314. If executive clemency is truly the "fail safe" for the wrongly convicted, as described by the Court, see Herrera, 506 U.S. at 415, prisoners have a clear due process interest in access to the evidence necessary to make a showing of innocence.

perceived unreliability of most new evidence, such as new witness
testimony, makes it unlikely that a new trial would provide a
substantially more accurate determination of guilt or innocence.
Absent an improved determination, it is hard to justify the added
cost incurred by the government, especially if this potential
right were extended to every individual convicted of a crime.
Thus, before the advent of DNA technology, the questionable value
of a <u>Brady</u> safeguard for defendants and the substantial cost of
implementing the safeguard made restricting <u>Brady</u> to the pre-
trial context more understandable.

DNA evidence fundamentally alters the traditional Due
Process calculus.  In cases where DNA evidence could have
exculpated a defendant and was not utilized at trial, one can no
longer describe the earlier adjudication as deciding guilt or
innocence "within the limits of human fallibility."  <u>Herrera</u>, 506
U.S. at 401.  The "limits of human fallibility" have advanced,
making it possible to improve on earlier decisions, even after
accounting for "erosion of memory" and "dispersion of witness"
concerns.  As a result, the adjudication at trial is no longer
the most reliable determination of guilt or innocence possible
for this limited set of cases.[38]

---

[38] Even the Justice Department's National Commission on the Future of
DNA Evidence has observed, "[t]he strong presumption that verdicts are
correct, one of the underpinnings on restrictions on post-conviction relief,
has been weakened by the growing number of convictions that have been vacated
by exclusionary DNA test results."  <u>Postconviction DNA Testing:</u>
<u>Recommendations for Handling Requests</u>, Nat'l Inst. Just, U.S. Dept. Just., NCJ

Recognition of a Due Process right to access may impose administrative judicial costs as well as adversely impairing the government's interest in finality.  But none of these costs will be significant, particularly in light of the interests counter-balancing them.

The Supreme Court has explained that the interest in finality is, in reality, an amalgam of several interests, namely: retribution, deterrence, the quality of judging, and the interest of victims in finality.  <u>Calderon v. Thompson</u>, 523 U.S. 538, 555-556 (1998).  None of these interests is adversely affected by allowing for DNA testing in cases where an exclusionary test result would reveal a fundamental defect in the trial verdict.  DNA testing does not itself attack the finality of a judgment.  Attacks on a conviction can only occur if a DNA test yields exculpatory results.  In these cases, the State should have grave concerns about the fairness and accuracy of the original verdict.  When the State loses faith in a trial verdict, it no longer has valid reason to detain an individual. Retribution and deterrence are not served by continued incarceration, and judging is not improved by further detention.

Even the victims' interests are not served.  Victims may have an interest in moving on, but they do not have an interest in imprisoning the wrong person.  On the contrary, the State's

---

177626 (Sept. 1999).

interests may actually support the release, or at least re-trial, of such individuals.  See Herrera, 506 U.S. at 398 (citing United States v. Nobles, 422 U.S. 225, 230 (1975)) ("[T]he central purpose of any system of criminal justice is to convict the guilty and free the innocent."); Schlup, 513 U.S. at 325 (quoting In re Winship, 397 U.S. 358, 372 (1970) (Harlan, J. concurring) ("[C]oncern about the injustice that results from the conviction of an innocent person has long been at the core of our criminal justice system.  That concern is reflected, for example, in the 'fundamental value determination of our society that it is far worse to convict an innocent man than to let a guilty man go free.'").  In accordance with the State's interest in doing justice, exculpatory DNA results may allow the state to both free the innocent and convict the guilty.  Not only have 183 individuals been exonerated thus far by DNA evidence,[39] but almost 30% of the exonerations have led to the apprehension of the real perpetrator.[40]

Scarce administrative and judicial resources are also not threatened by post-conviction DNA testing.  In cases where the convicted individual has agreed to foot the bill for testing,

---

[39] See http://www.innocenceproject.org (last visited Aug. 22, 2006).

[40] Barry C. Scheck, Barry Scheck Lectures on Wrongful Convictions, 54 DRAKE L. REV. 597, 602 (2006).  Scheck noted that 47 real perpetrators had been apprehended out of the first 165 exonerations.  Since the time of his lecture, 18 more individuals have been exonerated.  Because I do not have the new apprehension figure, the above-cited statistic is the percentage of the first 165 exonerations that led to an apprehension (47/165=28.5%).

prosecutors need only grant access to DNA evidence already in
their possession.  If the test provides results that are
inculpatory or inconclusive, the defendant will provide no new
tax on resources.  And if the test results are exculpatory, the
State may willingly release the individual.  Even if a new trial
is necessary, our society has clearly expressed a value judgment
that a reliable determination of guilt or innocence is worth the
cost of a fair trial.

