UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. No. 04-12135-NG

ROBERT WADE,
Petitioner

v.

BERNARD F. BRADY, Acting Superintendent,
MARTHA COAKLEY, Attorney General, and
TIMOTHY J. CRUZ, District Attorney for Plymouth County
Respondents

**MEMORANDUM IN SUPPORT
OF MOTION FOR SUMMARY JUDGMENT**

I.      <u>**Introduction**</u>

In the Court's initial opinion denying the Defendants' motion to dismiss, it answered several critical questions relating to Mr. Wade's §1983 action.  Similarly, the Court left certain issues unresolved, issues which will be addressed in the instant summary judgment motion. Once addressed, it will be obvious that summary judgment is appropriate because there are no genuine issues in dispute as to any material facts.

A.      <u>**Questions Previously Answered**</u>

The Court resolved several issues in its initial opinion.  First, it recognized that the "advent of DNA testing has been a watershed development for criminal law and criminal procedure, allowing for a qualitative advance in the determination of guilt or innocence." <u>Wade v. Brady</u>, 460 F.Supp.2d 226, 230 (D.Mass. 2006).  DNA's "unique qualities" to exonerate the innocent and identity the guilty, "justif[ies] a completely different balance than the courts usually

strike in addressing post-conviction challenges." Id. at 231.  Specifically, because "DNA testing

can exonerate the defendant, the government may only legitimately deny access to testing if it

has a compelling reason to do so." Id.  Moreover, even if a legitimate interest exists, it must still

give way "[w]here DNA can prove that a miscarriage of justice was perpetrated by an earlier

verdict[.]" Id.

Second, the Court held that Mr. Wade's request to access physical evidence did not

violate Heck v. Humphrey, 512 U.S. 477 (1994).  As the Court explained, "[n]othing about this

request 'necessarily' implies **anything** about [Mr. Wade's] underlying conviction." Id. at 236

(emphasis in original).  In particular, the DNA test results "could be inconclusive or

inculpatory." Id.  Additionally, if the DNA tests produced "exculpatory results, [Mr. Wade's]

conviction would stand unless" he "successfully challenged it in a separate action, brought at a

future date, alleging a different constitutional violation altogether." Id.

Third, the Court identified two "major impediments" which precluded collateral estoppel

principles from barring Mr. Wade's § 1983 action. Id. at 240.  The first impediment is "that none

of the state court decisions ever decided whether [Mr.] Wade had a Due Process right to DNA

testing." Id. at 240-41.[1]  Because the Commonwealth courts never decided the issue, "it cannot

have a preclusive effect." Id. at 241.  The second impediment is that the Commonwealth courts

failed to "acknowledge[] the constitutional principle upon which [Mr.] Wade based his claim for

DNA testing[.]" Id.  The Commonwealth courts' failure to acknowledge the federal

constitutional basis of Mr. Wade's claim–and to rule on the federal issue–"makes the application

---

[1] See also Id. at 242 ("Because the due process argument was so clearly outside the scope of either Superior Court decision, it would make little sense to say that this legal issue was ever actually 'decided' by the court, as required by the Restatement (Second) of Judgments § 27.").

of collateral estoppel inappropriate for the present case." Id. 241, 243.

Fourth, and most importantly, the Court held that Mr. Wade possessed a due process right to post-conviction DNA testing. The Court correctly noted that "DNA evidence fundamentally alters the traditional Due Process calculus." Id. at 248. Drawing on the U.S. Supreme Court's access to evidence cases, the Court initially concluded that: (1) the physical evidence was material and potentially exculpatory; (2) no confidentiality issues prevented its disclosure; and (3) the evidence had not been destroyed (in good or bad faith). Id. at 245 (citing United States v. Valenzuela-Bernal, 458 U.S. 858 (1982), Pennsylvania v. Ritchie, 480 U.S. 39 (1987), and Arizona v. Youngblood, 488 U.S. 51 (1988)). Similarly, the Court recognized that Brady and its progeny were aimed at "protecting the innocent from erroneous conviction and ensuring the integrity of our criminal justice system," Id. at 246 (quoting California v. Trombetta, 467 U.S. 479, 485 (1984), an that in each case, the defendant's right to "fundamental fairness trumped the adverse impact imposed on the government by new procedural requirements." Id. at 247. Additionally, the Court recognized that because DNA evidence does not present with the same shortcomings as other post-conviction evidence–i.e., erosion of memory or dispersion of witnesses–any concerns that DNA testing will not improve the adjudication's accuracy are meritless. Id. at 248 ("the adjudication at trial is no longer the most reliable determination of guilt or innocence possible for this limited set of cases."). The Court also recognized that DNA testing does not impose substantial administrative costs or significantly impair the government's interest in finality. Id. at 248-49. Consequently, because "individual interests implicated by DNA testing so profoundly outweigh the adverse impact on the state," the Court found that the "Due Process Clause provides a substantive right to post-conviction DNA testing in cases where

testing could raise serious doubts about the original verdict." Id. at 249.

Fifth, the Court held that Mr. Wade presented a "valid argument" that the "State has denied him meaningful access to the courts by withholding access to the requested evidence." Id. at 244. As the Court recognized, "denying [Mr.] Wade access to DNA evidence makes it functionally impossible for him to challenge the legality of his confinement. Absent favorable results on a DNA test, [Mr.] Wade will not be able to receive meaningful relief through either habeas corpus or state post-conviction proceedings." Id.

B.    **Questions Not Answered**

The Court left two significant issues unresolved. The outcome of these issues will dictate whether Mr. Wade is entitled to summary judgment. First, the Court refused to definitively answer whether the statute of limitations barred Mr. Wade's §1983 action. Id. at 235, 249. Intertwined with this issue is whether Mr. Wade is entitled to equitable tolling if he is in fact time barred. Id. at 231. Second, while the Court recognized that Mr. Wade possessed a due process right to DNA testing, it did not articulate "what showing a defendant must make before receiving access to DNA evidence." Id. at 231. Not having articulated the appropriate "showing," the Court did not determine "whether the facts of [Mr. Wade's] case meet the showing required for the relief sought." Id.

As explained infra, Mr. Wade's §1983 action is timely; if it is not, he is entitled to equitable tolling. Likewise, to trigger his constitutional right to DNA testing, Mr. Wade must show that the envisioned DNA testing has the potential to raise "serious doubts" about his or her "original conviction." Wade v. Brady, 460 F.Supp.2d at 249. The physical evidence, which Mr. Wade seeks to test, has the potential to produce such results. Consequently, he is entitled to

4

access the physical evidence.

## II.    <u>Statement of Facts</u>

Robert Wade, a mentally challenged individual with an IQ of 72, worked as a farm hand for the victim in Lakeville, Massachusetts; Mr. Wade also lived on the farm in a cabin.  On October 24, 1993 the victim's son found his mother naked and injured in Mr. Wade's cabin; she had been physically and sexually assaulted.  Shortly thereafter, medical personnel examined the victim and collected her clothing and rape kit specimen (i.e., vaginal swabs, vaginal smear slide, fingernail scrapings).  Three weeks later, the victim died of pneumonia on November 13, 1993. The Commonwealth indicted Mr. Wade (and only him) for rape and felony murder.  Mr. Wade pled not guilty and proclaimed his innocence.

Pre-trial examination of the vaginal swabs, the vaginal smear slide, and the victim's clothing tested positive for semen and sperm.  Additionally, the vaginal swab tests revealed the presence of both H **and A antigens**.  Likewise, blood tests indicated that Mr. Wade is a secretor with type O blood, while the victim was also a secretor with type O blood; O secretors only yield an H antigen when serologically examined.  Thus, "[b]ecause the victim also has Type O  blood, the presence of  A antigens, if accurately typed, suggests that a third party's blood and/or semen was also present on the victim's clothing." <u>Wade v. Brady</u>, 460 F.Supp.2d at 232.  Neither the Commonwealth nor Mr. Wade pursued DNA testing prior to trial.

At trial, the Commonwealth presented rudimentary serological evidence regarding the vaginal swab and the victim's clothing; the Commonwealth's serologist informed the jury Mr. Wade could not be excluded as a possible contributor of the semen identified on the vaginal swab and the victim's orange pants.  More importantly, the serologist conceded that her tests

revealed the presence of a third-party.  During closing arguments, the prosecutor greatly exaggerated the serologist's conclusions and proclaimed that the serology evidence unequivocally proved the semen came from Mr. Wade.[2]  The jury convicted Mr. Wade in September 1997.

To prove his innocence, by establishing the unknown third-party's identity, Mr. Wade sought access to the potentially exculpatory vaginal swabs, vaginal smear slide, and the victim's orange pants in state court.  These items are, without question, directly relevant to the victim's sexual assault and to proving Mr. Wade's actual innocence; if subjected to DNA testing, they have the potential to produce results, which would "raise serious doubts about [his] original verdict." Wade v. Brady, 460 F.Supp.2d at 249.  Despite this showing, the Commonwealth courts denied him access to the sought after physical evidence.

Mr. Wade petitioned this Court for relief pursuant to § 1983, claiming the Defendants violated (and continue to violate) his federal constitutional right to access potentially exculpatory evidence.  The Court, as mentioned, recognized a federal constitutional right to access potentially exculpatory evidence, in the post-conviction context, when DNA testing is involved and when a certain threshold is satisfied.  The issues presently before the Court concern whether Mr. Wade's § 1983 action is timely and whether he presented sufficient facts to trigger his right to access potentially exculpatory evidence for DNA testing purposes.

---

[2] Notwithstanding his repeated claims of innocence, Mr. Wade's trial counsel pursued an illogical and objectively unreasonable trial strategy; he informed the jury that while Mr. Wade did in fact have intercourse with the victim, it was consensual (i.e., a consent defense).  Trial counsel's strategy was unreasonable for two reasons; first, the victim suffered from Alzheimer's disease and therefore did not have the requisite capacity to consent; and second, the strategy completely undermined Mr. Wade's

## III.    Arguments

As discussed *infra*, Mr. Wade is entitled to summary judgment regarding the statute of limitations and the threshold issues.

### A.    Summary Judgment Standard

Under Rule 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); accord Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 585-86 (1986).[3] Summary judgment's primary purpose is to "isolate and dispose of factually unsupported claims or defenses[.]" Celotex Corp. V. Catrett, 477 U.S. at 323-24. Moreover, summary judgment is "an integral part of the Federal Rule... which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" Id. at 327 (citation omitted).

