UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

ROBERT WADE,

Petitioner,

vs.

BERNARD F. BRADY, Acting Superintendent, MARTHA COAKLEY, Attorney General, and TIMOTHY J. CRUZ, District Attorney for Plymouth County Respondents,

Respondents.

Case No.04-12135NG

MEMORANDUM OF LAW IN SUPPORT OF PETITIONER'S RULE 15(d) SUPPLEMENTAL PLEADING MOTION

Petitioner, Robert Wade, submits the following memorandum of law in support of his request, pursuant to Fed. R. Civ. P. 15(d), to supplement his original summary judgment motion. His request is made in good faith and premised on the following points and authorities.

## I.    Introduction

On January 4, 2008, Mr. Wade filed his Memorandum in Support of Motion for Summary Judgment. *See* Doc. No. 58 (hereinafter SJ motion). In his SJ motion, Mr. Wade addressed two issues: (1) whether the statute of limitations bars his § 1983 action; and (2) whether the facts in his case trigger his due process right to access the biological evidence. In regards to the threshold issue, Mr. Wade argued that a petitioner's due process right to post-conviction DNA testing is triggered when the envisioned DNA tests have the potential to raise "serious doubts" about his or her "original conviction." *Id.* at 4. Mr. Wade supported his "serious doubt" standard by referencing the Court's own language in its initial opinion in which it denied the

1

Defendant's Motion to Dismiss. *See Wade v. Brady*, 460 F.Supp.2d 226, 249 (D.Mass. 2006). He did not cite to additional authorities to support his "serious doubts" standard because, at the time, no federal courts had addressed or issued a comprehensive ruling regarding the issue. This changed, however, when the Ninth Circuit Court of Appeals issued its decision in *Osborne v. District Attorney's Office*, --- F.3d ---, 2008 WL 861890 (9th Cir., April 2, 2008) (hereinafter *Osborne II*).[1] Because the Ninth Circuit issued *Osborne II* after Mr. Wade filed his SJ motion, and because it is directly applicable to an issue currently pending before the Court, Mr. Wade respectfully asks the Court to allow him to supplement his SJ motion, pursuant to Fed. R. Civ. P. 15(d), with a brief memorandum explaining *Osborne II's* holding and how it supports his position.[2]

## II.    Fed. R. Civ. P. Rule 15(d)

Pursuant to Rule 15(d), this Court may, "on reasonable notice," permit "a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented." Fed. R. Civ. P. 15(d); *accord Connectu LLC v. Zuckerberg et al.*, 2008 U.S. App. LEXIS 7064, at *15 (1st Cir., April 3, 2008). Mr. Wade satisfies these requirements. First, by filing this motion on May 5, 2008, he is giving the Court reasonable and timely notice of the Ninth Circuit's April 2, 2008 decision in *Osborne II*. Second, the *Osborne II* decision is an "occurrence" or "event" that "happened after the date of the pleading

---

[1]    The *Osborne II* reference is used because this is the second opinion issued by the Ninth Circuit relating to petitioner Osborne's § 1983 action to access physical evidence for DNA testing. *See Osborne v. District Attorney's Office*, 423 F.3d 1050 (9th Cir. 2005) (hereinafter *Osborne I*).

[2]    The *Osborne II* decision is attached hereto as Exhibit 1.

to be supplemented." As noted, Mr. Wade filed his SJ motion on January 4, 2008, while the Ninth Circuit only recently issued its *Osborne* decision on April 2, 2008. Third, *Osborne II* is directly relevant to a critical issue raised by the Court in its initial opinion and addressed by Mr. Wade in his SJ motion.

**III.    *Osborne's* Facts and Procedural History**

Petitioner in *Osborne*, like Mr. Wade, filed a § 1983 action to access biological evidence for DNA testing purposes. *See Osborne II,* 2008 WL 861890, at *4-8 (discussing procedural history); *Osborne I*, 423 F.3d at 1052-53 (same). Like the current issue pending before the Court, a significant issue in *Osborne II* concerned the standard petitioners must to satisfy to trigger their due process right to access biological evidence in post-conviction proceedings. While the Ninth Circuit did not "determine the full breadth of post-conviction *Brady* rights[,]" *Osborne II*, at *14, it nonetheless held that "Osborne's claim for post-conviction access to evidence is no higher than a reasonable probability that, if exculpatory DNA evidence were disclosed to Osborne, he could prevail in an action for post-conviction relief." *Id.* at *15. Of great importance to Mr. Wade, is the fact the Ninth Circuit ruled in Osborne's favor even though the State introduced *overwhelming evidence of his guilt at trial. See infra* (discussing the overwhelming evidence of guilt). While the Ninth Circuit carefully factored the trial evidence into its due process equation, the critical variable that ultimately determined the outcome of this constitutional algorithm was whether the biological evidence, which Osborne sought to test, could produce results that undermined confidence in his trial. The biological evidence,

coincidently, is very similar to the biological evidence Mr. Wade seeks to test in his case.

In many respects, the Ninth Circuit used a very similar, if not identical, due process standard as advocated by Mr. Wade in his SJ motion—a standard premised on this Court's initial opinion. According to that standard, a petitioner triggers his due process right to post-conviction DNA testing when the proposed DNA tests have the potential to raise "serious doubts" about his or her "original conviction." *Id.* at 4 (quoting *Wade v. Brady*, 460 F.Supp.2d at 249). Regardless of how each standard is characterized (e.g., "materiality" standard, "serious doubts" standard, or "reasonable probability" standard), both standards focus primarily on the evidence sought to be tested and whether DNA testing can produce results that would undermine confidence in the petitioner's original verdict.

### A.    Facts of the Sexual Assault

Osborne's conviction arose from a March 1993 incident in which the victim, a female prostitute, after agreeing to perform oral sex on two male clients, was driven to a secluded area of Anchorage, Alaska and brutally attacked. At gun point, the assailants forced the victim to perform oral sex on the driver, while the passenger vaginally penetrated her with his finger and penis. The passenger wore a blue condom that the victim brought with her. After the assault, the assailants demanded the victim to get out of the car. When she refused, the driver choked her and hit her in the head with a gun. When she attempted to flee, the assailants pursued her and beat her with an axe handle. At this point, as she played dead in the snow, she heard the gun fire and felt a bullet graze her head. Though she could not see her

assailant's faces, judging from their pants and footwear she believed it was the passenger who shot her. *See Osborne II*, at *1.

Once the car drove off, the victim got up, walked to the main road, flagged down a passing car, told its occupants what happened, and asked only for a ride home. The following day a neighbor of one of the car's occupants notified the police about the assault, who contacted the victim. Though initially uncooperative, the victim eventually described the incident to the police. *See Osborne II*, at *1.

### 1.    Physical Evidence Collected from the Scene

Medical personal examined the victim, during which hair and blood samples were collected. A vaginal examination was not conducted because the victim bathed repeatedly after the attack and the passenger-assailant had worn a condom. At the crime scene, police recovered a used blue condom, a spent shell casing, and two pairs of the victim's grey knit pants stained with blood. *See Osborne II*, at *2.

### 2.    Osborne's Arrest

Police arrested Osborne a week after the attack after military police stopped Dexter Jackson for a traffic violation. When Jackson opened his glove box to retrieve his registration, the officer saw a gun case, which held a .380 caliber pistol. A further search of the car revealed a box of ammunition and a pocketknife. Observing that Jackson, his car, and his passenger at the time (who was not Osborne) resembled composite sketches that had been circulated after the assault, the military police contacted the Anchorage Police. When the Anchorage Police (AP) interviewed Jackson, he told them that Osborne was his accomplice and that it was Osborne who vaginally raped and shot the victim. *See Osborne II*, at *2.

### 3.    Evidence Supporting Osborne's Guilt

Anchorage police and prosecutors collected a voluminous amount of evidence that pegged Osborne as the rapist and shooter.  This evidence included: (1) eyewitness identification; (2) forensic evidence, including DNA tests; and (3) other circumstantial evidence placing Osborne near the scene before and after the crime.  As noted *infra*, Osborne confessed in 2004 and 2005 when he applied for discretionary parole and met with the Alaska Board of Parole.  *See Osborne II*, at *4.

#### a.    Eyewitness Identification

The victim identified Osborne from a photo-lineup, as the passenger-assailant, who raped and shot her.  The victim also identified Jackson's car as the one she was sexually assaulted in.  Likewise, she identified a pocketknife found in Jackson's car as hers.  *See Osborne II*, at *2.

#### b.    Forensic Evidence

Forensic evidence implicated Osborne, as well.  First, the police matched tire tracks at the crime scene to Jackson's car.  Second, policed matched the spent shell casing found at the crime scene to Jackson's pistol.  Third, the State's crime lab subjected sperm found in the used condom to DQ Alpha DNA testing, which showed that the sperm had the same DQ Alpha type as Osborne.  The same DQ-Alpha type is shared by 14.7 to 16 percent of African Americans.[3]  Fourth, police recovered a

---

[3]

Notably, Osborne's trial counsel did not even believe in his innocence.  According to her post-conviction affidavit, she strategically decided not to pursue more discriminary RFLP DNA testing because she "disbelieved Osborne's statement that he did not commit the crime" and was more "concerned about a more inculpatory result nullifying Osborne's misidentification defense."  She concluded that he "was in a strategically better position without RFLP DNA testing," especially given the initial DQ-Alpha testing results. *See Osborne II*, at *2-3.

pubic hair from the blue condom and the victim's sweatshirt, which were consistent with having come from Osborne because they "exhibited the same microscopic features" as Osborne's pubic hair samples. *See Osborne II*, at *2-3.

