UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ROBERT WADE,<br><br>               Petitioner-Plaintiff,<br><br>vs.<br><br>BERNARD F. BRADY, Acting<br>Superintendent, MARTHA COAKLEY,<br>Attorney General, and TIMOTHY J. CRUZ,<br>District Attorney for Plymouth County<br>Respondents,<br><br>               Respondents-<br>               Defendants. | Case No.04-12135NG<br>_____<br><br>OPPOSITION TO DEFENDANTS' CROSS<br>MOTION FOR SUMMARY JUDGMENT |

Petitioner, Robert Wade, submits the following Opposition to the Defendants' Cross-Motion for Summary Judgment and its supporting Memorandum. His response is made in good faith and based on the following points and authorities.

## I.    <u>Introduction</u>

Defendants present three primary arguments to support its claim that they need not grant Mr. Wade access to the biological evidence. First, they argue he lacks standing to bring his § 1983. *See* Doc. No. 63-2, at 3-9. Second, they argue that his § 1983 is time-barred. *Id*. at 9-32. Third, they argue that if the Court rejects their first two arguments, and reaches the threshold question, that the threshold suggested by Mr. Wade is far too low a threshold. Instead, they suggest a "more stringent" due process threshold, one which they claim Mr. Wade cannot meet. *Id*. at 32-38. Each argument lacks merit. As such, the Court must enter judgment as a matter of law in Mr. Wade's favor.

## II.    <u>Arguments</u>

### A.    <u>Mr. Wade *Does Not* Lack Standing</u>

Defendants claim Mr. Wade lacks standing to bring his § 1983 action. Before he addresses the Defendants' arguments, Mr. Wade will briefly outline the standing principles as articulated by the U.S. Supreme Court. When the Court applies these principles to Mr. Wade's case, it will conclude that the current litigation "retains the essentials of an adversary proceeding, involving a real, not a hypothetical, controversy,"

*Nashville, C. & St. L. R. Co.* v. *Wallace*, 288 U.S. 249, 264 (1933), and therefore qualifies as a "Case" for Article III, § 2 purposes.

### 1.  Basic Constitutional Principles of "Standing"

It is undisputed that federal courts have "an obligation to assure" themselves of litigants' standing under Article III. *Friends of Earth, Inc.* v. *Laidlaw Environmental Services (TOC), Inc.,* 528 U.S. 167, 180 (2000).  A party seeking to invoke a federal court's jurisdiction (or "standing") must demonstrate three things: (1) injury in fact; (2) causation; and (3) redressability.  First, "injury in fact" means an invasion of a *legally protected* interest that is "(a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 55, 560 (1992) (citations, footnote, and internal quotation marks omitted).  Second, "causation" means that the injury "fairly can be traced to the challenged action of the defendant[s]," and has not resulted "from the independent action of some third party not before the court." *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 41-42 (1976).  Third, "redressability" means that the "prospect of obtaining relief from the injury as a result of a favorable ruling" is not "too speculative." *Allen* v. *Wright,* 468 U.S. 737, 752 (1984).  These elements are the "irreducible minimum," *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc*., 454 U.S. 464, 472 (1982), required by the Constitution. *See FW/PBS, Inc.* v. *Dallas*, 493 U.S. 215, 231 (1990) (holding that the party invoking federal jurisdiction bears the burden of establishing these elements).[1]

### 2.  Applying these Three Elements to Mr. Wade's Case

The injuries identified in Mr. Wade's § 1983 action and the remedy he seeks to redress these injuries satisfy these three requirements.

#### a.  Injury in Fact

Mr. Wade filed suit pursuant to 42 U.S.C. § 1983.  To state a claim under § 1983, Mr. Wade had to plead sufficient facts to prove that the Defendants (1) violated his federal constitutional rights while (2) acting under the color of state law. *See* 42 U.S.C. § 1983; *Monell v. Dept. of Social Services*, 436 U.S. 658, 691-92 (1978).  Mr. Wade did

---

[1] A "plaintiff must allege a personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 (2006) (quoting *Allen* v. *Wright,* 468 U.S. at 751.

just this; he alleged that Defendants' refusal to grant him access to the biological evidence violated his federal constitutional right to access potentially exculpatory evidence and his right to have meaningful access to the federal courts. *See* Doc. No. 36, at 5, 6 (citing *Brady v. Maryland*, 373 U.S. 38 (1963) and *Ex Parte Hu*, 312 U.S. 546 (1941)). In its initial opinion, the Court sided with Mr. Wade and held that both claims are cognizable federal constitutional claims.

With respect to his *Brady* due process claim, the Court held: "Because the individual interests implicated by DNA testing so profoundly outweigh the adverse impact on the state, I find that the Due Process Clause provides a substantive right to post-conviction DNA testing in cases where testing could raise serious doubts about the original verdict." *Wade v. Brady*, 460 F.Supp.2d 226, 249 (D.Mass. 2006). Similarly, in regards to his meaningful access claim, the Court observed: "Denying prisoners access to potentially exculpatory DNA evidence limits meaningful access to the courts in even more profound terms than denying access to a law library or attorney. While the latter restrictions substantially impinge on a prisoner's ability to gain judicial access, the former operates as an absolute bar." *Id.* at 250. The Court went on to hold: "[W]hen the State refuses to provide DNA evidence that could undermine the legitimacy of a prisoner's underlying conviction, the constitutional right to access the courts is also lost." *Id.* at 251.[2]

Both constitutional violations represent "concrete" and "particularized" injuries because both deny Mr. Wade access to something that the Federal Constitution says he has a right to access. In particular, the Federal Constitution recognizes *Brady's* due

---

[2] Judge King's concurring opinion in *Harvey v. Horan,* further supports the Court's analysis:

> In essence, the concept of due process requires that the government treat its citizens in an evenhanded and neutral manner; thus the targeting of specific individuals with the purpose of frustrating the exercise of their lawful rights contradicts the basic premise of the constitutional guarantee.
>
> Thus, given that prisoners possess a right of effective access to the court system, a governmental decision to deny access to evidence with the intent--and with the effect--of preventing a prisoner from exercising his right of effective access to the court system would violate due process. To permit a state official to target a particular prisoner and to deliberately frustrate that prisoner's ability to take advantage of post-conviction legal options contravenes the essence of fair and impartial procedural justice.

278 F.3d 370, 387 (4th Cir. 2002) (internal citations omitted) (King, J., concurring in part).

process rights in the post-conviction context, especially where DNA testing is involved, because DNA testing has the unprecedented ability to further the "joint constitutional imperatives of 'protecting the innocent from erroneous conviction and ensuring the integrity of our criminal justice system.'" *Id*. at 246 (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)).  By refusing to disclose the biological evidence, however, the Defendants are denying Mr. Wade *the opportunity* to adequately determine whether his original conviction is in fact worthy of confidence and in accordance with the Federal Constitution.  Simply put, in today's DNA-dependent criminal justice system, where DNA evidence has repeatedly proven that criminal trials are "no longer the most reliable determination of guilt or innocence" when biological evidence is available for testing, *id*. at 248, denying a defendant, who proclaims his innocence, access to the biological evidence that can conclusively establish his innocence, pre-trial or post-trial, inflicts an irreparable injury to the defendant.

The same can be said with his meaningful access claim.  Pursuant to the U.S. Supreme Court's meaningful access cases, the Commonwealth must ensure that Mr. Wade has "a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts." *Lewis v. Casey*, 518 U.S. 343, 351 (1996); *accord Wade v. Brady*, 460 F.Supp.2d at 250 ("The Constitution requires access to the courts to be 'adequate, effective, and meaningful.'") (quoting *Bounds v. Smith,* 430 U.S. 817, 822 (1977)).[3]  As pled in his original § 2254 petition, *see* Doc. Nos. 1 & 2, Mr. Wade ultimately wants to present (at least) two "fundamental constitutional" claims to the Court: (1) an ineffective assistance of counsel claim (IAC); and (2) a free standing actual innocence claim.  As explained in his Rule 15(d) motion, *see* Doc. No. 64, to adequately present these claims requires access to the biological evidence and DNA testing. *Id*.  Consequently, by refusing to grant access to the biological evidence the Defendants have effectively prevented Mr. Wade from developing the "key facts which would form the basis of [his] claims for redress." *Wade v. Brady*, 460 F.Supp.2d at 250

---

[3] The Supreme Court has also identified a similar right at the pre-trial and trial phase of the criminal process. *See Ake v. Oklahoma*, 470 U.S. 66, 77 (1985) (criminal proceedings are "fundamentally unfair if the State proceeds against an indigent defendant without making certain that he has access to the *raw materials* integral to the building of an effective defense.") (emphasis added); *Britt v. North Carolina*, 404 U.S. 226, 227 (1971).

(quoting *Bell v. Milwaukee*, 746 F.2d 1205, 1261 (7th Cir. 1984) (overturned on other grounds)).  Without question, then, the Defendants' actions (or inactions) have caused (and continue to cause) an "actual," "concrete," and "particularized" injury that "affect[s] [Mr. Wade] in a personal and individual way." *Lujan v. Defenders of Wildlife*, 504 U.S. at 560 n.1.

Furthermore, and perhaps more importantly, both claims challenge the legality of government action or inaction.  When this is the case, "there is ordinarily little question that the action or inaction has caused [petitioner's] injury[.]" *Id.* at 504 U.S. at 561-62.  As Justice Scalia explained in *Lugan*:

> When the suit is one challenging the legality of government action or inaction, the nature and extent of facts that must be averred (at the summary judgment stage) or proved (at the trial stage) in order to establish standing depends considerably upon whether the plaintiff is himself an object of the action (or forgone action) at issue.  If he is, there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it.

*Id.*  Accordingly, contrary to the Defendants' claim, "the *mere lack of possession* of the DNA evidence," Doc. No. 63-2, at 6 (emphasis in original), does in fact cause great harm to Mr. Wade thereby satisfying the injury in fact requirement.

### b.  <u>Causation</u>

Article III's "case or controversy" limitation requires that "a federal court act only to redress injury that fairly can be traced to the challenged action of the defendant, and not injury that results from the independent action of some third party not before the court." *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. at 41-42.  Mr. Wade satisfies the causation requirement, as well.  It is the Defendants' refusal to grant Mr. Wade access to the biological evidence that caused (and continues to cause) the "concrete" and "particularized" injuries identified *supra*.  Thus, there is a "sufficient nexus between [his] injury and the government action which [he] attacks to justify judicial intervention." *Linda R.S. v. Richard D.*, 410 U.S. 614, 617-18 (1973).

### c.  <u>Redressibility</u>

Redressibility "examines the causal connection between the alleged injury and the judicial relief requested," *Allen v. Wright*, 468 U.S. at 753 n.19, and asks whether the requested relief would remedy the petitioner's alleged injury. *See id.* at 752.  Mr. Wade

satisfies this requirement, as well. His injuries, as mentioned, are two fold: (1) the inability to adequately determine whether his original conviction is in fact worthy of confidence and in accordance with the Federal Constitution; and (2) the inability to adequately develop the key facts that would form the basis of his claims for redress, which in turn prevents him from presenting his claims to the courts. His requested relief is simple *and remedies* his "concrete" and "particularized" injuries: access to the biological evidence so he may subject it to DNA testing, the results of which he will use to meaningfully access the courts and to present his meritorious IAC and actual innocence claims.[4]    Moreover, the remedy is limited to the Defendants' actions (or inactions) that produced the injury. *See Lewis v. Casey*, 518 U.S. at 357 ("The remedy must of course be limited to the inadequacy that produced the injury in fact that the plaintiff has established.").[5]    As such, Mr. Wade satisfies the redressability requirement.

### 3.    Rebutting the Defendants' Standing Arguments

The Defendants' standing arguments, to be perfectly blunt, are truly astounding. First, they are at odds with the Court's initial opinion. Second, they cannot be reconciled with the numerous opinions where federal courts have addressed the issue of whether § 1983 is an appropriate vehicle to access biological evidence. Third, they cannot be reconciled with the U.S. Supreme Court's standing jurisprudence. Fourth, and more significantly, carried to their logical end, their arguments would have drastic implications, particularly for pro se prisoners seeking to attack their conviction and sentence. Finally, if the Court buys into the Defendants' (mis)characterization of Mr.