Because the individual interests implicated by DNA testing
so profoundly outweigh the adverse impact on the state, I find
that the Due Process Clause provides a substantive right to post-
conviction DNA testing in cases where testing could raise serious
doubts about the original verdict.  Significantly, the motion
before the Court does not raise the issue of what specific
standards should be applied to determine when testing should be
ordered.  Defendants argue only that no right to access DNA
evidence exists; neither party has discussed the propriety of any
particular standards.  Thus, the question of what the appropriate
standard may be, or whether Wade can meet this standard, is not
properly before the Court.

### 2.    Meaningful Access to the Courts

Plaintiff has also asserted that defendants' actions
violated his Due Process right to meaningful access to the
courts.  Defendants do not specifically address this portion of

the Complaint, but inferentially oppose the claim by arguing that Wade is not entitled to any legal recourse.

It is undisputed that individuals have a fundamental right to meaningful access to the courts.  See, e.g., Bounds v. Smith, 430 U.S. 817, 828 (1977) (recognizing a "fundamental constitutional right of access to the courts"); Graham v. Nat'l Collegiate Athletic Ass'n, 804 F.2d 953, 959 (6th Cir. 1986) ("It is beyond dispute that the right of access to the courts is a fundamental right protected by the Constitution."). Double Helix, 151 U. PA. L. REV. at 567.  See also McCarthy v. Madigan, 503 U.S. 140, 153 (1992) ("Because a prisoner ordinarily is divested of the privilege to vote, the right to file a court action might be said to be his remaining most 'fundamental political right, because preservative of all rights.'") (quoting Yick Wo v. Hopkins, 118 U.S. 356, 370 (1886)).  Without access to the courts, prisoners would have no means of contesting wrongful convictions.  Thus, limitations imposed by the State on the right of access manifest themselves in a denial of the substantive constitutional rights protected by the courts.

The Constitution requires access to the courts to be "adequate, effective, and meaningful."  Bounds, 430 U.S. at 822. See also Bell v. Milwaukee, 746 F.2d 1205, 1261 (7th Cir. 1984) (overturned on other grounds); Heinrich ex rel. Heinrich v. Sweet, 62 F. Supp. 2d 282, 315 (D. Mass. 1999).  "To deny such

-48-

access defendants need not literally bar the courthouse door or
attack plaintiffs' witnesses." Bell, 746 F.2d at 1261. In this
vein, the Supreme Court has held that prisons may not prohibit
inmates from assisting other inmates in the preparation of habeas
corpus petitions, unless an alternative means of assistance is
provided. Procunier v. Martinez, 416 U.S. 396 (1974). See also
Johnson v. Avery, 393 U.S. 483, 490 (1969) (affirming a judgment
requiring state court officials to provide indigent inmates with
access to a reasonably adequate law library); Younger v. Gilmore,
404 U.S. 15 (1971) (holding that prison authorities must assist
inmates in the filing of "meaningful legal papers" by providing
either adequate law libraries or the assistance of individuals
trained in the law); Bounds, 430 U.S. at 828 (finding that a
prison regulation restricting attorney-client interviews with
prisoners to members of the bar and private investigators
infringed on prisoners' meaningful right of access to the
courts). This promise "does not guarantee inmates the
wherewithal to transform themselves into litigating engines
capable of filing everything from shareholder derivative actions
to slip-and-fall claims." Lewis v. Casey, 518 U.S. 343, 355
(1996). However, it does require that the State provide the
tools that "inmates need in order to attack their sentences,
directly or collaterally, and in order to challenge the
conditions of their confinement." Id.

Denying prisoners access to potentially exculpatory DNA
evidence limits meaningful access to the courts in even more
profound terms than denying access to a law library or attorney.
While the latter restrictions substantially impinge on a
prisoner's ability to gain judicial access, the former operates
as an absolute bar.

The Supreme Court has never addressed a similar question,
but the Seventh Circuit has held that the "constitutional right
[to access] is lost where, as here, police officials shield from
the public and the victim's family key facts which would form the
basis of the family's claims for redress." <u>Bell</u>, 746 F.2d at
1261 (city police officer fatally shot an individual, planted a
weapon in the hands of the victim, and then conspired with other
officers to hide the crime). Analogously, I hold that when the
State refuses to provide DNA evidence that could undermine the
legitimacy of a prisoner's underlying conviction, the
constitutional right to access the courts is also lost.

      3.   <u>**Additional Claims**</u>

Plaintiff has also raised claims for violation of procedural
due process of law (second claim), actual innocence (fourth
claim), confrontation and compulsory process (fifth claim), and
cruel and unusual punishment (sixth claim). Defendants do not
address any of these claims in their motion to dismiss, arguing
only that plaintiff has not stated a claim for which relief can

be granted.  Because these claims were not addressed by defendant, it is not necessary to discuss any of them at this point.

## IV.  <u>CONCLUSION</u>

For the reasons stated herein, Defendants' Motion to Dismiss (document #38) is hereby **DENIED.**


**SO ORDERED.**

**Date:  October 27, 2006**          /s/Nancy Gertner
                              **NANCY GERTNER, U.S.D.C.**