To avoid summary judgment, the nonmoving party must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,'" and identify "specific facts showing that there is a genuine issue for trial." Id. at 324; accord Anderson v. Liberty Lobby, Inc., 477 U.S. at 250; Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. at 587.[4] The "mere existence of **some** alleged factual dispute between the

___

repeated claims of innocence. In short, trial counsel's defense guaranteed a conviction.

[3] The "standard" for granting summary judgment "mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a)[.]" Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986) (citing FED. R. CIV. P. 50(a)).

[4] Mr. Wade concedes that "[o]n summary judgment the inferences to be drawn from the underlying facts... must be viewed in the light most favorable to the party opposing the motion." United States v. Diebold, Inc., 369 U.S. 654, 655 (1962); accord Matsushita Elec. Indus. Co., Ltd. v. Zenith

parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no **genuine** issue of **material** fact." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. at 247-48 (emphasis in original); <u>accord</u> <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. at 586; <u>Mulloy v. Acushnet Co.</u>, 460 F.3d 141, 145 (1st Cir.2006). Similarly, the Court may not consider factual disputes which are "irrelevant or unnecessary" to the primary issues at hand. <u>Id.</u> at 248.   Conversely, the moving party's burden "may be discharged by 'showing'... that there is an absence of evidence to support the nonmoving party's case." <u>Id.</u> at 325.

The Court's "function is not himself [or herself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. at 249.  Ultimately, then, the critical issue is whether "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Id.</u> at 248, 250. Thus, if "reasonable minds could differ as to the import of the evidence," the Court may not enter summary judgment. <u>Id.</u> at 250-51; <u>Sanchez v. Alvarado</u>, 101 F.3d 223, 227 (1st Cir.1996). However, the "mere existence of a scintilla of evidence" supporting the nonmoving party's position is "insufficient" to defeat the moving party's request for summary judgment. <u>Id.</u> at 252. Simply put, where the "record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. at 587.

### B.    <u>Mr. Wade's § 1983 Action is Timely</u>

Mr. Wade's § 1983 action is timely for several reasons.  First, pursuant to 42 U.S.C. §

---

Radio Corp., 475 U.S. at 587; <u>O'Connor v. Steeves</u>, 994 F.2d 905, 907 (1st Cir.1993).

1988, no statute of limitations should apply because the Innocence Protection Act demonstrates a clear federal interest against applying a statute of limitations in the post-conviction DNA context. Second, because Mr. Wade's action is equitable, laches, rather than a statute of limitations, applies. Third, the Defendants' refusal to grant access to the physical evidence represents a continuing violation, wherein the accrual date starts anew each day the Defendants refuses to disclose the evidence. Fourth, even if Massachusetts's personal injury statute of limitations (SOL) applies, Mr. Wade's action is timely because the SOL did not begin to accrue until the Commonwealth court denied his DNA testing petition on July 29, 2003. And fifth, if Mr. Wade's petition is untimely, the statute of limitations should be equitably tolled due to Mr. Wade's illiteracy and mental retardation.

### 1. 42 U.S.C. § 1988 Mandates that the Court Refer to and Adopt the Innocence Projection Act's Timeliness Requirements

Section 1983 "creates a private right of action for violations of federally protected rights." Vistamar, Inc. v. Fagundo-Fagundo, 430 F.3d 66, 69 (1st Cir.2005); Mitchum v. Foster, 407 U.S. 225, 239 (1972). Section 1983, however, does not contain a specific statute of limitations. See Wilson v. Garcia, 471 U.S. 261, 266 (1985).[5] Consequently, "a § 1983 claim, according to 42 U.S.C. § 1988, borrows the appropriate state law governing limitations unless **contrary to federal law**." Poy v. Boutselis, 352 F.3d 479, 483 (1st Cir. 2003) (citing Wilson v.

---

[5] To fill this void, federal courts used to look for the "most analogous" statute of limitations, Board of Regents, Univ. of New York v. Tomanio, 446 U.S. 478, 488 (1980), and "most appropriate," Johnson v. Railway Express Agency, Inc., 421 U.S. 454, 462 (1975), to the particular § 1983 action, so long as the selected limitations period coincides with federal law and policy. E.g., Owens v. Okure, 488 U.S. 235, 239 (1989); Wilson v. Garcia, 471 U.S. at 266-67; Occidental Life Ins. Co. of California v. EEOC, 432 U.S. 355, 367 (1977). As Mr. Wade will demonstrate, Massachusetts's personal injury statute of limitations is "contrary to" and "inconsistent with" federal law—namely, the Innocence Protection Act.

Garcia, 471 U.S. at 267) (emphasis added).  Generally, federal courts have applied the forum state's personal injury statute of limitations in § 1983 actions.  See Wallace v. Kato, 127 S.Ct. 1091, 1094 (2007); Wilson v. Garcia, 471 U.S. at 267-69.[6]  However, as the First Circuit noted in *Poy v. Boutselis*, if the forum state's statute of limitations is "contrary to" or "inconsistent with" federal law, the federal law's limitation period trumps the forum state's limitations period. 352 F.3d at 483; accord Burnett v. Grattan, 468 U.S. 42, 47 (1984) ("courts are to apply state law only if it is not 'inconsistent with the Constitution and laws of the United States.'").  Accordingly, the question becomes whether Massachusetts's personal injury statute of limitations period is "contrary to" or "inconsistent with" federal law.

Massachusetts's personal injury statute of limitations **is** "contrary to" and "inconsistent with" federal law.  Mr. Wade's suit for DNA testing is identical to the remedy granted to federal (and certain state) prisoners in the Innocence Protection Act of 2004 (IPA).  See 18 U.S.C. § 3600.  Congress enacted the IPA "to provide a defendant convicted of a crime through mostly circumstantial evidence a vehicle to petition for DNA testing in cases where it had not been previously done (or where the procedures have been improved through the passage of time) to show that the DNA evidence did not implicate him in the crime." United States v. Boose, 498 F.Supp.2d 887, 889 (N.D. Miss. 2007).  Accordingly, when Congress enacted the IPA, it expressed a clear federal interest with respect to post-conviction DNA testing.[7]

---

[6] As noted *infra*, the Massachusetts statute governing personal injury claims is Mass. Gen. Laws ch. 260, § 2A, providing that actions shall be commenced "within three years next after the cause of action accrues."  Massachusetts begins counting on the day following the day of the incident, with the last day for filing suit being the anniversary date of the event, in accordance with Mass. R. Civ. P. 6(a). See Ciampa v. January, 1992 Mass.App. Div. 204 (1992).

[7] Likewise, the IPA represents "a rule from elsewhere in federal law [that] clearly provides a closer analogy" to Mr. Wade's suit than Massachusetts's personal injury statute. DelCostello v.

Significantly, Congress imposed no statute of limitations regarding when a petitioner must file his DNA testing petition. See 18 U.S.C. § 3600. This is understandable because "the entire purpose of the statute is to permit collateral review of convictions through DNA testing— **no matter how much time has transpired—or what other deadlines have passed**. What the statute seeks–with its narrow tailoring–is justice itself." United States v. Boose, 498 F.Supp.2d at 889 (emphasis added). From Congress's well-considered perspective, justice can be served at any time when DNA evidence can raise "serious doubts" about a petitioner's conviction. Stated differently, in the DNA context, it simply cannot be said that "because of the passage of time, the memories of witnesses have faded or evidence is lost" such that "[j]ust determinations of fact cannot be made" and a statute of limitations is warranted. Wilson v. Garcia, 471 U.S. at 271. In its initial opinion, the Court agreed with this sentiment:

> DNA evidence fundamentally alters the traditional Due Process calculus. In cases where DNA evidence could have exculpated a defendant and was not utilized at trial, one can no longer describe the earlier adjudication as deciding guilt or innocence "within the limits of human fallibility." The "limits of human fallibility" have advanced, making it possible to improve on earlier decisions, even after accounting for "erosion of memory" and "dispersion of witness" concerns. As a result, the adjudication at trial is no longer the most reliable determination of guilt or innocence possible for this limited set of cases.

Wade v. Brady, 460 F.Supp.2d at 248. Thus, when DNA evidence enters into the fray, it can no longer be said that a federal cause of action "brought at any distance of time" is "utterly repugnant to the genius of our laws." Adams v. Woods, 2 Cranch 336, 342, 2 L.Ed.2d 297 (1805).

Given 42 U.S.C. § 1988's directive and the constitutional principle that it is "imperative" the judiciary "accord[] respect to... Congress," Ashcroft v. American Civil Liberties Union, 542

---

Teamsters, 462 U.S. 151, 172 (1983); accord Reed v. United Transp. Union, 488 U.S. at 324.

U.S. 656, 660 (2004), the Court must apply the IPA's statutory framework to Mr. Wade's § 1983 action.[8]  Moreover, because the IPA has no statute of limitations, it would defy logic and constitutional principles to strictly apply a limitations period–intended by the Commonwealth's legislature to only apply to state personal injury actions–to a § 1983 action premised on a federal right to obtain the exact same relief.

Congress is not the only branch of the federal government which has spoken to the federal interest in refusing to impose a statutory time limit on post-conviction DNA testing. Successive presidential administrations have also recognized that DNA revolutionized this country's criminal justice system precisely because its value does not fade over time. E.g., NAT'L INST. OF JUST., DEPT. OF JUST., CONVICTED BY JURIES, EXONERATED BY SCIENCE: CASE STUDIES IN THE USE OF DNA EVIDENCE TO ESTABLISH INNOCENCE AFTER TRIAL (1996) (Clinton Administration); NAT'L INST. OF JUST., DEP'T OF JUST., USING DNA TO SOLVE COLD CASES (July 2002) (Bush Administration).  Because DNA testing is more objective, discriminating, and accurate than lay evidence, access to post-conviction DNA testing has fundamentally altered the "finality" equation.  As the Department of Justice noted in its groundbreaking 1999 report on post-conviction DNA testing:

> The results of DNA testing do not become weaker over time in the manner of testimonial proof.  To the contrary, the probative value of DNA testing has been

---

[8] Courts still recognize the importance of § 1988's command to let the federal interest govern the rules of decision in § 1983 actions. E.g., Wilson v. Morgan, 477 F.3d 326, 332-33 (6th Cir. 2007) (apply § 1988's inconsistent-with-federal-interest test to a choice-of-law question presented in a § 1983 action); Davis v. Rodriquez, 364 F.3d 424, 433 & n. 7 (2d. Cir. 2004) (same); Andrews v. Neer, 253 F.3d 1052, 1056-57 (8th Cir. 2001) (apply § 1988's test to a choice-of-plaintiff question in a § 1983 action where an injured plaintiff died); Allen v. City of Portland, 210 F.3d 381, *2 n.3 (9th Cir. 2000) (unpublished table decision) (applying § 1988's test to a choice-of-law question raised in a § 1983 action); Tinch v. City of Dayton, 77 F.3d 483, *1-3 (6th Cir. 1996) (unpublished table decision) (applying § 1988's test to a damages question in a § 1983 action).

steadily increasing as technological advances and growing databases amplify the ability to identify perpetrators and eliminate suspects... The strong presumption that verdicts are correct, one of the underpinnings on restrictions on post-conviction relief, has been weakened by the growing number of convictions that have been vacated by exclusionary DNA test results.