### c.    Other Circumstantial Evidence

Prosecutors presented other circumstantial evidence of Osborne's guilt. First, police found tickets from an arcade, where Osborne had been before the crime, in Jackson's car.  Second, a group of witnesses saw Osborne get into Jackson's car shortly before the crime, while other witnesses saw him with Jackson after the crime and reported seeing blood on his clothing. *See Osborne II*, at *2-3.

### 4.    Verdict

At trial, the State jointly prosecuted Osborne and Jackson.  Osborne presented alibi and mistaken identification defenses.  The jury rejected his defenses and convicted him of kidnapping, first-degree assault, and two counts of first-degree sexual assault. *See Osborne II*, at *3.

### B.    Procedural History

### 1.    State Court Litigation

On direct appeal, the Alaska Court of Appeals affirmed his conviction. *See Jackson v. State*, Nos. A-5276, A-5329, 1996 WL 33686444, at *7-8 (Alaska Ct. App., Feb. 7, 1996) (consolidated appeal).  In state post-conviction, Osborne argued that trial counsel was ineffective for failing to pursue RFLP testing and that he had a due process right to have evidence retested using DNA tests that were not available until after his trial.  In 2002, the trial judge denied his application and in 2005 the Alaska Court of Appeals affirmed in part and remanded in part. *See Osborne v.*

*State*, 110 P.3d 986 (Alaska Ct. App. 2005).  On remand, the trial judge held that Osborne failed to prove he was entitled to post-conviction DNA testing under state law.  The Alaska Court of Appeals affirmed. *See Osborne v. State*, 163 P.3d 973, 979-81 (Alaska Ct. App. 2007).

### a.    Osborne's Application for Parole

In 2004, as his state appeal and federal action, *see infra*, were pending, Osborne applied for discretionary parole with the Alaska Parole Board.  In his written application, Osborne "confessed to participating in the attack on [the victim] and described his actions in detail." *Osborne II*, at *4.  Moreover, at his August 2005 hearing before the Parole Board, he "stated he had told his mother and lawyer the truth about the incident." *Id.*  Despite his confessions, the Parole Board denied his request.

### 2.    Federal Court Litigation

### a.    *Osborne I*

In June 2003, while he was appealing his first state post-conviction petition, Osborne filed a § 1983 access-to-evidence claim.  He alleged similar constitutional violations as Mr. Wade, including: (1) a due process claim to access exculpatory evidence; (2) a due process claim to demonstrate actual innocence; (3) an Eighth Amendment cruel and unusual punishment claim; (4) a due process claim to a fair clemency hearing; (5) a Sixth Amendment compulsory process and confrontation claim; and (6) a due process and equal protection meaningful access claim. *See Osborne II*, at *5.  Furthermore, like Mr. Wade, to remedy these violations Osborne sought access to "the biological evidence—the semen and pubic hair from the blue

condom and the pubic hair from [the victim's] sweater—and the transfer of such evidence for DNA testing." *Id.* Finally, like Mr. Wade, Osborne identified the DNA tests he wished to pursue and potential testing scenarios that would prove his actual innocence.[4]

The district court dismissed Osborne's § 1983 action pursuant to *Heck v. Humphrey*, 512 U.S. 477 (1994). On appeal, the Ninth Circuit, like the Court in its initial opinion, held that *Heck v. Humphrey* did not bar Osborne's action because, even if successful, it would not necessarily demonstrate the invalidity of his conviction. *See Osborne I*, 423 F.3d at 1056. In its concluding paragraph, where it remanded the case back to the district court, the Ninth Circuit stated: "We express no opinion as to whether Osborne has been deprived of a federally protected right, and leave that question to the district court to address in the first instance." *Id.*

### b.    *Osborne II*

On remand, the district court ruled in Osborne's favor when it held that "there *does* exist, *under the unique and specific facts presented*, a very limited constitutional right to the testing sought." *Osborne v. Dist. Attorney's Office*, 445 F.Supp.2d 1079, 1080-81 (D.Alaska 2006) (emphasis in original; citations omitted). The State appealed to the Ninth Circuit arguing that *Brady v. Maryland's* due process principles do not extend into the post-conviction context, and even if they did, Osborne failed to satisfy the threshold that triggered this post-conviction due process right. On appeal, the Ninth Circuit rejected the State's arguments and

---

[4]

    In particular, Osborne sought STR and mitochondrial DNA testing. Osborne sought STR testing because its discriminatory potential is far greater than DQ-Alpha's potential.

made three significant determinations, two of which (the second and third) are directly applicable to the issues currently pending before the Court.

First, like this Court held in its initial opinion, *see Wade v. Brady*, 460 F.Supp.2d at 246-48, the Ninth Circuit said that *Brady's* due process principles extend into the post-conviction context. *See Osborne II*, at *7-12. The Ninth Circuit said it actually resolved this issue more than a decade again when it decided *Thomas v. Goldsmith*, 979 F.2d 746, 749-50 (9th Cir. 1992), "in which [it] ordered the disclosure of potentially-exculpatory semen evidence in a habeas corpus proceeding where testing of the evidence was potentially material to a... 'gateway' showing of actual innocence." *Id.* at *8.

Second, while it did not "determine the full breadth of post-conviction *Brady* rights," it held that the "standard of materiality applicable to Osborne's claim for post-conviction access to evidence is no higher than a reasonable probability that, if exculpatory DNA evidence were disclosed to Osborne, he could prevail in an action for post-conviction relief." *Id.* at *14, 15. Thus, because Osborne, like Mr. Wade, intends to file a free standing actual innocence claim, "*materiality would be established by a reasonable probability that [he] could 'affirmatively prove that he is probably innocent.'*" *Id.* at *15 (emphasis added; citation omitted).[5] Stated differently, the "question is... whether in the absence of the DNA evidence Osborne would receive a fair habeas hearing, understood as a hearing resulting in a judgment 'worthy of confidence.'" *Id.* (citation omitted).

---

[5]
*See also id.* at *16 ("we have determined that materiality under federal law requires Osborne to demonstrate, at most, only a reasonable probability that with favorable DNA test results he could affirmatively prove that he is probably innocent.").

Third, despite the overwhelming evidence of guilt and his confessions, Osborne's proposed DNA testing and theories of exoneration satisfied the nebulous materiality standard. As the Ninth Circuit explained, "this standard is satisfied by the potential probative value of the DNA evidence to which Osborne seeks access." *Id.* at *15. Significantly, it placed great emphasis on the "obvious exculpatory potential of semen evidence" in sexual assault cases:

> In light of the obvious exculpatory potential of semen evidence in a sexual assault case, and given the evidentiary record in this sexual assault case and the unique circumstances of this crime, we have no difficulty concluding that DNA tests favorable to Osborne would have *extraordinary exculpatory potential* and would be material to proving his actual innocence. At the very least, exculpatory DNA tests would entitle Osborne to an evidentiary hearing on his actual innocence claim in order to more fully develop the factual record and reconcile any conflicting evidence.

*Id.* at *20 (emphasis added).

In its concluding section, the Ninth Circuit summarized when due process prohibits the State from denying a petitioner access to evidence for DNA testing purposes:

> [D]ue process of law prohibits the State from denying him reasonable access to biological evidence for the purpose of further DNA testing, [1] where that biological evidence was used to secure his conviction, [2] the DNA testing is to be conducted using methods that were unavailable at the time of trial and are far more precise than the methods that were then available, [3] such methods are capable of conclusively determining whether Osborne is the source of the genetic material, [4] the testing can be conducted without cost or prejudice to the State, and [5] the evidence is material to available forms of post-conviction relief.

*Id.* at *23 (numbers added).

Moreover, the Ninth Circuit took the State to task for presenting intellectually dishonest reasons (or hypotheticals) as to why the biological evidence, which at trial the State said proved Osborne's guilt beyond a reasonable doubt, "might [now] be

11

entirely unrelated to the rape and therefore immaterial to Osborne's claim of innocence." *Id.* at *17. The Ninth Circuit said that the State's new "hypotheticals must be assessed in light of the entire record." *Id.* at *18. Viewed in this regard, the Ninth Circuit held:

> [A]lthough the State points to the circumstantial and eyewitness evidence that is supportive of the prosecution's case at trial and Osborne's conviction, the State fails to point to any evidence in the record that would affirmatively support its newly imagined alternative theories of the crime and accordingly rebut its own presentation at trial regarding the significance of the biological evidence as positively identifying the real perpetrator.

*Id.* Thus, from the Ninth Circuit's perspective, the "State's hypotheticals [were] formulated based on nothing more than the very uncertainties that necessarily arise where new evidence upsets accepted notions of reality and forces a fundamental reassessment of the factual record. Even worse, they fail to account for evidence already in the record that seriously calls into question whether the State's hypotheticals might have any basis in reality." *Id.*

For instance, the State argued that the blue condom filled with semen and found at the crime scene was not associated with the rape, even though it argued so at trial when it introduced the DQ-Alpha results to prove Osborne's guilt. Similarly, the State argued that a pubic hair recovered from the victim's sweater was irrelevant as well, even though at trial it linked the pubic hair to Osborne through microscopic analysis. The Ninth Circuit dismissed the State's arguments by referring back to the State's trial presentation:

> As the State itself should expect given the prosecutor's trial presentation and its continued belief in Osborne's guilt, further DNA testing could establish a genetic match between the semen and pubic hair on the condom and the pubic hair on [the victim's] sweater,

> proving that the user of the condom was also in such contact with [the victim] as to transfer a pubic hair to her sweater. As the prosecutor argued at trial, because the sweater was spread out underneath [the victim] during the rape, the most likely scenario is that the hair was transferred by Jackson's accomplice at that time.