---

[4] It is also worth noting that Mr. Wade's due process right, while implicating questions of tremendous importance, is narrow in its reach. It does not, for example, affect how the Commonwealth collects and stores biological evidence—procedures for which cost is clearly a significant concern. Rather, Mr. Wade only seeks access to, and perhaps testing of, biological evidence already in the Commonwealth's possession. Moreover, through the Innocence Project's assistance, Mr. Wade will be able to cover the costs of DNA testing himself, and, therefore, would not need to fashion a remedy wherein the Court would compel the Commonwealth to conduct the testing for him at the Commonwealth's expense.

[5] *Accord Missouri* v. *Jenkins*, 515 U.S. 70, 88, 89 (1995) ("The nature of the… remedy is to be determined by the nature and scope of the constitutional violation") (citation and internal quotation marks omitted); *Califano* v. *Yamasaki*, 442 U.S. 682, 702 (1979) ("The scope of injunctive relief is dictated by the extent of the violation established, not by the geographical extent of the plaintiff class").

Wade's injuries, he is entitled to discovery, pursuant to Rule 26(b)(1), to demonstrate that he has suffered a "concrete" and "particularized" injury.

### a.    The Court's Initial Opinion

The Court's initial opinion undermines the Defendants' standing arguments. Nowhere does it directly or indirectly suggest that Mr. Wade failed to articulate a "concrete" and "particularized" injury.   Indeed, the Court held that a petitioner's substantive due process rights are irreparably damaged if the Commonwealth prevents him from pursuing DNA testing, when such testing could raise serious doubts about his original verdict. *See Wade v. Brady*, 460 F.Supp.2d at 249.  Similarly, the Court held that a defendant's due process right to meaningful access is absolutely eviscerated when the Commonwealth refuses to provide access to biological evidence that could undermine the legitimacy of his conviction. *Id*. at 251.   Both violations represent "concrete" and "particularized" injuries that can be traced directly to the Defendants' actions.

Furthermore, the Court presented several questions the parties needed to address when they moved for summary judgment.[6]  None of these questions concerned—directly or indirectly—whether Mr. Wade lacked standing.  Mr. Wade concedes that, for motion to dismiss purposes, the Court perhaps presumed that his "general allegations embrace[d] those specific facts that [were] necessary to support [his] [constitutional] claim[s]." *Lujan v. Defenders of Wildlife*, 504 U.S. at 561 (citation omitted).  At the same time, however, pursuant to Rule 12(h)(3), "If the court determines *at any time* that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3) (emphasis added).   That the Court refused to dismiss Mr. Wade's § 1983 action on standing grounds, at the motion to dismiss stage, strongly suggests Mr. Wade does not lack standing.

### b.    Other Federal Court Opinions Regarding § 1983 Actions

---

[6] For instance, the Court refused to answer whether the statute of limitations barred Mr. Wade's §1983 action. *Id*. at 235, 249.  Intertwined with this issue is whether Mr. Wade is entitled to equitable tolling if he is in fact time barred. *Id*. at 231.  Second, while the Court recognized that Mr. Wade possessed a substantive due process right to DNA testing, it did not articulate "what showing a defendant must make before receiving access to DNA evidence." *Id*. at 231.  Not having articulated the appropriate "showing," the Court did not determine "whether the facts of [Mr. Wade's] case meet the showing required for the relief sought." *Id*.

The Defendants conspicuously fail to cite to a single case where a federal court dismissed a § 1983 action, like Mr. Wade's, because the petitioner's access-to-evidence claim failed to satisfy Article III's standing requirements. Such is the case because there are no cases that support the Defendants' unprecedented interpretation of the Supreme Court's standing jurisprudence. *See, e.g.*, *Osborne v. District Attorney's Office*, 521 F.3d 1118 (9th Cir. 2008) (*Osborne II*); *McKithen v. Brown*, 481 F.3d 89 (2d Cir. 2007); *Savory v. Lyons*, 469 F.3d 667 (7th Cir. 2006); *Grayson v. King*, 460 F.3d 1328 (11th Cir. 2006); *Alley v. Key*, 2006 U.S. App. LEXIS 12882 (6th Cir., May 14, 2006); *Osborne v. District Attorney's Office*, 423 F.3d 1050 (2005) (*Osborne I*); *Bradley v. Pryor*, 305 F.3d 1287 (11th Cir. 2002); *Kutzner v. Montgomery County*, 303 F.3d 339 (5th Cir. 2002); *Harvey v. Horan*, 278 F.3d 370 (4th Cir. 2002); *Breest v. Attorney General for N.H.*, 2008 WL 183240 (D.N.H., Jan. 18, 2008); *Wade v. Brady*, 460 F.Supp.2d 226 (D. Mass. 2006); *Osborne v. District Atty's Office*, 445 F.Supp.2d 1079 (D. Alaska 2006); *Alley v. Key*, 431 F. Supp.2d 790 (W.D. Tenn. 2006); *Moore v. Lockyer*, 2005 WL 2334350 (N.D.Cal., Sept. 23, 2005); *Godschalk v. Montgomery County District Attorney's Office*, 177 F. Supp. 2d 366 (E.D. Pa. 2001).

Not all the aforementioned courts ultimately granted relief. Those courts that refused to grant access to the biological evidence did so *not because petitioners lacked standing*, but because they either failed to identify a constitutionally protected right, their request for DNA testing violated *Heck v. Humphrey*, 512 U.S. 477 (1994), or because the petitioner failed to timely file his action. In regards to the first category, these courts held that the refusal to allow DNA testing did *not* deprive petitioners of a constitutionally protected right. *See Grayson v. King*, 460 F.3d 1328 (11th Cir. 2006); *Alley v. Key*, 2006 U.S. App. LEXIS 12882 (6th Cir., May 14, 2006); *Alley v. Key*, 431 F. Supp.2d 790 (W.D. Tenn. 2006). In regards to the second category, these courts denied DNA testing because the petitioner's ultimate goal was to use the DNA results to invalidate his conviction thereby violating *Heck*. *See Harvey v. Horan*, 278 F.3d 370 (4th Cir. 2002); *Kutzner v. Montgomery County*, 303 F.3d 339 (5th Cir. 2002). In regards to the third category, the Seventh Circuit denied relief in *Savory* because the petitioner failed to timely file his § 1983 action. *See Savory v. Lyons*, 469 F.3d 667 (7th Cir. 2006).

Furthermore, the Defendants fail to reconcile their novel standing arguments with the cases where federal courts awarded DNA testing to § 1983 petitioners. In these cases, the federal courts not only held that the petitioners had standing to bring their § 1983 actions, they had a constitutionally protected right to post-conviction DNA testing. *See*, *e.g*., *Osborne v. District Attorney's Office*, 521 F.3d 1118 (9th Cir. 2008); *Breest v. Attorney General for N.H*., 2008 WL 183240 (D.N.H., Jan. 18, 2008); *Wade v. Brady*, 460 F.Supp.2d 226 (D.Mass. 2006); *Moore v. Lockyer*, 2005 WL 2334350 (N.D.Cal., Sept. 23, 2005); *Godschalk v. Montgomery County District Attorney's Office*, 177 F. Supp. 2d 366 (E.D. Pa. 2001).[7]

Indeed, the Ninth Circuit's two *Osborne* opinions, particularly its most recent opinion, refute the Defendants' standing argument. *See Osborne I*, *Osborne II*. As Mr. Wade explained in his Rule 15(d) motion, *see* Doc. No. 64, *Osborne II* clearly articulated, as this Court did in its original opinion, the nature of the injury inflicted to a petitioner when the State refuses to grant access to biological evidence for DNA testing purposes. In particular, *Osborne II* focused heavily on the fact that DNA testing gave the petitioner the *opportunity* to develop his constitutional claims, especially his actual innocence claim, and to present them to a post-conviction court.[8] Consequently, if the State refuses access to the biological evidence, the inverse must be true—i.e., the

---

[7] Similarly, in *McKithen v. Brown*, 481 F.3d 89 (2d Cir. 2007), the Second Circuit Court of Appeals held that, contrary to the district court's ruling, the district court did in fact have subject matter jurisdiction to consider petitioner's § 1983 action to access the biological evidence. The Second Circuit vacated the district court's judgment and remanded the case for consideration of (1) whether there existed a constitutional right to post-conviction access to evidence for the purpose of conducting potentially exonerative biological testing and (2) if such a right existed, whether the contours of that right were sufficiently similar to the state standards previously adjudicated that issue preclusion applied. *Id*. at 108. Similarly, in *Bradley v. Pryor*, 305 F.3d 1287 (11th Cir. 2002), the Eleventh Circuit Court of Appeals held that, contrary to the district court's opinion, *Heck v. Humphrey* did not bar petitioner's § 1983 action to access the biological evidence. *Id*. at 1291.

[8] *See Osborne II*, at 1122 ("Osborne has a limited due process right of access to the evidence for purposes of post-conviction DNA testing, which might… provide strong evidence upon which he may seek post-conviction relief."); *id*. at 1129 ("these newly available methods have the potential to pro-vide strong evidence upon which Osborne might seek post-conviction relief."); *id*. at 1130 ("Osborne has declared in his § 1983 complaint his intention, once he obtains the requested DNA testing, to file a petition for postconviction relief based on a 'free-standing' claim of actual innocence--i.e., despite the lack of any constitutional error at his trial, his incarceration is unconstitutional due to actual innocence—which Osborne might bring in either state or federal court.").

petitioner will be unable to effectively develop and meaningfully present his constitutional claims. This, in turn, inflicts a severe injury on him because the State is denying him a fundamental right, which is "a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts." *Lewis v. Casey*, 518 U.S. at 351.

> **c.** **The Defendants Misconstrue the Nature of Mr. Wade's Injury and the U.S. Supreme Court's Standing Jurisprudence**

The Defendants not only misconstrue the nature of Mr. Wade's injury, their standing arguments cannot be reconciled with the U.S. Supreme Court's standing jurisprudence. According to the Defendants, Mr. Wade lacks standing because he cannot definitively establish that DNA testing will produce exculpatory results. For instance, Defendants hang their hat on the following passage from the Court's original opinion: "The results of any such test are uncertain: they could be exculpatory, inclusive, or inculpatory." Doc. No. 63-2, at 6 (citing *Wade v. Brady*, 460 F.Supp.2d at 236). They place great emphasis on this passage, as well: "[T]he only inevitable consequence of plaintiff's § 1983 action would be the release of evidence for DNA testing… [the plaintiff's] success in this action does not even necessarily speed consideration of his release." *Id*. at 6-7 (quoting *Wade v. Brady*, 460 F.Supp.2d at 239). Defendants then extrapolate from these comments and make the following unprecedented standing argument:

> If it is such a matter of conjecture whether the Plaintiff would have grounds for and be able to bring a nonfrivolous challenge to his conviction if he had access to the DNA evidence, then it cannot be said that his injury in lack such access [to the biological evidence] is "concrete and… actual or imminent," as opposed to "conjectural or hypothetical."

*Id*. at 7 (citations omitted).

From the Defendants' perspective, Mr. Wade's alleged injury is that he is being held in violation of the Federal Constitution because he is actually innocent. By characterizing the injury in this manner, the Defendants can easily argue that Mr. Wade cannot identify a "concrete" and "particularized" injury *at this point* because he has yet to present newly discovered DNA evidence establishing his actual innocence. Thus,

without exculpatory DNA results, it is quite easy to characterize this type of injury as "conjectural" or "hypothetical."[9]

The Defendants' characterization of Mr. Wade's injuries is completely off point. The principal injuries caused by the Defendants' actions (or inactions) are: (1) an inability to adequately determine whether his original conviction is in fact worthy of confidence and in accordance with the Federal Constitution; and (2) an inability to adequately develop the key facts that would form the basis of his constitutional claims for redress. Thus, the injury at *this point in the litigation*, is *not* that the Defendants are incarcerating a factually innocent person,[10] but that they have erected an insurmountable obstacle that prevents Mr. Wade from proving his innocence to a state or federal court.