NAT'L INST. JUST., U.S. DEP'T. OF JUST., POSTCONVICTION DNA TESTING: RECOMMENDATIONS FOR HANDLING REQUESTS 9-10 (Sept.1999).[9]  Moreover, DNA evidence can identify the guilty and exonerate the innocent with such precision that former Attorney General John Ashcroft described it as "a kind of truth machine[.]" *Justice Dep't. Acts to Clear DNA Backlog*, MIAMI HERALD, Aug. 2, 2001, at 19A (quoting then U.S. Attorney General John Ashcroft as saying "DNA technology can operate as a kind of truth machine, ensuring justice by identifying the guilty and clearing the innocent.").

There is a clear federal interest at stake in Mr. Wade's § 1983 action.  The IPA represents a federal statute which provides for the very relief Mr. Wade now seeks; Congress refused to incorporate a statute of limitations into the IPA; the Executive branch has, for more than a decade now, emphasized DNA's transcendent nature and how it can further numerous federal interests.  These congressional and executive acts indicate that both branches of the federal government recognized that the rules of "finality" must be viewed through a new and different constitutional lens when DNA evidence is involved.  Thus, when Congress enacted the IPA, it expressed a clear federal interest to post-conviction DNA testing; in particular, Congress felt this interest could only be advanced by **not** placing time restrictions on DNA testing requests.  Consequently, because Massachusetts's personal injury limitations period is "contrary to" and "inconsistent with" the IPA, the Court must apply the IPA's timeliness requirement. E.g., Poy v.

---

[9] Again, the Court concurred with this realization in its initial opinion. See Wade v. Brady, 460

Boutselis, 352 F.3d at 483.

### 2. Laches is the Only Timeliness Limitation on a § 1983 Action Which Only Seeks Equitable Relief

In addition to being inconsistent with the clear federal interest against imposing formal time limits on proving one's innocence, no statute of limitations should apply because Mr. Wade's case proceeds entirely in equity where timeliness is judged under a laches inquiry.[10]  As the U.S. Supreme Court recognized, "where equity jurisdiction is exclusive and is not exercised in aid or support of a legal right, state statutes of limitations barring actions at law are inapplicable." Russell v. Todd, 309 U.S. 280, 289 (1940) (citation omitted); Holmberg v. Ambrecht, 327 U.S. 392, 396 (1946) ("Traditionally and for good sense, statutes of limitation are not controlling measures of equitable relief.").  Massachusetts state courts recognize the same legal principle. E.g., Robinson v. Rose, 2001 Mass. Super. LEXIS 239, at * 8-9 (June 28, 2001) (discussing equitable relief exception to the statute of limitations); New England Trust Co. v. Spaulding, 310 Mass. 424, 38 N.E.2d 672 (1942) (same).

Of course, even though Mr. Wade's suit cannot be barred by the statute of limitations, timeliness is still an important equitable issue under the laches doctrine. E.g., Russell v. Todd, 309 U.S. at 289 (collecting cases).  Laches is a fact-dependent, "equitable defense which allows a court to dismiss an action when there exists inexcusable delay in instituting an action and prejudice to the non-moving party as a result of the delay." Dator v. Dator, 2006 Bankr. LEXIS 1596 (D. Mass., July 21, 2006); accord Holmberg v. Armbrecht, 327 U.S. at 396; Puerto Rican-

---

F.Supp.2d at 248 n.38.

[10] Mr. Wade asserts a federal constitutional right to access evidence for DNA testing, and the only relief he seeks is access to evidence for DNA testing.  Thus, the right he asserts co-exists with the remedy he seeks.  After receiving injuctive relief, Mr. Wade's § 1983 would come to an end; there is no

American Ins. Co. v. Benjamin Shipping Co., 829 F.2d 281, 283 (1st Cir. 1987). As a matter of federal civil procedure, laches is an affirmative defense. See Fed.R.Civ.P. 8(c). Likewise, a defendant claiming laches has the burden of proving both unreasonableness of the delay and prejudice. See K-Mart Corp., Oriental Plaza, Inc., 875 F.2d 907, 911 (1st Cir. 1989).[11]

In Mr. Wade's case, laches cannot bar his action. First, the Commonwealth never raised laches as an affirmative defense in its initial pleading; as a result, the defense is waived. E.g., Jewelers Mut. Ins. Co. v. N. Barquet, Inc., 410 F.3d 2, 11 (1st Cir., 2005); Guerrido v. Alcoa Steamship Co., 234 F.2d 349 (1st Cir. 1956); Fed.R.Civ.P. 8 (c). Second, as outlined in Mr. Wade's pleadings and the Court's initial opinion, he diligently pursued his DNA testing claim in state court before he filed his § 1983 action.[12] Third, he diligently pursued his DNA testing claim in federal court.[13] And fourth, because the Defendants failed to plead laches as an affirmative defense, they failed to explain how Mr. Wade's actions were "unreasonable" and how they prejudiced them.

Even if Mr. Wade somehow acted unreasonable in filing his DNA testing claim in

_____

possibility of damages if Mr. Wade prevails.

[11] The IPA requires a laches-types inquiry to determine the timeliness of federal prisoners' motions for post-conviction DNA testing. Distinctly equitable in character, the IPA's timeliness assessments turn on such factors as whether the "applicant's filing is done solely to cause delay or harass," 18 U.S.C. § 3600(a)(10)(A)(ii), or whether "considering all relevant facts and circumstances..., a denial would result in a manifest injustice." 18 U.S.C. § 3600(a)(10)(B)(iii).

[12] On December 9, 2002 he filed his DNA testing motion, which the Commonwealth court denied on July 29, 2003. Shortly thereafter, on August 13, 2003 he filed a motion for reconsideration, which the Commonwealth court denied on August 15, 2003. Shortly thereafter, on February 9, 2004 he filed a petition for appeal to the Massachusetts Supreme Judicial Court (SJC), which the SJC denied on April 12, 2004.

[13] After the SJC denied his motion in April 2004, Mr. Wade filed a federal habeas petition, in which he raised his DNA testing claim, on October 8, 2004. On October 11, 2005, immediately before the Court dismissed his federal habeas petition as time-barred, Mr. Wade reconfigured his federal pleadings into a § 1983 action. As explained in more detail infra, because Mr. Wade's § 1983 action incorporate the same facts and claim raised in his federal habeas petition, his § 1983 relates back to when

October 2004, the Defendants cannot demonstrate how they were prejudiced by his unreasonableness; it is hard to image how disclosing physical evidence for DNA testing can prejudice the Defendants in anyway.  If DNA testing inculpates Mr. Wade, the Defendants have only strengthened their case against him and essentially ended his litigation; on the other hand, if DNA results exculpate Mr. Wade, this evidence, as the Court noted, is far superior at undermining his conviction than faded memories or questionable witnesses. See Wade v. Brady, 460 F.Supp.2d at 248-49.  Thus, Mr. Wade's case is not one in which "the truth-finding value provided by new evidence is outweighed by the inevitable erosion of memory and dispersion of witnesses that happens over time." Id. at 248.

### 3. Defendants' Actions Represent Serial and Systematic Violations Which Restarts the Accrual Period Each Day They Refuse to Grant Access to the Potentially Exculpatory Evidence

Mr. Wade's § 1983 action is timely because the Defendants' refusal to grant him access to the physical evidence represents a continuing violation.  While the "limitations clock generally starts with the commission of a discriminatory act, a true 'continuing violation' rewinds the clock for each discriminatory episode along the way." Mack v. Great Atlantic and Pacific Tea Co., Inc., 871 F.2d 179, 183 (1st Cir. 1989); accord Velazquez v. Chardon, 736 F.2d 831, 833 (1st Cir.1984).[14]  There are two kinds of continuing violations: serial violations and systemic

---

he originally filed his federal habeas petition on October 8, 2004.

[14] The U.S. Supreme Court has repeatedly intimated that when an ongoing duty applies, a new and actionable harm is produced each time a defendant does not comply with the duty. E.g., United States v. Fordice, 505 U.S. 717, 727 (1992); Papasan v. Allain, 478 U.S. 265, 282 (1986); Columbus Bd. of Educ. v. Pelncik, 443 U.S. 449, 459 (1979).  Other circuits have recognized the continuing violation doctrine in a number of different contexts. See Khunle Brothers, Inc. V. County of Geauga, 103 F.3d 516 (6th Cir. 1997) (ongoing prohibition placed on Plaintiff's use of road stated continuing violation); Rehabilitation Assoc. Of Va. V. Kozlowski, 838 F.Supp. 243 (E.D. Va. 1993) (continued application to

violations. See Jensen v. Frank, 912 F.2d 517, 522 (1st Cir. 1990); Mack v. Great Atlantic & Pacific Tea Co., 871 F.2d 179, 181 (1st Cir.1989).  Depending on how the Defendants' actions are described and perceived, their actions can be classified as either serial or systemic violations.

A serial violation "is composed of a number of discriminatory acts emanating from the same discriminatory animus, each act constituting a separate [actionable] wrong [.]" Jensen v. Frank, 912 F.2d at 522.  Similarly, the serial violation "theory recognizes that some acts are imbricated, i.e., they involve an interlinked succession of related events or a fully-integrated course of conduct." Mack v. Great Atlantic & Pacific Tea Co., 871 F.2d 179 at 183.  For instance, if an employee is passed over several times for promotion, based on the same (actionable) animus; this represents a serial violation. See Cajigas v. Banco de Ponce, 741 F.2d 464 (1st Cir.1984).  Viewed through one lens, the Defendants' refusal to disclose the sought after potentially exculpatory physical evidence represents a serial violation because "it keeps happening" each time Mr. Wade requests access to the evidence. Jensen v. Frank, 912 F.2d at 522 ("a serial violation is 'continuing' by virtue of the fact that it keeps happening[.]"); accord Provencher v. CVS Pharmacy, 145 F.3d 5, 14 (1st Cir.1998).  That Defendants may have previously violated the Constitution does not absolve them of their present (or future) constitutional violations.[15]

---

unlawful policy stated continuing violation); Abif v. Slaton, 806 F.Supp. 993 (N.D. Ga 1992) (failure to release or transfer prisoner after sentence vacated constituted a continuing violation); Pitts v. City of Kankakee, 267 F.3d 592 (7th Cir. 2001) ("each day ... brings a new duty on the government's part and a corresponding new right to seek vindication of the constitutional right in question"); United States v. City of Parma, 661 F.2d 562 (6th Cir. 1981) (Fair Housing Act action not barred under statute of limitations where pattern and practice involved continuing violation); Kielczynski v. Village of LaGrange, 19 F.Supp.2d 877 (E.D. Ill. 1998) (continuing violation doctrine applied to unlawful employment practices).