*Id.* at *19.  The Ninth Circuit concluded that "the State's proposed hypotheticals for reconciling exculpatory DNA tests with Osborne's guilt are so inconsistent with and improbable in light of the evidence in the trial record that they cannot negate the materiality of further DNA testing to possible post-conviction relief." *Id.* at *20.

The Ninth Circuit also addressed Osborne's confessions and whether they foreclosed his right to obtain access to the biological evidence.  While the court said that his "confessions [were] certainly relevant to [its] inquiry," it disagreed with the State's argument that the "confessions foreclose[d] Osborne's right to obtain post-conviction access to evidence." *Id.* at *21.  The court explained that the "same rule that allows us to consider the probative value of the confessions requires that we do so in light of exculpatory DNA tests and all the rest of the new and old evidence in this case." *Id.*  Consequently, the issue before the court was "*not* how much weight [it] should afford Osborne's confessions standing alone, but how they might be squared with exculpatory DNA tests and the remainder of the evidentiary record." *Id.* (emphasis added).  From the court's perspective, DNA testing could prove one of two things:

> Either the confessions will be proven accurate by test results proving Osborne was in fact the passenger-rapist and his case will proceed no further, or the test results will exclude him as the source of the biological material, in which case serious questions will be raised about the validity of his confessions and whether, as Osborne now claims, he was motivated to confess falsely as the most expeditious means available to obtain release from prison.

*Id.* In the end, the court refused to categorically bar DNA testing in cases where petitioners confessed pre- or post-trial because such "a rule would ignore the emerging reality of wrongful convictions based on false confessions and the capability of DNA testing to reveal the objective truth and exonerate the innocent." *Id.*

Finally, the Ninth Circuit, like this Court did in its initial opinion, *see Wade v. Brady*, 460 U.S. at 248-49, held that granting access to the biological evidence for the limited purpose of DNA testing did not erode "the important value of finality in the criminal justice system." *Id.* at *22. As the court explained, "[a]lthough finality is undoubtedly an important consideration, it is not such an immovable force as to override the due process interests presently at stake." *Id.* In particular, the Court dismissed the State's claim that, because the evidence against Osborne was "so strong," granting access to the biological evidence was "not likely to 'further the truth seeking function of our criminal justice system.'" *Id.* (citation omitted). In dismissing the State's claim, the court referred to the "recent history" of DNA exonerations for the proposition that "DNA evidence has the capability of refuting otherwise irrefutable inculpatory evidence, and as we have already established this case is no exception." *Id.*

## IV.     *Osborne II's* Impact on the Current Issues Pending Before The Court

In many respects, Mr. Wade's case is factually similar to Osborne's case. This is critical because determining whether a petitioner satisfies the imprecise due process standard for accessing evidence post-conviction is a fact-intensive inquiry

14

that focuses on (1) the evidence to be tested, (2) the DNA tests to be used, and (3) whether the DNA tests can produce results that would undermine confidence in (or raise serious doubts about) the original conviction. Thus, because Mr. Wade's case is factually similar to Osborne's case, the Ninth Circuit's application of the facts to the law in *Osborne II* should prove significantly relevant to this Court as it attempts to answer the same questions presented to the Ninth Circuit in *Osborne II*.

### A.    Factual Similarities

In terms of factual similarities, both cases represent sexual assaults where the assailant left behind seminal material, which petitioners sought to access to prove their innocence with DNA testing. Likewise, in both cases the State relied on the seminal material to secure the petitioners' convictions. During Mr. Wade's trial, for instance, the prosecutor presented a serologist who testified that Mr. Wade *could not* be eliminated as a potential source of the semen recovered from the vaginal swab.[6] In his closing argument, the prosecutor argued that the serology tests proved Mr. Wade's guilt.[7] Furthermore, in both cases prosecutors presented significant circumstantial evidence that prompted and supported the juries' guilty verdicts. For instance, in Mr. Wade's case, the Commonwealth presented the victim's son who said that when he knocked on Mr. Wade's cabin on October 24, 1993, Mr. Wade emerged naked from a bedroom. Her son then discovered his mother, naked and bruised, on Mr. Wade's bed. *See Wade v. Brady*, 460 F.Supp.2d. at 231. Finally, both cases involve additional evidence or decisions that

---

[6]     Vol. 4, at 186-87.

[7]

further aggravated petitioners' culpability. In *Osborne*, for example, petitioner's post-conviction confessions to the parole board appeared to reinforce the validity of his conviction. Similarly, in Mr. Wade's case, trial counsel's (objectively unreasonable) decision to present a consent defense all but guaranteed a conviction for the Commonwealth.

    **B.**    *Osborne II's* **Legal Relevance**

The Ninth Circuit applied the aforementioned facts to the relevant due process case law and made several determinations that are directly pertinent to the issues currently pending before the Court. Those questions are: What standard or fact pattern triggers a petitioner's due process access-to-evidence claim? And, do the facts in Mr. Wade's case coupled with his testing requests, satisfy this nebulous standard? *Osborne II* also provides an excellent framework for evaluating potential new arguments presented by the Commonwealth that seek to minimize the materiality of the biological evidence used to convict Mr. Wade. Finally, *Osborne II* presents a superb analysis on how courts should handle a petitioner's confession (or incriminating trial strategy) when evaluating his access-to-evidence claim.

    **1.**    *Osborne II's* **Materiality Standard is Premised on the Same Due Process Principles Articulated by This Court's "Serious Doubt" Standard**

---

Vol. 5, at 23-25.

*Osborne II's* materiality standard is premised on the *Brady* line of cases that focus on whether, in the absence of the undisclosed evidence, the petitioner received a fair trial (or post-conviction evidentiary hearing), "understood as a trial [or hearing] resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995).[8]  The Ninth Circuit made this clear when it said that the "question is... whether in the absence of the DNA evidence Osborne would receive a fair habeas hearing, understood as a hearing resulting in a judgment 'worthy of confidence.'" *Osborne II*, at *15 (citation omitted).  This standard, in many respects, is identical to the due process standard articulated by this Court in its initial opinion when it said that the "Due Process Clause provides a substantive right to post-conviction DNA testing in cases where testing could *raise serious doubts about the original verdict*." *Wade v. Brady*, 460 F.Supp.2d at 249 (emphasis added).  Specifically, when a court finds that a verdict lacks confidence, the court is in essence saying that it has "*serious doubts*" about whether the State would have obtained a conviction due to the non-disclosed evidence's materiality.   Accordingly, it makes no difference whether the Court uses the more common "undermines confidence" terminology or the less common "serious doubts" language—both terms focus on the same underlying issue—*i.e.*, confidence in the original verdict.

  **2.     Mr. Wade Satisfies the Imprecise Due Process Standard Articulated in *Osborne II***

---

[8]   Notably, this Court, like the Ninth Circuit did, need not set forth the standard by which all future right-to-access cases must be judged. *See Osborne II*, at *23 ("we do not purport to set the standards by which all future cases must be judged.").

To answer the question of whether DNA testing could undermine confidence in (or raises serious doubts about) a petitioner's conviction, the Ninth Circuit examined several issues: (1) whether the biological evidence was used to secure the petitioner's conviction; (2) whether the DNA testing petitioner seeks to use was unavailable at his trial; (3) whether the DNA testing is capable of conclusively determining whether petitioner is the source of the biological evidence; and (4) whether the biological evidence is material to available forms of post-conviction relief. *See Osborne II*, at *23.[9]  When the Court applies the facts of Mr. Wade's case to these issues it will easily conclude that he satisfies this flexible due process standard.  This is so because there is a "reasonable probability that with favorable DNA test results [Mr. Wade] could affirmatively prove that he is probably innocent." *Osborne II*, at *16.  Stated differently, given "the obvious exculpatory potential of semen evidence in a sexual assault case," *id.* at *20, if DNA tests on the vaginal swab and vaginal smear slide produce a DNA profile inconsistent with Mr. Wade's DNA profile, such results would undermine confidence in (or raise serious about) his original verdict.

a.    **The Commonwealth Used the Biological to Secure Mr. Wade's conviction**

---

[9]    A fifth factor was whether "the testing can be conducted without cost or prejudice to the State[.]" *Osborne II*, at *23.  The Court already ruled on this issue in its initial opinion when it held:

> Scarce administrative and judicial resources are also not threatened by post-conviction DNA testing. In cases where the convicted individual has agreed to foot the bill for testing, prosecutors need only grant access to DNA evidence already in their possession. If the test provides results that are inculpatory or inconclusive, the defendant will provide no new tax on resources.

*Wade v. Brady*, 460 F.Supp.2d at 249.

Mr. Wade seeks to test the vaginal swab, the vaginal smear slide, the victim's orange pants, and the victim's fingernail scrapings. At trial, the Commonwealth relied on this evidence to secure Mr. Wade's conviction. As mentioned, the prosecutor presented a serologist who testified that Mr. Wade *could not* be eliminated as a potential source of the semen recovered from the vaginal swab.[10] The serologist also testified that Mr. Wade could not be excluded as a contributor of the seminal fluid identified on the victim's orange pants.[11] In closing arguments, the prosecutor argued that the serology tests proved Mr. Wade's guilt.[12]

---

[10]

Vol. 4, at 186-87.