Viewed through this constitutional lens, Mr. Wade has standing because his injury is one of *opportunity*. Moreover, he is not required to—nor can he at this point—prove that the envisioned DNA tests will produce exculpatory results.[11] More importantly, Mr. Wade's current injuries can be analogized with several equal protection U.S. Supreme Court cases where the Court held that a plaintiff or a group of plaintiffs had standing despite the fact they could not definitively prove that they would have received a government benefit had it not been for certain governmental actions that prevented them from receiving the benefit. The Supreme Court resolved the standing issue in these cases by how it characterized the plaintiffs' alleged injuries. In each case, the Supreme Court characterized the injury as one of *opportunity*.

For instance, in *Turner v. Fouche*, 396 U.S. 346, (1970), petitioners challenged, on equal protection grounds, a Georgia law limiting school board membership to property owners. The Supreme Court held that a plaintiff who did not own property had standing to challenge the law, *id.*, at 361, n.23, and although the Court did not explicitly say so,

---

[9] As noted *infra*, the Defendants argument creates a Catch-22 that requires the Court's intervention.

[10] If DNA testing is in fact performed, and the results prove favorable to Mr. Wade, then the issue would become whether Mr. Wade's custody violates the Federal Constitution because of his actual innocence. Accordingly, the Defendants' current characterization of Mr. Wade's injuries is one step ahead of the ballgame.

[11] Mr. Wade can *assert* that DNA testing will produce exculpatory results, but asserting that an event will happen is entirely different than definitively proving it will happen. As the Court noted in its initial opinion, the test results may prove inconclusive.

"its holding *did not depend upon an allegation that he would have been appointed to the board but for the property requirement*. All that was necessary was that the plaintiff wished to be considered for the position." *AGC v. City of Jacksonville*, 508 U.S. 656, 664 (1993) (describing *Turner v. Fouche's* holding; emphasis added); *accord Quinn v. Millsap*, 491 U.S. 95, 103 (1989) (plaintiffs who do not own real property have standing to challenge property requirement for membership on "board of freeholders").

The Supreme Court addressed an analogous issue in *Clements v. Fashing*, 457 U.S. 957 (1982).    There, several Texas officeholders claimed that the Texas Constitution's "automatic resignation" provision, which required the immediate resignation of some (but not all) state officeholders upon their announcement of a candidacy for another office, violated their equal protection rights.   Noting that the plaintiffs alleged that they would have announced their candidacy were it not for the consequences of doing so, the Court rejected the claim that the dispute was "merely hypothetical," and that the allegations were insufficient to create an "actual case or controversy." *Id*. at 962.   Citing *Turner v. Fouche*, the Court emphasized that the plaintiffs' injury was the "*obstacle* to [their] candidacy," 457 U.S. at 962 (emphasis add); the Court "did not require any allegation that the plaintiffs would actually have been elected but for the prohibition." *AGC v. City of Jacksonville*, 508 U.S. at 665 (describing *Clements v. Fashing*).

In *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265 (1978), a twice-rejected white male applicant claimed that a state medical school's admissions program, which reserved 16 of the 100 places in the entering class for minority applicants, violated the Equal Protection Clause.   Addressing the argument that the applicant lacked standing to challenge the program, Justice Powell concluded that the "constitutional requirements of Art. III" had been satisfied, because the requisite "injury" was the medical school's "decision not to permit Bakke to *compete* for all 100 places in the class, simply because of his race." *Id*. at 281, n.14 (emphasis added) (principal opinion). Thus, "even if Bakke had been unable to prove that he would have been admitted in the absence of the special program, it would not follow that he lacked standing." *Id*., at 280-281, n.14 (emphasis added).

Lastly, in *AGC v. City of Jacksonville*, *supra*, petitioner (a construction contractors' association) challenged, on equal protection grounds, a Jacksonville ordinance requiring that 10% of the amount spent on the city contracts be set aside each fiscal year for so-called "Minority Business Enterprises" (MBE's). The contractors' association, most of whose members did not qualify as MBE's, alleged that many of its members regularly bid on, and performed, construction work for the city and "would have… bid on… designated set aside contracts but for the restrictions imposed by the ordinance." *Id.* at 659. The City of Jacksonville alleged that petitioner and its members lacked standing because it had "not demonstrated that, but for the program, any… member would have bid successfully for any of the contracts." *Id*. at 660. The Supreme Court rejected Jacksonville's argument. Instead, the Court characterized the petitioner's injury as one of *opportunity*. Specifically, the Court held that the "injury in fact" element of standing in such a case *is not* the ultimate inability to obtain the benefit, but rather the denial of equal treatment or opportunity resulting from the imposition of a Government barrier. *Id*. at 666. Thus, to establish standing "a party challenging a set-aside program like Jacksonville's need only demonstrate that it is able and ready to bid on contracts and that a discriminatory policy prevents it from doing so on an equal basis." *Id*.

Once the Court applies these principles to Mr. Wade's case, it will conclude that he has standing to bring his § 1983 action even though he cannot—at this point—demonstrate that the DNA tests will exonerate him. Again, his injury is one of *opportunity*.

### d.    The Defendants' Standing Argument Would Have Drastic Implications

Defendants argue that Mr. Wade lacks standing to bring his *Brady* and meaningful access claims because it is uncertain whether DNA tests will produce exculpatory results. In essence, then, Defendants read the Supreme Court's standing cases to mean that a prisoner must establish that a claim will definitely lead to the relief sought before he can file suit. If the prisoner cannot establish that a court will definitely grant him relief, then, according to the Defendants, the prisoner has failed to show "injury in fact" because the alleged injury is merely "hypothetical" or "speculative" rather than "concrete" or "particularized."

If accepted, the Defendants' standing argument would have significant implications—particularly for *pro se* prisoners. First, the Defendants' argument, in effect, would turn the litigation world upside down. Indeed, many injuries are (and can only be) fleshed out once discovery has taken place. The same thing can be said regarding the causation issue, as well. According to the Defendants' argument, however, litigants who cannot identify upfront (before discovery), in "concrete" or "particularized" terms the exact extent of their injury or injuries, have no right for a federal court to consider their claims because there is no "case" or "controversy" for the federal court to decide.

Second, the Defendants' position would require the "mostly uneducated and indeed largely illiterate prison population" to "transform themselves into litigating engines capable of," *Lewis* v. *Casey*, 518 U.S. at 354, 355, determining not only what claims are meritorious, but which ones will *definitely* garner relief from a court. Such a transformation is inconsistent with the practice of holding *pro se* prisoners to "less stringent [pleading] standards." *Haines* v. *Kerner,* 404 U.S. 519, 520 (1972).[12]

### e.   If the Court Agrees With the Defendants' Characterization of Mr. Wade's Injury, He Is Entitled to Discovery

Finally, if the Court buys into the Defendants' (mis)characterization of Mr. Wade's injury (i.e., his injury is that he is actually innocent and it is unconstitutional to incarcerate an actually innocent person), he requests discovery, pursuant to Rule 26(b)(1), in order to prove that his injury is "concrete" and "particularized" rather than "speculative" and "hypothetical." It would be fundamentally unfair not to grant discovery in such a situation because the Defendants have access to the most probative evidence that can substantiate Mr. Wade's "concrete" and "particularized" injury.

Pursuant to Rule 26(b)(1),

[A party] may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense—including the existence, description, nature, custody, condition, and location of any documents or other tangible things

---

[12] *Accord Erickson v. Pardus*, 127 S.Ct. 2197, 2200 (2007) ("A document filed *pro se* is 'to be liberally construed,' and 'a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.'") (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)).

and the identity and location of persons who know of any discoverable matter. For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action.

FED. R. CIV. P. 26(b)(1).[13]   The biological evidence is not privileged, it is relevant to Mr. Wade's claim that he has standing, and there is good cause to believe that modern DNA testing will accurately answer the standing question.   Indeed, according to the Defendants' argument, if DNA tests exonerate Mr. Wade, he has standing; if they incriminate him, he does not have standing.

In many ways, Mr. Wade's discovery request is similar to the request made by the defendant in *Pennsylvania v. Ritchie*, 480 U.S. 39 (1987).  In *Ritchie*, the Commonwealth charged the defendant with child sexual abuse against his daughter.   Prior to trial, defendant subpoenaed a state child welfare agency's records pertaining to his daughter, and in which he hoped to find medical reports, names of witnesses, and other exculpatory evidence.   The Commonwealth argued that defendant was not entitled to the records because he could not identify anything of material value in the records. *Id.* at 58 n.15. Defendant rebutted by claiming he needed access to the records to adequately determine whether they contained material evidence to his defense; without access he could not "make a particularized showing of what information he was seeking or how it would be material." *Id.*   Simply put, defendant argued that due process mandated that he be afforded an adequate opportunity to establish the materiality of these records.[14]

The Supreme Court sided with both the Commonwealth and the defendant.  First, it agreed with the Pennsylvania Supreme Court (and the defendant) that the case should be remanded back to the trial judge "to determine whether [his daughter's file] contains information that probably would have changed the outcome of [defendant's] trial." *Id.* at

---

[13]Because Mr. Wade's § 1983 action is not challenging his conviction or sentence, Rule 26(a)(B)(iii) *does not* prohibit discovery in his case. *See* FED. R. CIV. P. 26(a)(B)(iii) (noting that "a petition for habeas corpus or any other proceeding to challenge a criminal conviction or sentence" are "exempt from initial disclosure"); *Cf.* Fed. Rule Civ. Proc. 8(f) ("All pleadings shall be so construed as to do substantial justice").

[14] The defendant also made a Compulsory Process argument. *See id.*  The Supreme Court, though, analyzed his claim under a due process analysis.

58.[15]  Second, the Court held that defendant's "right to discover exculpatory evidence [did] not include the unsupervised authority to search through the Commonwealth's files." *Id*. at 59 ("Defense counsel has no constitutional right to conduct his own search of the State's files to argue relevance.").[16]  The Court concluded by noting that defendant's "interest (as well as that of the Commonwealth) in ensuring a fair trial can be protected fully by requiring that the CYS files be submitted only to the trial court for *in camera* review." *Id*. at 60.

While the Court's holding in *Ritchie* is fact specific, the procedural due process analysis used by the Court to reach its holding is instructive. *See County of Allegheny v. ACLU Greater Pittsburgh Chapter*, 492 U.S. 573, 668 (1989) (Kennedy, J., concurring in part and dissenting in part) ("As a general rule, the principle of *stare decisis* directs us to adhere not only to the holdings of our prior cases, but also to their explications of the governing rules of law."); *Witt v. Dep't of the Air Force*, 2008 U.S. App. LEXIS 10794, at *27-28 (9th Cir., May 21, 2008) (holding that courts are bound by the theory or reasoning underlying a Supreme Court case, not just by its holding); Antonin Scalia, *The Rule of Law as a Law of Rules*, 56 U. Chi. L. Rev. 1175, 1177 (1989).  Just as the defendant in *Ritchie* needed a vehicle to assess the child welfare agency's files to establish materiality, Mr. Wade needs a similar vehicle to examine the biological evidence and to expose its exculpatory value so he can establish standing.  The Court, in reality, can conduct a similar *in camera* review as witnessed in *Ritchie*.  Indeed, pursuant to Federal Rule of Evidence 706, the Court "may appoint expert witnesses of its own selection" to conduct the DNA testing on the biological evidence. Fed. R. Evid. 706(a). The experts can then report to the Court whether the DNA tests produced exculpatory or incriminatory results.  If it is the former, Mr. Wade has standing, but if it is the latter, he would not have standing.

---

[15]The Court added: "If it does, he must be given a new trial. If the records maintained by CYS contain no such information, or if the nondisclosure was harmless beyond a reasonable doubt, the lower court will be free to reinstate the prior conviction." *Id*. at 58.

[16]The Court also said that it "has never held—even in the absence of a statute restricting disclosure—that a defendant alone may make the determination as to the materiality of the information." *Id*. at 59.