[15] As the Seventh Circuit recently noted, a violation "continue[s] for as long as the defendants [have] the power to do something about [plaintiff's] condition." Heard v. Sheahan, 253 F.3d 316, 318 (7th Cir. 2001).  The Defendants clearly have the power to "do something about" Mr. Wade's "condition" or

A systemic violation, on the other hand, "has its roots in a discriminatory policy or practice; so long as the policy or practice itself continues into the limitations period, a challenger may be deemed to have filed a timely complaint." Provencher v. CVS Pharmacy, 145 F.3d at 14; accord Jensen v. Frank, 912 F.2d at 523. This type of claim requires no identifiable act of discrimination in the limitations period, Muniz-Cabrero v. Ruiz, 23 F.3d 607, 610 (1st Cir. 1994), and refers to general practices or policies. See Mack v. Great Atl. & Pac. Tea Co., 871 F.2d 179, 183 (1st Cir. 1989); Rich v. Martin Marietta Corp., 522 F.2d 333, 348 (10th Cir.1975). Viewed through a different lens, the Defendants' refusal to disclose the potentially exculpatory evidence represents an unconstitutional policy or practice—i.e., the Defendants refuse to disclose potentially exculpatory evidence under any circumstances unless forced to do so by a court order.

Notwithstanding the serial and systemic violations case law, perhaps the most compelling reason why the Defendants' actions constitute a continuing violation, and demand relief, is the nature and importance of the right being asserted. As the Court explained in its initial opinion, *Brady v. Maryland* created an "affirmative obligation" for prosecutors to disclose exculpatory evidence to the accused. See Wade v. Brady, 460 F.Supp.2d at 244. The U.S. Supreme Court created this "affirmative obligation" to "avoid wrongful convictions by providing access to evidence in the prosecutor's possession." Id. at 243, 246; accord United States v. Bagley, 473 U.S. 667, 675 (1985) (stating that *Brady's* purpose is "to ensure that a miscarriage of justice does not occur"). While *Brady* dealt with a narrow subset of evidence—i.e., evidence of known exculpatory value—*Brady's* "central premise has been adapted to evidence of uncertain

situation; all they need to do is grant access to the physical evidence so Mr. Wade may subject it to DNA

18

exculpatory value, such as the untested DNA evidence in this case." Id. at 245 (citing U.S. Supreme Court cases).

More importantly, *Brady's* objective of avoiding wrongful convictions does not cease once a defendant has been prosecuted and convicted:

> [L]ogic dictates that [a] conviction cannot entirely eradicate the interest [of preventing wrongful convictions]. Whenever an exclusionary DNA test result will destroy confidence in a verdict, the **exact** same interests that are present in *Brady* and *In re Worship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), are also present. The costs of vindicating those interests may have changed post-conviction-and as a result, plaintiff's entitlement to relief may have changed-but the interest itself is identical. A criminal defendant's right to a verdict worthy of confidence simply cannot be lost by virtue of his having received a trial verdict that is, itself, not worthy of confidence.

Id. at 247 n.37. Consequently, the affirmative duty to disclose "exculpatory" evidence or "evidence of uncertain exculpatory value" extends into post-conviction proceedings; disclosing such evidence has the potential to **expose** wrongful convictions—an outcome directly related to *Brady's* initial objective of **preventing** miscarriages of justice. The Defendants currently possess the physical evidence that can prove Mr. Wade's innocence, and it is within their power to provide access–yet they continue to refuse to do so. Each day the Defendants refuse to disclose the physical evidence represents a new injury because it prevents Mr. Wade (and the Court) from ascertaining whether his "original verdict" is one "worthy of confidence."[16]

### 4. Even if Massachusetts's Personal Injury Statue of Limitations is Applicable, Mr. Wade's § 1983 Action is Timely Because the Statue of

---

testing.

[16] Moreover, the Defendants' actions also prevent Mr. Wade from "meaningfully" accessing the courts to prove his innocence. The "Constitution requires access to the courts to be adequate, effective, and meaningful." Wade v. Brady, 460 F.Supp.2d at 250 (citing Bounds v. Smith, 430 U.S. 817, 822 (1977)). Without "adequate, effective, and meaningful" access to the courts, "prisoners would have no means of contesting wrongful convictions." Id.

### **Limitations Started to Accrue When the Commonwealth Court Denied Mr. Wade's DNA Motion**

As noted, § 1983 creates a private right of action for redressing abridgments or deprivations of federally assured rights. See Cox v. Hainey, 391 F.3d 25, 29 (1st Cir.2004). Because it does not contain a limitations period, it is **presumed** the district court will (and must) borrow the forum state's general statute of limitations for personal injury actions. E.g., Wallace v. Kato, 127 S.Ct. at 1094.[17] The Massachusetts statute governing personal injury claims is Mass. Gen. Laws ch. 260, § 2A, providing that actions shall be commenced "within three years after the cause of action accrues." Massachusetts begins counting on the day following the day of the incident, with the last day for filing suit being the anniversary date of the event, in accordance with Mass. R. Civ. P. 6(a). See Ciampa v. January, 1992 Mass.App. Div. 204 (1992).

While the Court must borrow from state law to identify the applicable statute of limitations, the question of when the statue of limitations starts to accrue represents a federal question. E.g., Wallace v. Kato, 127 S.Ct. at 1095; Carreras-Rosa v. Alves-Cruz, 127 F.3d 172, 174 (1st Cir.1997). In particular, aspects of § 1983 which are not dictated by state law are governed by federal rules conforming in general to common-law tort principles. E.g., Heck v. Humphrey, 512 U.S. 477, 483 (1994); Carey v. Piphus, 435 U.S. 247, 257-58 (1978). Under these principles, it is "the standard rule that [accrual occurs] when the plaintiff has 'a complete and present cause of action,'" Bay Area Laundry and Dry Cleaning Pension Trust Fund v. Ferbar Corp. of Cal., 522 U.S. 192, 201 (1997) (citation omitted), that is, when "the plaintiff can file

---

[17] As noted *supra*, with the IPA's enactment, this presumption is in serious doubt because the IPA represents a federal statute which expresses a clear federal interest against imposing time limits on proving one's innocence.

suit and obtain relief[.]" Id. at 201; Wallace v. Kato, 127 S.Ct. at 195; Nieves-Vega v. Ortiz-Quinones, 443 F.3d 134, 136-37 (1ˢᵗ Cir. 2006); Rodriguez Narvaez v. Nazario, 895 F.2d 38, 41 n. 5 (1st Cir.1990) (the limitations period begins to run when the plaintiff "knows or has reason to know of the injury which is the basis for his claim."). To determine when Mr. Wade had a complete and present cause of action, the "first step ... is to identify the actual injury of which the plaintiff complains." Guzmán-Rivera v. Rivera-Cruz, 29 F.3d 3, 5 (1st Cir.1994); accord Hileman v. Maze, 367 F.3d 694, 696 (7th Cir.2004). An "injury" is the "violation of another's legal right, for which the law provides a remedy." BLACK'S LAW DICTIONARY 789 (7ᵗʰ ed. 1999).

For § 1983 purposes, the actual "injury" suffered by Mr. Wade is the Commonwealth's refusal to provide him access to the potentially exculpatory physical evidence -- this occurred on July 29, 2003, when the Superior Court denied his DNA testing motion. Other federal courts have held that accrual starts when the state court initially denied a prisoner's DNA petition. E.g., Savory v. Lyons, 469 F.3d 667 (7ᵗʰ Cir. 2006); Moore v. Lockyer, 2005 WL 2334350 (N.D. Cal., Sept. 23, 2005). By refusing to authorize access to the potentially exculpatory physical evidence, the Commonwealth deprived Mr. Wade of his "rights, privileges, or immunities secured" by the Federal Constitution thereby triggering § 1983's remedial powers. E.g., Imbler v. Pachtman, 424 U.S. 409, 417 (1976). The Court's initial opinion comprehensively explained the nature of Mr. Wade's federally protected substantive due process right to potentially exculpatory DNA evidence. See Wade v. Brady, 260 F.Supp.2d at 247-250. Thus, the date which Mr. Wade had a "complete and present cause of action," for § 1983 purposes, was July 29, 2003. Consequently, Mr. Wade had three years from this date to file his § 1983 action.[18]

---

[18] A similar analysis is used in employment discrimination cases. In such cases, the U.S.

Because the statute of limitations started accruing on July 29, 2003, Mr. Wade's § 1983 action is timely. On October 8, 2004 Mr. Wade filed his federal habeas petition; within his habeas petition, he asserted a federal constitutional claim to access the biological evidence. On May 13, 2005 he filed a motion to amend his petition. On September 26, 2005 the Court entered an order granting the Defendants' motion to dismiss Mr. Wade's habeas petition as time-barred, yet allowing Mr. Wade's motion to amend to include claims made pursuant to § 1983; because Mr. Wade raised identical DNA claims in his § 1983 action and federal habeas petition, the § 1983 claims related back to the filing on his original federal habeas petition on October 8, 2004.[19] Accordingly, because the accrual date is July 29, 2003, Mr. Wade's § 1983 action, which he technically filed on October 8, 2004, falls well within the three-year statute of limitations period.