[11]

Vol. 4, at 188, 189.

[12]

19      Vol. 5, at 23-25.

The fact the Commonwealth subjected this evidence to forensic testing and introduced the results of the testing at trial, plainly suggests that the evidence is material to proving the assailant's identity.  If the Commonwealth construed the evidence to be immaterial to proving the assailant's identity, it would have never spent taxpayer money to test such irrelevant and immaterial evidence. Consequently, the Commonwealth's actions demonstrate that the seminal fluid is not "tangentially" related to the finding of guilt.[13]  Instead, its actions make obvious that the seminal fluid has the capacity to "automatically exonerate" Mr. Wade. *See Wade v. Brady*, 460 F.Supp.2d at 231 n.6 ("Where an exclusionary test result would automatically exonerate a prisoner, the right is clearly implicated.").

### b.    STR, Y-STR, and Mini-STR Testing Was Not Available or Reasonably Available When the Commonwealth Prosecuted Mr. Wade

Mr. Wade seeks to perform STR, Y-STR, and mini-STR testing.  While Y-STR and mini-STR testing were definitely not available when the Commonwealth prosecuted Mr. Wade, STR testing only recently became available shortly before his trial and thus he could not reasonably pursue such testing before trial. *See Wade v. Brady*, 460 F.Supp. at 234 (noting that the Massachusetts Supreme Judicial Court upheld the admissibility of STR testing on August 25, 1997 a scant week before Mr.

---

[13]    *See Wade v. Brady*, 460 F.Supp.2d at 231 n.6 ("The first and last questions here are an acknowledgment that many a case exists where DNA evidence relates very tangentially, if at all, to the finding of guilt.  In cases where an exclusionary test result would have no impact on the earlier verdict, plaintiff would not have a right to testing.").

Wade's trial began); *see also Commonwealth v. Rosier*, 685 N.E.2d 739 (Mass. 1997) (STR testing valid). [14]

### c. The DNA Testing Can Conclusively Determine Whether Mr. Wade is the Source of the Seminal Material

STR and mini-STR testing can conclusively determine whether Mr. Wade is the contributor of the seminal fluid. STR testing is the most discriminatory type of DNA testing. The statistical probability of an STR match between two unrelated persons in the Caucasian American population has been conservatively estimated at 1 in 575 trillion. *See* NAT'L INST. OF JUST., DEP'T OF JUST., THE FUTURE OF FORENSIC DNA TESTING 19 (Nov. 2000) (hereinafter 2000 NIJ Report). Thus, given the population of the United States, an STR profile is "effectively unique." *Id.* at 25. As one federal appellate court recently conceded:

> As far as scientists have determined, DNA is the most reliable means of identifying individuals. There is an infinitesimal chance that any two individuals will share the same DNA profile unless they are identical twins. Thus, a DNA match between two samples excludes the rest of the population from suspicion to a near 100% certainty.

---
[14]

21          As noted *infra*, trial counsel could have pursued RFLP DNA testing prior to trial.

*Banks v. United States*, 490 F.3d 1178, 1188 (10th Cir. 2007).[15]

The newest form of STR testing is mini-STR testing, which is premised on the same principles as STR (i.e., DNA tests which look for short tandem reports).  Mini-STR testing, however, works incredibly well with "highly degraded DNA as well as very low amounts of DNA," JOHN M. BUTLER, FORENSIC DNA TYPING: BIOLOGY, TECHNOLOGY, AND GENETICS OF STR MARKERS 148 (2d 2005), because the PCR primers anneal closer to the repeat region than conventional STR kit primers.  *See id.* At 150 ("[I]t is likely that miniSTRs will play a role in the future of degraded DNA analysis probably to help recover information that has been lost with larger loci from conventional [STR testing].").[16]  Thus, mini-STR testing, like conventional STR testing, can produce a DNA profile that is "effectively unique." NIJ 2000 Report, *supra*, at 25.

Y-STR testing, on the other hand, can definitively *exclude* Mr. Wade as a contributor of the seminal fluid.  STR DNA testing focuses on autosomal DNA markers; autosomes are non-sex chromosomes.  The genetic (or DNA) markers on autosomes are shuffled with each generation because half of an individual's genetic information comes from his/her father and half from his/her mother.  *See* Butler,

---

[15]

    *Accord United States v. Boose,* 498 F.Supp.2d 887, 890-91 (N.D. Miss. 2007) (noting that STR testing is "the most widely used by DNA labs... because it is capable of a high degree of accuracy, showing an overwhelmingly large probability that a suspect's DNA matches an evidence sample."); *United States v. Sczubelek*, 402 F.3d 175 (3rd Cir. 2005) (commenting that modern-day DNA technology has "greater precision" compared to the "traditional methods of identification").

[16]

    *See also* Pablo Martin, Oscar Garcia, Cristina Albarran et al., *Application of Mini-STR Loci to Severely Degraded Casework Samples*, 1288 FORENSIC SCI. INT'L 522, 524 (2006) ("our data indicate that the mini-STR [tests] offer an effective tool for recovering information in degraded forensic samples that generated negative results or partial profiles with commercial STR kits."); C. Romano, E. Di Luise, D. Di Martino et al., *A Novel Approach for Genotyping of LCN-DNA recovered from highly degraded samples*, 1288 FORENSIC SCI. INT'L 577 (2006).

*supra*, at 201-03.  Y-STR testing, conversely, represents lineage markers, which are passed down from generation-to-generation without changing (except for mutational events). *Id.*  Paternal lineages can be traced with Y chromosome markers (Y-STRs). Although not as discriminatory as autosomal STR tests, Y-STR tests "have an important role to play in forensic investigations" because they can *conclusively exclude* a person as a possible contributor of biological material. *Id.* at 201.

**d.**    **The Evidence to Be Tested is Material to Available Forms of Post-Conviction Relief**

Exculpatory DNA tests can lead to available forms of post-conviction relief. The primary evidence Mr. Wade seeks to test is the seminal fluid on the vaginal swab and the victim's orange pants. *See* Doc. No. 58, at 33-39.  As the Ninth Circuit repeatedly noted, the exculpatory potential of seminal material is "obvious." *Osborne II*, at *23 (quoting *Thomas v. Goldsmith*, 979 F.2d at 750 n.2).  Mr. Wade's case is no different.   Specifically, considering the forensic evidence introduced by the Commonwealth and its characterizations of this evidence, the Commonwealth's theory was clear: a lone assailant attacked and sodomized the victim.  Accordingly, because the Commonwealth's theory was that a lone assailant attacked and raped the victim, it is reasonable to infer that the person whose seminal fluid was recovered from the victim came from her assailant. *See In re Braxton*, 258 F.3d 250, 254 (4th Cir. 2001) ("because the prosecution's theory of the case at trial was that a lone assailant murdered and sodomized Van Hart, it is reasonable to infer that the person whose seminal fluid was recovered from Van Hart's anus is her killer.").  Thus, if DNA tests on the seminal fluid produce a DNA profile inconsistent with Mr.

Wade's DNA profile, this would not only undermine confidence in his original verdict, it would presumably establish his actual innocence.

Furthermore, if DNA tests on the vaginal smear slide and the victim's fingernails produce the same DNA profile as witnessed on the vaginal swab and orange pants (i.e., redundant results), such results would not only further undermine confidence in his original verdict, they would further strengthen his actual innocence claim. *See Kyles v. Whitley*, 514 U.S. at 436 (explaining that materiality is defined "in terms of suppressed evidence considered collectively, not item by item"). Finally, "if the STR DNA test results exclude him, those results could then be placed into the state and national DNA databank system, which did not exist when [Mr. Wade] was tried, and possibly identify the real perpetrator." *Osborne II*, at *20. If the DNA databank produced a cold "hit" to a previously convicted offender, this would, without question, establish Mr. Wade's actual innocence.

By establishing his actual innocence, Mr. Wade could once again seek federal habeas relief pursuant to 28 U.S.C. § 2254. In particular, exculpatory DNA results can do three significant things for him: (1) they can trigger the actual innocence exception, which would allow the Court to consider his time barred (or forfeited) claims, *see House v. Bell*, 126 S.Ct. 2064, 2076-77 (2006); (2) they would create newly discovered facts, which would not only re-start 28 U.S.C. § 2244's one-year statute-of-limitations, *see Johnson v. United States*, 544 U.S. 295, 310 (2005); 28 U.S.C. § 2244(d)(1)(D), they would satisfy AEDPA's successive petition requirements, *see* 28 U.S.C. §§ 2244(b)(2)(B)(i-ii); and (3) they would demonstrate that he is entitled to relief pursuant to his free standing actual innocence and

ineffective assistance of counsel claims. *See Herrera v. Collins*, 506 U.S. 390, 417 (1993); *Strickland v. Washington*, 466 U.S. 668 (1984).

### (1)    Exculpatory Results Would Trigger the Actual Innocence Exception

Exculpatory DNA results will trigger the procedural default's "actual innocence" exception thereby allowing the Court to consider the merits of Mr. Wade's constitutional claims.  This Court dismissed Mr. Wade's first federal habeas petition, *see* Doc Nos. 1-2, because he filed his petition after § 2244(d)'s one-year statute-of-limitation. *See* Doc No. 35, at 9 (noting that Mr. Wade's federal petition was due by November 4, 1999, but that he did not file his petition until October 8, 2004).  Consequently, unless he demonstrates "cause" and "prejudice" or that he is "actually innocent," *Bousley v. United States*, 523 U.S. 614, 622 (1998), this Court may not consider the merits of his defaulted (or forfeited) claims. *See also House v. Bell*, 547 U.S. 518, 536 (2006); *Schlup* v. *Delo,* 513 U.S. 298 (1995); *Gunter* v. *Maloney*, 291 F.3d 74, 78 (1st Cir. 2002); *Simpson v. Matesanz*, 175 F.3d 200, 209 (1st Cir. 1999).