### B.     Mr. Wade's § 1983 Action is Timely

The Defendants present several arguments why Mr. Wade's § 1983 is untimely. First, they argue that under U.S. Supreme Court precedent, his action is governed by M.G.L. c.260, § 2A's three-year limitations period. *See* Doc. No. 63-2, at 9-11. This in turn, they argue, invalidates Mr. Wade's claim that the Innocence Protection Action must govern his action. *See id.* at 11-15. Second, they argue that his action is governed by M.G.L. c.260, § 2A's three-year limitations period, despite the fact Mr. Wade only seeks equitable relief. *See id.* at 16-20. Third, they argue that the continuing violation doctrine is inapplicable to Mr. Wade's action. *See id.* at 20-26. Fourth, they argue that despite this Court's concession that Mr. Wade is "borderline" mentally retarded, *see Wade v. Brady*, 460 F.Supp.2d at 231, he is not entitled to equitable tolling pursuant to M.G.L. c.260, § 7. *See id.* at 26-29. Finally, they argue that Mr. Wade's injury occurred more than three years before he commenced the present action. *See id.* at 29-32.

Each argument lacks merit. To conserve judicial economy, however, Mr. Wade will only focus on (and discredit) two of the Defendants' arguments.[17] First, he will demonstrate how the Defendants' M.G.L. c.260, § 2A argument is inconsistent with the spirit and language of 42 U.S.C. § 1988. And second, he will (once again) establish that his injury accrued on the date the Commonwealth court denied his request to access the biological evidence. He will further show that he filed his current action within three years of this date.

### 1.     The Defendants Fail to Correctly Apply 42 U.S.C. § 1988 (a)

The Defendants argue that M.G.L. c.260, § 2A's three-year limitations period governs Mr. Wade's § 1983 action. In particular, they argue that *Wilson v. Garcia*, 471 U.S. 261 (1985) and *Owens v. Okure*, 488 U.S. 235 (1989) categorically mandate federal courts to "mechanically" apply the forum state's general or residual statute of limitations for personal injury actions in § 1983 cases. The Defendants' argument lacks merit; it completely disregards 42 U.S.C. § 1988's "three-step process" for determining the rules of decision applicable to civil rights claims.

---

[17] Mr. Wade incorporates the arguments he presented in his SJ motions regarding equitable tolling and the continuing violation doctrine. *See* Doc. No. 58, at 16-19, 23-29.

As the Court correctly noted in its initial opinion, "Section 1983 does not contain a specific statute of limitations." *Wade v. Brady*, 460 F.Supp.2d at 233. Accordingly, when facing deficiencies in federal law, the borrowing doctrine authorizes courts to "look to other sources of law to 'borrow' appropriate provisions." *Brown v. United States*, 742 F.2d 1498, 1503 (D.C. Cir. 1984) (en banc).[18] When a federal court must borrow from another statute, be it a federal or state statute, the court must begin its analysis with 42 U.S.C. § 1988 (a)'s text. *See Wilson v. Garcia*, 471 U.S. at 268 ("Our identification of the correct source of law properly begins with the text of § 1988."); *Owens v. Okure*, 488 U.S. at 239; *Burnett v. Grattan*, 468 U.S. 42, 47-48 (1984) *Robertson v. Wegmann*, 436 U.S. 584, 588 (1978). Section 1988 is "intended to complement the various acts which… create federal causes of action for the violation of federal civil rights." *Moor v. County of Alameda*, 411 U.S. 693, 702 (1973) ("§ 1988 instructs federal courts as to what law to apply in causes of actions arising under federal civil rights acts.").

The "language of § 1988, directs the courts to follow 'a three-step process' in determining the rules of decision applicable to civil rights claims" *Wilson v. Garcia*, 471 U.S. at 267; *Burnett v. Grattan*, 468 U.S. at 47 (citing 42 U. S. C. § 1988). First, "the Court must determine whether 'suitable' federal law exists. If so, § 1983 must be applied in conformity with such law." *Banks v. Yokemick*, 177 F.Supp.2d 239, 248 (S.D.N.Y. 2001) (citing *Burnett v. Grattan*, 468 U.S. at 47).[19] Second, if "no *suitable* federal rule exists," courts must consider "application of state 'common law, as modified and changed by the constitution and statutes' of the forum State." *Burnett v. Grattan*, 468 U.S. at 48 (emphasis added). The "third step asserts the predominance of the federal interest: courts are to apply state law *only* if it is not 'inconsistent with the Constitution

---

[18] As the Supreme Court has said: "There will often be no specific federal legislation governing a particular transaction… But silence… in federal legislation is no reason for limiting the reach of federal law… The inevitable incompleteness [of federal enactments] means that interstitial federal lawmaking is a basic responsibility of the federal courts." *United States v. Little Lake Misere Land Co.*, 412 U.S. 580, 593 (1973).

[19] *Accord Wilson v. Garcia*, 471 U.S. at 268 ("Congress' first instruction in the statute is that the law to be applied in adjudicating civil rights claims shall be in 'conformity with the laws of the United States, so far as such laws are suitable.'"); *Mason v. City of New York*, 949 F. Supp. 1068, 1077 (S.D.N.Y. 1996) ("Section 1988 therefore requires courts first to determine whether "suitable" federal law exists. If it does not, the relevant state law must be compared with principles underlying Sections 1983 and 1988.").

and laws of the United States.'" *Green v. City of Welch*, 467 F. Supp. 2d 656, 660 (D.WV. 2006) (emphasis in original) (citing *Burnett v. Grattan*, 468 U.S. at 48).

In short, § 1988 (a)'s "mandate implies that resort to state law… should not be undertaken before principles of federal law are exhausted." *Wilson v. Garcia*, 471 U.S. at 268. Stated differently, "[s]tate law is to be resorted to in resolving an issue if, *and only if*, federal law is deficient, and if, *and only if*, state law 'is not inconsistent with the constitution and laws of the United States.'" *Jaworski v. Schmidt*, 684 F.2d 498, 500 (7th Cir. 1982) (quoting 42 U.S.C. § 1988 (a)) (emphasis in original).[20] As Mr. Wade will demonstrate, federal law is *not* "deficient" in the post-conviction DNA testing area. Rather, Congress enacted the Innocence Protection Act (IPA) to deal with *the very issue currently pending before the Court*—access to biological evidence for DNA testing purposes. *See* 18 U.S.C. § 3600. Thus, the Court need not even consider the question of whether there is an applicable state law that is not "inconsistent with the Constitution and laws of the United States." 42 U.S.C. § 1988 (a). Even if the Court advances to the second step, M.G.L. c.260, § 2A's three-year limitations period is "contrary to" and "inconsistent with" the IPA's directives and policies regarding post-conviction DNA testing.

### a.    The IPA is a Suitable Federal Law to Refer to In Order to Resolve the Statute of Limitations Issue

The Defendants' "borrowing" argument conveniently by-passes the first step of § 1988 (a)'s three-step process. Specifically, they fail to ask whether there is a suitable federal law that can resolve the limitations issue. Rather, they go directly to the second and third steps of the process and argue that *Garcia* and *Owens* mandate that federal courts can *only* apply the forum state's statute of limitations for personal injury actions for *all* § 1983 actions. *See* Doc. No. 63-2, at 13 ("the Plaintiff's argument ignores the fact that a determination as to the appropriate limitations period to be applied in *all* § 1983 actions in Massachusetts has been made.") (emphasis added).

---

[20] *Accord Robertson v. Wegmann*, 436 U.S. at 588 ("*When federal law is thus 'deficient*,' § 1988 instructs us to turn to 'the common law, as modified and changed by the constitution and statutes of the [forum] State,' as long as these are 'not inconsistent with the Constitution and laws of the United States.'") (emphasis added).

The Defendants' analysis is incorrect. In essence, the Defendants claim that federal courts need not adhere to the first-step of § 1988 (a)'s three-step process in *all* § 1983 actions. Instead, federal courts must "mechanically" apply the forum state's limitations period for personal injury actions in such cases. Such a reading of § 1988 (a) is contrary to the Supreme Court's statutory interpretation case law and its holding in *Wilson v. Garcia*.

First, the Defendants' analysis nullifies the first-step in § 1988's three-step process. This violates the Supreme Court's statutory interpretation case law, which requires "that 'a statute ought, *upon the whole*, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.'" *Market Co. v. Hoffman*, 101 U.S. 112, 115 (1879) (emphasis added); *accord Duncan v. Walker*, 533 U.S. 167, 174 (2001); *Williams v. Taylor*, 529 U.S. 362, 404 (2000) (describing this rule as a "cardinal principle of statutory construction").

Second, the Defendants' argument conflicts with the Supreme Court's comment in *Occidental Life Insurance Co. v. EEOC*, in which it held: "[T]he Court has *not mechanically applied* a state statute of limitations simply because a limitations period is absent from the federal statute. State legislatures do not devise their limitations periods with national interests in mind, and it is the duty of the federal courts to assure that the importation of state law will not frustrate or interfere with the implementation of national policies" 432 U.S. 355, 367 (1977) (emphasis added). Here, the importation of state law will frustrate and interfere with congressional policies regarding post-conviction DNA testing.[21]

Finally, *Wilson v. Garcia* must be narrowly interpreted and limited to its facts. The Defendants claim that in *Wilson* the Supreme Court concluded that for the purposes of "uniformity, certainty, and the minimization of unnecessary litigations," *all* § 1983 claims should be characterized in the same manner; and it chose the state period of limitations for tortuous personal injury to govern. 471 U.S. at 275, 280. The Defendants'

---

[21] *Cf. DelCostello v. Int'l Brotherhood of Teamsters et al.*, 462 U.S. 151, 161 (1983) ("In some circumstances, however, state statutes of limitations can be unsatisfactory vehicles for the enforcement of federal law. In those instances, it may be inappropriate to conclude that Congress would choose to adopt state rules at odds with the purpose or operation of federal substantive law.").

reading of *Wilson* is misleading.  What the Defendants fail to acknowledge is that *Wilson's* holding is only applicable if the first-step of the process failed to identify a federal statute that is "suitable to carry [the civil and criminal rights statutes] into effect.'" *Id.* at 267 ("First, courts are to look to the laws of the United States 'so far as such laws are suitable to carry [the civil and criminal civil rights statutes] into effect.'") (citing 42 U.S.C. § 1988).  In *Wilson*, the parties, the federal courts, and the Supreme Court all agreed that there were no "suitable" federal laws that could give effect to the plaintiff's civil rights claims.  The Supreme Court conceded this point when it said: "This case principally involves the second step in the process:  the selection of 'the most appropriate,' or 'the most analogous' state statute of limitations to apply to this § 1983 claim." *Id.* at 268.[22]  Thus, *Wilson's* true holding is: If there are *no suitable federal laws to give effect to the plaintiff's cause of action*, and the federal courts must look to state law to resolve the limitations issue, § 1983 actions should be characterized in the same manner, and they should be governed by the forum state's limitations period for personal injury.  As noted *infra*, because the IPA is a *suitable* federal statute, the Court need not refer to M.G.L. c.260, § 2A's three-year limitations period, but instead must defer to the IPA's timeliness requirements.

As Mr. Wade thoroughly explained in his SJ motion, *see* Doc. No. 58, at 9-14, the IPA is a *suitable* federal law that can resolve the limitations issue because it deals strictly with post-conviction DNA testing (i.e., the exact remedy that Mr. Wade's § 1983 action seeks).  Specifically, Mr. Wade filed his § 1983 for the singular purpose of accessing the biological evidence so he can subject it to modern DNA testing.  The IPA represents a federal statute that provides federal (and certain state) prisoners this exact remedy: *access to biological evidence* for DNA testing purposes.  If the IPA is, for whatever reason, deemed inappropriate to resolve the limitations issue, Mr. Wade would argue that the first step in § 1988 (a)'s three-step process is a worthless endeavor—for if a federal statute, which Congress explicitly enacted to deal with post-conviction DNA testing issues, cannot be relied on to resolve a *federal question* pertaining to post-conviction DNA

---

[22] The Court emphasized this point in *Moor v. County of Alameda* when it said: "§ 1988 proceeds to authorize federal courts, *where federal law is unsuited or insufficient "to furnish suitable remedies,"* to look to principles of the common law, as altered by state law, so long as such principles are not inconsistent with the Constitution and laws of the United States. 411 U.S. 693, 703 (1973) (emphasis added).

testing, *Wilson v. Garcia*, 471 U.S. at 268-269 (deciding what statute of limitations applies is a federal question reserved for the federal courts), the question then becomes whether any federal statute, pertaining to any issue, will ever be deemed "suitable" to rely on to resolve statute of limitations issues.