### 5.    Even if Mr. Wade's § 1983 Action is Untimely, He is Entitled to Equitable Tolling Due to His Mental Illness, Illiteracy, Borderline Mental

---

Supreme Court has held that, "the proper focus is on the time of the discriminatory act, not the point at which the consequences of the act become painful." Chardón v. Fernández, 454 U.S. 6, 8 (1981) (citing Delaware State College v. Ricks, 449 U.S. 250, 258 (1980)) (emphasis in original). Consequently, the "rule in an employment discrimination case is that the limitations period begins to run when the [plaintiff] receives unambiguous and authoritative notice of the discriminatory act (which is another way of saying that the period begins to run when the employee learns of the adverse employment action)." Morris v. Gov't Dev. Bank of P.R., 27 F.3d 746, 749 (1st Cir.1994) (parentheses in original). In Mr. Wade's case, he received "unambiguous and authoritative notice of the ... act," id. at 749, on July 29, 2003 when the Superior Court sided with the Commonwealth and refused to grant him access to the physical evidence. Moreover, unlike most employment termination cases, Mr. Wade immediately suffered the "consequences" of the Commonwealth's discriminatory actions—i.e., he could not access the most probative evidence to prove his innocence.

[19] As the Court noted in its initial opinion: "Because the claims raised in [Mr. Wade's] § 1983 complaint do not just arise out of the actions referenced in his original complaint, but are identical to the earlier claims in his habeas petition, the amended pleading relates back to the date of the original pleading." Wade v. Brady, 460 F.Supp.2d at 234 n.13 (referencing Fed.R.Civ.P. 15(c)(2)); see also Mayle v. Felix, 545 U.S. 644 (2005); Schiavone v. Fortune, 477 U.S. 21, 29 (1986).

**Retardation, his Diligence in Pursuing DNA Testing in State Court, and DNA's Revolutionary Capabilities**

If Mr. Wade's § 1983 action is considered untimely, the only (reasonable) date of accrual is the date in which the Eastern District of Pennsylvania issued the first federal court decision finding a federal constitutional right to post-conviction DNA testing. See Godschalk v. Montgomery County Dist. Attorney's Office, 177 F.Supp.2d 366, 370 (E.D.Pa.2001). Judge Weiner issued his *Godschalk* opinion on August 27, 2001. As the Court explained in its initial opinion:

> Selecting this particular theory of accrual avoids the major problems inherent to the two positions above: it does not require Wade to divine the future constitutional significance of his lack of DNA access in 1997, nor does it link the accrual date to a time selected by Wade, at his convenience, for the vindication of his rights. Instead it focuses on the real statute of limitations issue: when Wade could have been reasonably expected to file a motion challenging the constitutionality of the State's refusal to allow access to the DNA evidence in question. If the August 27, 2001 date is appropriate, Wade's action, which commenced on October 8, 2004, would be barred by the statute of limitations.

Wade v. Brady, 460 F.Supp.2d at 235 n.17.

If Mr. Wade's § 1983 action is deemed untimely, his mental deficits, illiteracy, and borderline mental retardation mandate that the statute of limitations be tolled pursuant to M.G.L.A. 260 § 7.[20] According to M.G.L.A. 260 § 7, if the person seeking relief is "incapacitated by reason of mental illness when a right to bring an action first accrues, the action

---

[20] Equitable tolling is "a doctrine used to advance the cause of justice when strict application of the statute of limitations would yield fundamentally unfair results." Wade v. Brady, 460 F.Supp.2d at 234; accord Kelley v. Nat'l Labor Relations Bd., 79 F.3d 1238, 1247 (1st Cir. 1996) (equitable tolling is "appropriate only to avoid injustice in particular cases."). As noted *infra*, it would be "fundamentally unfair" if the statute of limitations was not equitably tolled.

may be commenced within the time hereinbefore limited after the disability is removed."[21]   A "mental illness" is "any mental condition in which a person is precluded from understanding the nature or effects of his acts and which prevents the person from understanding his legal rights." Boudreau v. Landry, 536 N.E.2d 339, 341 (Mass. 1989); accord Pederson v. Time, Inc., 532 N.E.2d 1211, 1213 (1989).  Mr. Wade pled sufficient facts in his post-trial and post-conviction pleadings, his federal habeas pleadings, and his § 1983 pleadings to demonstrate that his mental deficits prevented him from understanding when his right to post-conviction DNA testing became cognizable. E.g., Hornig v. Hornig, 374 N.E.2d 289 (1978) (statute of limitations tolled seven years because plaintiff's mental illness prevented him from understanding his legal rights). In particular, his pleadings demonstrated that he is illiterate and suffers from borderline mental retardation because his IQ is only 72. See Wade v. Brady, 460 F.Supp.2d at 231 ("testing reveals that [Mr. Wade] has a 72 point IQ-a score that places him in the range of borderline mental retardation."); Cf. Atkins v. Virginia, 536 U.S. 304, 309 n.5 (2002) ("an IQ between 70 and 75 or lower… is typically considered the cutoff IQ score for the intellectual function prong of the mental retardation definition.").

        The statute of limitations should also be equitably tolled because: (1) Mr. Wade "actively" and "diligently" pursued (with the assistance of qualified counsel) his right to DNA testing in state and federal court once he learned of his right to post-conviction DNA testing; (2) DNA's revolutionary capabilities create extraordinary circumstances; and (3) the Defendants will

---

[21] The Court must look to **Massachusetts state law** regarding equitable tolling to determine whether the statute of limitations should be equitably tolled. See Moore v. Lockyer, 2005 WL 2334350, at *6 (N.D. Cal., Sept. 23, 2005).

not be prejudiced by Mr. Wade's untimely filing.[22]

Mr. Wade "actively" and "diligently" pursued his right to post-conviction DNA testing in state and federal court. In its initial opinion, the Court outlined the numerous steps he took to obtain DNA testing in state and federal court. See Wade v. Brady, 460 F.Supp.2d at 232-33.

In terms of extraordinary circumstances, it would be fundamentally unfair to dismiss Mr. Wade's action because the sought-after physical evidence has the potential to exonerate him. DNA testing has the potential to answer the question left unanswered by the rudimentary serological evidence–namely, who is the third-party who contributed the "A" antigens identified in the victim's vaginal swabs and clothing. E.g., Arizona v. Youngblood, 488 U.S. 51, 70 (1988) (Blackmun, J., dissenting) ("As technology develops, the potential for... [forensic] evidence to provide conclusive results on any number of questions will increase.").[23] If DNA tests on the vaginal swabs and the victim's clothing exclude Mr. Wade as the semen donor, this would exonerate him. Thus, because "DNA testing can exonerate the defendant, the government may only legitimately deny access to testing if **it has a compelling reason to do so.**" Wade v. Brady,

---

[22] Under federal law, equitable tolling applies where the litigant "diligently" or "actively" pursued his rights, extraordinary circumstances are present, and the defendants are not prejudiced by the untimely filing. See Pace v. DiGuglielmo, 544 U.S. 408, 418 (2005) (habeas litigant must have "pursu[ed] his rights diligently" and there must be "extraordinary circumstances" before a federal court may equitably toll the statute of limitations for filing a federal habeas petition); Irwin v. Dep't. of Veterans Affairs, 498 U.S. 89, 96 (1990) (federal courts "have allowed equitable tolling in situations where the claimant has actively pursued his judicial remedies"); Baldwin County Welcome Center v. Brown, 466 U.S. 147, 151 (1984) ("One who fails to act diligently cannot invoke equitable principles to excuse that lack of diligence."); Donald v. Cook County Sheriff's Dep't., 95 F.3d 548, 562 (7th Cir. 1996) ("Considerations weighing in favor of equitable tolling must be balanced against the possibility of prejudice to the defendants occasioned by the delay."). As explained infra, Mr. Wade satisfies these requirements as well.

[23] As the Court noted in its initial opinion: "Because the victim also has Type 'O' blood, the presence of 'A' antigens, if accurately typed, suggests that a third party's blood and/or semen was also present on the victim's clothing." Wade v. Brady, 460 F.Supp.2d at 232.

460 F.Supp.2d at 231 (emphasis added).[24]

The Defendants, however, have yet to identify a single legitimate interest which explains why Mr. Wade should not be granted access to the evidence; indeed, the Court highlighted this critical point in its initial opinion. Id. at 244 ("no such costs have been asserted by defendants thus far"). More importantly, the Court said that the interests typically raised by the Commonwealth in post-conviction proceedings–i.e., retribution, deterrence, the quality of judging, and the interest of victims in finality–are not undermined by granting access to the physical evidence for DNA testing. Id. at 248-49. Accordingly, given the legitimate questions surrounding the rudimentary serological testing, the Defendants' interest should be aimed at making certain it did not mistakenly convict Mr. Wade. E.g., Schlup v. Delo, 513 U.S. 298, 321 (1995) (noting that there is a compelling societal interest in rectifying wrongful imprisonment); Kuhlmann v. Wilson, 477 U.S. 436, 452 (1986) (same).[25] This can be **easily** accomplished if the Defendants granted Mr. Wade access to the sought-after physical evidence.

_____

[24] The U.S. Supreme Court's comment in *Ake v. Oklahoma* is particularly relevant to Mr. Wade's case: "The State's interest in prevailing at trial–unlike that of a private litigant–is necessarily tempered by its interest in the fair and accurate adjudication of criminal cases." 470 U.S. 68, 79 (1985). Given DNA's transcendent capabilities, the same can now be said regarding post-conviction proceedings involving DNA testing which has the potential to exonerate a criminal defendant. Specifically, the Commonwealth's interest in preserving a conviction is "tempered by its interest in the **fair and accurate**" review of the criminal conviction. In today's criminal justice system, if biological evidence exists, which is directly relevant to establishing the defendant's guilt or innocence, and which can be subjected to DNA testing, the biological evidence must be tested because this represents the "fairest and most accurate" manner in which to review a criminal conviction.

[25] Moreover, if "the central purpose of [our] system of criminal justice is to convict the guilty and free the innocent," Herrera v. Collins, 506 U.S. 390, 398 (1993), and to see "that justice shall be done," Berger v. United, 295 U.S. 78, 88 (1935); accord Bradshaw v. Stumpf, 545 U.S. 175, 189-90 (2005), the Commonwealth's arbitrary refusal to release this evidence directly undermines these well established principles; it is also inconsistent with the fundamental principle that "it is far worse to convict an innocent man than to let a guilty man go free." In re Winship, 397 U.S. 358, 372 (1970) (Harlan, J., concurring); accord Schulp v. Delo, 513 U.S. at 325 ("concern about the injustice that results from the conviction of an innocent person has long been at the core of our criminal justice system.").