As a general rule, forfeited claims "may support federal habeas relief only if the prisoner demonstrates cause for the default and prejudice from the asserted error." *House v. Bell*, 547 U.S. at 536.  The cause and prejudice requirement is premised on "finality, comity, and the orderly administration of justice[.]" *Dretke v. Haley*, 541 U.S. 386, 388 (2004).  The cause and prejudice requirement, however, "is not a perfect safeguard against fundamental miscarriages of justice." *Id.* at 393. As a result, "in the appropriate cases," the Supreme Court has said, "the principles of comity and finality that inform the concepts of cause and prejudice 'must yield to

the imperative of correcting a fundamentally unjust incarceration." *Murray v. Carrier*, 477 U.S. 478, 495 (1986) (citation omitted); *accord Walker v. Russo*, 506 F.3d 19, 21 (2007).

Under *Schlup* and *House*, as adopted by *Matesanz*, a petitioner "must show that it is more likely than not that no reasonable juror would have found [him] guilty beyond a reasonable doubt." *Schlup v. Delo*, 513 U.S. at 327; *Simpson v. Matesanz*, 175 F.3d at 210.[17]   To be credible, "a gateway claim requires new reliable evidence–whether it be *exculpatory scientific evidence*, trustworthy eyewitness accounts, or critical physical evidence–that was not presented at trial." *House v. Bell*, 547 U.S. at 537 (internal quotation marks omitted) (emphasis added). Moreover, while the *Schlup* standard is "demanding and permits review only in the 'extraordinary' case," it "does not require absolute certainty about the petitioner's guilt or innocence." *Id*.   Finally, the *Schlup* standard is not a sufficiency of the evidence standard as articulated in *Jackson v. Virginia*, 443 U.S. 307 (1979).   In short, because a *Schlup* "claim involves evidence the trial jury did not have before it, the inquiry requires the federal court to assess how reasonable jurors would react to the overall, newly supplemented record." *House v. Bell*, 547 U.S. at 538.

---

[17]

The Supreme Court added: "[T]he standard requires the district court to make a probabilistic determination about what reasonable, properly instructed jurors would do. Thus, a petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *Schlup v. Delo*, 513 U.S. at 329.

Given the Commonwealth's characterization of the seminal fluid at trial—*i.e.*, that it could have only come from the assailant—if DNA tests establish that it did not come from Mr. Wade, "no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *Schlup v. Delo*, 513 U.S. at 329.[18] Moreover, no reasonable prosecutor would have prosecuted him had such results been available prior to trial.[19] Thus, by satisfying the "actual innocence" exception, this Court could review the merits of Mr. Wade's previously forfeited constitutional claims.

---

[18]

The same can be said if redundant results are identified from the victim's fingernail and the vaginal smear slide.

[19]

Several recent cases, where prosecutors dropped rape or rape-murder charges against an initial suspect after DNA tests (on vaginal swabs, slides, or the victim's clothing) excluded the initial suspect, only strengthens this point. *See* Ex. 2. These cases not only demonstrate the significance of non-match DNA results in sexual offenses, they demonstrate the "special role" prosecutors play and the "high standard" they are held to in our criminal justice system. *Strickler v. Greene*, 527 U.S. 263, 281 (1999); *Banks v. Dretke*, 540 U.S. 668, 696 (2005); MODEL RULES OF PROF'L CONDUCT R. 3.8 cmt. (2004) (characterizing government officers as "minister[s] of justice"); *United States v. Giorgi*, 840 F.2d 1022, 1036 (1st Cir. 2007) (noting that the Supreme Court "set a high standard for prosecutorial behavior"). The prosecutor's "duty… [is] to do justice, not merely 'win' convictions." ABA STDS. FOR CRIM. JUST.: PROSECUTION FUNCTION, Std. 3-3.4 (3rd ed. 1993) (commentary). Thus, because prosecutors "must exercise sound discretion in the performance of his or her functions," ABA STDS. FOR CRIM. JUST.: PROSECUTION FUNCTION, Std. 3-1.1(b) (3rd ed. 1993), and "refrain from improper methods calculated to produce a wrongful conviction[,]" *Berger v. United States*, 295 U.S. 78, 88 (1935); justice and logic dictate that where DNA results (from a sexual offense) do not match the initial suspect's DNA, the most appropriate and just course of action is to dismiss the charges and free the suspect. *See United States v. Wade*, 388 U.S. 218, 256 (1967) (White, J., concurring and dissenting in part) (noting that prosecutors "have the obligation to convict the guilty and to make sure they do not convict the innocent.").

Simply put, no prosecutor in the United States would prosecute a rape case where the biological evidence from the rape kit or victim's underwear did not match the suspect's DNA. However, if a zealous prosecutor pursued charges where the DNA results excluded the defendant, he or she runs the risk of jeopardizing their career, and worse yet, being disbarred for pursuing a case where objective science clearly trumped a witness's identification. Perhaps the strongest case emphasizing this point is the Duke Lacrosse rape case, where Durham County, North Carolina District Attorney Mike Nifong pursued rape charges against several Duke Lacrosse players despite the fact DNA results excluded the players. *See* Robert P. Mosteller, *The Duke Lacrosse Case, Innocence, and False Identifications: A Fundamental Failure to "Do Justice*," 76 FORDHAM L. REV. 1337 (2007)

(discussing the case in detail).  The North Carolina State Bar disbarred Mr. Nifong, in part, because he pursued charges against these players even though objective DNA evidence contradicted the victim's (questionable) statements.  Moreover, in light of the DNA results, the North Carolina Attorney General's Office declared all the players innocence because "[n]o... physical evidence... corroborated [the victim's] testimony." *Id.* at 1347 (citing the North Carolina Attorney General's Office's official report).

**(2)    Exculpatory DNA Tests Can Lead to New Facts Which Would Re-Trigger §2244's One-Year Statute-of-Limitations and Satisfy Its Successive Petition Requirements**

Exculpatory DNA results can re-start AEDPA's one-year statute-of-limitations, *see* 28 U.S.C. § 2244(d)(1)(D), and successive petition requirements. *See* § 2244(b)(2)(B) (i-ii); *Burton v. Stewart*, 127 S. Ct. 793 (2007).

**(a)    Re-Starting § 2244(d)(1)'s One-Year Statute of Limitations**

Section 2244(d)(1) provides that "[a] 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court."  The one-year period begins to run, from the latest of the following:

> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>
> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (D) *the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.*

28 U.S.C. §§ 2244(d)(1)(A-D) (emphasis added); *accord Pace v. DiGuglielmo*, 544 U.S. 408, 416 n.6 (2005).

Under subsection § 2244(d)(1)(D), exculpatory DNA results would re-start the one-year statute of limitations.  The exculpatory DNA results would constitute a "factual predicate" for all of Mr. Wade's constitutional claims; most notably, his free standing actual innocence claim and ineffective assistance of counsel claim. Likewise, Mr. Wade diligently pursued DNA testing in state court before pursuing relief in federal court.  Moreover, exculpatory DNA results from STR, Y-STR, and mini-STR testing could not have been discovered any earlier through due diligence because the Defendants prohibited (and continues to prohibit) Mr. Wade from accessing the biological evidence.

In *Johnson v United States*, 544 U.S. 295 (2005), the Supreme Court considered whether 28 U.S.C. § 2255(4) applied to a § 2255 petition that collaterally attacked a federal conviction on the theory that a state court conviction used to enhance petitioner's sentence had been vacated by the state courts.[20]  There, on April 25, 1997, one year and three days after his conviction became final, and after the one year grace period accorded prisoners to file their collateral attacks after AEDPA's effective date, petitioner asked the district court for an additional 60 days to file his § 2255 petition.  The district court denied petitioner's request, but without prejudice so he may argue that another limitations period applied.

Nine and a half months later, on February 6, 1998, petitioner filed a state post conviction petition attacking a prior state court conviction that the federal court used

---

[20]

As noted by the Ninth Circuit in *Shannon v. Newland*, 410 F.3d 1083, 1088 (9th Cir.2005), § 2255, ¶ 6(4) is the near identical counterpart to § 2244(d)(1)(D) that applies to motions by federal prisoners attacking their state court convictions and sentences.  The U.S. Supreme Court has interpreted the statute of limitations provisions of § 2244 and § 2255 in concert with one another.  *See, e.g., Lackawanna County Dist. Attorney v. Coss*,

to enhance his federal sentence. The state court granted his challenge. Three months after the state court granted relief, petitioner once again filed his § 2255 petition in federal court, this time arguing that the order vacating the state court judgment triggered § 2255, ¶ 6(4)'s new limitation period. The magistrate judge, the district court judge, and the Court of Appeals all disagreed.

The Supreme Court granted certiorari and agreed with petitioner, except on the due diligence issue. The Supreme Court (as well as both parties) agreed that petitioner stated a valid claim, a claim that but for limitations, he would have been entitled to § 2255 relief:

> This case presents the distinct issue, of how soon a prisoner, successful in his state proceeding, must challenge the federal sentence under Sec. 2255. The resolution turns on understanding what "facts" affecting an enhanced sentence could most sensibly fall within that term as used in the fourth paragraph of the 2255 limitation, under which the one-year runs from "the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence."