The significance of post-conviction DNA testing in the IPA can be gleaned from several statements by Senator Patrick Leahy, one of the IPA's primary advocates. For instance, Senator Leahy made the following comments last month (April 2008) regarding the IPA:

> In 2000, I introduced the Innocence Protection Act, which aimed to improve the administration of justice by ensuring that defendants in the most serious cases have access to counsel and, where appropriate, access to post-conviction DNA testing necessary to prove their innocence in those cases where the system got it grievously wrong. That legislation and this Committee have attempted to ensure that our system gets it right, particularly when the stakes are as high and the results as final as they are in capital cases. *The conviction of innocent defendants is a tragedy that our system of criminal justice is designed to prevent.* With it comes the corresponding criminal justice nightmare that the actual wrongdoer remains undiscovered, and possibly at large, committing additional crimes.

Statement of Sen. Patrick Leahy (D-Vt.), Chairman, Senate Judiciary Committee, On "The Adequacy of Representation in Capital Cases", April 8, 2008, at http://leahy.senate.gov/press/200804/040808b.html (last visited May 12, 2008) (emphasis added). Senator Leahy made a similar comment in 2001:

> The need to make DNA testing more available is obvious. DNA is the fingerprint of the 21st Century. Prosecutors across the country use it, and rightly so, to prove guilt. By the same token, it should be used to do what it is equally scientifically reliable to do - prove innocence. *Our bill would provide broader access to DNA testing by convicted offenders.* It would also prevent the premature destruction of biological evidence that could hold the key to clearing an innocent person or identifying the real culprit.

Senator Patrick Leahy, *The Innocence Protection Act of 2001*, 29 HOFSTRA L. REV. 1113, 1115 (2001) (emphasis added). Simply put, Congress enacted the IPA "to provide a defendant convicted of a crime through mostly circumstantial evidence a vehicle to petition for DNA testing in cases where it had not been previously done (or where the procedures have been improved through the passage of time) to show that the DNA

evidence did not implicate him in the crime." *United States v. Boose*, 498 F.Supp.2d 887, 889 (N.D. Miss. 2007).

More importantly, as the IPA worked its way through the legislative process, Congress and the Senate gave much consideration to and heard considerable testimony regarding the statute of limitations issue. For instance, on June 20, 2000, Innocence Project Co-Director, Peter Neufeld, offered the following testimony to the House Judiciary Committee:

> In the report, POSTCONVICTION DNA TESTING: RECOMMENDATIONS FOR HANDLING REQUESTS, and in the model statute, the Commission on the Future of DNA Evidence did not create any time limits or statute of limitations for making a postconviction DNA application. The key requirements were substantive-the inmate has to show a reasonable probability that DNA testing would demonstrate he was wrongly convicted or sentenced. *I can assure you, based on the work of the Innocence Project, which has done, by far, more postconviction DNA litigation than anyone else, that the Commission's decision not to create any new time limits or statute of limitations was a considered judgment and a correct one.* When one is dealing with old cases (ten, fifteen, sometimes twenty years old) it is difficult to assemble police reports, lab reports, and transcripts of testimony that are necessary to show that a DNA test would demonstrate innocence or cause a reduction in sentence. *Indigent inmates serving hard time do not have the resources or access to counsel to gather the necessary materials expeditiously.* Frequently, it takes us four years or more to get the necessary materials together and to locate the biological evidence.

Peter Neufeld, *Preventing the Execution of the Innocent: Testimony Before the House Judiciary Committee*, 29 HOFSTRA L. REV. 1155, 1158 (2001) (emphasis added). Barry Scheck, the Innocence Project's other Co-Director, provided similar testimony to the Senate Judiciary Committee on June 13, 2000:

> In our report, RECOMMENDATIONS FOR HANDLING POSTCONVICTION DNA APPLICATIONS, and in our model statute, the Commission on the Future of DNA Evidence did not create any time limits or statute of limitations for making a postconviction DNA application. The key requirements were substantive - the inmate has to show a reasonable probability that DNA testing would demonstrate he was wrongly convicted or sentenced. *I can assure you, based on the work of the Innocence Project, which has done, by far, more postconviction DNA litigation than anyone else, that the Commission's decision not to create any new time limits or statute of limitations was a considered judgment and a correct one.* When one is dealing with old cases (ten, fifteen, sometimes twenty years old) it is difficult to assemble police reports, lab reports, and transcripts of testimony that are necessary to show that a DNA test would demonstrate innocence. Indigent inmates serving hard time may not have the resources or access to counsel to gather the necessary materials expeditiously.

…

> Without adequate counsel, and without resources, it is simply unrealistic and
> unfair to create a new statute of limitations on post-conviction DNA testing. It
> should be enough for the inmate to show that a DNA test would provide non-
> cumulative, exculpatory evidence demonstrating that he was wrongfully
> convicted or sentenced.

Barry C Scheck, *Preventing the Execution of the Innocent: Testimony Before the Senate Judiciary Committee*, 29 HOFSTRA L. REV. 1165, 1166-68 (2001) (emphasis added).

Besides hearing testimony, the IPA's drafters also referred to two Executive Branch reports (i.e., the National Institute of Justice) that focused exclusively on post-conviction DNA testing and exonerations. In 1996, the NIJ published *Convicted by Juries, Exonerated by Science: Case Studies in the Use of DNA Evidence to Establish Innocence After Trial*, which chronicled 28 DNA exonerations. *See* NAT'L INST. OF JUST., DEPT. OF JUST., CONVICTED BY JURIES, EXONERATED BY SCIENCE: CASE STUDIES IN THE USE OF DNA EVIDENCE TO ESTABLISH INNOCENCE AFTER TRIAL (1996). As (then) Attorney General Janet Reno acknowledged, many of these individuals spent several years in prison before a court granted their requests for DNA testing. *See id.* at iii ("They had served, on average, 7 years in prison."). In response to the NIJ's report, Attorney General Reno "requested that the [NIJ] establish a National Commission on the Future of DNA Evidence to identify ways to maximize the value of DNA in our criminal justice system." NAT'L. INST. OF JUST., POSTCONVICTION DNA TESTING: RECOMMENDATIONS FOR HANDLING REQUESTS iii (1999). In 1999, the Commission published its post-conviction DNA testing recommendations. As intimated by Mr. Scheck and Mr. Neufeld's congressional testimony, the Commission made a "considered judgment" when it refused to incorporate a limitations period for when defendants could or had to seek testing. This decision is evident in Attorney General Reno's introductory statement:

> The analysis offered by these recommendations applies DNA technology to the
> appeals process while recognizing the value of finality in the criminal justice
> system. *Where DNA evidence can establish actual innocence, the*
> *recommendations encourage the pursuit of truth over the invocation of appellate*
> *time bars.*

*Id.* at iii (emphasis added).

In the end, Congress diligently and comprehensively considered the statute of limitations issue before it enacted the IPA.  Thus, its "considered judgment" to incorporate an easily rebuttable limitations period must be given deference by the Court. *See Ashcroft v. ACLU*, 542 U.S. 656, 660 (2004) (noting that it is "imperative" that the judiciary "accord[] respect to… Congress"); *Ashcroft v. ACLU*, 535 U.S. 564, 592 (2002) (Kennedy, J., concurring in judgment).  Consequently, because the IPA represents a *suitable* federal law on which the limitations issue can be resolved, the Court must defer to the IPA's timeliness requirements.  As noted *infra*, Mr. Wade satisfies the IPA's timeliness requirements.

b. **M.G.L. c.260, § 2A's Three-year Limitations Period is "Contrary To" and "Inconsistent With" the IPA's Directives**

The Court should also apply the IPA because M.G.L. c.260, § 2A's three-year limitations period is "contrary to" and "inconsistent with" the IPA's clearly established federal policies regarding post-conviction DNA testing. *See Poy v. Boutselis*, 352 F.3d 479, 483 (1st Cir. 2003) ("a § 1983 claim, according to 42 U.C.S. § 1988, borrows the appropriate state law governing limitations unless contrary to federal law.").[23]  Notably, in resolving questions of inconsistency between state and federal law raised under § 1988, the Court "must look not only at [the] particular federal statute[]… , but also at 'the policies expressed in [it].'" *Robertson v. Wegmann*, 436 U.S. at 590 (quoting *Sullivan* v. *Little Hunting Park, Inc*., 396 U.S. 229, 240 (1969)); *Moor* v. *County of Alameda*, 411

---

[23] The Supreme Court has repeatedly emphasized the inconsistency principle.  In *Wilson v. Garcia*, for instance, the Court said: "When Congress has not established a time limitation for a federal cause of action, the settled practice has been to adopt a local time limitation as federal law *if it is not inconsistent with federal law or policy to do so*." 471 U.S. at 266-67 (emphasis added).  Likewise, in *Owens v. Okure*, the Court said: "Title 42 U.S.C. § 1988 endorses the borrowing of state-law limitations provisions *where doing so is consistent with federal law*." 488 U.S. at 239.  Furthermore, in *Robertson v. Wegmann*, the Court said: "§ 1988 instructs us to turn to 'the common law, as modified and changed by the constitution and statutes of the [forum] State,' as long as these are "not inconsistent with the Constitution and laws of the United States.'" 436 U.S. 584, 588 (1978).  The Court also made this clear when it said: "Federal courts must be ever vigilant to insure that application of state law poses 'no significant threat to any identifiable policy or interest.'" *Burks v. Lasker*, 441 U.S. 471, 479 (1979) (quoting *Wallis v. Pan American Petroleum Corp*., 384 U.S. 63, 68 (1966)).

U.S. at 703. As a result, the Court must begin its analysis by examining § 1983's text and purpose.

The "policies underlying § 1983 include compensation of persons injured by deprivation of federal rights and prevention of abuses of power by those acting under color of state law." *Robertson v. Wegmann*, 436 U.S. at 590-91. The Fifth Circuit offers a succinct paraphrase: "Section 1983 embodies two policies: compensation and deterrence." *Dobson v. Camden,* 705 F.2d 759, 763 (5th Cir. 1983), *rev'd on other grounds,* 725 F.2d 1003 (5th Cir. 1984)*; Monroe v. Pape*, 365 U.S. 167, 184 (1961); *Carey v. Piphus*, 435 U.S. 247, 254 (1978). The question therefore is whether applying M.G.L. c.260, § 2A's three-year limitations period, as compared to the IPA's timeliness requirements, would tend to defeat these policies. *Cf. Johnson v. Railway Express Agency, Inc*., 421 U.S. 454, 465 (1975) (holding that it is particularly important to determine whether application of state law "would be inconsistent with the federal policy underlying the cause of action under consideration.").

Here, the particular interest asserted and the fundamental constitutional right sought to be vindicated is Mr. Wade's due process right to access potentially exculpatory biological evidence that, if tested with modern DNA technology, can produce results that can raise "serious doubts" about his original conviction. Accordingly, § 1983's compensatory objective is irrelevant to Mr. Wade's § 1983 action.[24] Instead, Mr. Wade's § 1983 action focuses exclusively on deterring state actors from barring access to biological evidence that can prove a defendant's innocence. Applying M.G.L. c.260, § 2A would defeat § 1983's deterrence policy.