Furthermore, thanks to the advent of state and federal DNA databanks, the requested DNA testing has the potential not just to exonerate Mr. Wade, but to identify the true perpetrator, who might otherwise be free to commit additional violent offenses. As the Court noted: "In accordance with the State's interest in doing justice, exculpatory DNA results may allow the state to both free the innocent and convict the guilty." Wade v. Brady, 460 F.Supp.2d at 249.[26]

Additionally, the typical concerns which support a statute of limitations are not applicable in the post-conviction DNA testing context. As the U.S. Supreme Court explained in *Wilson v. Garcia*:

> A federal cause of action "brought at any distance of time" would be "utterly repugnant to the genius of our laws." *Adams v. Woods*, 2 Cranch 336, 342, 2 L.Ed.2d 297 (1805). Just determinations of fact cannot be made when, because of the passage of time, the memories of witnesses have faded or evidence is lost. In compelling circumstances, even wrongdoers are entitled to assume that their sins may be forgotten.

471 U.S. at 271. The concerns identified by the Supreme Court are not implicated in a § 1983 action which seeks access to biological evidence for DNA testing. The Defendants need not call a single witness to resolve the litigation–it must simply grant Mr. Wade access to the physical evidence. Thus, neither the passage of time, nor faded memories can adversely affect the Defendants' ability to defend themselves. Likewise, the sought-after physical evidence is not lost; the Defendants possess the evidence. As such, the Defendants' position is not adversely

---

[26] The Court highlighted Innocence Project statistics which indicated that almost 30% of the (then) 183 exonerations also resulted in the true perpetrator being identified. Id. (citing Barry C. Scheck, *Barry Scheck Lectures on Wrongful Convictions*, 54 DRAKE L. REV. 597, 602 (2006)). Indeed, the Innocence Project's most recent DNA exoneration involving Ronald Taylor represents yet another case where DNA testing not only exonerated Mr. Taylor, it identified Roosevelt Carrol–a repeat sex offender– as the true perpetrator. See Roma Khanna, *DNA Tests Point to Repeat Offender as Real 1993 Rapist*, HOUS. CHRON., Oct. 5, 2007, at A1.

affected by lost evidence.[27]  Put simply, granting access to the physical evidence for DNA

testing purposes cannot disadvantage the Defendants in any respect.  Mr. Wade is willing to pay

for the DNA testing so that the Commonwealth will not be financially burdened.  Furthermore,

allowing Mr. Wade's § 1983 action to proceed will not prejudice the Defendant's ability to

challenge the impact of the test results on Mr. Wade's conviction.  Even if exculpatory results

are obtained, the Defendants will have the opportunity to object to Mr. Wade's attempt to attack

his conviction in later proceedings.

On the other hand, the prejudice to Mr. Wade is great.  Mr. Wade's post-conviction

proceedings have been rendered fundamentally unfair because the Defendants have repeatedly

denied him access to evidence which can potentially prove his long-proclaimed innocence.

Thus, when the harm caused to a criminal defendant significantly outweighs the (alleged) harm

inflicted on the Government, due process and fundamental fairness dictate that a Court must

balance the scales of justice by looking past the statute of limitations and asking whether justice

would be served by time-barring a § 1983 DNA testing action.  In Mr. Wade's case, the answer

is an unequivocal–NO.  Justice can only be served if the Defendants are forced to grant Mr.

---

[27] The Supreme Court's holding in *Wilson v. Garcia* is also premised on at least one major (faulty) assumption: all relevant factual determinations are affected by the passage of time or a witness's fading memory.  As the Court noted in its initial opinion, while this may have been true before modern DNA technology, see Wade v. Brady, 460 F.Supp.2d at 247-48, the assumption is absolutely false in today's DNA-dependent criminal justice system. Id. At 248.  The Court made this quite clear when it stated:

> In cases where DNA evidence could have exculpated a defendant and was not utilized at trial, one can no longer describe the earlier adjudication as deciding guilt or innocence "within the limits of human fallibility." *Herrera,* 506 U.S. at 401, 113 S.Ct. 853. The "limits of human fallibility" have advanced, making it possible to improve on earlier decisions, even after accounting for "erosion of memory" and "dispersion of witness" concerns.  As a result, the adjudication at trial is no longer the most reliable determination of guilt or innocence possible for this limited set of cases.

Id.

Wade access to the physical evidence, and the physical evidence is actually tested.

### C.    The Threshold Question

In its denial of the Defendants' Motion to Dismiss, the Court clearly intimated that before it could address the summary judgment issue, it needed to resolve the questions of "what showing a defendant must make before receiving access to DNA evidence" and whether Mr. Wade's "case meet[s] the showing required for the relief sought." Wade v. Brady, 460 F.Supp.2d at 231.  The Court acknowledged there are many cases where DNA evidence "relates very tangentially, if at all, to the finding of guilt." Id. at 231 n.6.  In these cases, "where an exclusionary test result would have no impact on the earlier verdict," a criminal defendant's due process right to access the evidence would not be triggered. Id.  On the other hand, where "an exclusionary test result would automatically exonerate a prisoner," his due process right to access the evidence would "clearly [be] implicated." Id.  The question the Court posed to Mr. Wade and the Defendants is, "at what point between th[e]se two poles does the due process interest become actionable?" Id.

### 1.    The Threshold Question: Whether Test Results Could Raise Serious Doubts about the Original Verdict

As the Court explained, the threshold issue is one that few federal courts have addressed, and none have definitively answered.  As a result, the threshold proposed by Mr. Wade is premised on common sense, case law from various state courts, and the Court's initial opinion. In regards to the later consideration, Mr. Wade believes the Court answered its own question when it stated: the "Due Process Clause provides a substantive right to post-conviction DNA testing in cases where testing **could raise serious doubts about the original verdict**." Wade v.

Brady, 460 F.Supp.2d at 249 (emphasis added).[28]    Accordingly, Mr. Wade's right to post-conviction DNA testing is triggered if the evidence he wishes to test has the potential to produce results which "could raise serious doubts about [his] original verdict." Id.[29]

This analysis is completely different from a post-test analysis aimed at determining whether DNA results warrant a new trial or completely exonerate a defendant. Instead, this pre-DNA test analysis is aimed at determining whether the evidence Mr. Wade seeks to test is so insignificant or tangentially related to the guilt-innocence issue it has no or very little potential to produce results which could raise serious doubts about his conviction. The analysis must be different at this juncture because Mr. Wade simply wishes to use DNA testing to further develop his actual innocence claim. Accordingly, because his actual innocence claim is not yet fully developed–no thanks to the Defendants–the Court may not, at this point, speculate as to whether his actual innocence claim is meritorious; only when DNA testing has been completed and the results reviewed by a court–this Court or a Commonwealth court–can such a determination be made.

When conducting this pre-test analysis, the Court must make specific assumptions and may not be influenced by certain factors. First, the Court must assume the DNA testing will produce exculpatory results. Second, the strength of the Commonwealth's case against Mr.

---

[28] The Court also suggested that access should be granted "[w]henever an exclusionary DNA test result will destroy confidence in a verdict." Id. at 247 n.37. As explained infra, if certain items of evidence are tested and produce exclusionary results, these results would "destroy confidence" in Mr. Wade's conviction.

[29] Stated somewhat differently, Mr. Wade's due process right is triggered when the evidence he seeks to test has the potential to produce new, noncumulative results materially relevant to his actual innocence claim even though the results may not completely exonerate him. Materially relevant evidence is evidence which tends to significantly advance his actual innocence claim. Several states endorse this analysis. E.g., Johnson v. State, 157 S.W.3d 151 (Ark. 2004); Anderson v. State, 831 A.2d 858 (Del. 2003); People v. Savory, 756 N.E.2d 804 (Ill. 2001).

Wade is irrelevant under this analysis. In each of the 210 DNA exonerations, the government's case against the defendant was very strong; if that were not the case, why else would the jury or judge have convicted the defendant in the first place? DNA testing, however, overcame the overwhelming evidence of guilt in each case and proved the defendant's actual innocence. Third, any incriminating statements or actions made or said by Mr. Wade or his trial counsel cannot be used to prohibit DNA testing. Most notably in Mr. Wade's case is trial counsel's (objectively unreasonable and prejudicial) decision to present a consent defense. In many respects, trial counsel's decision had the same effect as a confession or a guilty plea.[30] Confessions or guilty pleas, however, are not absolute bars to proving one's innocence with DNA testing. For instance, of the first 210 DNA exonerations, 25% involved cases where innocent defendants made incriminating statements, delivered outright confessions, or pled guilty. See www.innocenceproject.org (last visited Jan. 2, 2008).[31] Consequently, the Court must look past trial counsel's ill-advised and prejudicial theory of defense, and simply ask whether the evidence Mr. Wade seeks to test has the potential to significantly advance his actual innocence claim or whether it can "raise serious doubts about [his] original verdict." Wade v. Brady, 460 F.Supp.2d at 249.

　　　As mentioned, once DNA testing is performed, the Court may conduct a post-test

---

[30] As emphasized in his initial federal pleadings, although trial counsel pursued this objectively unreasonable and extremely prejudicial defense, Mr. Wade has maintained his innocence from the very beginning and adamantly denied having sexual intercourse with or harming the victim.

[31] Accord Brandon L. Garrett, *Judging Innocence*, 108 COLUMBIA L. REV. (forthcoming 2008); THE INNOCENCE PROJECT, LESSONS NOT LEARNED, Exc. Summary, at 4 (Oct. 2007); Samuel R. Gross et al., *Exonerations in the United States 1989 Through 2003*, 95 J. CRIM. L. & CRIMINOLOGY 523, 544 (2005); Steven A. Drizin & Richard A. Leo, *The Problem of False Confessions in the Post-DNA World*, N.C. L. REV. 891 (2004); Kansas v. Marsh, 126 S.Ct. 2516, 2545 (2006) (Souter, J., dissenting) (commenting that a significant number of wrongful convictions have "resulted from... false confession[s]").

analysis of whether the results warrant a new trial or completely exonerate Mr. Wade. This can be accomplished if Mr. Wade files another federal habeas petition premised on the newly discovered DNA results.[32]   In particular, the new DNA results would allow Mr. Wade to overcome several procedural hurdles incorporated in 28 U.S.C. § 2254. For instance, he could use exculpatory DNA results to overcome procedural bars involving defaulted claims or an untimely petition because the exculpatory results would trigger the miscarriage of justice exception under the cause and prejudice doctrine. See House v. Bell, 126 S.Ct. 2064, 2076-77 (2006); Schlup v. Delo, 513 U.S. 298, 321-22 (1995). Similarly, exculpatory DNA results would enable the Court to hold an evidentiary hearing, pursuit to 28 U.S.C. § 2254(e), to consider the effects of the DNA results and whether they warrant a new trial or completely exonerate him. In particular, because Mr. Wade diligently pursued DNA testing in state court, an evidentiary hearing is permissible under 28 U.S.C. § 2254(e)(A)(ii). See Williams v. Taylor, 529 U.S. 420, 430 (2000).