544 U.S. at 304. The Supreme Court held that the statute of limitations is triggered when a constitutional claims ripens or accrues: "Johnson's argument [pegs] the limitations period to notice of the state order eliminating the predicate required for enhancement, which is almost always necessary and always sufficient for relief." *Id.* at 306 (emphasis added).

The Supreme Court, however, rejected petitioner's due diligence argument. It was not enough that petitioner diligently pursued his claim after the new "fact" developed. Instead, he must have exercised diligence "in the steps necessary for [developing] that fact." *Id.* at 310. Using DNA testing as an example, the Supreme

---

532 U.S. 394, 402 (2001) (plurality op. of O'Connor, J.).

Court noted that a prisoner must not only use diligence in pursuing the claim once the DNA results are known, he must also diligently pursue DNA testing once he learned the State still possessed the biological evidence:

> When a petitioner bases his Sec. 2255 claim on the result of a DNA test, it is the result of the test that is the "fac[t] supporting the claim" in the Sec. 2255 motion, and the 1-year limitation period therefore begins to run from the date the test result is "discovered." Yet unless it is to be read out of the statute, the due diligence requirement would say that the test result only triggers a new 1-year period if the petitioner began the testing process with reasonable promptness once the DNA sample and testing technology were available.

*Id.* at 310. In short, the petitioner should have diligently pursued "the state court order vacating his prior conviction." *Id.* Because he did not, the Supreme Court affirmed the dismissal of his § 2255 petition.

Pursuant to *Johnson*, then, if a petitioner diligently pursues DNA testing in state (or federal) court, and the exculpatory results constitute a "factual predicate" for his constitutional claim(s), such events will re-trigger § 2244(d)(1)'s one-year statue of limitations period under subsection (D). Mr. Wade satisfies the diligence requirement and if DNA tests produce a DNA profile from the seminal material that is inconsistent with Mr. Wade's DNA profile, such results would constitute a new "factual predicate" that would re-start § 2244(d)(1)'s one-year statue-of-limitations period. Once re-started, Mr. Wade could file a timely § 2254 petition.

### (b) Satisfying the Successive Petition Requirements

The Court dismissed Mr. Wade's initial federal habeas petition because it was time-barred under § 2244. *See* Doc. No. 35. Consequently, to once again seek § 2254 relief, Mr. Wade must file another or "successive" federal habeas petition. *See*

*Burton v. Stewart*, 127 S. Ct. at 796 (describing when a second habeas petition is considered a "successive" petition pursuant to §§ 2244(b)(1)-(3)).    To file a "successive" petition, however, Mr. Wade must satisfy the requirements set forth in §§ 2244(b)(1)-(3).    Exculpatory DNA results will satisfy §§ 2244(b)(1)-(3)'s requirements.    Pursuant to these provisions:

> (b) (2) A claim presented in a second or successive habeas corpus application under section 2254 that was not presented in a prior application shall be dismissed unless–
>
> (A) the applicant shows that the claim relies on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>
> (B)(i) the factual predicate for the claim could not have been discovered previously through the exercise of due diligence; and
>
> (ii) the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

Notwithstanding the stricter "actual innocence" provision, *see infra*, and the fact that § 2244(b)(2)(A) is inapplicable to Mr. Wade's case, these provisions are similar to § 2244(d)(1)(D)'s provisions.    Thus, to satisfy the successive petition requirements, Mr. Wade must establish three things: (1) he diligently pursued DNA testing, (2) the results of which produced (or can produce) a "factual predicate" for a claim that (3) would establish his actual innocence by clear and convincing evidence. *See Burton v. Stewart*, 127 S. Ct. at 796; *Gonzalez v. Crosby*, 545 U.S. 524, 529-30 (2005); *In re Byrd*, 269 F.3d 585, 587 (6th Cir. 2001) ("If the petitioner is unable to satisfy the statutory requirements of the AEDPA, the court of appeals may

yet authorize a second or successive filing if the court deems that this is necessary to prevent a miscarriage of justice.").

Mr. Wade's diligence and exculpatory DNA tests will satisfy these requirements.  First, Mr. Wade diligently pursued DNA testing in state court before seeking relief in federal court.  Second, exculpatory DNA results will satisfy § 2244(b)(2)(B)(ii)'s actual innocence standard, even though it is stricter than the *Schulp* standard.[21]  If DNA results on the seminal fluid produce a male DNA profile that does not match Mr. Wade's profile, this standard would be satisfied.  Likewise, if the DNA profile "hits" to a previously convicted offender when uploaded to a state or federal DNA databank, such results would also satisfy § 2244(b)(2)(B)(ii)'s stricter innocence standard because such results would prove by "clear and convincing evidence that... no reasonable factfinder would have found [Mr. Wade] guilty of the underlying offense."

### (3)    Exculpatory DNA Results Will Demonstrate that Mr. Wade's Constitutional Claims are Meritorious and that He is Entitled to Relief

Besides allowing the Court to consider the merits of his constitutional claims, exculpatory DNA results will also demonstrate that Mr. Wade's free standing actual innocence and ineffective assistance of counsel claims are meritorious and that he is entitled to relief.

---

[21]

This standard has been described as "a strict form of 'innocence,'... roughly equivalent to the Supreme Court's definition of 'innocence' or 'manifest miscarriage of justice' in *Sawyer v. Whitley*." 2 RANDY HERTZ & JAMES S. LIEBMAN, FEDERAL HABEAS CORPUS PRACTICE & PROCEDURE § 28.3e, at 1459-60 (5th ed. 2005) (citing *Sawyer v. Whitley*, 505 U.S. 333 (1992)); *accord Graham v. Blaisdell*, 2007 U.S. Dist. LEXIS 88497, at *15 n.3 (D.N.H., Nov. 30, 2007).

(a)     <u>**Actual Innocence Claim**</u>

If DNA tests on the seminal fluid produce a DNA profile that is inconsistent with Mr. Wade's DNA profile, such results would prove the validity of his free standing actual innocence claim under *Herrera v. Collins*, 506 U.S. 390 (1993).[22]  In *Herrera*, the Supreme Court assumed without deciding that "a truly persuasive demonstration of 'actual innocence' made after trial would... warrant federal habeas relief if there were no state avenue open to process such a claim." 506 U.S. at 417.

---

[22]

   Whether Mr. Wade's "free standing" actual innocence claim is cognizable under the Federal Constitution "is presently an open question." *Osborne II*, at \*10; *compare Cress v. Palmer*, 484 F.3d 844, 854 (6th Cir. 2007) (finding against free standing actual innocence claims), *Hayes v. Warden*, 2001 U.S. Dist. LEXIS 9186, at \*7 (D.N.H., June 6, 2001), *with Jackson v. Calderon*, 211 F.3d 1148, 1164-65 (9th Cir. 2000) (finding that the Federal Constitution permits free standing actual innocence claims).  In *Herrera*, the Supreme Court assumed without deciding that such a claim is possible.  *See Herrera v. Collins*, 506 U.S. at 417.  And in *House*, the Court again declined to resolve "the question left open by *Herrera*[.]" *House v. Bell*, 547 U.S. at 554-55.

   While the U.S. Supreme Court has yet to hold that "free standing" innocence claims are cognizable under the Federal Constitution, its repeated comments on preventing the conviction of an innocence person supports Mr. Wade's argument that actual innocence claims are, in fact, cognizable under the Federal Constitution. *See Schulp v. Delo*, 513 U.S at 325 ("concern about the injustice that results from the conviction of an innocent person has long been at the core of our criminal justice system."); *California v. Trombetta*, 467 U.S. 479, 485 (1984) (commenting that the right to access cases protect "the innocent from erroneous conviction and ensuring the integrity of our criminal justice system."); *Herring v. New York*, 422 U.S. 853, 862 (1975); *In re Winship*, 397 U.S. 358, 372 (1970) (Harlan, J., concurring) ("it is far worse to convict an innocent man than to let a guilty man go free.") *Robinson v. California*, 370 U.S. 660, 667 (1962) ("Even one day in prison would be a cruel and unusual punishment for the 'crime' of having a common cold"); *Berger v. United States*, 295 U.S. 78, 88 (1935) (noting that the "twofold aim" of justice "is that guilt shall not escape or innocence suffer.**").**

   Moreover, because *Herrera* and *House* are capital cases, the same might be said of the question of whether there should be a distinction between capital and non-capital cases, although *Herrera* and the Court's previous cases have suggested equal treatment. *Compare United States v. Sampson*, 486 F.3d 13, 27-28 (1st Cir. 2007) (interpreting *Herrera* to suggest that its holding is limited to wrongly *executing* the innocent), *with Carriger v. Stewart*, 132 F.3d 463, 476 (9th Cir. 1997) (holding that non-capital free standing innocence claims are cognizable under *Herrera*).  For instance, the *Herrera* Court "refused to hold that the fact that a death sentence has been imposed requires a different standard of review on federal habeas corpus." *Herrera v. Collins*, 506 U.S. at 405 (citation omitted).  This holding is consistent with the Court's previous holdings. *See Murray v. Giarratano*, 492 U.S. 1, 9 (1989); *Smith v. Murray*, 477 U.S. 527, 538-39 (1986); *Barefoot v. Estelle*, 463 U.S. 880, 887 (1983).