As Mr. Scheck and Mr. Neufeld's congressional testimony made clear, *see supra*, for a variety reasons, it takes several years for most convicted defendants to move for post-conviction DNA testing. These reasons include, but are not limited to, searching for

---

[24] The non-compensatory nature of Mr. Wade's § 1983 action also counsels against applying Massachusetts's personal injury statute. Like most personal injury statutes, plaintiffs litigate under the statute to be compensated. In a tort action, compensation is generally provided so as to restore the damaged person, as nearly as possible, to the position he would have occupied had no wrong been committed. *See Kramer v. Chabot*, 564 A.2d 292 (Vt. 1989). In such cases, the tortfeasor is liable for damages which directly or proximately result from the wrong committed. *See Cooley v. Big Horn Harvestore Sys., Inc*., 767 P.2d 740 (Colo. Ct. App. 1988). Mr. Wade, as noted, *is not* seeking compensatory damages. Instead, his suit rests entirely in equity, in that he merely requests an equitable remedy—i.e., access to the biological evidence.

evidence, not having an attorney, or mental deficits.  Regardless of the reason, though, had the majority of states with post-conviction DNA testing statutes applied a similar three-year limitations period as witnessed in M.G.L. c.260, § 2A, most of the Innocence Project's exonerees would have been barred from testing.  Thus, not only would they— the innocent—have languished in prison for a crime they did not commit, the State would not have been deterred from refusing to grant access to potentially exculpatory biological evidence in future cases.

The IPA, on the other hand, incorporates a timeliness inquiry that focuses on, *inter alia*, the defendant's competence and whether he presented good cause for the DNA testing.  For instance, if the applicant failed to file his DNA testing motion within three years of his conviction, yet he "was or is incompetent and such incompetence substantially contributed to the delay in the applicant's motion for a DNA tests" the presumption against timeliness is rebutted. 18 U.S.C. § 3600 (a)(10)(B)(i).  Likewise, if the applicant failed to file his DNA testing motion within three years of his conviction, yet presents "good cause" for the DNA testing, the presumption against timeliness is rebutted. 18 U.S.C. § 3600 (a)(10)(B)(iv).  "Good cause" is shown "where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is[] entitled to relief." *Bracy v. Gramley*, 520 U.S. 899, 909 (1997) (quoting *Harris v. Nelson*, 394 U.S. 286, 300 (1969)).  The good cause "standard... is not a demanding one." *United States ex rel. Recoraro v. Page*, 1998 U.S. Dist. LEXIS 15746, at *2 (N.D. Ill., Sept. 30, 1998).

Given his borderline mental retardation, the facts of his case, and the nature of the biological evidence, Mr. Wade would qualify for testing even if he failed to file his DNA testing motion within years of his conviction.  In particular, Mr. Wade's initial SJ motion and his Rule 15 (d) motion established "good cause" for the DNA testing. *See* Doc. Nos. 58 & 64.  Accordingly, the IPA's minimal and easily rebuttal timeliness requirements are better suited to give effect to § 1983's deterrence policies because it will force States to abide by the Due Process Clause and provide access to potentially exculpatory evidence that, if tested with modern DNA technology, can produce results that raise "serious doubts" about original convictions.

2.    **Mr. Wade's § 1983 Action Accrued When the Commonwealth Court Denied His Request to Access the Biological Evidence For DNA Testing Purposes**

The Defendants claim Mr. Wade's injury did not accrue when the Commonwealth court denied his request for DNA testing on July 29, 2003. Specifically, the Defendants argue "that there is no basis for looking past the district attorney's alleged denial of access when the Plaintiff first requested it and viewing only the courts' denials as actionable." Doc. No. 63-2, at 30. The Defendants arguments lack merit because they conspicuously fail to reconcile them with *Savory v. Lyons*, 469 F.3d 667 (7th Cir. 2006) and *Moore v. Lockyer*, 2005 WL 2334350 (N.D. Cal., Sept. 23, 2005). Their refusal to discuss or distinguish *Savory* and *Moore* is telling because in both cases the federal courts held that accrual starts when the state court initially denied a prisoner's DNA testing petition.

In *Savory*, the defendant filed a § 1983 action "seeking access to the physical evidence in his case for the purposes of DNA testing." *Savory v. Lyons*, 469 F.3d 667, 669 (7th Cir. 2006). Savory filed his § 1983 action after he sought relief in state court. For instance, in 1998 the defendant filed his DNA testing motion pursuant to 725 ILCS 5/116-3. On July 7, 1998, the Illinois circuit court "determined… that testing was not warranted under the terms of the statute." *Id*. at 669. The appellate court and Illinois Supreme Court upheld the order on Dec. 17, 1999 and Oct. 1, 2001 respectively. *Id*.

On April 4, 2005, the defendant filed his § 1983. Once filed, the district court dismissed his action as untimely under Illinois's two-year statute of limitations period. Significantly, the "district court determined that the relevant accrual date was July 7, 1998, the date on which the Illinois circuit court denied Savory's request for DNA testing under Illinois law." *Id*. at 672. The Seventh Circuit Court of Appeals affirmed the district court's dismissal and agreed that accrual started when the Illinois circuit court denied the defendant's DNA motion. As the Seventh Circuit noted: "Savory was notified on a specific day, July 7, 1998, that the state of Illinois had denied his request for testing." *Id*. at 673.

In *Moore*, the defendant filed a § 1983 action to access the biological evidence in his case for DNA testing purposes. Like the defendant in *Savory*, the defendant in *Moore*

filed his § 1983 action after he sought access to the evidence in the California state courts. *See Moore v. Lockyer*, 2005 WL 2334350, at *1 (N.D. Cal., Sept. 23, 2005). For instance, during the "mid-1990s," the defendant filed a state habeas petition in the California superior court requesting that DNA tests be performed on the evidence. The superior court denied this request, as well as several other requests "made in the 1990s." *Id*. at *1. In 2001, the defendant filed another DNA testing motion pursuant to California's DNA testing statute. On April 11, 2002, the California superior court denied his motion. On September 18, 2002, the defendant filed another motion for post-conviction DNA testing in the California superior court. On December 10, 2002, the court denied his motion. *Id*. at *2.

On May 18, 2004, the defendant filed his § 1983 action. Once filed, the State moved to dismiss because it was untimely under the applicable one-year limitations period. To determine whether the defendant's action was untimely, the district court noted that "a claim accrues when the plaintiff knows or has reason to know of the injury which is the basis of the action." *Id*. at *5 (citation omitted). The district court then noted:

> Applying this standard to the case at bar, it is apparent that plaintiff's claims are well outside the one-year limitations period that applies to pre-2003 personal injury claims in California. The injury that plaintiff seeks to remedy in the instant action is the denial of access to biological evidence for the purpose of conducting DNA testing. *As the facts alleged in his complaint make clear, plaintiff has known of his injury since at least the mid-1990s and has filed two state court motions seeking access to the evidence*. These undisputed facts establish that plaintiff failed to file this action within California's one-year limitations period for personal injury actions.

*Id*. at *6 (emphasis added).

Thus, even if the Court applies M.G.L. c.260, § 2A's three-year limitations period, Mr. Wade's action is timely. The Superior Court denied his DNA testing motion on July 29, 2003. Thus, Mr. Wade had three years from this date to file his § 1983 action. On October 8, 2004, Mr. Wade filed his federal habeas petition. Within his petition, he asserted a federal constitutional claim to access the biological evidence. On May 13, 2005, he filed a motion to amend his petition. On September 26, 2005, the Court entered an order granting the Defendants' motion to dismiss Mr. Wade's habeas

petition as time-barred, yet allowing Mr. Wade's motion to amend to include claims made pursuant to § 1983; because Mr. Wade raised identical DNA claims in his § 1983 action and federal habeas petition, the § 1983 claims related back to the filing of his original federal habeas petition on October 8, 2004.[25]   Accordingly, because the accrual date is July 29, 2003, Mr. Wade's § 1983 action, which he technically filed on October 8, 2004, falls well within the three-year limitations period.

C.    **The Threshold Question**

In his SJ motion, Mr. Wade argued that his due process right to post-conviction DNA testing "is triggered if the evidence he wishes to test has the potential to produce results which 'could raise serious doubts about [his] original conviction.'" Doc. No. 58, at 30 (citing *Wade v. Brady*, 460 F.Supp.2d, at 249).   As Mr. Wade comprehensively explained in his Rule 15 (d) supplemental motion, *see* Doc. No. 64, this standard, which is premised on the Court's initial opinion, is strikingly similar to the standard articulated by the Ninth Circuit Court of Appeals in *Osborne v. District Attorney's Office*, 521 F.3d 1118 (9th Cir. 2008).   Mr. Wade also argued that the Court must assume exculpatory results, that the strength of the Commonwealth's case should not be a consideration, and that trial counsel's objectively unreasonable consent defense should not prohibit testing. *Id*. at 30-31.  The Defendants disagree with Mr. Wade's proposed threshold and offer a more demanding one.  The Defendants' arguments in support of this more demanding threshold not only lack merit, the threshold itself would prohibit a class of prisoners from proving their innocence with DNA technology.  As such, the Court is urged to rely on the threshold articulated by Mr. Wade in his SJ motion, *see* Doc. No. 58, at 29-39, and the Ninth Circuit in *Osborne*.

1.    **Uncertainty as to Whether Discovery Will Prove a Defendant's Innocence Is Not a Legitimate Consideration Under the *Brady* and the "Good Cause" Analyses**

---

[25] As the Court noted in its initial opinion: "Because the claims raised in [Mr. Wade's] § 1983 complaint do not just arise out of the actions referenced in his original complaint, but are identical to the earlier claims in his habeas petition, the amended pleading relates back to the date of the original pleading." *Wade v. Brady*, 460 F.Supp.2d at 234 n.13 (referencing Fed.R.Civ.P. 15(c)(2)); *see also Mayle v. Felix*, 545 U.S. 644 (2005); *Schiavone v. Fortune*, 477 U.S. 21, 29 (1986).

The Defendants urge a higher threshold because they believe that the threshold suggested by Mr. Wade *and the Court* "fails to take into account the substantial uncertainty that such testing will in fact yield an exclusionary result and enable the Plaintiff to successfully challenge his conviction." Doc. No. 63-2, at 33. The Defendants' argument lacks merit. What the Defendants fail to acknowledge is that there is uncertainty with respect to any discovery request. Litigants, civil and criminal, request access to certain documents or tangible items because *they believe* this evidence contains information that can partially or wholly substantiate their claims. Many times, however, not all the documents or disclosed items contain information that substantiates the litigant's good faith beliefs.

For instance, *Brady* and its progeny require prosecutors to disclose impeachment evidence even though such evidence does not definitively prove a defendant's innocence. *See Giglio v. United States*, 405 U.S. 150 (1972). Disclosure is still required, nonetheless, because it enables the parties and the court to make a full and fair assessment of the defendant's culpability. *See United States v. Nobles*, 422 U.S. 225, 231 (1975) ("The very integrity of the judicial system and public confidence in the system depend on *full disclosure of all the facts*, within the framework of the rules of evidence.") (emphasis added). In particular, such evidence can impact on a witness's credibility, which in many instances can mean the difference between a guilty verdict and an acquittal. *See Giglio v. United States*, 405 U.S. at 154 ("When the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within this general rule.") (quoting *Napue v. Illinois*, 360 U.S. 264, 269 (1959)). The same can be said with biological evidence that has yet to be subjected to DNA testing. At this point, the biological evidence cannot prove Mr. Wade's innocence, but once it is disclosed and subjected to DNA testing, the results will enable the Court to make a full and fair assessment regarding his culpability.

Likewise, as noted *supra*, the "good cause" standard under Rule 6 of the Federal Rules Governing § 2254 Cases does not require habeas petitioners to definitively prove, at the outset, that their requested discovery will ultimately produce evidence allowing them to prevail on their underlying claims. *See Phan v. Terhune*, 400 F.3d 740, 743 (9th Cir. 2005) (habeas petitioners need "not demonstrate that [they] will ultimately prevail on

their underlying claims" before discovery can be granted).[26]  Instead, a habeas petitioner need only present "specific allegations," which if proven true, "*may... demonstrate* that he is entitled to relief." *Bracy v. Gramley*, 520 U.S. at 909 (emphasis added; citation omitted).