**2.      The Items of Evidence Mr. Wade Seeks to Test Have the Potential to Produce Results Which Would Raise Serious Doubts About His Original Conviction**

The crime for which Mr. Wade stands convicted is a single perpetrator rape case, where police recovered biological material (i.e., semen and sperm) from the victim. Moreover, there is no evidence to suggest the victim was sexually active shortly before she was raped. Consequently, the semen and sperm could have only come from the assailant. Mr. Wade seeks to test the items of evidence which tested positive for semen and sperm; these items, without

---

[32] Mr. Wade could also file another post-conviction relief petition in state court.

question, are "material" to the victim's sexual assault and to proving Mr. Wade's innocence; the Court even acknowledged the evidence's materiality in its initial opinion. See Wade v. Brady, 460 F.Supp.2d at 245 ("There are no doubts regarding the potential materiality of the evidence…"). Accordingly, because the evidence is "material" to proving Mr. Wade's innocence, it has the potential to produce results which would raise "serious doubts about the original verdict." Wade v. Brady, 460 F.Supp.2d at 249.

More importantly, given the nature of the evidence sought to be tested and the potential to produce exculpatory results, Mr. Wade's request for DNA testing would qualify as a Category One case under the National Institute of Justice's 1999 report entitled POSTCONVICTION DNA TESTING: RECOMMENDATIONS FOR HANDLING REQUESTS. Category One cases are "cases in which biological evidence was collected and still exists. If the evidence is subjected to DNA testing or retesting, exclusionary results will exonerate the petitioner." Id. at 4. The following is an example of a Category One case:

> Example 1: Petitioner was convicted of rape of a sexually inactive [victim]. Vaginal swabs were taken and preserved. DNA evidence that excludes the petitioner as the source of the sperm will be dispositive of innocence.[33]

Thus, under the NIJ's standards, Mr. Wade's testing request represents the prototypical case where DNA testing can prove a petitioner's innocence. As such, Mr. Wade is entitled to access the sought-after items of physical evidence.

### a.    The Vaginal Swab

Mr. Wade would like to test the vaginal swab.[34] The vaginal swab, without question, is

---

[33] Id. at 4.
[34] The vaginal swab is marked as Item 1c in the serologist's June 27, 1997 "Criminalistics Report." The report is attached hereto as Exhibit One.

probative, intimately related to the sexual assault, and directly relevant to proving Mr. Wade's

innocence. See U.S. Dep't of Just., Understanding DNA Evidence: A Guide for Victim

Service Providers (Apr. 2001). So probative is the vaginal swab, the Commonwealth

introduced the swab's serological results to prove Mr. Wade could not be excluded as a potential

contributor of the seminal fluid identified on the swab.[35] For instance, during trial, the

prosecutor and the forensic serologist engaged in the following colloquy regarding the vaginal

swab:

> Prosecutor:    And can you tell the jurors what that [conclusion] is [regarding the vaginal swab]?
>
> Serologist:    In reference to the vaginal swab, at this level of analysis, the suspect cannot be excluded as a contributor into that sample.
>
> Prosecutor:    And why is that? Can you explain to the jurors how you come to that conclusion?
>
> Serologist:    Yes. In comparing the results obtained with the standard from the suspect, Mr. Wade, he is both an O secretor... and he's a secretor. On that particular sample, we do find the evidence reflect... [an] individual of type O, is also a secretor, and the fact that his PGM markers are present in that sample. The Defendant is a one plus, two plus, and a one plus, two plus is identified in the specimen. The specimen is the seminal residue that was tested.[36]

Likewise, during closing arguments, the prosecutor argued that the serological evidence proved

Mr. Wade raped the victim:

> Putting the clothing aside for a moment on the scientific testing. One piece of evidence, one swab tells you that when Johanna Francescon said Bob did this, that

---

[35] See Wade v. Brady, 460 F.Supp.2d at 231 ("At trial, the pathologist testified that 'in reference to the vaginal swab, at this level of analysis, the suspect can not be excluded as a contributor into that sample.'"). It must be emphasized that conventional (and rudimentary) serology testimony supported nearly 40% of the first 200 convictions which DNA testing exposed as erroneous. See Brandon L. Garrett, *Judging Innocence*, 108 Columbia L. Rev. (forthcoming 2008)

[36] Vol. 4, at 186-87.

it was that Defendant there, because the lab tested that swab, that swab from a sample that was taken up inside of Mrs. Franceson's vagina. And the chemist told you there was no problem or not denigration and no indication of any problem, and the police couldn't have touched that swab, either, because the doctor told you how she got that sample, how she swabbed from inside and then put it in a container that was closed and not opened until the lab tested it. And what was the result? It corroborated what Mrs. Franceson told you, it was Bob. It corroborates Elliot Franceson's visual, of seeing the Defendant standing naked beside his mother… who was also naked. Those samples indicate, after scientific testing, that the Defendant cannot be excluded from that vaginal swab. And I asked the chemist, is that consistent with having, the Defendant being the source? And she explained to you it is. Why is it? Because here are the numbers, one minus, one plus; one plus, two plus. She told you that indicates two people contributed, but only one person whose bodily fluids in that swab could have contributed the seminal fluid. The evidence suggests the Defendant.[37]

Individually and collectively, the serologist and prosecutor's testimony and arguments make clear that the Commonwealth intended to prove that the semen on the vaginal swab came from Mr. Wade. DNA testing, however, is significantly more discriminatory than serology testing; thus, if DNA testing had been performed prior to trial, and the results excluded Mr. Wade as a possible contributor of the seminal fluid, it is reasonably likely he would not have been prosecuted or convicted. Accordingly, the vaginal swab has the potential to produce results which could raise serious doubts about his original conviction. Consequently, he is entitled to access and test the vaginal swab.

**b.    Vaginal Smear Slide**

Mr. Wade would like to test the vaginal smear slide.[38] The smear slide is probative, intimately related to the sexual assault, and directly relevant to proving his innocence. The serologist microscopically examined the smear slide. According to her June 27, 1997 report, her

---

[37] Vol. 5, at 23-25.

[38] The vaginal smear slide is marked as Item 1b in the serologist's June 27, 1997 "Criminalistics Report." Ex. 1, at 3.

"microscopic examination revealed the presence of sperm." Ex. 1, at 3.[39]  The sperm evidence is

directly relevant to proving Mr. Wade's innocence; the only individual who could have deposited

the sperm is the perpetrator.  If DNA testing is performed on the smear slide, and the results

exclude Mr. Wade as a possible donor, this would raise serious doubts about his original

conviction—if not entirely exonerate him.  Consequently, Mr. Wade is entitled to access and test

the vaginal smear slide.

### c.        The Victim's Orange Pants

Mr. Wade would like to test the victim's orange pants; the pants are probative, intimately

related to the sexual assault, and directly relevant to proving his innocence.[40] E.g., JOHN O.

SAVINO & BRENT E. TURVEY, RAPE INVESTIGATION HANDBOOK 81-82 (2005) (commenting on

the critical need to collect the victim's clothing because it may contain biological evidence from

the perpetrator).  The serologist examined the victim's orange pants.  According to her June 27,

1997 report: "Testing for the presence of seminal fluid reside [sic] and sperm cells was positive

of the crotch panel area of this garment." Ex. 1, at 3, 5.  Likewise, during trial, the serologist

informed the jury that Mr. Wade could not be excluded as a contributor of the seminal fluid

identified on the orange pants:

> Prosecutor:    Were you able to make any further comparisons in regards to the
> orange pants?
>
> Serologist:     In regards to the orange pants, in all three specimens, the suspect

---

[39] The serologist's report is not entirely consistent.  On page 3, for example, she reports that the smear slide tested positive for sperm; however, on page 5, she reports she only identified three items which tested positive "for the presence of seminal fluid residue or sperm cells." Ex. 1, at 3.  The three items which tested positive were: Item 1c (the vaginal swab), Item 2 (the victim's orange pants), and Item 10 (Mr. Wade's t-shirt).  The smear slide is not mentioned as testing positive for sperm.

[40] The victim's orange pants are marked as Item 2 in the serologist's June 27, 1997 "Criminalistics Report." Ex. 1, at 3.

cannot be excluded as a contributor or a source of the seminal residue and amylase identified on those items. However, on item specimen which is cutting number two, he cannot be the single source.

…

Prosecutor:    And would the seminal fluid be consistent with having come from the Defendant in this case?

Serologist:    Yes, at this level of analysis, he cannot be excluded as a contributor into the stain, yes, into the seminal residue amylase stain.[41]

Again, the Commonwealth clearly argued that the seminal fluid came from Mr. Wade. Thus, if the pants are subjected to DNA testing, and the results exclude him as a potential contributor, this would raise serious doubts about his original conviction, if not establish his actual innocence. As such, he is entitled to access and test the victim's orange pants.

### d.    The Victim's Fingernail Scrapings

Mr. Wade would like to test the victim's fingernail scrapings. During the victim's sexual assault examination, medical personnel recovered her fingernail scrapings (as part of the rape kit) and submitted them for forensic testing.[42] The serologist examined the scrapings and reported: "No debris were noted." Ex. 1, at 3. Despite the serologist's initial conclusions, Mr. Wade would like to re-examine the fingernail scrapings with today's DNA technology.[43]

---

[41] Vol. 4, at 188, 189.

[42] The victim's fingernail scrapings are marked as Item 1e in the serologist's June 27, 1997 "Criminalistics Report." Ex. 1, at 3.