The "threshold showing for such an assumed right would necessarily be extraordinarily high," the Supreme Court explained, and petitioner's evidence there fell "far short of that which would have to be made in order to trigger the sort of constitutional claim which we have assumed, *arguendo*, to exist." *Id.* at 417; *see also id.*, at 427 (O'Connor, J., concurring) (noting that because "[p]etitioner has failed to make a persuasive showing of actual innocence... the Court has no reason to pass on, and appropriately reserves, the question whether federal courts may entertain convincing claims of actual innocence."). If DNA tests on the seminal fluid produce a male DNA profile that is inconsistent with Mr. Wade's DNA profile, such results would satisfy *Herrera's* "extraordinarily high" standard. *Id.* at 417.

(b)    **Ineffective Assistance of Counsel Claims**

In his original federal habeas petition, Mr. Wade raised two ineffective assistance of counsel claims (IAC). He claimed trial counsel acted objectively unreasonable by (1) failing to pursue DNA testing prior to trial and (2) by presenting a consent defense to the jury. *See* Doc. No. 1, at 6. An IAC claim has two components: A petitioner must show that counsel's performance was deficient, and that the deficiency prejudiced the defense. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Dugas v. Coplan*, 428 F.3d 317, 327 (1st Cir. 2005). If DNA tests produce exculpatory results, both components will be satisfied for both claims.

1.    **Consent Defense**

Mr. Wade comprehensively briefed this issue in his Memorandum in Support of Petition for Writ of Habeas Corpus. *See* Doc. No. 2, at 10-14. As the memorandum thoroughly explained, trial counsel acted objectively unreasonable

when he pursued a consent defense because the victim's mental infirmities prevented her from providing legal consent. Consequently, Mr. Wade incorporates herein that portion of the briefing into the instant motion.

In terms of prejudice, if DNA tests produce a male DNA profile that is inconsistent with Mr. Wade's profile, this would establish prejudice because it would so undermine confidence in his original verdict as to render it fundamentally unfair.

## 2.    Failure to Pursue DNA Testing

Trial counsel failed to pursue pre-trial DNA testing. To determine whether trial counsel's decision fell below professional norms, the Court must determine whether trial counsel's decision constitutes a strategic decision; if so, the decision is "virtually unchallengeable." *Strickland v. Washington*, 466 U.S. at 690; *accord Wiggins v. Smith*, 539 U.S. 510, 521 (2003); *Darden v. Wainwright*, 477 U.S. 168, 186 (1986). To qualify as a strategic or tactical decision, however, the decision must be premised on a reasonable investigation. *E.g., Strickland v. Washington*, 466 U.S. at 691 ("counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."); *Mayfield v. Woodford*, 270 F.3d 915, 927 (9th Cir. 2001) ("Judicial deference to counsel is predicated on counsel's performance of sufficient investigation and preparation to make reasonably informed, reasonably sound judgments."). Accordingly, the issue is not whether trial counsel should have pursued DNA testing, but instead whether the investigation supporting his decision *not* to pursue DNA testing was itself reasonable. *Cf. Wiggins* v. *Smith*, 539 U.S. 510, 523 (2003); *Dugas v. Coplan*, 428 F.3d at 328. Because trial counsel failed to conduct even a cursory investigation

regarding DNA testing, his decision not to pursue DNA testing cannot be considered strategic or tactical.  More importantly, his decision not to pursue DNA testing is objectively unreasonable given what he knew (or should have known) before trial. This information would have prompted a reasonably competent defense attorney to investigate DNA testing's feasibility and to ultimately pursue DNA testing.

Trial counsel's performance was deficient for several reasons.  First, Mr. Wade proclaimed his innocence from the very beginning.  He never confessed, nor did he make incriminating statements.  Second, prior to trial, counsel knew (or should have known) that the serology evidence "suggest[ed] that a third party's blood and/or semen was also present on the victim's clothing." *Wade v. Brady*, 460 F.Supp.2d at 232.  Third, prior to trial, counsel knew (or should have known) that the serology results did not exclude Mr. Wade as a potential contributor of the seminal fluid recovered from the vaginal swab and the victim's orange pants.  Fourth, prior to trial, counsel knew (or should have known) that the Commonwealth would place great emphasis on the inculpatory serology results.  Fifth, prior to trial, counsel knew (or should have known) that a layperson would likely view the serology evidence a significantly incriminating, despite its limited discriminatory potential.[23]  Sixth, prior to trial, counsel knew (or should have known) that DNA testing was available and more discriminatory than conventional serology results.  And seventh, prior to trial,

---

[23]

     *See Dugas v. Coplan*, 428 F.3d at 330 (trial counsel's failure to adequately investigate and hire an independent arson expert constituted deficient performance in part because trial counsel "knew and admitted that a layperson would be likely to view the scene as an arson").

counsel knew (or should have known) that Massachusetts courts deemed RFLP testing generally accepted and admissible.

Without question, the first two factors would have prompted a reasonably competent defense attorney to adequately investigate the DNA testing options. In particular, when Mr. Wade's repeated proclamations of his innocence are coupled with the fact that the serology results identified a *foreign* blood group substance on the vaginal swab, this created a degree of doubt that could not be flippantly dismissed, but instead demanded further investigation.[24] Simply put, these two facts, standing alone, would have prompted a reasonably competent attorney to further investigate the DNA testing issue to determine who contributed the A antigen identified on the vaginal swab.[25]

---

[24] The presence of an A antigen also should have indicated to trial counsel that there might be problems with the Commonwealth's serology results. This too should have prompted him to adequately investigate the DNA testing issue. *See Dugas v. Coplan*, 428 F.3d at 330 (trial counsel's failure to adequately investigate and hire an independent arson expert constituted deficient performance in part because trial counsel "conceded that he had at least some reason to believe that there were problems with the state's arson case").

[25] *See Wiggins v. Smith*, 539 U.S. at 527 ("In assessing the reasonableness of an attorney's investigation... a court must consider... whether the known evidence would lead a reasonable attorney to investigate further."); *Strickland v. Washington*, 466 at 691 ("The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions."); *Schriro v. Landrigan*, 127 S.Ct. 1933, 1940-42 (2007) (holding that defendant's actions significantly impact whether trial counsel's actions were reasonable or not). Notwithstanding these two facts, trial counsel still had an independent duty to adequately investigate the DNA testing issue. *See* ABA STDS. FOR CRIM. JUST.: DEFENSE FUNCTION, Std. 4-4.1(a) (3rd ed. 1993) ("Defense counsel should conduct a prompt investigation of the circumstances of the case and explore *all avenues leading to facts relevant to the merits of the case.*") (emphasis added).

Similarly, the third, fourth, fifth, and sixth factors only magnified the need for DNA testing. To begin with, because the victim never identified Mr. Wade as her assailant, trial counsel knew (or should have known) that the inculpatory serology results would likely be the "cornerstone" of the Commonwealth's case.[26] In many respects, the inculpatory serology results can be analogized to aggravating evidence in a capital sentencing hearing. Whereas aggravating evidence enhances a capital defendant's death-worthiness during a sentencing hearing, inculpatory evidence, like the serology results, aggravates a defendant's culpability and places a thumb on guilt's side of the scale during the guilt-innocence hearing. Because the serology results had the predictable impact of aggravating Mr. Wade's culpability, trial counsel had a duty to obtain and review the serology evidence to determine whether its aggravating impact could be mitigated. *See Rompilla v. Beard*, 545 U.S. 374, 377 (2005) (holding that trial counsel "is bound to make reasonable efforts to obtain and review material that counsel knows the prosecution will probably rely on as evidence of aggravation"). As the DNA exonerations have repeatedly demonstrated, DNA testing could have excluded Mr. Wade as a potential contributor of the seminal fluid even though he could not be excluded via conventional ABO blood group typing. *See* Brandon L. Garrett, *Judging Innocence*, 108 COLUM. L. REV. 55 (2008) (finding that conventional serology supported 40% of the first 200 convictions that DNA

---

[26]    *See Dugas v. Coplan*, 428 F.3d at 330 (trial counsel's failure to adequately investigate and hire an independent arson expert constituted deficient performance in part because "the arson evidence was the cornerstone of the state's case."); *State v. Hicks*, 536 N.W.2d 487, 492 (Wis. Ct. App. 1995) (trial counsel acted unreasonably where "trial counsel understood that the hair samples were going to be a major issue in the case," but failed to provide a "reasoned basis for failing to pursue a testing process that he knew had the potential to provide exculpatory evidence on this major issue."), *aff'd on other grounds*, 549

testing ultimately exposed as erroneous).[27]  In short, exculpatory DNA results would

have mitigated, if not "demolished," the Commonwealth's case. *See Commonwealth*

*v. William*s, 899 A.2d 1060, 1064 (Pa. 2006) ("DNA testing... can demolish the

prosecution's case").

---

N.W.2d 435 (Wis. 1996).

[27]

       Indeed, the National Institute of Justice (NIJ) issued its first report concerning DNA's exonerative power in 1996. *See* NAT'L INST. OF JUST., DEPT. OF JUST., CONVICTED BY JURIES, EXONERATED BY SCIENCE: CASE STUDIES IN THE USE OF DNA EVIDENCE TO ESTABLISH INNOCENCE AFTER TRIAL (1996).  In particular, the report discussed several cases where DNA testing (mainly RFLP and DQ-Alpha testing) undermined inculpatory serology results. *Id.* at 15.