Finally, *Brady's* due process discovery obligations do not require courts to consider whether the requested discovery would definitively prove the defendant's innocence or result in his acquittal.  Instead, disclosure is required "if there is a *reasonable probability* that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Strickler v. Greene*, 527 U.S. 263, 280 (1999) (emphasis added).  The emphasis on "reasonable probability" makes clear that it is not absolutely certain the defendant's initial trial or re-trial would have resulted or will result in an acquittal.

Thus, simply because Mr. Wade cannot, at this point, establish with absolute certainty, that the DNA tests will produce interpretable results that clearly exonerate him, is no reason to increase the threshold standard for triggering his due process right to access the biological evidence.

### 2.    The Cost of Enforcing a Constitutional Right and Finality Cannot Be Used to Deny the Right Altogether

The Defendants claim that a higher threshold is necessary to prevent the "adverse impact on public interests as a result of the testing." Doc. No. 63-2, at 33.  The Defendants also claim: "Contrary to the Plaintiff's assertions, his request could place burdens on the Defendants and the Commonwealth and give rise to the kinds of problems that statute of limitations were designed to avoid." *Id*.  In particular, the Defendants assert that if the testing results are "*less than clearly exculpatory*… the Commonwealth could be forced to undertake considerable effort and expense in" litigating the significance of such results "or retrying the Plaintiff, where his challenges may in fact be meritless." *Id*. (emphasis added).  This, they claim, "would also detract from the Defendants' own interest in being able to move on without fear of having to answer old actions" and

---

[26] *See also Drake v. Portuondo*, 321 F.3d 338, 346 (2d Cir. 2003) (granting discovery on limited issue of whether prosecution expert presented perjured testimony because "[i]f [petitioner] *can successfully establish* that the prosecution knew or should have known of the perjured testimony, he may be able to establish a 'reasonable likelihood that the false testimony could have affected the judgment of the jury.'").

"would offend the interests of the victims and the public in the finality of conviction… ." *Id.* at 33-34. In essence, the Defendants argue that the due process threshold should be set relatively high because if it is set too low the Commonwealth would be overwhelmed or greatly burdened with litigating ambiguous test results or retrying old cases. The Defendants' arguments lack merit for several reasons.

First, the Defendants fail to define what "less than clearly exculpatory" means, particularly in relation to Mr. Wade's case. They also fail to present evidence indicating that it is more likely than not that ambiguous or "less than clearly exculpatory" results will be produced by the DNA testing. Today's DNA technology is extremely sensitive and highly discriminatory. As such, it is very unlikely the results will be "less than clearly exculpatory," *whatever the phrase means*, especially when you take into account the facts in Mr. Wade's case. His case, as mentioned, is a straightforward single perpetrator rape where the assailant left behind biological fluid. Thus, DNA testing can produce one of three results: (1) the biological fluid came from Mr. Wade (i.e., inculpatory result); (2) the biological fluid did not come from Mr. Wade (i.e., exculpatory result); or (3) the biological evidence is too degraded or there is insufficient biological material to produce conclusive results (i.e., inconclusive result). If the DNA tests incriminate Mr. Wade, the Commonwealth "will be relieved of the burden of further post-conviction litigation." *Osborne v. District Attorney's Office*, 521 F.3d at 1141 (noting that the "the State will have lost nothing" if the DNA tests incriminate Osborne; "indeed, it will gain even more definitive proof of Osborne's guilt and will be relieved of the burden of further post-conviction litigation."). If the DNA tests exclude Mr. Wade, subsequent litigation would be quick and easy because such results would not only undermine confidence in the outcome of his trial requiring reversal, it would, in all likelihood, prove his actual innocence. *See* Doc. No. 64, at 35-46. Finally, if the tests produce inconclusive results, Mr. Wade could not file a successive habeas petition because he would not have the requisite new facts to satisfy § 2244's successive petition requirements. *See Burton v. Stewart*, 127 S. Ct. 793 (2007).

Second, the fact that the "reasonably probability" standard articulated in *Osborne* or the "serious doubt" standard articulated by Mr. Wade and the Court, may exact a heavy cost on the Commonwealth is no reason to increase the threshold to such a level

that few defendants, if any, would be able to satisfy the standard and thus qualify for DNA testing. As Justice Marshall stressed three decades ago: "[T]he cost of protecting a constitutional right, cannot justify its total denial." *Bounds* v. *Smith*, 430 U.S. 817, 825 (1977). For instance, when the Supreme Court set forth its "materiality" standard regarding the failure to disclose exculpatory evidence, *see United States v. Bagley*, 473 U.S. 667 (1985), whether the State or Commonwealth would be burdened by retrying a defendant many years after his conviction never factored into the Court's consideration. Instead, the Court primarily focused on making certain that States afforded criminal defendants their constitutional rights and that States did not convict the innocent. *See id*. at 675 (noting that *Brady's* "purpose is not to displace the adversary system as the primary means by which truth is uncovered, but to ensure that a miscarriage of justice does not occur."); *California v. Trombetta*, 467 U.S. 479, 485 (1984).[27] More importantly, the Defendants' rationale creates a perverse incentive for prosecutors; it encourages prosecutors not to disclose "material" evidence until years after a defendant's conviction, for then they can argue that the defendant should not be entitled to a new trial because a new trial would substantially burden the State by forcing it to "reintroduce

---

[27] The Supreme Court's decision in *Davis v. Washington*, 547 U.S. 813 (2006), supports this notion. In *Davis*, which the Court decided with *Hammond v. Indiana*, the parties asked the Court to decide when "statements made to law enforcement personnel during a 911 call or at a crime scene are 'testimonial' and thus subject to the requirements of the Sixth Amendment's Confrontation Clause." *Id*. at 817. For a variety of reasons, the State argued that such statements are not "testimonial" and thus not subject to the Confrontation Clause. Its primary argument, though, contended that the nature of the offense charged in both cases—domestic violence— required greater flexibility in the use of testimonial evidence because this "particular type of crime is notoriously susceptible to intimidation or coercion of the victim to ensure that she does not testify at trial. When this occurs, the Confrontation Clause gives the criminal a windfall." *Id*. at 832-33. Thus, Washington and Indiana basically asked the Court to interpret the Confrontation Clause in such a way to greatly minimize the protection it affords to criminal defendants; if the Court did not interpret the Confrontation Clause in this manner, the State would be tremendously burdened in domestic violence cases and guilty defendants would be able to escape justice. Again, this is a similar argument made by the Defendants in Mr. Wade's case because they, in essence, have asked the Court to interpret the due process right to post-conviction DNA testing in such a way as to greatly minimize the protection it affords to criminal defendants. Moreover, the Defendants also suggest that even if Mr. Wade is constitutionally entitled to DNA testing, it should nonetheless be prohibited in his case because DNA testing may in fact result in a guilty person being set free. As the Supreme Court said in *Davis*, however, "We may not… vitiate constitutional guarantees when they have the effect of allowing the guilty to go free." *Id*. at 833.

evidence after memories have faded and witnesses and evidence have disappeared[.]" Doc. No. 63-2, at 33.

Third, the Court already held that DNA testing would *not* "offend the interests of victims and the public in the *finality of convictions*[.]" *Id.* at 34 (emphasis added). Specifically, it explained that none of the interests that fall under finality's umbrella (e.g., retribution, deterrence, the quality of judging, and the interest of victims in finality), "is adversely affected by allowing for DNA testing in cases where an exclusionary test result would reveal a fundamental defect in the trial verdict." *Wade v. Brady*, 460 F.Supp.2d at 248. The Court added:

> DNA testing does not itself attack the finality of a judgment. *Attacks on a conviction can only occur if a DNA test yields exculpatory results*. In these cases, the State should have grave concerns about the fairness and accuracy of the original verdict. When the State loses faith in a trial verdict, it no longer has valid reason to detain an individual. Retribution and deterrence are not served by continued incarceration, and judging is not improved by further detention.

*Id.* at 248-49 (emphasis added).[28]

What the Defendants fail to realize is that if Mr. Wade already had the exculpatory evidence he seeks and filed another habeas petition raising the claims he identified in his Rule 15(d) motion, *see* Doc. No. 64, at 35-46, and initial habeas petition, *see* Doc. Nos. 1 & 2, there would be no question that his petition must be heard despite finality considerations. The "federal writ of habeas corpus overrides all [such] considerations, essential as they are to the rule of law, when a petitioner raises a meritorious constitutional claim in a proper manner in a habeas petition." *McCleskey v. Zant*, 499 U.S. 467, 492-93 (1991). Notably, § 2244's successive petition requirements or a procedural default would not foreclose Mr. Wade's claims given the availability of a *Schlup* gateway actual innocence claim. *See Walker v. Russo*, 506 F.3d 19, 21 (2007);

---

[28] The Ninth Circuit in *Osborne* offered similar commentary regarding the finality issue when it held: "Although finality is undoubtedly an important consideration, it is not such an immovable force as to override the due process interests presently at stake." *Osborne v. District Attorney's Office*, 521 F.3d at 1141. A fellow First Circuit district judge made a similar comment, as well, when he wrote: "No doubt the State will say that it opposes Breest's request in the interest of preserving the value of finality of criminal convictions, and, to be sure, finality is an important aspect of the criminal justice system. *But finality falls well below truth on the scale of relative values.*" *Breest v. Attorney General for N.H.*, 2008 WL 183240, at *4 (D.N.H., Jan. 18, 2008) (emphasis added).

Doc. No. 64, at 25-29, 35-46 (explaining how exculpatory results would trigger *Schulp's* "actual innocence" exception and satisfy §2244's successive petition requirements). The Commonwealth's "conception of finality," however, "would reverse these priorities." *Osborne v. District Attorney's Office*, 521 F.3d at 1141.

As noted, *supra* n. 28, the Commonwealth also supports its finality argument by arguing that the circumstantial evidence is so strong that granting Mr. Wade access to the biological evidence is not likely to further the criminal justice system's truth seeking function. As "recent history has shown, however, DNA evidence has the capability of refuting otherwise irrefutable inculpatory evidence[.]" *Id.*[29]

### 3. A Defendant's Confession, Guilty Plea, or Trial Strategy Cannot Bar DNA Testing

The Defendants argue that the due process standard must take into account a petitioner's pre-trial statements and whether his trial strategy placed the assailant's identity at issue. *See* Doc. No. 63-2, at 36-39. It then argues that if a petitioner pled guilty or presented an affirmative defense at trial, DNA testing should be prohibited

---

[29] This basically undercuts the Defendants' claim that before Mr. Wade is entitled to DNA testing he must explain away the incriminating evidence against him. *See* Doc. No. 63-2, at 37-38 (arguing that Mr. Wade should not be entitled to DNA testing because he has not made a "serious attempt at this stage to address the weight of the evidence or other evidence against him or the Massachusetts Superior Court's finding that his innocence claim was not credible."). If the 216 DNA exonerees had to present compelling evidence to rebut the incriminating evidence against them, before they could receive DNA testing, it's a wonder whether any of these individuals would ever have been exonerated. Moreover, in many instances, what this would require is for the defendant to prove a negative, which is extremely difficult. For instance, nearly 80% of the exonerees were wrongly identified by one or more witnesses as the actual assailant. Even if a defendant is truly innocent, how does he prove the eyewitnesses erred when they identified him without DNA testing? He can ask the witnesses to recant their identifications or testimony, but recantations "are viewed with extreme suspicion by the courts." *Byrd v. Collins*, 209 F.3d 486, 508 n.16 (6th Cir. 2000) (citation omitted); *see also Dobbert v. Wainwright*, 468 U.S. 1231, 1233-34 (1984) (Brennan, J., dissenting from denial of certiorari) ("Recantation testimony is properly viewed with great suspicion. It upsets society's interest in the finality of convictions, is very often unreliable and given for suspect motives, and most often serves merely to impeach cumulative evidence rather than to undermine confidence in the accuracy of the conviction."). The same thing can be said about alibi defenses, especially when the defendant's alibi witnesses are family or friends. In both situations, the alibi witnesses have a motive to fabricate evidence to help the defendant given their relationship with the defendant. Mr. Wade's case is no different. Given the facts of his case, outside of him denying any wrongdoing, how else could he prove his innocence without the DNA testing? It is illogical and fundamentally unfair to require the defendant to put forward evidence of his innocence before he can gain access to the very evidence that can prove his innocence beyond all doubt.

because such actions rendered the "identity" issue moot. *Id*. at 37 (arguing that Mr. Wade "certainly has not [i]dentified a theory of defense that… is not inconsistent with an affirmative defense at trial,'" and he has not "claim[ed] that 'the identity of the perpetrator was at issue in the trial,' or claim[ed] that 'DNA testing… would… support the theory of defense [at trial].'""). The Defendants envisioned due process standard cannot be accepted, as it does not comport with the Due Process Clause's primary objective of fundamental fairness.