[43] The fact that the Commonwealth's serologist failed to identify any biological material should not bar Mr. Wade from re-testing the fingernail scrapings. Indeed, one of Innocence Project's most recent exonerations–involving Ronald Taylor–proves this very point. At his 1994 rape trial, the State's serologist testified she examined the bed sheet where the rape occurred and found no signs of semen or seminal fluid; the alleged lack of semen prevented the Houston Crime Laboratory from pursuing DNA tests which would have exonerated Mr. Taylor prior to trial. However, when the Innocence Project accepted the case, and had the bed sheet re-examined by a private DNA laboratory, the laboratory identified a semen stain and developed a DNA profile which ultimately exonerated Mr. Taylor and

In violent offenses, like the one the victim endured, fingernail scrapings may be very probative at identifying the assailant. See U.S. DEP'T OF JUST., UNDERSTANDING DNA EVIDENCE: A GUIDE FOR VICTIM SERVICE PROVIDERS 2 (Apr. 2001) ("if the victim scratched the assailant, skin tissue that contains the assailant's DNA can be collected from beneath the victim's fingernails.").[44] For instance, many recent investigations and exonerations have turned on DNA tests performed on fingernail clippings or scrapings.[45] Indeed, the Innocence Project's most recent exoneration—involving Chad Heins—involved DNA testing on the victim's fingernail scrapings; the fingernail scrapings were but one item of evidence which exonerated Mr. Heins. See http://www.innocenceproject.org/Content/1052.php (last visited Jan. 3, 2008). Moreover, if a profile is developed,[46] and it is identical to a profile developed from another item

---

identified Roosevelt Carroll–a twice convicted sex offender–as the actual assailant. *See* Mike Tolson & Roma Khanna, *Mix-up on DNA Deals HPD Lab Another Blow*, HOUS. CHRON., Oct. 4, 2007, at A1.

[44] Police collected fingernail scrapings well before DNA evidence entered the criminal justice system. E.g., Cupp v. Murphy, 412 U.S. 291, 292 (1973):

> Suspecting that the spot might be dried blood and knowing that evidence of strangulation is often found under the assailant's fingernails, **the police asked Murphy if they could take a sample of scrapings from his fingernails**. He refused. Under protest and without a warrant, the police proceeded to take the samples, which turned out to contain traces of skin and blood cells, and fabric from the victim's nightgown.

(emphasis added).

[45] E.g., Prepared Remarks of Attorney General John Ashcroft, *DNA Grant Announcements*, Pgh., PA., Sept. 20, 2004, available at, www.usdoj.gov/archive/ag/speeches/2004/ag092004_dna.htm (last visited Oct. 21, 2007) ("Across the country, we have seen critical DNA evidence come from a few cigarette butts, from a child victim's blood on the baby blanket in the offender's possession, **and from underneath a victim's fingernails after she fought her assailant in terror**.") (emphasis added); Anemona Hartcollis, *DNA Testing May Help in 1990 Case*, N.Y. TIMES, Oct. 23, 2007 (discussing how a New York trial judge ordered prosecutors to subject a victim's fingernail scrapings to DNA testing to determine whether DNA links a defendant to a 1990 murder); *DNA Links Man to 2004 Sex Grab*, Goldcoast.com, Oct. 7, 2007, at www.goldcoast.com.au/article/2007/10/04/3432_gold-coast-news.html (last visited Oct. 14, 2007); Melissa Vargas, *Man's DNA Was Found Under Nails of Victim*, FT. WORTH STAR-TELEGRAM, Oct. 10, 2007, at B1; *State Trooper Arrested in 2006 Blairsville Dentist Murder Case*, PGH. TRIB. REV., Sept. 27, 2007.

[46] The fingernail scrapings can be subjected to STR and Y-STR testing. Both forms of testing require only a minuscule amount of DNA material; can be used on degraded samples; can detect and decipher mixtures; and are highly discriminatory. Y-STR testing is valuable in forensic settings because it

of evidence (i.e., redundant results), and the profiles exclude Mr. Wade, this would significantly advance, if not categorically prove, his actual innocence claim.[47]   Consequently, Mr. Wade is entitled to access and test the victim's fingernail scrapings.

## IV.  <u>Conclusion</u>

The Court left several questions unanswered in its initial opinion.  Mr. Wade addressed these questions and explained: (a) why his §1983 action is timely; (b) that the threshold question is whether the evidence he seeks to test has the potential to raise significant doubts about his conviction; and (c) if the vaginal swab, the victim's clothing, the victim's fingernail scrapings, and the recovered hairs are tested, they have the potential to produce exculpatory results which would raise significant doubts about his conviction.

First, Mr. Wade explained why his § 1983 action is timely; under § 1988's directive, a federal court may not apply the forum state's personal injury statute of limitations (SOL) if

---

is found only in males; male sex chromosomes possess an X and a Y chromosome (X, Y), whereas female sex chromosomes possess two X chromosomes (X, X).  Because the vast majority of crimes where DNA is available and relevant–i.e., sexual assaults–involve male perpetrators, Y-STR tests can prove invaluable and more beneficial than regular (autosomal) STR testing in certain circumstances.  <u>See</u> Cassie Johnson, *Validation and Uses of a Y-Chromosome STR 10-Plex for Forensic and Paternity Laboratories*, 48 J. FORENSIC SCI. 6, 1-9 (Nov. 2003).  For instance, Y-STR tests can produce interpretable results where autosomal STR tests are limited by the evidence, such as in mixtures samples where high levels of female DNA may overwhelm the minor amounts of male DNA (e.g., a female's fingernail scrapings where her DNA may overwhelm the male DNA).  However, using "Y chromosome specific PCR primers can improve the chances of detecting low levels of the perpetrators DNA in a high background of the female victim's DNA." JOHN M. BUTLER, FORENSIC DNA TYPING: BIOLOGY, TECHNOLOGY, AND GENETICS OF STR MARKERS 203 (2d 2005); <u>see also</u> *Profile: Killer Instinct; Melinda Elkins works seven year to prove her husband's innocence in murder of Judy Johnson and rape of Brooke Sutton*, Dateline NBC, Oct. 7, 2007 (discussing how Y-STR played a critical role Clarence Elkins's exoneration); Chief Justice Thomas J. Moyer & Stephen P. Anway, *Biotechnology and the Bar: A Response to the Growing Divide Between Science and the Legal Environment*, 22 BERKELEY TECH. L.J. 671, 688 n.91 (2007) (discussing Clarence Elkins's case and the importance of Y-STR testing).

[47] Chad Heins's case also represents a "redundancy" exoneration, in that the Innocence Project tested several items of evidence which developed the same DNA profile—a profile which excluded Mr. Heins       as       a       possible       contributor       of       the       biological       material.       <u>See</u>

applying the SOL would be "inconsistent with" or "contrary to" federal law. In Mr. Wade's case, the Innocence Protection Act (IPA), **a federal statute**, provides the exact relief he currently seeks—i.e., access to physical evidence for DNA testing. As such, the Court must rely on the IPA's timeliness requirements; because the IPA does not contain a statute of limitations, Mr. Wade's § 1983 cannot be time-barred. Instead, the only timeliness doctrine which could possibly prevent the Court from considering his § 1983 action is laches. The laches doctrine, however, cannot bar his § 1983 action because the Commonwealth failed to plead laches as an affirmative defense and failed to explain how it was prejudiced by his late filing. Furthermore, even if the IPA's timeliness requirement is inapplicable, Mr. Wade's § 1983 action is timely under Massachusetts's personal injury statute of limitations; Mr. Wade had a "complete and present cause of action" when the Commonwealth court denied his DNA testing motion on July 29, 2003; thus, he had three years from this date to file his § 1983 action. Mr. Wade filed his request for DNA testing on October 8, 2004; as such, his § 1983 action falls well within the three-year statute of limitations period. Finally, if the Court deems Mr. Wade's §1983 action untimely, the statute of limitations should be tolled due to his illiteracy and mental retardation; the SOL should also be tolled because he "actively" and "diligently" pursued his legal rights; there are extraordinary circumstances, in that the Commonwealth possesses physical evidence which can prove his innocence; and the Commonwealth has yet to identify a legitimate interest which supports its decision not to turn over the biological evidence, nor has it explained how it was prejudiced by the alleged late filing.

Second, Mr. Wade identified the appropriate standard for evaluating § 1983 claims which

---

www.innocenceproject.org/Content/1052.php (last visited December 13, 2007). For another example of a

seeks access to post-conviction DNA testing. The standard is simply whether the evidence, which Mr. Wade seeks to test, has the potential to produce results which could raise significant doubts about the petitioner's original conviction. The Court must assume exculpatory results and may not consider the strength of the Commonwealth's case. The evidence which Mr. Wade seeks to test—i.e., the vaginal swab, the victim's clothing, and her fingernail scrapings—easily satisfy this standard. All the items are intimately connected to the victim's assault and probative to proving Mr. Wade's innocence. As such, subjecting these items of evidence to DNA testing "could raise serious doubts about [his] original verdict." Wade v. Brady, 460 F.Supp.2d at 249.

As of this writing, the Innocence Project has identified no fewer than 210 individuals in the United States who have been exonerated by post-conviction DNA testing. See www.innocenceproject.org (last visited Jan. 2, 2008).[48] DNA technology is unquestionably more sensitive, discriminating, and accurate than the rudimentary serological techniques which the Commonwealth used to convict Mr. Wade.[49] In light of the numerous convictions that have been conclusively determined to be erroneous, it is unconscionable to ignore readily available biological evidence which, if subjected to DNA testing, could determine whether the Commonwealth wrongly convicted Mr. Wade. Mr. Wade has a constitutional right to DNA testing in this case; allowing such testing harms no state interest and serves only the cause of truth; and there are no genuine issues of material fact regarding the timeliness of Mr. Wade's §

redundancy DNA exoneration, see Yarris v. County of Delaware, 465 F.3d 129, 132-33 (3rd Cir. 2006).

[48] See also United States v. Boose, 498 F.Supp.2d at 889 ("Indeed, over the years DNA testing has been used to exonerate 200 defendants who have wrongfully been convicted of crimes and spent years in prison."); People v. Saxon, 871 N.E.2d 244, 256 (Ill. App. Ct. 2007) (McDade, J., dissenting) (commenting on the "horrific statistics" regarding the 200 plus DNA exonerations).

[49] For this reason, former Attorney General John Ashcroft observed that "DNA can operate as a kind of truth machine, ensuring justice by identifying the guilty and clearing the innocent." Jonathan

1983 action or whether his constitutional right to DNA testing is triggered in this case. For the reasons given, summary judgment should be granted.

Respectfully submitted,


/s/ Janet Hetherwick Pumphrey
Robert Wade, by his Attorney
Janet Hetherwick Pumphrey
45 Walker Street
Lenox, MA 01240
(413) 637-2777
BBO 556424

/s/ Barry Scheck
Barry Scheck
The Innocence Project
Co-Director
100 Fifth Avenue, 3rd Floor
New York, New York 10011
Tel. 212.364.5361

/s/ Craig M. Cooley
Craig M. Cooley
The Innocence Project
Staff Attorney
100 Fifth Avenue, 3rd Floor
New York, New York 10011
Tel. 212.364.5361
Illinois Bar #6282688

---

Peterson, *Funds for DNA Testing of Criminals are Diverted*, L.A. Times, Dec. 27, 2001, at A22.