This leads to the seventh factor. By 1997, when the Commonwealth prosecuted Mr. Wade, a reasonably competent defense attorney would have known that DNA was available and far more discriminatory than conventional serology. For instance, trial counsel could have pursued RFLP DNA testing prior to trial. *See* NIJ 2000 Report, *supra*, at 17 (noting that RFLP was generally accepted by 1995).[28] The Massachusetts Supreme Judicial Court (SJC) and Massachusetts trial courts recognized RFLP's general acceptance in several cases before 1997. *See Commonwealth v. Curnin*, 565 N.E.2d 440 (Mass. 1991); *Commonwealth v. Daggett*, 622 N.E.2d 272 (Mass. 1993); *Commonwealth v. Lanigan*, 596 N.E.2d 311 (Mass. 1992); *Commonwealth v. Lanigan*, 641 N.E.2d 1342 (Mass. 1994); *Commonwealth v. Clark*, 1996 Mass. Super. LEXIS 413 (Mass. Super. Ct., May 1996).[29] Despite the scientific and legal landscape prior to trial, trial counsel failed

---

[28]

RFLP involves the use of the DNA loci that contain "variable number tandem repeat" (VNTR) sequences, which are stretches of DNA in which a short nucleotide core sequence of base pairs is repeated in tandem along the chromosome. As a result of VNTR sequencing, the length of a given allele, which is measured by the number of repeated base pairs, varies from person to person. See NATIONAL RESEARCH COUNCIL, THE EVALUATION OF FORENSIC DNA EVIDENCE 14-15 (1996) (hereinafter NCR). VNTR loci are particularly useful in forensic DNA analysis because they have a very large number of different alleles. *See Armstead v. State*, 673 A.2d 221, 227 (Md.1996). RFLP analysis yields distinct DNA profiles because the exact number of repeats, and therefore the length of the VNTR region, varies from one allele to another, and different VNTR alleles can be identified by their length. *See* NRC, *supra*, at 14-15. DNA fragments containing VNTRs are detected by specially constructed molecular "probes," which are short segments of single-stranded DNA with radioactive components that bind to specific DNA sequences. *See id;* NIJ 2000 Report, *supra*, at 37-39.

[29]

While the SJC found the RFLP *technique* generally accepted in all of its early DNA cases, it ruled that the statistical methodology used to generate the statistical significance of a DNA "match" was not yet generally accepted. *See Commonwealth v. Daggett*, 622 N.E.2d 272 (Mass. 1993); *Commonwealth v. Lanigan*, 596 N.E.2d 311 (Mass. 1992); *Commonwealth v. Curnin*, 565 N.E.2d 440 (Mass. 1991). In 1994, however, the SJC reversed course when DNA analysts began using the "ceiling principle" when they calculated the statistical likelihood of a random match. *See Commonwealth v. Lanigan*, 641

to: (1) consult with the Commonwealth's serologist to discuss DNA testing options; (2) consult with an independent DNA expert; (3) request funds from the trial judge to consult with or hire a DNA expert; and (4) conduct independent research regarding DNA testing.  Trial counsel acted objectively unreasonable.

In terms of prejudice, if DNA tests produce a male DNA profile that is inconsistent with Mr. Wade's profile, this would establish prejudice because it would so undermine confidence in his original verdict as to render it fundamentally unfair.

### 3.    Mr. Wade's Consent Defense Cannot Bar DNA Testing

As Mr. Wade pled in his initial SJ motion, trial counsel's decision to pursue a consent defense "had the same effect as a confession or guilty plea." Doc. No. 58, at 31.  As *Osborne II* demonstrates, however, a defendant's confession, guilty plea, of (detrimental) defense strategy does not create a per se barrier to DNA testing. Instead, in certain cases, exculpatory DNA results can so undermine confidence in a confession, guilty plea, or (prejudicial) defense strategy, a reasonable probability exists that, had the exculpatory DNA results been generated before trial, the proceeding's outcome would have been different.  In *Osborne II*, for instance, the Ninth Circuit held that petitioner's confession did not foreclose his right to access the biological evidence. *See Osborne II*, at *21 ("We disagree... that the confessions foreclose Osborne's right to obtain post-conviction access to evidence.").  Instead, the court held that:

> The same rule that allows us to consider the probative value of the confessions requires that we do so in light of exculpatory DNA tests and all the rest of the new and old evidence in this case. *Thus, the question before us is not how much weight we should afford*

> *Osborne's confessions standing alone, but how they might be squared with exculpatory DNA tests... .*

*Id.* (emphasis added). The court also held that "DNA testing will be highly probative of Osborne's guilt or innocence given the facts as we know them" and that it could "expect to see one of two possible scenarios" occur:

> Either the confessions will be proven accurate by the test results proving Osborne was in fact the... rapist and his case will proceed no further, or the test results will exclude him as the source of the biological material, in which case serious questions will be raised about the validity of his confessions and whether... he was motivated to confess falsely as the most expeditious means available to obtain release from prison.

*Id.* The court concluded by stating that "we decline to hold that Osborne's confession... necessarily trumps the materiality of physical evidence or the right to obtain post-conviction access to evidence." *Id.*[30]

Consequently, relying on *Osborne* (and *Godschalk*), the question before the Court is not how much weight it should afford Mr. Wade's detrimental defense strategy, but how it might be squared with exculpatory DNA tests. As in *Osborne*, exculpatory DNA results will prove highly probative of Mr. Wade's innocence "given the facts as we know them." Put simply, then, trial counsel's objectively

---

[30]    Similarly, when Bruce Godschalk (a former Innocence Project client) moved for DNA testing in federal court, to prove his innocence of two rapes, the federal district judge ruled that his knowing and voluntary confession did not eliminate the possibility that exculpatory DNA results could change the outcome of his proceedings:

> While plaintiff's detailed confessions to the rapes are powerful inculpatory evidence, so to any DNA testing that would exclude plaintiff as the source of the genetic material taken from the victims would be powerful exculpatory evidence. Such contradictive results could well raise reasonable doubts in the minds of jurors as to plaintiff's guilt. Given the well-known powerful exculpatory effect of DNA testing, confidence in the jury's finding of plaintiff's guilt at his past trial, where such evidence was not considered, would be undermined... Thus,... there is indeed a reasonable probability that had DNA evidence which showed plaintiff was not the source of the genetic material found on the victims been disclosed to the defense, the result of the proceeding would have been different.

*Godschalk v. Montgomery County Dist. Attorney's Office*, 177 F.Supp. 2d. 366, 370 (E.D. Pa. 2001). Accordingly, despite his confession, the district judge granted Godschalk's DNA testing request. The DNA results proved Godschalk could not have committed the two rapes. After serving fifteen years in prison for two rapes he did not commit, Godschalk was exonerated in February 2002. *See* www.innocenceproject.org/Content/154.php.

unreasonable defense strategy cannot be squared with exculpatory DNA results and therefore cannot bar Mr. Wade from accessing the biological evidence.

## V.    __Conclusion__

The Ninth Circuit decided *Osborne II* after Mr. Wade filed his original SJ motion. *See* Doc. No. 58 (SJ motion filed on January 4, 2008). The issues addressed and decided in *Osborne II* are identical to several issues currently pending before the Court (notwithstanding the statute of limitations question). As such, Mr. Wade's instant brief is filed pursuant to Fed. R. Civ. P. 15(d).

The Ninth Circuit made three significant determinations in *Osborne II*, two of which bear significantly on the issues currently before the Court. First, it held that *Brady's* due process rights apply to the post-conviction context. Second, it held that a petitioner triggers his due process right to access biological evidence for DNA testing purposes when the proposed DNA tests can produce results that would undermine confidence in (or raise serious doubts about) his original conviction. And third, to properly apply this nebulous materiality standard, the Ninth Circuit considered five factors: (1) the Commonwealth used the biological evidence to secure petitioner's conviction; (2) the DNA tests, which petitioner seeks to use, were unavailable at the time of his trial and are far more precise than the methods that were then available; (3) the DNA tests are capable of conclusively determining whether the petitioner is the source of the biological evidence; (4) the testing can be conducted without cost or prejudice to the Commonwealth; and (5) the DNA results are material to available forms of post-conviction relief. *See Osborne II*, at *23.

As thoroughly explained *supra*, Mr. Wade satisfies each of these requirements. First, the serology results from the seminal material on the vaginal

swab formed the "cornerstone" of the Commonwealth's case.  Second, STR, Y-STR, and mini-STR DNA testing was not available when the Commonwealth prosecuted Mr. Wade.  Third, each of these DNA tests is capable of conclusively determining whether Mr. Wade is the source of the seminal material recovered from the vaginal swab and the victim's orange pants.  Fourth, testing can be performed without cost or prejudice to the Commonwealth.  And fifth, exculpatory DNA results will allow Mr. Wade to seek relief pursuant to 28 U.S.C. § 2254.

Thus, for the foregoing reasons, Mr. Wade respectfully requests the Court to consider his supplemental pleading and to rule in his favor as a matter of law.

Respectfully submitted this 5th day of May 2008.

/s/ Janet Hetherwick Pumphrey
Robert Wade, by his Attorney
Janet Hetherwick Pumphrey
45 Walker Street
Lenox, MA 01240
(413) 637-2777
BBO 556424

/s/ Barry Scheck
Barry Scheck
The Innocence Project
Co-Director
100 Fifth Avenue, 3rd Floor
New York, New York 10011
Tel. 212.364.5361

/s/ Craig M. Cooley
Craig M. Cooley
The Innocence Project
Staff Attorney
100 Fifth Avenue, 3rd Floor
New York, New York 10011
Tel. 212.364.5361
Illinois Bar #6282688