First, the Defendants' proposed standard would prohibit DNA testing in cases where defendants confessed or pled guilty.[30] As Mr. Wade explained in his SJ motion, trial counsel's objectively unreasonable decision to present a consent defense is tantamount to a confession or guilty plea. *See* Doc. No. 58, at 31. Confessions or guilty pleas, however, are not and cannot be absolute bars to proving one's innocence with DNA testing. *See Osborne v. District Attorney's Office*, 521 F.3d at 1140 ("We disagree… that the confessions foreclose Osborne's right to obtain post-conviction access to evidence."); *Godschalk v. Montgomery County Dist. Attorney's Office*, 177 F.Supp.2d 366, 370 (E.D.Pa.2001) (granting DNA testing to a petitioner who falsely confessed) Doc. No. 64, at 44-46.[31] For instance, of the first 216 DNA exonerations, 25% involved cases where innocent defendants made incriminating statements, delivered outright confessions, or pled guilty. *See* www.innocenceproject.org (last visited May 15, 2008). Justice Souter even commented that a significant number of wrongful convictions have "resulted from... false confession[s][.]" *Kansas v. Marsh*, 126 S. Ct. 2516, 2545 (2006) (Souter, J., dissenting).[32] Notably, one of the most recent DNA exonerations involved a

---

[30] The Defendants' "argument is necessarily premised on the assumption that all those who plead guilty are in fact guilty, for it cannot be saying that it would keep an innocent person in prison if DNA testing showed the person to be innocent, even if the person pleaded guilty." *State v.Weeks*, 140 S.W.3d 39, 46 (Mo. 2004) (holding that defendants who pled guilty may still pursue DNA testing pursuant to Missouri's DNA testing statute).

[31] It should be noted that the DNA testing in Bruce Godschalk's case ultimately exonerated him. *See* www.innocenceproject.org/Content/154.php (last visited May 16, 2008).

[32] Several recent studies support Justice Souter's claim and have found similar statistics regarding false confessions to those determined by the Innocence Project. For instance, one group of researchers concluded: "In fifty-one of the 340 exonerations between 1989 and 2004–15%–the defendants confessed to crimes they had not committed." Samuel R. Gross et al., *Exonerations in the United States 1989 Through 2003*, 95 J. Crim. L. & Criminology 523

false confession.[33]   These cases and statistics establish two critical points.   First, it demonstrates how often people falsely confess or pled guilty to crimes they did not commit.   Second, and more importantly, it demonstrates that individuals who falsely confessed or pled guilty to violent crimes can still establish their innocence with DNA testing.

Thus, the same rule that allows the Court to consider the probative value of confessions, guilty pleas, or affirmative defenses, requires that the Court do so in light of exculpatory DNA tests.   Consequently, the question before the Court is not how much weight it should afford Mr. Wade's consent defense standing alone, but how it might be squared with exculpatory DNA tests. *See Osborne v. District Attorney's Office*, 521 F.3d at 1140; Doc. No. 64, at 44-46.   As Mr. Wade comprehensively explained, *see* Doc. Nos. 58 & 64, DNA testing will be highly probative of his guilt or innocence given the facts as we know them.   The Court can therefore expect to see one of two possible scenarios unfold: the DNA tests will either prove Mr. Wade's consent defense accurate (i.e., incriminating results), or they will prove his consent defense inaccurate (e.g., exculpatory

---

(2005).   Two other researchers "identified false confession as the leading or primary cause of wrongful conviction in anywhere from 14-25% of the sample cases studied." Steven A. Drizin & Richard A. Leo, *The Problem of False Confessions in the Post-DNA World*, N.C. L. REV. 891, 902 (2004).   Similarly, a more recent study found that of the first 200 DNA exonerations, 31(or 16%) involved false confessions which prosecutors introduced at trial. *See* Brandon L. Garrett, *Judging Innocence*, 108 COLUMBIA L. REV. 55 (2008).   Finally, the Innocence Project's most recent report, which analyzed 23 wrongful convictions from New York State, revealed that in 10 of the 23 cases, "innocence people falsely confessed or admitted to crimes that DNA later proved they did not commit."  THE INNOCENCE PROJECT, LESSONS NOT LEARNED, Exc. Summary, at 4 (Oct. 2007).   So problematic are false confessions, several states enacted criminal justice commissions to study the problem.   Several of these commissions issued reports regarding their findings and recommendations for minimizing or preventing false confessions. *E.g.*, WISCONSIN CRIMINAL JUSTICE STUDY COMMISSION, POSITION PAPER ON FALSE CONFESSIONS (2007) (Wisconsin Report); CALIFORNIA COMMISSION ON THE FAIR ADMINISTRATION OF JUSTICE: REPORT AND RECOMMENDATIONS REGARDING FALSE CONFESSIONS (2006) (California Report); ILLINOIS CAPITAL PUNISHMENT COMMISSION, Ch. 2 (2002) (Illinois Report).

[33]   Nathaniel Hatchett spent nearly twelve years in prison (1996 to 2008) for a rape and kidnapping he did not commit.   Police arrested Hatchett driving the woman's car three days after the attack.   Once in custody, he *confessed to the rape and kidnapping* and the victim identified him as her assailant.   DNA testing on probative items of evidence recovered from the victim's body, however, failed to link Hatchett to the rape.   In light of the DNA results, prosecutors dismissed all charges in April 2008.   The lead prosecutor stated: "We could have fought for a new trial, but our job is to seek justice. It was served today." Amber Hunt, *DNA Clears Man Imprisoned 12 Years for Rape*, DETROIT FREE PRESS, April 14, 2008.

results), in which case serious questions will be raised about whether Mr. Wade received adequate representation under the Sixth Amendment.[34]  Accordingly, the Court cannot prohibit DNA testing because Mr. Wade, in effect, confessed to having sexual intercourse with the victim.  Such a "rule would ignore the emerging reality of wrongful convictions based on false confessions and the capability of DNA testing to reveal the objective truth and exonerate the innocent." *Osborne v. District Attorney's Office*, 521 F.3d at 1140.

Second, as explained in his Rule 15(d) motion, if a confession or an objectively unreasonable affirmative defense prohibited DNA testing, such a rule would substantially impair, if not completely prevent, Mr. Wade from fully and fairly developing his ineffective assistance of counsel and actual innocence claims. *See* Doc. No. 64, at 34-44. More fundamentally, such a rule would bar Mr. Wade from seeking federal review of his case because without exculpatory DNA results, he cannot satisfy § 2244's successive petition requirements.[35]  Such a result would be fundamentally unfair and contrary to the writ's primary purpose. *See Engle v. Isaac*, 456 U.S. 107, 126 (1982) ("Today, as in prior centuries, the writ is a bulwark against convictions that violate 'fundamental fairness.'") (citation omitted); *Wainwright v. Sykes*, 433 U.S. 72, 97 (1977) (Stevens, J., concurring); *Sanders v. United States*, 373 U.S. 1, 17-18 (1963).

### 4.    The Court Should Adhere to the Ninth Circuit's Ruling in *Osborne II*

As comprehensively explained in his Rule 15(d) motion, the Court should adhere to the Ninth Circuit Court of Appeals' ruling in *Osborne II*.  To save time, Mr. Wade herein incorporates the arguments he presented in his Rule 15(d) motion. *See* Doc. No. 64.

## III.    Conclusion

In light of the Defendants' motion, there are three issues currently pending before

---

[34] As noted, the results could also be inconclusive, but given modern DNA technology's extreme sensitivity, this should not be a problem.

[35] Furthermore, had the Commonwealth provided access to the biological evidence before Mr. Wade filed his initial habeas petition, *see* Doc. Nos. 1 & 2, exculpatory DNA results would have permitted the Court to consider the merits of his defaulted claims.  In effect, then, if the Court buys into the Defendants' threshold argument, the Defendants' actions (or inactions) will have prevented Mr. Wade from having his conviction reviewed by a federal court on two different occasions.

the Court.  First, whether Mr. Wade has standing to bring his § 1983 action.  Second, if Mr. Wade has standing, did he timely file his § 1983 action?  And third, if his action is timely, what triggers his due process right to access the biological evidence for DNA testing purposes?

Mr. Wade has standing to bring his § 1983 action.  His injury—at this point—is about *opportunity* and *access*; it is not about his wrongful imprisonment.  The Defendants' actions (or inactions) are denying Mr. Wade the *opportunity* to prove his innocence with DNA evidence.  This represents a "concrete" and "particularized" injury.

Regardless of whether the Court relies on the IPA's timeliness requirements or M.G.L. c.260, § 2A's three-year limitations period, Mr. Wade's § 1983 action is timely.  Under the IPA, he not only presented "good cause" for DNA testing, *see* 18 U.S.C. § 3600 (a)(10)(B)(iv), his mental deficits "substantially contributed" to his delay in filing his § 1983 action. *See* 18 U.S.C. § 3600 (a)(10)(B)(i).  He also satisfies M.G.L. c.260, § 2A's three-year limitations period because the accrual date was July 29, 2003 and he moved for DNA testing in federal court on October 8, 2004. *See* Doc. Nos. 1 & 2 (initial habeas petition requesting DNA testing).

Finally, as advocated in his SJ motion and Rule 15(d) motion, Mr. Wade's due process right to access the biological evidence is triggered when the envisioned DNA testing can undermine confidence in or raise serious doubts about Mr. Wade's original conviction. *See* Doc. Nos. 58 & 64.   This threshold would not prejudice the Commonwealth in any way.

DNA technology is unquestionably more sensitive, discriminating, and accurate than the rudimentary serological techniques that the Commonwealth used to convict Mr. Wade.  As of this writing, the Innocence Project has identified no fewer than 217 individuals who have been exonerated by post-conviction DNA testing. *See* www.innocenceproject.org (last visited May 28, 2008).  Moreover, since Mr. Wade filed his initial SJ motion on January 4, 2008, there have been eight DNA exonerations. *Id*.  In each case, the State or Commonwealth presented significant evidence supporting the defendant's guilt.  Despite the overwhelming evidence of guilt in each case, DNA testing revealed the truth and exposed these injustices.  In light of the numerous convictions that have been conclusively determined to be erroneous, it is unconscionable to ignore readily

available biological evidence which, if subjected to DNA testing, could determine whether the Commonwealth wrongly convicted Mr. Wade.    Mr. Wade has a constitutional right to DNA testing; allowing such testing harms no state interest and serves only the cause of truth; and there are no genuine issues of material fact regarding the timeliness of Mr. Wade's § 1983 action or whether his constitutional right to DNA testing is triggered in this case.    For the reasons given, summary judgment should be granted in favor of Mr. Wade.

Respectfully submitted this the 30th day of May, 2008.

/Janet Hetherwick Pumphrey/
Janet Hetherwick Pumphrey
45 Walker Street
Lenox, MA 01240
(413) 637-2777
BBO 556424

/Barry Scheck/
Barry Scheck
The Innocence Project
Co-Director
100 Fifth Avenue, 3rd Floor
New York, New York 10011
Tel. 212.364.5361

/Craig M. Cooley/
Craig M. Cooley
The Innocence Project
Staff Attorney
100 Fifth Avenue, 3rd Floor
New York, New York 10011
Tel. 212.364.5361
Illinois Bar #6282688